JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
    PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

Attorneys for Plaintiffs
INDIGENOUS
ENVIRONMENTAL
NETWORK and NORTH
COAST RIVERS ALLIANCE

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:      svolker@volkerlaw.com
            akrieg@volkerlaw.com
            sclarke@volkerlaw.com
            jvolker@volkerlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>                Plaintiffs,<br><br>vs.<br><br>PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency; GREG SHEEHAN, in his official | ) Civ. No. CV 19-28-GF-BMM<br>)<br>) **MEMORANDUM OF POINTS**<br>) **AND AUTHORITIES IN**<br>) **SUPPORT OF PLAINTIFFS'**<br>) **MOTION FOR**<br>) **PRELIMINARY**<br>) **INJUNCTION**<br>)<br>) **Hearing:**<br>) **Time:**<br>)<br>) **Judge:  Hon. Brian M. Morris**<br>)<br>)<br>)<br>)<br>) |

capacity as Acting Director of the U.S. Fish )
and Wildlife Service; UNITED STATES )
BUREAU OF LAND MANAGEMENT, )
and DAVID BERNHARDT, in his official )
capacity as Acting U.S. Secretary of the )
Interior, )
                                    )
               Defendants, )
                                    )
TRANSCANADA KEYSTONE PIPELINE, )
LP, a Delaware limited partnership, and TC )
ENERGY CORPORATION, a Canadian )
Public Company, )
                                    )
           Defendant-Intervenors. )
_____ )

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.   SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  THIS COURT HAS JURISDICTION OVER PLAINTIFFS'
      CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   STANDARD OF REVIEW FOR  PRELIMINARY
      INJUNCTIVE RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR
      CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    PRESIDENT TRUMP'S 2019 PERMIT VIOLATES
            ARTICLE IV,  SECTION 3, CLAUSE 2 OF THE
            UNITED STATES CONSTITUTION.. . . . . . . . . . . . . . . . . . . 20

      B.    PRESIDENT TRUMP'S 2019 PERMIT VIOLATES
            ARTICLE 1, SECTION 8, CLAUSE 3 OF THE
            UNITED STATES CONSTITUTION.. . . . . . . . . . . . . . . . . . . 22

      C.    PRESIDENT TRUMP'S 2019 PERMIT VIOLATES
            EXECUTIVE ORDER 13337. . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.  THIS COURT HAS AUTHORITY TO ENJOIN ANY
      ACTIVITIES RELATED TO PIPELINE CONSTRUCTION.. . . . . 28

VIII. PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE
      HARM IN THE ABSENCE OF PRELIMINARY RELIEF.. . . . . . 29

IX.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS AND
      INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST. . . . . . . 34

X.    IF GRANTED INJUNCTIVE RELIEF, PLAINTIFFS SHOULD
      BE REQUIRED TO POST ONLY A NOMINAL BOND.. . . . . . . . 35

XI.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alabama v. Texas*
  347 U.S. 272 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Alliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 34, 35

*American Motorcyclist Association v. Watt*
  714 F.2d 962 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bob Marshall Alliance v. Hodel*
  852 F.2d 1223 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bob Marshall Alliance v. Lujan*
  804 F.Supp. 1292 (D. Mont. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Boston Waterfront Res. Ass'n v. Romney*
  343 F.Supp. 89 (D. Mass. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Buttrey v. United States*
  690 F.2d 1186 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*City and County of San Francisco v. Trump*
  897 F.3d 1225 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Colorado Wild, Inc. v. U.S. Forest Service*
  523 F.Supp.2d 1213 (D.Colo. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 32

*Commonwealth of Massachusetts v. Watt*
  716 F.2d 946 (1st Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Environmental Defense Fund v. Corps of Engineers*
  331 F.Supp. 925 (D. D.C. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*E.V. v. Robinson*
  906 F.3d 1082 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Friends of the Earth v. Brinegar*
  518 F.2d 322 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*High Sierra Hikers Association v. Blackwell*
    390 F.3d 630 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Larson v. Domestic & Foreign Commerce Court*
    337 U.S. 682 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*League of Conservation Voters v. Donald J. Trump*
    363 F.Supp.3d 1013 (D.Ak. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*League to Save Lake Tahoe v. Tahoe Regional Planning Agency*
    558 F.2d 914 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*National Audubon Society v. Department of Navy*
    422 F.3d 174 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 32

*Natural Resources Defense Council v. Morton*
    337 F.Supp. 167 (D. D.C. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional*
    *Planning Agency*
    766 F.2d 1319 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Save Our Sonoran, Inc. v. Flowers*
    408 F.3d 1113 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Save Strawberry Canyon v. Department of Energy*
    613 F.Supp.2d 1177 (N.D. Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Save the Yaak Committee v. Block*
    840 F.2d 714 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Sierra Club v. Marsh*
    872 F.2d 497 (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

*South Fork Band Council v. U.S. Dept. of Interior*
    588 F.3d 718 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*State of Ala. ex rel. Baxley v. Corps of Engineers*
    441 F.Supp. 1261 (N.D. Ala. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Stewart v. Potts*
    996 F.Supp. 668 (S.D. Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Stop H-3 Assoc. v. Volpe*
  349 F.Supp. 1047 (D. Haw. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Swan v. Clinton*
  100 F.3d 973 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12, 16

*Textile Unlimited, Inc. v. A..BMH & Co.*
  240 F.3d 781 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*The Wilderness Society v. Tyrrel*
  701 F.Supp. 1473 (E.D. Cal. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Yakima Tribal Court*
  806 F.2d 853 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Winter v. Natural Resources Defense Council, Inc.*
  555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 29

## CONSTITUTION

United States Constitution, Article 1
  § 8, cl. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 22

United States Constitution, Article IV
  § 3, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 20, 21, 22

## FEDERAL STATUTES

United States Code, Title 5
  §§ 701, *et seq.* (Administrative Procedure Act ("APA")). . . . . . . . . . . . . 9, 13
  § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States Code, Title 16
  §§ 1531 *et seq.* (Endangered Species Act ("ESA")). . . . . 9, 13, 14, 22, 23, 25
  § 1536. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
  §§ 1536-1533. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
  §§ 1536-1539. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
  § 1536(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  § 1538. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  § 1539. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States Code, Title 28
    § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

United States Code, Title 33
    §§ 1251 *et seq.* (Clean Water Act ("CWA")). . . . . . . . . . . . 13, 14, 22, 23, 25
    § 1311. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25
    § 1342. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25
    § 1344. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 25
    § 1344(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

United States Code, Title 42
    §§ 4321 *et seq.* (National Environmental Policy Act ("NEPA")). . . . . *passim*
    § 4332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States Code, Title 43
    §§ 1701 *et seq.* (Federal Land Policy Management Act
        ("FLPMA")). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 21, 23
    §§ 1712-1716. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21
    § 1732. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21
    §§ 1763-1765. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21, 22

## <u>OTHER AUTHORITIES</u>

69 Fed.Reg. (5/5/04)
    25299. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    25300. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    25300. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25
    25301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24, 25

74 Fed.Reg. (1/28/09)
    5019-02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

77 Fed.Reg. (5/10/12)
    27533-02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

82 Fed.Reg. (1/24/17)
    8663. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

84 Fed.Reg. (4/3/19)
    13101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20
    13101-13103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20

84 Fed.Reg. (4/15/19)
    15491. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

W. Rodgers, *Environmental Law* (1977)
    § 7.7 at 767. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# I.    INTRODUCTION

President Trump has now unlawfully approved the Keystone XL Pipeline ("Keystone") twice.  On review of his first approval, in March 2017, this Court issued a comprehensive sequence of well-reasoned rulings holding that the Trump Administration's issuance of its 2017 Presidential Permit for Keystone violated bedrock environmental laws.  Rejecting the Administration's procedural defenses, the Court ruled that it has jurisdiction over Presidential permits,[1] and that the citizen-suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., provides a private right of action independent of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq.[2]  On the merits, this Court held that the 2017 Permit violated (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., and the APA by failing to address Keystone's Main Line Alternative Route through Nebraska,[3] and (2) NEPA, the APA and ESA by ignoring:  the effects of current oil prices, the cumulative effects of greenhouse gas emissions, impacts on unsurveyed cultural resources, potential oil spills and recommended mitigation measures in light of updated modeling, impacts to endangered species in light of updated oil spill data, and former

---

[1] *Indigenous Environmental Network v. United States Department of State,* CV 17-29-GF-BMM ("*IEN v. State*"), 2017 WL 5632435 (11/22/17) (ECF 99).

[2] *IEN v. State*, 2017 WL 9280323 (12/12/17) (ECF 113).

[3] *IEN v. State*, 317 F.Supp.3d 1118, 1123 (8/15/18) (ECF 210).

Secretary of State John Kerry's detailed findings that Keystone would not serve the national interest.[4]

Based on these rulings, this Court enjoined TransCanada's (hereafter, "TC Energy's") construction and surface-disturbing pre-construction activities to prevent irreparable environmental and cultural harm and protect the public interest.[5]  The Court then denied TC Energy's motion to stay the injunction pending appeal because (1) it failed to demonstrate a likelihood of success on the merits, (2) Keystone's construction and pre-construction would irreparably injure plaintiffs, and (3) the injunction served the public interest.[6]

The Ninth Circuit denied TC Energy's motion to stay this Court's injunction, concluding that "[TC Energy] has not made the requisite strong showing that they are likely to prevail on the merits" and "[t]he record shows that the district court carefully considered all applicable factors in denying the stay of its injunction."[7]

After losing on the merits in this Court, and failing to stay this Court's injunction on appeal, President Trump chose to evade rather than comply with these court orders and the environmental laws they enforced.  On March 29, 2019, President Trump issued a new "Presidential Permit" purportedly "grant[ing]

---

[4]  *IEN v. State*, 347 F.Supp.3d 561, 590-591 (11/8/18) (ECF 218).

[5]  *IEN v. State*, 369 F.Supp.3d 1045, 1049-1052 (12/7/18) ( ECF 231).

[6]  *IEN v. State*, 2019 WL 652416 (2/15/19) (ECF 252).

[7]  *IEN v. State*, Ninth Circuit Case No. 18-36068, Order filed 3/15/19 (Dkt. 28).

permission" for TC Energy "to construct, connect, operate and maintain" Keystone *without compliance with the laws of the United States*.  (84 Fed.Reg 13101-13103 (4/3/19), attached as Exhibit 1 to Declaration of Stephan C. Volker in Support of Motion for Preliminary Injunction ("Volker Declaration") filed concurrently herewith.)

President Trump's 2019 Permit cannot stand, however, because even the President is not above the law.  Under Article III of the U.S. Constitution, President Trump's unlawful conduct is subject to this Court's review.  And, because his 2019 Permit usurps Congress' authority to manage federal lands under the Property Clause (Article IV, section 3, clause 2) and the Commerce Clause (Article I, section 8, clause 3) of the U.S. Constitution, violates Executive Order 13337, and threatens irreparable harm to nationally-significant resources, including four of the nation's most celebrated rivers – the Missouri, Yellowstone, Cheyenne and Platte – and the Indigenous communities dependent on them, this Court should grant preliminary injunctive relief until the constitutionality and lawfulness of President Trump's actions are adjudicated.

## II.    SUMMARY OF ARGUMENT

This Court has federal question jurisdiction under 28 U.S.C. section 1331. (*League of Conservation Voters v. Donald J. Trump* ("*League*"), 363 F.Supp.3d 1013, 1017-1018 (D.Ak. 2019).)  Because plaintiffs allege the 2019 Permit was *ultra vires*, "sovereign immunity does not act as a bar." (*Swan v. Clinton*, 100

- 11 -

F.3d 973, 981 (9th Cir. 1996).)

   To secure preliminary injunctive relief a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (*Winter v. Natural Resources Defense Council, Inc.* ("*Winter*"), 555 U.S. 7, 21 (2008).)  Plaintiffs satisfy these tests.

   Plaintiffs will prevail on the merits because the 2019 Permit is unconstitutional and issued in violation of Executive Order 13337.  The President usurped powers given to Congress when he ignored the laws that require federal agencies to consider Keystone's grave risks to the climate, cultural and environmental resources, fish and wildlife, and human health and safety.

   President Trump did not have the authority to "grant permission . . . to [TC Energy] . . . to construct, connect, operate, and maintain pipeline facilities . . . . [extending] 1.2 miles from the international border . . . for the import of oil from Canada" (84 Fed.Reg. 13101 (4/3/19)) because Congress assigned authority to regulate this federally-owned segment of Keystone to the Bureau of Land Management ("BLM").  (*IEN v. State*, Department of State Administrative Record (lodged at ECF 111-112, 158, 167) ("DOS") 1201 (confirming that most of this segment is federally owned and managed by BLM).)  Under the Property Clause, Congress – and not the President – holds the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property

belonging to the United States."  (U.S. Constitution, Article IV, section 3, clause 2; *League,* 363 F.Supp.3d at 1018 n. 20, citing *Alabama v. Texas*, 347 U.S. 272, 273 (1954).)  "[T]he President's authority to dispose of [federally owned] lands can arise only by delegation from Congress."  (*Id.*)

Exercising its exclusive Property Clause authority to administer federal land, Congress has directed BLM to manage this property under the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. section 1701 *et seq.*  (*E.g.*, sections 1712-1716 (land use planning; public land disposal, withdrawal, and exchange), 1732 (land management), and 1763-1765 (rights-of-way).)  In doing so, BLM must comply with NEPA,[8] ESA[9] and the Clean Water Act ("CWA"), 33 U.S.C. section 1251 *et seq.*),[10] and its decisions are reviewable under the APA, 5 U.S.C. section 706.  Because BLM has not yet reviewed, let alone approved, a right-of-way for Keystone as required by FLPMA, 43 U.S.C. sections 1763-1765, President Trump's purported authorization of its first 1.2 miles across BLM lands is *ultra vires*.

---

[8]  *E.g.*, 42 U.S.C. § 4332 ("all agencies of the Federal Government*"* must examine the environmental impact of "major Federal actions").

[9]  *E.g.*, 16 U.S.C. § 1536(a)(2) ("[e]ach Federal agency . . . shall . . . . insure that any action . . . is not likely to jeopardize . . . . any endangered . . . or threatened species or . . . . [cause] adverse modification of habitat").

[10]  *E.g.*, 33 U.S.C. § 1344 (requiring permits for the "discharge of dredged or fill material into . . . . navigable waters").

President Trump's apparent attempt to authorize the balance of Keystone's 875 miles, by referring to its other "Facilities" – which include "the portion in the United States" – likewise usurped Congress' exclusive power over federally-owned lands, including 45 additional miles administered by BLM in Montana. (DOS5954, 6046.)

The 2019 Permit also conflicts with Congress' correlative power to regulate foreign and interstate commerce under Article 1, section 8, clause 3 (the "Commerce Clause") of the Constitution, as the Project includes river crossings and poses impacts to imperiled species that are likewise regulated by Congress under FLPMA, NEPA, ESA and CWA.

President Trump's actions also conflicted with Executive Order 13337, which delegates review of Keystone to the Department of State ("State"), and likewise requires compliance with applicable environmental laws.  (69 Fed.Reg. 25299 (5/5/04) at 25300-25301, sections 2-5 (State is "designated and empowered" to review transboundary pipeline permit applications, and applicants are not relieved from "any requirement to obtain authorization from [other federal agencies] in compliance with applicable laws and regulations").)

Because the 2019 Permit was thus *ultra vires* in these three respects, plaintiffs are likely to succeed on the merits.

Plaintiffs will suffer irreparable harm because TC Energy plans to mow 11,666 acres of Keystone's proposed right-of-way, causing "[p]ermanent loss of

wetlands," "permanent modification of surface and subsurface flow patterns,"
"permanent modification of wetland vegetation," and "[l]oss or alteration of
wetlands soil integrity," among other harms.  (*IEN v. State*, ECF 221-1 ¶18;
DOS5952, 6782-6784, 6809-6811; FWS Administrative Record (ECF 112)
("FWS") 2062.)  Pre-construction clearing would denude 1,916 to 2,316 acres,
including 1,037.6 acres for pipe storage yards, 479 acres for contractor yards, and
400 to 800 acres for "man-camps."  (DOS5979-5980).

These pipeline route "improvements" would create bureaucratic momentum
making it far less likely the government would – notwithstanding any court-
ordered environmental reviews – disapprove the Project or change its location.
(*Colorado Wild, Inc. v. U.S. Forest Service* ("*Colorado Wild*"), 523 F.Supp.2d
1213, 1221 (D.Colo. 2007); *National Audubon Society v. Department of Navy*
("*Audubon*"), 422 F.3d 174, 206 (4th Cir. 2005).)

The balance of equities favors plaintiffs because delaying construction
pending adjudication of the merits would cause no irreparable harm to TC Energy,
whereas allowing construction and surface-disturbing pre-construction of
Keystone would irreparably harm plaintiffs.

The public interest favors an injunction because it would prevent irreparable
harm while assuring compliance with this nation's environmental laws.

Finally, if granted preliminary injunctive relief, the non-profit, public
interest plaintiffs should be required to post only a nominal bond.

Accordingly, this Court should grant plaintiffs' motion.

## III.   THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS.

This Court has federal question jurisdiction over plaintiffs' constitutional and executive order-based challenges to the 2019 Permit pursuant to 28 U.S.C. section 1331.  (*League*, 363 F.Supp.3d at 1017 (district court had federal question jurisdiction in case alleging President Trump's "violation of the Constitution's Property Clause, and . . . of the President's statutory authority under section 12(a)" of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331, et seq.).**)**  Because plaintiffs allege the 2019 Permit was *ultra vires*, "sovereign immunity does not act as a bar to [this Court's] exercising jurisdiction."  (*Swan v. Clinton*, *supra*, 100 F.3d at 981; *United States v. Yakima Tribal Court*, 806 F.2d 853, 859 (9th Cir. 1986) ("if a federal official . . . . commits an unconstitutional act, he cannot be acting on behalf of the government because his actions go beyond the scope of his authority and are *ultra vires*"); *Larson v. Domestic & Foreign Commerce Court*, 337 U.S. 682, 690, 696-697, 702 (same); *E.V. v. Robinson*, 906 F.3d 1082, 1099 (9th Cir. 2018) ("the 1976 amendment to [5 U.S.C. § 702] did not abrogate the *Larson* framework in suits where section 702's waiver of sovereign immunity does not apply").)

## IV.   STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIVE RELIEF.

A preliminary injunction preserves the status quo pending final

determination of the action.  (*Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001).)  The plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (*Winter*, 555 U.S. at 20.)  The Ninth Circuit applies a "sliding scale" approach, whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." (*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).)  Plaintiffs satisfy all four factors, as shown below.

## V.    BACKGROUND

On May 4, 2012, State received TC Energy's application for a Presidential permit for Keystone.  (DOS1-50.)  On March 1, 2013, State released its Draft Supplemental Environmental Impact Statement ("DSEIS"), and on May 15, 2013, FWS issued its Biological Opinion, on the application.  (DOS243-244; FWS 2036-2122.)

On November 6, 2015, Secretary of State Kerry determined pursuant to EO 13337 that Keystone would *not* serve the national interest, and *denied* TC Energy's application.  (DOS1157-1188.)

On January 24, 2017, President Trump invited TC Energy "to resubmit its application . . . for a Presidential permit," and issued an Executive Order

- 17 -

announcing a policy "to streamline and expedite, *in a manner consistent with law, environmental reviews and approvals for all infrastructure projects*, especially projects that are a high priority for the Nation" such as pipelines.  (DOS1191-1192 (emphasis added).)

On January 26, 2017, State received TC Energy's re-submitted application, and less than two months later, on March 23, 2017, State granted a Presidential Permit allowing TC Energy to construct and operate Keystone.  (DOS1194-1234, 2485-2523.)

On March 27, 2017, plaintiffs filed suit challenging State's Record of Decision ("ROD"), National Interest Determination ("NID") and Presidential Permit approving Keystone.  (*IEN v. State*, ECF 1.)  A second suit (*Northern Plains Resource Council v. Shannon*, CV 17-31-GF-BMM) was filed three days later, and on October 4, 2017, these actions were consolidated for briefing and hearing.  (ECF 82.)

On November 22, 2017 this Court denied defendants' motions to dismiss. (2017 WL 5632435 (ECF 99).)  Thereafter, State and FWS lodged their Administrative Records (ECF 111-112, 158, 167) and the parties filed cross-motions for summary judgment (ECF 139-157, 170-176, 180-185).

On August 15, 2018, this Court granted partial summary judgment to plaintiffs, and ordered State to supplement its NEPA review to analyze Keystone's "Main Line Alternative" route through Nebraska.  (317 F.Supp.3d 1118, 1123

(ECF 210).)  That review is ongoing.

On November 8, 2018, this Court decided the remaining claims, ruling for plaintiffs on some and vacating State's ROD/NID.  (347 F.Supp. 561 (ECF 218).) The Court permanently enjoined defendants "from engaging in any activity in furtherance of the construction or operation of Keystone [XL] and associated facilities" until specified supplemental reviews are completed and State renders a new ROD/NID.  (*Id*. at 591.)

On November 15, 2018, TC Energy moved this Court to allow certain "pre-construction activities."  (ECF 222.)  By Order filed December 7, 2018, the Court allowed some of them.  (369 F.Supp.3d 1045, 1052-1053 (ECF 231).)

On December 21, 2018, TC Energy appealed and moved to stay this Court's injunction.  (ECF 232.)  By Order filed February 15, 2019, the Court denied the stay but modified its injunction to allow pipeline storage yards outside of Keystone's right-of-way.  (2019 WL 652416 (ECF 252).)

On February 21, 2019, TC Energy moved the Ninth Circuit to stay this Court's injunction.  (Ninth Cir. No. 18-36068, Dkt. 19.)  On March 15, 2019, the Ninth Circuit denied TC Energy's Motion because it had "not made the requisite strong showing that [it is] likely to prevail on the merits."  (*Id.*, Dkt. 28.)

After losing on the merits in this Court, and the Ninth Circuit refused to disturb this Court's injunction, President Trump chose to evade the effect of those court orders.  On March 29, 2019 President Trump issued a new "Presidential

Permit" purportedly "grant[ing] permission" for TC Energy "to construct, connect, operate and maintain" Keystone *without compliance with the laws of the United States*.  (84 Fed.Reg. 13101-13103, attached as Exhibit 1 to accompanying Volker Declaration.)

President Trump, however, is not above the law.  Under Article III of the United States Constitution, President Trump's unlawful conduct is subject to this Court's review and reversal, as shown below.

## VI.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS.

### A.    PRESIDENT TRUMP'S 2019 PERMIT VIOLATES ARTICLE IV, SECTION 3, CLAUSE 2 OF THE UNITED STATES CONSTITUTION.

President Trump's 2019 Permit "grant[s] permission . . . to [TC Energy] . . . to construct [and] . . . operate . . . pipeline facilities . . . . 1.2 miles from the international border . . . for the import of oil from Canada."  (84 Fed.Reg. 13101.) The 2019 Permit is also apparently intended to allow TC Energy to construct and operate the balance of Keystone.  (*Id*.)

However, the 2019 Permit must be declared unlawful and vacated because President Trump lacked authority to authorize any portion of Keystone.  First, he lacked the power to approve "pipeline facilities" between Canada and a point 1.2 miles south because Congress exercises exclusive power over management of the federal lands that comprise the majority of this 1.2 mile segment.  As TC Energy admitted in its January 26, 2017 permit application, "[t]he portion of the border

crossing facilities from Milepost 0.0 to Milepost 0.93 will be located *on lands administered by the U.S. Bureau of Land Management* (BLM)."  (DOS1201 (emphasis added).)

Second, Mr. Trump lacked the power to authorize the balance of the Project because approximately 45 miles of Keystone's route elsewhere in Montana are *likewise located on federally-owned lands administered by BLM*.  (DOS5954, 6046).

Under the Property Clause of the U.S. Constitution, Congress – and not the President – holds the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other *Property belonging to the United States*."  (U.S. Constitution, Article IV, section 3, clause 2 (emphasis added); *League*, 363 F.Supp.3d at 1017, n. 20.)

Congress has not ceded its Property Clause power to the President.  To the contrary, it has directed BLM – rather than the President – to manage all of the federal lands within Montana that Keystone would cross, including those between Milepost 0.0 and Milepost 0.93 and the balance of the 45 miles of BLM lands, in accordance with FLPMA.  (43 U.S.C. §§ 1712-1716 (land use planning and disposal, withdrawal, and exchange of public lands), 1732 (land management), 1763-1765 (rights-of-way).)

Before those lands could be used for Keystone, BLM would have to first grant TC Energy a right-of-way that would "minimize adverse environmental

impacts," "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment [and] . . . require compliance with applicable air and water quality standards . . . pursuant to applicable Federal or state law." (43 U.S.C. §§ 1763, 1765.) And, in granting a right-of-way, BLM would have to comply with NEPA, ESA, and CWA.

But BLM has done neither. No right-of-way has been granted by BLM to TC Energy allowing its use of these BLM lands for Keystone. And only BLM has authority to issue such a right-of-way. (Article IV, section 3, clause 2, U.S. Constitution; 43 U.S.C. §§ 1763-1765.)

Accordingly, President Trump's purported 2019 Permit is *ultra vires*.

## B.   PRESIDENT TRUMP'S 2019 PERMIT VIOLATES ARTICLE 1, SECTION 8, CLAUSE 3 OF THE UNITED STATES CONSTITUTION.

The second reason President Trump lacked authority to authorize Keystone is that doing so conflicts with Congress' correlative power to regulate foreign and interstate commerce under Article I, section 8, clause 3 of the U.S. Constitution. Keystone's express purpose is to transport tar sands crude across both *international* and *interstate* boundaries for commercial purposes – and is thus subject to Congress' regulation of this commerce under the Commerce Clause. (*E.g.*, *Buttrey v. United States*, 690 F.2d 1186, 1189 (5th Cir. 1982) cert. den. 461 U.S. 927 (Congress has Commerce Clause power to require dredge and fill permits under CWA, 33 U.S.C. § 1344).) Keystone would cross many rivers including the

Missouri, Yellowstone, Cheyenne, and Platte.  (DOS6271-6282.)  These river crossings and their associated environmental  impacts are regulated by federal agencies pursuant to the many environmental laws Congress has enacted in the exercise of its broad Commerce Clause powers, including FLPMA, NEPA, ESA, and CWA.

Congress' comprehensive regulatory scheme requires that federal agencies including the U.S. Army Corps of Engineers ("Corps of Engineers") and the U.S. Fish and Wildlife Service ("FWS") manage these river crossings and their environmental impacts under CWA (*e.g.*, 33 U.S.C. sections 1311 (discharge prohibition), 1342 (NPDES permit program), 1344(d) (dredge and fill permit program administered by the Corps of Engineers), and ESA (*e.g.*, 16 U.S.C. sections 1536 (consultation with fish and wildlife agencies), 1538 (prohibited acts), 1539 (incidental take permits)), among other laws.  Those agencies – rather than President Trump – have the authority to issue approvals for these river crossings.

### C.     PRESIDENT TRUMP'S 2019 PERMIT VIOLATES EXECUTIVE ORDER 13337.

The third reason President Trump lacked authority to authorize Keystone is that doing so conflicted with Executive Order 13337, which delegated authority to approve this transboundary project to State, and required that agency to comply with all applicable environmental laws before approving Keystone.

As this Court has previously ruled, "Executive Order 13337 delegates to the

State Department the President's authority to issue a permit for the construction of an oil pipeline across the border of the United States."  (*IEN v. State*, 2017 WL 5632435 at *1 (11/22/17) (ECF 99).)  EO 13337 provides that "[n]othing contained in this order shall be construed to . . . *supersede or replace the requirements established under any other provision of law, or to relieve a person from any requirement to obtain authorization from any other department or agency of the United States Government in compliance with applicable laws and regulations . . . ."*  (69 Fed.Reg. at 25301, section 5 (emphasis added).)

As this Court also ruled, "[t]he State Department recognized that the issuance of a Presidential Permit [for Keystone] would constitute a "major Federal action [under NEPA] and retained the role as the lead agency."  (2017 WL 5632435 at **1, 3, citing State's two Notices of Intent to Prepare an EIS, 74 Fed.Reg. 5019-02 (1/28/09) and 77 Fed.Reg. 27533-02 (5/10/12).)  State's NEPA regulations would have required its preparation of an EIS in any event, as they likewise "recognize that the issuance of a Presidential Permit represents a 'major Departmental action' subject to Congress' mandates in NEPA."  (*IEN v. State*, 2017 WL 5632435 at *4, quoting 22 C.F.R. §§ 161.7, 161.7(c)(1) and citing the Presidential Memorandum Regarding Construction of the Keystone XL Pipeline, 82 Fed.Reg. 8663 (1/24/17).)

Contrary to EO 13337, President Trump purported to authorize construction and operation of Keystone *without* "compliance with applicable laws and

regulations."

EO 13337 further directs that, "[a]fter consideration of the views and assistance obtained" from other federal agencies and officials, and "any public comments submitted" in response to public notice of the proposed Presidential permit, the "Secretary of State [must find] that issuance of a permit to the applicant would serve the national interest." (69 Fed.Reg. 25300 at section 1(g).) Contrary to this requirement, President Trump did not make a finding that issuance of the 2019 Permit "would serve the national interest." Nor did he provide a "reasoned explanation" justifying his abrupt reversal of former Secretary of State John Kerry's detailed and factually-based reasons why climate change concerns compelled rejection of Keystone, as this Court has ruled is required under this Executive Order. (347 F.Supp.3d at 582-584.)

President Trump's 2019 Permit also ignores and violates EO 13337's requirement that applicants for transboundary permits must demonstrate "compliance with applicable laws and regulations." (69 Fed.Reg. 25301, section 5.) The many standards Congress has established for the construction and operation of oil pipelines such as Keystone include the requirements of CWA and ESA for review and approval by the Corps of Engineers and FWS of Keystone's numerous river crossings including the Missouri, Yellowstone, Cheyenne, and Platte rivers and their tributaries and impacts on habitat for listed species such as the whooping crane. (33 U.S.C. §§ 1311, 1342, 1344; 16 U.S.C. §§ 1536-1533.)

- 25 -

Since Congress has delegated authority to regulate river crossings to the Corps of Engineers pursuant to 33 U.S.C. section 1344(d), and authority to regulate impacts on listed species to FWS pursuant to 16 U.S.C. sections 1536-1539, the President is powerless to unilaterally "grant permission" to TC Energy to construct and operate Keystone's facilities where they impact these waters and species.  As this Court ruled in vacating the 2017 Permit, Keystone is subject to the detailed requirements of these laws that Congress enacted to protect the environment, endangered and threatened species, cultural resources, and public health and safety.  (347 F.Supp.3d at 590-591.)

President Trump's *subsequent* issuance on April 10, 2019, and publication in the Federal Register on April 15, 2019 (84 Fed.Reg. 15491) of EO 13867 – which purported to revoke EO 13337 – cannot be given retrospective effect to excuse the President's violation of EO 13337 for four reasons.  First, EO 13867 is worded prospectively.  All of its active verbs use the present tense and never imply any retroactive intent:  "I hereby grant permission," "[t]his permit supersedes . . . . [and] grants the permission . . . and revokes [the 2017 permit]."  (84 Fed.Reg. 15491; Volker Dec. at Exhibit 1, page 1.)

Second, executive orders are governed by the same "rules of statutory construction" as are statutes.  (*U.S. v. Angcog*, 190 F.Supp. 696, 699 (D.C. Guam 1961).)  A "statute may not be applied retroactively . . . absent a clear indication from Congress that it intended such a result."  (*I.N.S. v. St. Cyr*, 533 U.S. 289, 316

(2001).)  A finding of retroactive intent requires "statutory language that [is] so clear that it could sustain only one interpretation."  (*Id*. (quoting *Lindh v. Murphy*, 521 U.S. 320, 328 n. 4 (1997)).)  There is no such retrospective language here.

Third, EO 13867 expressly saves "*all permits heretofore issued* pursuant to the orders enumerated in section 2(k)" – *e.g.*, EO 13337 – evincing an unmistakable intent to *preserve* the applicability of EO 13337 right up to the moment that EO 13867 revoked it.  (EO 13867 § 3) (emphasis added).)

Fourth, the principle of separation of powers militates against an interpretation that would allow the Executive Branch to retroactively render lawful action that was unlawful when it was taken.  Otherwise, the President could escape the consequence of any court ruling invalidating his unlawful action by simply issuing a *new* executive order declaring the prior action lawful.  Judicial review of Presidential action would be effectively eviscerated, undermining the separation of powers vital to our constitutional system of governance.  (*City and County of San Francisco v. Trump*, 897 F.3d 1225, 1231-1235 (9th Cir. 2018).)

Because the 2019 Permit purports to "grant permission . . . to [TC Energy] . . . to construct [and] . . . operate" Keystone *without requiring compliance with applicable federal environmental laws*, it conflicts with both EO 13337 and Congress' comprehensive scheme of environmental regulation adopted pursuant to its Commerce Clause powers.  Accordingly, the 2019 Permit is *ultra vires*.

## VII.  THIS COURT HAS AUTHORITY TO ENJOIN ANY ACTIVITIES RELATED TO PIPELINE CONSTRUCTION.

This Court has broad authority to preserve the status quo pending its adjudication of this case.  TC Energy previously argued that this Court's "authority to enjoin actions by [TC Energy] 'extends only so far as the [presidential] permitting authority,'" and that the Court therefore lacks authority to enjoin "pre-construction" activities.  (ECF 234 at 24 (quoting *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1123 (9th Cir. 2005)).)  Not so.  This Court rejected that argument and ruled that it has authority to enjoin any activities related to pipeline construction that were within the scope of the Trump Administration's NEPA review of Keystone.  (2019 WL 652416 at **7-11 (ECF 252 at 23-31).)

TC Energy also argued that the Trump Administration's permitting authority over the "construction" of pipelines that cross United States borders does not extend to "transport[ing] or refurbish[ing] pipe, mow[ing] grass, fabricat[ing] materials, or construct[ing] a labor camp or storage yard."  (ECF 234 at 24.)  To the contrary, those activities are part and parcel of pipeline construction, and thus subject to the federal government's permitting authority, as this Court previously ruled.  (2019 WL 652416 at **7-11 (ECF 252:23-31).)

Dr. Ramsay, the TC Energy executive "responsible for the Project's engineering, procurement, construction, testing, commissioning and start-up," has admitted that these "preparatory activities . . . are necessary" for "constructing a

project the magnitude of Keystone XL."  (ECF 222-1 ¶16.)  The Trump Administration likewise conceded that "[c]onstruction of the proposed Project would include the pipeline itself plus various aboveground ancillary facilities (e.g., access roads, pump stations, and construction camps) and connected actions."  (DOS5652 (quote), 2497, 5968-86 (SEIS description of ancillary facilities).)  Consistent with these admissions, this Court has ruled that "[TC Energy's] proposed pre-construction activities" are so intertwined with pipeline construction that allowing them to continue "could skew the Department's future analysis and decision-making regarding the project."  (369 F.Supp.3d at 1051.)

Accordingly, this Court should again rule that TC Energy's "pre-construction" activities are "so interrelated and functionally interdependent" with project construction "as to bring the entire project within" this Court's "jurisdiction."  (*Stewart v. Potts*, 996 F.Supp.668, 683 (S.D. Tex. 1998) (quoted with approval in *Save Our Sonoran*, 408 F.3d at 1124).)

## VIII.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF.

The standard for issuance of a preliminary injunction "requires plaintiffs seeking [the] relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."  (*Winter*, 555 U.S. at 22 (original emphasis).)  Here, irreparable injuries are not only likely – they are admitted.  TC Energy plans to mow 11,666 acres of the right-of-way, causing "[p]ermanent loss of wetlands," "permanent

modification of surface and subsurface flow patterns," "permanent modification of
wetland vegetation," and "[l]oss or alteration of wetland soil integrity," among
other harms.  (ECF 221-1 ¶ 18; DOS5952, 6782-6784, 6809-6811; FWS
Administrative Record (ECF 112) ("FWS") 2062.)  Pre-construction activities will
also require clearing of 1,916 to 2,316 acres, including 1,037.6 acres for pipe
storage yards, 479 acres for contractor yards, and between 400 and 800 acres for
eight or nine worker camps.  (DOS5979-5980; Volker Dec. ¶ 5.)

Furthermore, allowing TC Energy to proceed with construction of the
Project would allow it to gain potentially unstoppable momentum.  "It is far easier
to influence an initial choice than to change a mind already made up."  (*Sierra
Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989).)  If the facilities are constructed,
TC Energy will not be willing to dismantle them and choose a different location,
and the Federal Defendants will be reluctant to ask it to do so.  In the analogous
context where a NEPA challenge is brought, courts have long recognized that
"[o]nce large bureaucracies are committed to a course of action, it is difficult to
change that course – even if new, or more thorough, NEPA statements are
prepared and the agency is told to 'redecide.'"[11]

In the context of the alleged failure of federal agencies to conduct required

---

[11] *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946, 952-53 (1st Cir. 1983)
(citing W. Rodgers, *Environmental Law* §7.7 at 767 (1977)) (NEPA's "purpose is to
require consideration of environmental factors before project momentum is irresistible,
before options are closed, and before agency commitments are set in concrete").

environmental review, "irreparable injury flows from the failure to evaluate the environmental impact of a major federal action."  (*High Sierra Hikers Association v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004).)  For example, to again refer to the analogous context in which NEPA violations are alleged, "[w]hile an injunction does not automatically issue upon a finding that an agency violated NEPA, 'the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction.'" (*Id*. (quoting *American Motorcyclist Association v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983)).)  Likewise here, plaintiffs have alleged strong constitutional and executive order claims that warrant vigorous judicial enforcement.  As detailed above, President Trump has attempted to evade this Court's orders requiring environmental review, including adequate analysis under NEPA.  The Federal Defendants' failure to provide an adequate analysis of the Keystone's impacts will irreparably harm the public by depriving them of information and analysis essential to an informed decision.

TC Energy has also claimed that any injury "caused by 'bureaucratic momentum' is legally erroneous and devoid of factual support."  (ECF 234:26-28.) To the contrary, this Court correctly ruled that – unlike project engineering and planning, engaging with agencies and other parties, maintaining a security presence, and conducting cultural, biological, civil and other surveys – the surface-disturbing pre-construction activities such as "preparation of pipe storage and contractor yards" and "worker camps," "mowing" and "discourag[ing]

migratory bird nesting" "go beyond 'design, planning, and permit application'"
and "simply integrating the NEPA process with other planning."  (369 F.Supp.3d
at 1050 (citing *Audubon*, 422 F.3d at 206).)

Rather, as this Court previously held, Keystone's surface-disturbing pre-
construction activities are "analogous to those enjoined in *Colorado Wild* ."  (ECF
231:10; *Colorado Wild*, 523 F.Supp.2d at 1221.)  Allowing these impactful
activities would "'skew the analysis and decision-making' toward approving a
pipeline route" because they will have occurred along one particular route.
(*Colorado Wild*, 523 F.Supp.2d at 1221.)  As in *Colorado Wild*, the pre-
construction activities here are all "in furtherance of the decision that is being
challenged."  (*Id.*)  "Each step taken . . . in reliance on this decision 'represents a
link in the chain of bureaucratic commitment that will become progressively
harder to undo the longer it continues.'" (*Id.* (citing *Sierra Club v. Marsh*, 872
F.2d 497, 500 (1st Cir. 1989)).)

Equally important, TC Energy must not be allowed to irreparably destroy
environmental and cultural resources while the Court adjudicates the merits of
plaintiffs' claims.  Should TC Energy build Keystone before this case is
adjudicated, the impacts on plaintiffs and the public would be severe and
irreparable.  (*See* the following declarations concurrently filed in support of this
motion:  Declaration of Joye Braun at ¶¶ 5-10 (attesting to the irreparable impacts
of Keystone and its massive "man-camps" on nearby Native American

communities); Declaration of Bill Whitehead at ¶¶ 4-13 (documenting the adverse impact of an oil spill from Keystone into the Missouri River upstream of the Fort Peck Indian Reservation's three river intakes which provide its water supply); Declaration of Kathleen Meyer at ¶¶ 10-17 (impacts on environmental and cultural resources); Declaration of Kandi White at ¶¶ 5-12 (impacts on environmental and cultural resources); Declaration of Angeline Cheek at ¶¶ 3-29 (severe cultural impacts on Native American communities, including the Fort Peck Indian Reservation in Montana and the Cheyenne Indian Reservation in South Dakota); Declaration of Tom B.K. Goldtooth at ¶¶ 5-19 (environmental and cultural impacts on Indigenous communities particularly the Cheyenne River Sioux Reservation); Declaration of Frank Egger at ¶¶ 6-21 (impacts on watershed resources including the Missouri and Yellowstone Rivers); Declaration of Elizabeth Lone Eagle at ¶¶ 6-11 (impacts on Indigenous communities, particularly along the Cheyenne River in South Dakota); Declaration of LaVae High Elk Red Horse at ¶¶ 3-6 (impacts on the Indigenous communities along the Cheyenne River in South Dakota).

These impacts are severe and irreparable.  By contrast, TC Energy's vague claims of potential delay in its construction plans reveal no actual irreparable harm.  It can always build later, should President Trump's purported approval be upheld.

In sum, Keystone will inflict irreparable injuries on the environment and on rural Indigenous communities.  Allowing Keystone's construction to proceed

could effectively pre-decide this case by giving Keystone potentially unstoppable momentum.  Issuance of a preliminary injunction is essential to prevent irreparable harm.

## IX.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS AND INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

It is settled law that "when environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment."  (*Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir. 1988); *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1230 (9th Cir. 1988); *Bob Marshall Alliance v. Lujan*, 804 F.Supp. 1292, 1295-1298 (D. Mont. 1992) (oil and gas leases issued in violation of NEPA cancelled rather than merely suspended to assure BLM fully considered other alternatives).)

The Ninth Circuit has reemphasized "the well-established 'public interest in preserving nature and avoiding irreparable environmental injury.'" (*Alliance for the Wild Rockies*, *supra*, 632 F.3d at 1138.)  Irreparable injury to the environment and Indigenous communities is not only "likely," it is a certainty if a stay is not issued.  The strong public interest in avoiding this irreparable environmental and cultural harm and compelling the Trump Administration to comply with the United States Constitution and EO 13337 far outweighs any potential "public interests that cut in favor of *not* issuing the injunction."  (*Id.*; *Bob Marshall Alliance v. Lujan*, 804 F.Supp. at 1297-1298.)

In contrast to the irreparable injuries to the public and plaintiffs if Keystone

construction proceeds, TC Energy will not suffer *any* irreparable harm if construction is stayed pending the resolution of this case.

The Ninth Circuit has long "recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and [has] held that suspending such projects until that consideration occurs 'comports with the public interest.'" (*Alliance for the Wild Rockies*, *supra*, 632 F.3d at 1138, *citing South Fork Band Council v. U.S. Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).)  Therefore it is in the public interest to enjoin construction of Keystone until this Court decides the merits of this case.

## X.   IF GRANTED INJUNCTIVE RELIEF, PLAINTIFFS SHOULD BE REQUIRED TO POST ONLY A NOMINAL BOND.

The federal courts, particularly in the Ninth Circuit, have repeatedly recognized the significant role of citizen lawsuits in ensuring that environmental laws are upheld.  Such lawsuits are typically brought by environmental groups and individual plaintiffs of limited means who would be left without effective judicial recourse if required to post substantial bonds in order to secure preliminary injunctive relief.[12]  Following this reasoning, a consistent line of federal cases

---

[12] *Save Strawberry Canyon v. Department of Energy*, 613 F.Supp.2d 1177, 1190-1191 (N.D. Cal. 2009) (citing *People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)) ("[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review"); *see also Natural Resources Defense Council v. Morton*, 337 F.Supp. 167, 169 (D.  D.C. 1971), *aff'd* 458 F.2d 827 (D.C. Cir 1972).

rejects defendants' requests for substantial bond amounts in environmental cases.[13] Since plaintiffs here would likewise be unable to meet a substantial bond requirement, they would have no means to enforce the laws that the Federal Defendants violated.  As noted by the Ninth Circuit, "[w]hile the Court battle over the approvals of the various . . . projects is going on, the actual [projects] would take place."  (*League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977).)  Accordingly, this Court should rule, in line with existing authority, that plaintiffs be required to post only a nominal bond.

## XI.   CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs' motion for a preliminary injunction.

Dated:  July 10, 2019          PATTEN, PETERMAN, BEKKEDAHL &
                               GREEN, PLLC
                               s/ *James A. Patten*
                               JAMES A. PATTEN

_____

[13]  The federal courts have set bonds at $100, $1000, $1 and no bond in cases similar to this.  *Save Strawberry Canyon, supra*, 613 F.Supp.2d at 1190-1191; *People of State of Cal. ex rel. Van de Kamp, supra,* 766 F.2d at 1375; *The Wilderness Society v. Tyrrel*, 701 F.Supp. 1473, 1492 (E.D. Cal. 1988) ("if these types of groups were 'required to post substantial bonds . . . in order to secure preliminary injunctions . . .' the bonds might undermine mechanisms for private enforcement of environmental law"), *Natural Resources Defense Council v. Morton,* 377 F.Supp.165 (D. D.C. 1971); *Friends of the Earth et al. v. Brinegar*, 518 F.2d 322 (9th Cir. 1975); *Environmental Defense Fund v. Corps of Engineers*, 331 F.Supp. 925 (D. D.C. 1971); *Boston Waterfront Res. Ass'n v. Romney,* 343 F.Supp. 89 (D. Mass. 1972); *Stop H-3 Assoc. v. Volpe*, 349 F.Supp. 1047 (D. Haw. 1972); *and State of Ala. ex rel. Baxley v. Corps of Engineers*, 441 F.Supp. 1261, 1276 (N.D. Ala. 1976).

Dated:  July 10, 2019          LAW OFFICES OF STEPHAN C. VOLKER
                               s/ *Stephan C. Volker*
                               STEPHAN C. VOLKER (Pro Hac Vice)

                               Attorneys for Plaintiffs
                               INDIGENOUS ENVIRONMENTAL NETWORK
                               and NORTH COAST RIVERS ALLIANCE

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2) of the District of Montana Local Rules, I certify that this Brief contains 6,491 words, excluding caption, certificates of service and compliance, table of contents and authorities, and exhibit index, as counted by WordPerfect X7, the word processing software used to prepare this brief.

Dated:  July 10, 2019              <u>s/ *Stephan C. Volker*         </u>
                                   STEPHAN C. VOLKER