Jeffery J. Oven                    Peter R. Steenland
Mark L. Stermitz                   Peter C. Whitfield
Jeffrey M. Roth                    SIDLEY AUSTIN LLP
CROWLEY FLECK PLLP                 1501 K Street, NW
490 North 31st Street, Ste. 500    Washington, DC  20005
P.O. Box 2529                      Telephone: 202-736-8000
Billings, MT  59103-2529           Email:  psteenland@sidley.com
Telephone: 406-252-3441                     pwhitfield@sidley.com
Email: joven@crowleyfleck.com
       mstermitz@crowleyfleck.com
       jroth@crowleyfleck.com

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>              Plaintiffs,<br><br>      vs.<br><br>PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers; UNITED STATES FISH AND WILDLIFE SERVICE, a  federal agency; GREG SHEEHAN, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; UNITED STATES BUREAU OF LAND MANAGEMENT, and DAVID BERNHARDT, in his official | CV 19-28-GF-BMM<br><br>**MEMORANDUM IN SUPPORT OF MOTION BY TRANSCANADA KEYSTONE PIPELINE, LP AND TC ENERGY CORPORATION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. RULE 12(B)(1) OR 12(B)(6)** |

capacity as Acting U.S. Secretary of the
Interior,

                Defendants,

TRANSCANADA KEYSTONE PIPELINE,
LP, a Delaware limited partnership, and TC
ENERGY CORPORATION, a Canadian
Public company,

                Defendant-Intervenors.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

I.      INTRODUCTION ......................................................................1

II.     BACKGROUND ........................................................................4

        A.      Regulatory Background.............................................................4

                1.      Federal Regulation of Oil Pipeline Construction.......................4

                2.      State Regulation of Oil Pipeline Construction...........................6

        B.      Procedural Background ............................................................7

III.    LEGAL STANDARD ...............................................................9

IV.     ARGUMENT............................................................................10

        A.      Plaintiffs Lack Standing ......................................................10

        B.      Count I Fails To State A Claim For Relief Under The Property
                Clause .........................................................................13

        C.      Count II Fails To State A Claim For Relief Under The
                Commerce Clause...............................................................15

                1.      The President Had The Constitutional Authority To Issue
                        The 2019 Permit.......................................................15

                2.      Presidents Have Not Recognized That Issuance Of
                        Presidential Permits Are Subject To The APA Or
                        Environmental Laws, And Issuance Of The 2019 Permit
                        Did Not Violate Those Laws. ...................................17

                3.      The President Did Not Violate Executive Order 13337 ..........20

V.      CONCLUSION.........................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................9

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...........................................................................10, 11

*Dalton v. Specter*,
   511 U.S. 462 (1994) ...............................................................................19

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...............................................................................15

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ...........................................................................19, 20

*Indigenous Envtl. Network v. U.S. Dep't of State*,
   369 F. Supp. 3d 1045 (D. Mont. 2018), *rev'd as moot*, No. 18-
   36068, Order (9th Cir. June 6, 2019) .................................................11

*Indigenous Envtl. Network v. U.S. Dep't of State*,
   No. CV-17-29-GF-BMM, 2019 WL 652416 (D. Mont. Feb. 15,
   2019), *rev'd as moot*, No. 18-36068, Order (9th Cir. June 6, 2019) .................11

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) .........................................................9

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...............................................................................10

*Manhattan-Bronx Postal Union v. Gronouski*,
   350 F.2d 451 (D.C. Cir. 1965) .........................................................21

*Proposals Regarding an Independent Attorney General*,
   1 Op. O.L.C. 75 (1977) ...........................................................................21

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ...........................................................................12

*Status of Presidential Memorandum Addressing the Use of*
   *Polygraphs*, 2009 WL 153263 (O.L.C. Jan. 14, 2009) ......................................21

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ..............................................................................10

**Statutes**

Pub. L. No. 112-78, 125 Stat. 1280 (2011).............................................................15

3 U.S.C. § 301 ...............................................................................................17, 18

15 U.S.C. § 717f ......................................................................................................4

25 U.S.C. § 323 .......................................................................................................5

25 U.S.C. § 324 .......................................................................................................5

30 U.S.C. § 185 .......................................................................................................5

33 U.S.C. § 404 .......................................................................................................5

33 U.S.C. § 408 .......................................................................................................5

33 U.S.C. § 1344 .....................................................................................................5

42 U.S.C. § 4332 ...................................................................................................19

42 U.S.C. § 4333 ...................................................................................................19

43 U.S.C. § 1761 .....................................................................................................5

49 U.S.C. app. § 1 (1988) .......................................................................................4

49 U.S.C. § 60102 ...................................................................................................4

49 U.S.C. § 60502 ...................................................................................................4

Mont. Code Ann. § 75-20-113 ................................................................................7

Mont. Code Ann. § 75-20-201 ................................................................................6

Neb. Rev. Stat. § 57-1101 .......................................................................................7

Neb. Rev. Stat. § 57-1405 .......................................................................................6

Neb. Rev. Stat. § 57-1503 ................................................................6

S.D. Codified Laws § 49-2-12 ..........................................................7

S.D. Codified Laws § 49-7-11 ..........................................................7

S.D. Codified Laws § 49-41B-2 ........................................................6

S.D. Codified Laws § 49-41B-2.1 .....................................................6

S.D. Codified Laws § 49-41B-4 ........................................................6

**Other Authorities**

40 C.F.R. § 1508.12 ........................................................................19

49 C.F.R. pt. 195 ..............................................................................4

161 Cong. Rec. H947 (daily ed. Feb. 11, 2015) ............................15

161 Cong. Rec. S1073 (daily ed. Feb. 24, 2015) ...........................15

161 Cong. Rec. S620 (daily ed. Jan. 29, 2015) .............................15

82 Fed. Reg. 1860 (Jan. 6, 2017) .....................................................5

84 Fed. Reg. 13,101 (Apr. 3, 2019) ........................................8, 12, 21

Executive Order 11423, 33 Fed. Reg. 11,741 (Aug. 20, 1968)................5, 6, 13, 18

Executive Order 13337, 69 Fed. Reg. 25,299 (May 5, 2004) ...........6, 14, 17, 18, 20

Executive Order 13867, 84 Fed. Reg. 15,491 (Apr. 15, 2019).......................6, 9, 14

Fed. R. Civ. P. 12 .............................................................................9

Neb. Pub. Serv. Comm'n, *In the Matter of the Application of TransCanada Keystone Pipeline L.P., Calgary, Alberta, seeking approval for Route Approval of the Keystone XL Pipeline Project Pursuant to the Major Oil Pipeline Siting Act*, Application No. OP-0003, Order (Nov. 20, 2017), *appeal pending,* No. 17-01331 (Neb.) ...............................................................................7

Pub. Util. Comm'n of S.D., *In the Matter of the Petition of
   TransCanada Keystone Pipeline, LP for Order Accepting
   Certification of Permit Issued in Docket HP09-001 to Construct
   the Keystone XL Pipeline*,
   No. HP14-001, Final Decision and Order Finding Certification
   Valid And Accepting Certification (Jan. 21, 2016)..............................................7

President Ulysses Grant's Seventh Annual Message to Congress,
   *reprinted in* Papers Relating to the Foreign Relations of the United
   States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, pt. 1 (Dec. 6,
   1875) ....................................................................................................................5

Whiteman, *Digest of International Law*, Vol. 9 (1968) ...........................................5

# I.      INTRODUCTION

On March 29, 2019, President Trump exercised his inherent Constitutional authority over foreign affairs to grant a Presidential Permit (the "2019 Permit") authorizing the construction, operation, and maintenance of 1.2 miles of oil pipeline facilities for the Keystone XL Pipeline ("Keystone XL") at the U.S.-Canadian border. Plaintiffs contend that, in exercising his authority, the President (and a number of federal agencies) violated the Property and Commerce clauses of the Constitution –Article IV, Section 3 and Article I, Section 8. These claims are based on a series of fundamental legal errors concerning (1) the nature of a Presidential Permit and its relationship to other permitting requirements, (2) the extent to which Congress has regulated or constrained the President's exercise of his permitting power (which, in the case of transboundary oil pipelines, is not at all), and (3) the nature of Executive Orders (which do not and cannot bind the President). Stripped of these legal misconceptions, it is clear that Plaintiffs' complaint fails to set forth any cognizable claim and must be dismissed.

Plaintiffs assert, correctly, that the Property Clause empowers Congress to dispose of or regulate federal property, and that Congress has assigned those responsibilities to the Bureau of Land Management ("BLM"). The 2019 Permit, however, plainly does not authorize use of any federal land for the Keystone XL Pipeline. A Presidential Permit is an *additional* legal requirement that an oil

pipeline must obtain to transport oil across the U.S./Canada border. A Presidential Permit does not excuse compliance with any other permitting requirements imposed by federal or state law, including the requirement for BLM-issued rights-of-way to cross federal land. Indeed, the 2019 Permit explicitly says so. As a consequence, issuance of the 2019 Permit does not and could not violate the Property Clause.

Moreover, operation of such a Permit does not violate the Commerce Clause. This claim is predicated primarily on the theory that Executive Orders issued by Presidents Johnson and George W. Bush somehow *recognized* that Congress has subjected transboundary oil pipelines to regulation under statutes such as National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). Further, Plaintiffs believe that these Presidents delegated their authority to issue permits for such facilities to the U.S. Department of State ("State") because State is a federal agency subject to these laws. Plaintiffs claim that, by issuing the permit himself, President Trump violated these Executive Orders and, as a consequence, transgressed Congress's correlative power under the Commerce Clause to regulate such oil pipelines.

This claim is foreclosed by settled legal principles. Subject to constitutional limitations, Congress can enact laws that constrain or regulate the manner in which the President exercises his inherent power to grant or deny permission for cross-

border infrastructure. But no statute governs issuance of Presidential Permits for transboundary oil pipelines. Thus, the President has no obligation to delegate such permitting decisions to State (or any other agency). And he has plenary authority to rescind such a delegation for any reason, at any time, and in whatever manner he sees fit.

That is precisely what the President did here, when he issued the 2019 Permit "notwithstanding" Executive Order 13337. That decision did not and could not "violate" prior Executive Orders. And it is not subject to review or challenge under the APA, NEPA, or any of the other statutes Plaintiffs invoke, as none of those laws applies to the President.

Finally, Plaintiffs' lack standing. They allege injuries from construction and operation of Keystone XL in its entirety. But the 2019 Permit authorizes only the construction and operation of 1.2 miles of pipeline facilities at the U.S./Canada border. Authorizations for facilities beyond the border crossing have been or will be obtained from state and local governments, as well as federal agencies having discrete authority over certain federal resources. Thus, any alleged harm is not traceable to the 2019 Permit itself.

For these reasons, explained in greater detail below, TransCanada Keystone Pipeline LP and TC Energy Corporation[1] move for dismissal of the Complaint.

## II.   BACKGROUND

### A.   Regulatory Background

Plaintiffs' claims proceed from the misbegotten premise that a Presidential Permit authorizes construction of a cross-border oil pipeline throughout its entire U.S. route. In fact, such a permit authorizes only the border crossing, and does not displace the federal permitting requirements that may apply to discrete segments of the pipeline, including the use of federal law within the border crossing itself. Beyond these discrete requirements, Congress has left approval of oil pipelines to the States.

#### 1.   Federal Regulation of Oil Pipeline Construction

Natural gas pipelines cannot be built without approval from the Federal Energy Regulatory Commission ("FERC"), but there is no such requirement for oil pipelines.[2]  Instead, while federal law establishes oil pipeline design and

---

[1] Since Plaintiffs filed their Complaint, TransCanada Corporation changed its name to TC Energy Corporation. This brief uses "TC Energy" to refer to both entities.
[2] *Compare* 15 U.S.C. § 717f(c)(1)(A) (FERC approval needed to construct a natural gas pipeline), *with* 49 U.S.C. § 60502 (no requirement for oil pipeline).

construction standards,[3] and regulates rates and access to pipeline transportation,[4] it requires federal agency approval only for the construction of those discrete segments of an oil pipeline (if any) that cross wetlands or navigable waters,[5] federally-owned land,[6] or land held in trust for individual Indians or tribes.[7]

An oil pipeline that crosses the Nation's border must obtain an *additional* permit—a Presidential Permit. Presidents have imposed this requirement on various types of cross-border facilities for nearly 150 years.[8] Until 1968, Presidents personally issued permits for certain cross-border facilities.[9] That year, President

---

[3] 49 U.S.C. § 60102(a); 49 C.F.R. pt. 195.

[4] *See* 49 U.S.C. § 60502; 49 U.S.C. app. § 1 (1988).

[5] *See* 33 U.S.C. §§ 404, 408, 1344. TC Energy is applying for Section 408 permission for construction under the Missouri River. For other water crossings, it will rely on Nationwide Permit 12, which allows construction of utility lines in U.S. waters "provided the activity does not result in the loss of greater and 1/2 acre of [U.S. waters] for each single and complete project." 82 Fed. Reg. 1860, 1985 (Jan. 6, 2017).

[6] *See* 30 U.S.C. § 185; 43 U.S.C. § 1761 (authorizing Interior Department to grant right-of-way). TC Energy is applying for a right-of-way grant to cross federal land in Montana.

[7] *See* 25 U.S.C. §§ 323, 324 (authorizing Interior to grant right-of-way across land held in trust for Indian tribes or individual Indians).

[8] *See* President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, pt. 1 (Dec. 6, 1875).

[9] *See* Whiteman, *Digest of International Law*, Vol. 9 (1968).

Johnson delegated his authority to issue such permits to State.[10] In 2004, President

George W. Bush refined the process by which State determined whether to issue

such permits.[11] On April 10, 2019, President Trump formally revoked that

delegation and established a new process in which the President again personally

issues or denies permits.[12] Notably, at no time in this long history did these

Presidential actions purport to convey the sweeping authorizations Plaintiffs

attribute to them.  Instead, these Executive Orders made clear that Presidential

permits only authorized "the construction, connection, operation, or maintenance"

of facilities "*at the borders of the United States.*"[13]

### 2.    State Regulation of Oil Pipeline Construction

Many states separately require permits to construct pipeline segments and

facilities within their borders. Montana, South Dakota, and Nebraska—the three

States that Keystone XL will cross—require the approval of a state agency or

---

[10] *See* Executive Order 11423, § 1(a), 33 Fed. Reg. 11,741 (Aug. 20, 1968).

[11] *See* Executive Order 13337, 69 Fed. Reg. 25,299 (May 5, 2004).

[12] *See* Executive Order 13867, 84 Fed. Reg. 15,491, 15,492 (Apr. 15, 2019).

[13] *See* Executive Order 13337, 69 Fed. Reg. 25,299 (emphasis added); *see also* Executive Order 11423, § 1(a), 33 Fed. Reg. 11,741 (same); Executive Order 13867, 84 Fed. Reg. at 15,492 (same, except referring to "the international boundaries of the United States").

official before an oil pipeline can be built in the State.[14] In addition, a pipeline

carrier must acquire any necessary land or easements by negotiating agreements

with landowners or invoking state eminent domain procedures.[15] To date, each of

the three states has approved construction of Keystone XL within its borders.[16]

### B.     Procedural Background

Plaintiffs Indigenous Environmental Network and North Coast Rivers

Alliance (collectively "IEN") originally filed suit against State and other federal

agencies in March 2017 alleging that the federal agencies violated the APA,

NEPA, and other environmental statutes as part of the State's issuance of a 2017

Presidential Permit (2017 Permit) authorizing the transboundary facilities for

---

[14] *See* Mont. Code Ann. § 75-20-201; Neb. Rev. Stat. §§ 57-1405(1), 57-1503; S.D. Codified Laws §§ 49-41B-2, 49-41B-2.1, 49-41B-4

[15] Montana, Nebraska and South Dakota authorize pipeline carriers to acquire property by eminent domain. *See* Mont. Code Ann. § 75-20-113; Neb. Rev. Stat. § 57-1101; S.D. Codified Laws §§ 49-2-12; 49-7-11.

[16] Mont. Dept. of Envtl. Quality, *In the Matter of the Application of TransCanada Keystone Pipeline, LP for a Certificate of Compliance under the Major Facility Siting Act*, at 1 (Mar. 30, 2012); Pub. Util. Comm'n of S.D., *In the Matter of the Petition of TransCanada Keystone Pipeline, LP for Order Accepting Certification of Permit Issued in Docket HP09-001 to Construct the Keystone XL Pipeline*, No. HP14-001, Final Decision and Order Finding Certification Valid And Accepting Certification, at 1-9 (Jan. 21, 2016); Neb. Pub. Serv. Comm'n, *In the Matter of the Application of TransCanada Keystone Pipeline L.P., Calgary, Alberta, seeking approval for Route Approval of the Keystone XL Pipeline Project Pursuant to the Major Oil Pipeline Siting Act*, Application No. OP-0003, Order (Nov. 20, 2017), https://psc.nebraska.gov/sites/psc.nebraska.gov/files/doc/2017.11.20.Final%20Order.pdf, *appeal pending,* No. 17-01331 (Neb.).

Keystone XL. *See Indigenous Envtl. Network v. State,* 4:17-cv-29-BMM ("*IEN I*"), Compl. (Doc. 1) and First Am. Compl. (Doc. 61). The defendants moved to dismiss the complaint, contending that the Court lacked jurisdiction because the APA does not authorize review of presidential actions. *See*, *e.g.*, *IEN I*, Mot. Dismiss (Doc. 44). Defendants argued that, in exercising the President's authority to issue a Presidential Permit, State engaged in presidential, not agency, action. *IEN I*, Mem. In Supp. of Defs.' Mot. for Summ. J. at 6-7 (Doc. 173).

The Court disagreed, and determined that State's issuance of the 2017 Permit constituted agency action that was reviewable under the APA. *See IEN I*, Nov. 22, 2017 Order at 11-15 (Doc. 99); *IEN I*, Aug. 15, 2018 Partial Order on Summ. J. at 9 (Doc. 210). On March 29, 2019, while the appeal of the Court's decisions was pending, the President revoked the 2017 Permit and directly granted a new Presidential Permit for Keystone XL under his own signature. 84 Fed. Reg. 13,101 (Apr. 3, 2019). IEN then filed this suit challenging the new 2019 Permit.

To further clarify the presidential nature of presidential permitting, the President thereafter issued Executive Order 13867, titled "Issuance of Permits With Respect to Facilities and Land Transportation Crossings at the International Boundaries of the United States," on April 10, 2019. This Executive Order makes clear that "[a]ny decision to issue, deny, or amend a [Presidential Permit for a transboundary infrastructure project] . . . shall be made solely by the President."

Executive Order 13867, § 2(i), 84 Fed. Reg. at 15,492. The President also formally

revoked Executive Orders 13337 and 11423. *Id.* § 2(k). Thereafter, the Ninth

Circuit granted defendants' motions to dismiss the appeal in IEN's first suit (and a

similar case) as moot, to dissolve the permanent injunction orders entered in those

cases, and to remand with instructions to dismiss the suits as moot. *See IEN*, No.

18-36068, Dkt. 56 (9th Cir. June 6, 2019).

## III.   LEGAL STANDARD

A motion to dismiss, challenging a court's jurisdiction pursuant to Rule

12(b)(1), may be brought either as a facial attack on the sufficiency of the

pleadings or as a factual attack contesting the complaint's allegations. *See Leite v.*

*Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). In a facial attack, the court

accepts factual allegations as true, as it would in resolving a Rule 12(b)(6) motion.

*Id.*

In deciding a motion to dismiss for failure to state a claim under Rule

12(b)(6), a court assumes the truth of the plaintiffs' allegations. *See Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). A court need not, however, accept the legal

conclusions as true, and a plaintiff must "state a claim to relief that is plausible on

its face." *Id*. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). A court may consider "documents attached to the complaint, documents

incorporated by reference in the complaint, or matters of judicial notice—without

9

converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Plaintiffs' claims against Federal Defendants should be dismissed pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) and Rule 12(b)(6). Plaintiffs have failed to state any cognizable claims. Additionally, this Court lacks jurisdiction over Plaintiffs' claims because any alleged injury is not traceable to the President's issuance of a Presidential Permit.

## IV.   ARGUMENT

### A.   Plaintiffs Lack Standing

Plaintiffs lack standing to raise their claims because they have not identified an actual or imminent injury, nor can they demonstrate that any alleged injury is traceable to the President's issuance of the 2019 Permit.

To invoke the jurisdiction of an Article III court, plaintiffs must establish that they have "standing" to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992). This requires that they suffer an "injury in fact" that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). If an alleged injury is only "threatened," and not "actual," it "must be *certainly impending* to constitute injury in fact." *Id.* (emphasis in

original). "[A]llegations of *possible* future injury are not sufficient." *Id.* (emphasis in original). The Complaint does not satisfy this test.

The Complaint contains numerous allegations of how construction and operation of Keystone XL *could* harm Plaintiffs. *See, e.g.,* Compl. ¶¶ 18-20 (recreational, cultural or religious harms; harms from oil spills). These threatened harms, however, are insufficient to confer standing to challenge the 2019 Permit because they are speculative, "*possible*," but not "*certainly impending*." *Clapper*, 568 U.S. at 409.

In *IEN I*, this Court concluded that similar allegations justified injunctive relief, but it did so in the context of claims under NEPA. Specifically, the Court agreed that (1) State's issuance of a Presidential Permit was a major federal action triggering NEPA analysis; (2) because authorization of the border facilities and the remainder of the pipeline were interconnected, State had to evaluate potential environmental impacts from the entire pipeline; (3) State had failed adequately to assess some of those potential harms; (4) Plaintiffs would therefore be injured if pipeline construction began before those potential harms were fully evaluated, because the "bureaucratic momentum" from construction would skew State's supplemental NEPA analysis.[17] The validity of that conclusion necessarily depends

_____

[17] *See Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV-17-29-GF-BMM, 2019 WL 652416, at *2-11 (D. Mont. Feb. 15, 2019), *rev'd as moot*, No. 18-

on the fact that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring)), and on the assumption that Congress did so in NEPA. Here, and unlike Plaintiffs' earlier efforts, Plaintiffs cannot challenge the 2019 Permit under NEPA, because this new permit was issued directly by the President, and he is not subject to NEPA. *Infra* § IV.C. Without that cause of action, Plaintiffs' alleged harms are too speculative.

Plaintiffs also lack standing because the threatened harms they allege are not caused by the 2019 Permit. Those harms allegedly will result from the construction or operation of Keystone XL along the full pipeline route. But the 2019 Permit only authorizes the construction of pipeline facilities in a 1.2-miles corridor at the U.S./Canada border[18]—an area in which none of the Plaintiffs has expressed an interest. Moreover, because that land is federally managed property, no

---

36068, Order (9th Cir. June 6, 2019); *Indigenous Envtl. Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045, 1049-51 (D. Mont. 2018), *rev'd as moot*, No. 18-36068, Order (9th Cir. June 6, 2019).

[18] It covers "Border facilities," defined as those "appurtenant" to the pipeline segment "from the international border … to and including the first mainline shut-off valve in the United States located approximately 1.2 miles from the international border." 84 Fed. Reg. at 13,101.

construction whatsoever is possible unless and until BLM approves the pending right-of-way application by TC Energy for this project. *See infra* § IV.B.

What is more, the 2019 Permit does not authorize construction or operation through waters of the United States, or other places of significance to Plaintiffs that are protected by federal or state law. Those authorizations have come (or will come) from the other federal and state agencies and local officials with jurisdiction over different parts of Keystone XL. And, because Plaintiffs have no valid NEPA claim, they cannot rely on NEPA's theories of "interconnectedness" to tie those harms to a Presidential Permit that authorizes only the border-crossing. Plaintiffs thus lack standing to challenge the 2019 Permit.

**B.    Count I Fails To State A Claim For Relief Under The Property Clause**

Plaintiffs contend that the President violated the Property Clause of the Constitution by issuing a permit that authorizes TC Energy to construct Keystone XL on federal land at the US-Canadian border, as well as over 45 miles of federal land along the pipeline route. Compl. ¶¶ 51-52. The 2019 Permit, however, does not grant any rights to use or occupy any federal land. It thus cannot violate this provision of the Constitution.

Presidents have long claimed that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for" cross-border facilities. Executive Order 11423, 33 Fed. Reg. 11,741; *see also supra*

p. 5. But the Presidentially-imposed permitting requirement is a requirement *in addition to*, not in derogation of, any and all other applicable federal, state, and local permitting requirements. *See* Executive Order 13337, § 5, 69 Fed. Reg. at 25,301; Executive Order 13867, § 4, 84 Fed. Reg. at 15,493; Executive Order 11423, § 3, 33 Fed. Reg. at 11,742. Thus, in authorizing the construction of Keystone XL facilities in the 1.2-mile border-crossing corridor, the 2019 Permit does not allow TC Energy to use or occupy any federal land without obtaining requisite rights-of-way from BLM for federal land within that corridor (or anywhere else). The 2019 Permit simply addresses the additional permitting hurdle that applies to Keystone XL *because* its facilities will cross the border.

The express terms of the 2019 Permit reflect and confirm this fundamental aspect of Presidential Permits. The 2019 Permit states that TC Energy must obtain "any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate." 2019 Permit, art. 6(1). And as required under the 2019 Permit, TC Energy has applied for such right-of-way grants from BLM in order to construct facilities on federal land within the 1.2 miles of the border as well as the additional 45 miles of federal land beyond the border. Accordingly, Plaintiffs do not—and cannot—state a claim under the Constitution's Property Clause.

14

### C.    Count II Fails To State A Claim For Relief Under The Commerce Clause

Under the guise of a Commerce Clause claim, Plaintiffs appear to advance three related but ultimately distinct theories for why issuance of the 2019 Permit is "*ultra vires*." First, that the President's assertion of power to issue such permits is inconsistent with the Congress's authority to regulate interstate commerce. Second, that Executive Orders 11423 and 13337 constitute a Presidential concession that issuance of Presidential Permits must comply with the APA and environmental laws, and that issuance of the 2019 Permit violated these laws. Third, that issuance of the 2019 Permit prior to the formal revocation of Executive Order 13337 violated that Order. All of these theories are legally meritless.

### 1.    The President Had The Constitutional Authority To Issue The 2019 Permit

Plaintiffs allege that the President's issuance of the 2019 Permit is *ultra vires* because it "conflicts with Congress' *correlative* power to regulate foreign and interstate commerce." Compl. ¶ 60 (emphasis added). But Congress has passed no laws restricting the construction of cross-border oil pipelines. And any separation-of-powers limits on the President's assertion of authority to permit the construction of cross-border facilities for Keystone XL are not contravened because "the views of the Legislative Branch toward such action," *Dames & Moore v. Regan*, 453 U.S.

15

654, 668 (1981), are plainly *supportive* of that action.[19] Plaintiffs' claims of a "conflict" between the respective powers of the Executive and Legislative Branches, Compl. ¶ 60, are thus wholly without foundation.

In all events, this theory of constitutional invalidity is self-defeating. If the President lacked authority to grant a Presidential Permit, that would not give the Court the power to enjoin "any activities in furtherance of the Project that could result in any change or alteration of the physical environment." Compl. at 25-26. It would mean that the President has no role to play in the permitting process, and that Keystone XL could be constructed *without* a Presidential Permit, as long as TC Energy obtains the BLM and Corps permits required under federal law, and any authorizations required under state and local laws.

---

[19] *See* Pub. L. No. 112-78, § 501, 125 Stat. 1280, 1289-90 (2011) (directing Secretary of State to "grant a permit" for Keystone XL within 60 days, unless the President determines it "would not serve the national interest," and mandating that if the President failed to act within 60 days, a permit "shall be in effect by operation of law"). Congress later passed the Keystone Pipeline Approval Act authorizing TransCanada to "construct, connect, operate, and maintain the pipeline and cross-border facilities" for Keystone XL, but President Obama vetoed it. *See* S. 1, 114th Cong. (2015); 161 Cong. Rec. S620, S637-41 (daily ed. Jan. 29, 2015) (Senate passage); 161 Cong. Rec. H947, H947-60 (daily ed. Feb. 11, 2015) (House passage); 161 Cong. Rec. S1073 (daily ed. Feb. 24, 2015) (veto).

2.     **Presidents Have Not Recognized That Issuance Of Presidential Permits Are Subject To The APA Or Environmental Laws, And Issuance Of The 2019 Permit Did Not Violate Those Laws.**

Because they cannot account for *Congress'* actions and inaction, Plaintiffs rely on a supposed *Presidential* "recogni[tion] and respect[] [for] Congress' legislative power over transboundary oil pipelines." Compl. ¶ 61. This recognition, Plaintiffs claim, is demonstrated in Executive Orders 11423, and 13337, which allegedly delegated the President's permitting authority to State *because* it is "an agency that is subject to the laws protecting the environment and governing agency procedure that Congress has enacted." Compl. ¶ 61. Based on this supposed Presidential recognition that the APA and various other laws apply to issuance of Presidential Permits, Plaintiffs assert that the 2019 Permit was issued in violation of these laws.

Plaintiffs' characterization of the earlier Executive Orders is completely untenable. The first of these Orders asserts that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for" cross-border facilities, and it invokes "the authority vested in me as President of the United States and Commander in Chief of the Armed Forces of the United States." Executive Order 11423, 33 Fed. Reg. 11,741. The second Order similarly invokes "the authority vested in me as President by the Constitution and the laws of the United States." Executive Order 13337, 69 Fed. Reg. 25,299. Neither Order

refers to any *obligation* of the President to delegate permitting decisions to State (or any other agency), much less to any need to ensure that issuance of Presidential Permits comply with NEPA or environmental laws.

In fact, the only statute the Orders mention, *see* Executive Order 11423, 33 Fed. Reg. 11,741; Executive Order 13337, 69 Fed. Reg. 25,299, is one that authorizes the President to delegate "any function which is vested in the President by law" to the head of, or any Senate-confirmed official in, a department or agency. 3 U.S.C. § 301. This provision does not *require* any delegations. To the contrary, it expressly provides that any delegation the President chooses to make "shall be revocable at any time by the President in whole or in part." *Id.*

Plaintiffs quote a provision in Executive Order 13337, which states that "[n]othing contained in this order shall be construed to . . . *supersede or replace the requirements established under any other provision of law, or to relieve a person from any requirement to obtain authorization from any other department or agency of the United States Government in compliance with applicable laws and regulations.*" Executive Order 13337 § 5, 69 Fed. Reg. at 25,301 (emphasis added). But this language simply reflects the fact that a Presidential Permit is an additional requirement, and thus does not supersede or replace other permitting requirements that apply to the pipeline (like BLM permitting requirements for use of federal lands, or Army Corps of Engineers approval of river crossings). It is

18

plainly not a recognition that the President *had* to delegate his permitting authority to State to ensure compliance with NEPA or the APA, or that the President himself is subject to these laws if he chooses to issue a Presidential Permit directly.

Indeed, the latter proposition is a legal impossibility. NEPA applies to "agencies of the Federal Government," 42 U.S.C. §§ 4332, 4333, and NEPA regulations define "Federal agency" to exclude "the President." 40 C.F.R. § 1508.12. Similarly, the APA applies to the actions of an "agency," and its definition of that term does not include the President. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Dalton v. Specter*, 511 U.S. 462, 470 (1994) (President's actions "are not reviewable under the APA"). Since these laws do not apply to the President at all, they obviously do not apply when he exercises his inherent authority to issue permits for cross-border facilities.

Thus, the President was not subject to the APA's "reasoned explanation" requirement when he issued the 2019 Permit and therefore could not have violated that requirement. Compl. ¶ 63.[20] Similarly, by issuing the 2019 Permit, he could

_____

[20] Moreover, because the President was not a defendant in the earlier *IEN* case, he could not possibly have violated this Court's order, Compl. ¶ 63, which required State, not the President, to explain why it approved a different permit.

not have violated NEPA and the other federal laws Plaintiffs cite, Compl. ¶ 65, as

none of these laws applies to him.[21]

### 3.    The President Did Not Violate Executive Order 13337

Finally, Plaintiffs allege that the President "violate[d] Executive Order

13337, which expressly requires 'compliance with applicable laws and

regulations.'" Compl. ¶ 64. The part of the Executive Order that Plaintiffs quote,

however, actually says that nothing in the Order "shall be construed … *to relieve a*

*person from any requirement to obtain authorization from any other department or*

*agency of the United States Government in compliance with applicable laws and*

*regulations*." Executive Order 13337 § 5, 69 Fed. Reg. at 25,301 (emphasis

added). This language refers to the obligations of the permit applicant or recipient,

not the issuer of the permit. Indeed, when State issued permits under this Order, it

did not need to "obtain *authorization* from any other department or agency."

Instead, it simply had to solicit and consider the views of specific agencies. *Id*.

More fundamentally, the President cannot violate an Executive Order. An

Executive Order does not bind the President because it can be "withdrawn at any

---

[21] Under *Franklin*, "an express statement by Congress" is required to establish that
a federal law applies to the President. 505 U.S. at 801. No such statement appears,
however, in the statutes Plaintiffs cite. *See* Compl. ¶ 65 (citing Endangered Species
Act, the Clean Water Act, or the Federal Land Policy and Management Act).
Indeed, Plaintiffs do not allege otherwise.

time for any or no reason." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965); *see also Proposals Regarding an Independent Attorney General*, 1 Op. O.L.C. 75, 77 (1977) (President "legally could revoke or supersede [an] Executive order at will"). Given the President's plenary power to withdraw, revoke, or *supersede* an Executive Order, it follows that he need not do so in any particular manner. *See Status of Presidential Memorandum Addressing the Use of Polygraphs*, 2009 WL 153263, at *8 (O.L.C. Jan. 14, 2009) ("the President is generally free to amend or revoke instructions to his subordinates in a form and manner of his choosing"). Here, the President explicitly stated in the 2019 Permit that he was granting it "*notwithstanding Executive Order 13337 of April 30, 2004*." 84 Fed. Reg. at 13,101 (emphasis added). The President therefore plainly superseded Executive Order 13337 when he issued the 2019 Permit, as he was entitled to do. As a matter of law, issuance of the 2019 Permit could not violate that Order.

## V.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint because Plaintiffs lack standing and have failed to state any cognizable claims for relief.[22]

---

[22] Although the Complaint attacks issuance of the 2019 Permit and seeks determinations and declarations that its issuance was "*ultra vires* and of no legal force and effect," Prayer for Relief ¶¶ 1-3, it also names various agencies and agency officials for alleged "violations of Articles I and IV of the United States

DATED this 16th day of July 2019,

/s/ Peter R. Steenland, Jr.
Peter R. Steenland, Jr.
Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (telephone)
(202) 736-8711 (fax)
Email:  psteenland@sidley.com
             pwhitfield@sidley.com


/s/ Jeffery Oven
Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT  59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
            mstermitz@crowleyfleck.com
            jroth@crowleyfleck.com

*Counsel for TransCanada Keystone
Pipeline LP and TC Energy
Corporation*

--------------------------------------------------

Constitution, and the federal environmental laws with which the Project must comply," Compl. ¶ 11. These defendants, however, did not issue the 2019 Permit and Plaintiffs do not allege that they have made any permitting decisions with respect to the Project. Insofar as the Complaint can be understood to state any claim against these defendants, those claims must be dismissed for lack of any final agency action subject to judicial review.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify that this brief is printed in 14-point font, double spaced, and contains 4,888 words, excluding tables, caption, signatures, and certificates of service and compliance.

*/s/ Jeffery J. Oven*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's

CM/ECF system on all counsel of record.

*/s/ Jeffery J. Oven*