MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Ph: (406) 247-4667; Fax: (406) 657-6058
mark.smith3@usdoj.gov

LAWRENCE J. VANDYKE
Deputy Assistant Attorney General

MARISSA A. PIROPATO (MA BAR 65160)
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
marissa.piropato@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, *et al.*,<br><br>　　　　　Defendants. | CV 19-28-GF-BMM<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................3

    I.    The Issuance of Border Crossing Permits .............................3

    II.   The 2017 Presidential Permit for the Keystone XL Pipeline and the Ensuing Litigation ..........................................................4

    III.  The President's Issuance of the March 2019 Permit............................5

    IV.   New Complaint......................................................................6

MOTION TO DISMISS STANDARD...................................................7

ARGUMENT ..........................................................................................7

    I.    Plaintiffs' Failure to Demonstrate Standing Deprives this Court of Jurisdiction .........................................................7

        A.   Plaintiffs fail to demonstrate injury in fact .................8

        B.   Plaintiffs' claims against the President are not redressable......11

    II.   The Claims Against the Agency Defendants Should Be Dismissed Because Plaintiffs Have Failed to Allege Any Legal Violations by the Agencies and Fail to Identify Any Final Agency Actions .................................................................12

    III.  Plaintiffs Fail to Raise a Viable Constitutional Challenge to the Permit .............................................................................14

        A.   The Issuance of a Presidential Permit is Within the Scope of Executive Power .................................................15

            i.    The President Has Broad Executive Powers .................17

            ii.   For Over a Century, Congress Has Never Disputed the Executive's Assertion of Authority Over Cross-Border Permits ..................................................19

              iii.     A Long Line of Precedent Confirms the Executive's Power to Issue the Permit ...............................................20

    B.    Plaintiffs' Property Clause Claim Lacks Merit ........................21

    C.    The Commerce Clause Neither Prohibits nor Conflicts with the Permit ..........................................................................22

    D.    Executive Order 13,337 Cannot Bind the President ................25

CONCLUSION ....................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ................................................................ 18, 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................7

*Chai v. Carroll*,
   48 F.3d 1331 (4th Cir. 1995) .....................................................26

*Chapman v. Pier 1 Imps. (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) .....................................................11

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
   333 U.S. 103 (1948) ............................................................ 17, 28

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................8, 11

*Coons v. Lew*,
   762 F.3d 891 (9th Cir. 2014) .......................................................8

*Dalton v. Specter*,
   511 U.S. 462 (1994) ............................................................ 24, 27

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...................................................................17

*Dep't of Army v. Blue Fox Inc.*,
   525 U.S. 255 (1999) ...................................................................24

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ...................................................................27

*Foreign Cables*,
   22 Op. Att'y Gen. 13 (1898) ......................................................23

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ............................................................ 24, 25

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ..........................................................................8

*Haig v. Agee*,
   453 U.S. 280 (1981) ........................................................................19

*In re Surface Mining Regulation Litig.*,
   627 F.2d 1346 (D.C. Cir. 1980) ......................................................26

*Indep. Meat Packers Ass'n v. Butz*,
   526 F.2d 228 (8th Cir. 1975)...........................................................26

*Kansas v. Colorado*,
   206 U.S. 46 (1907) .................................................................... 21, 22

*Kaplan v. Corcoran*,
   545 F.2d 1073 (1976) ......................................................................19

*Land v. Dollar*,
   330 U.S. 731 (1947) ..........................................................................7

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .....................................................................9, 13

*Manhattan-Bronx Postal Union v. Gronouski*,
   350 F.2d 451 (D.C. Cir. 1965) ........................................................25

*Mo. ex rel. Koster v. Harris*,
   847 F.3d 646 (9th Cir. 2017)...........................................................11

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*,
   658 F. Supp. 2d 105 (D.D.C. 2009) .......................................... 18, 21

*Newdow v. Bush*,
   391 F. Supp. 2d 95 (D.D.C. 2005) ..................................................12

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*,
   457 F.3d 941 (9th Cir. 2006)...........................................................13

*Rattlesnake Coal. v. EPA*,
   509 F.3d 1095 (9th Cir. 2007)..........................................................14

*Sierra Club v. Clinton*,
   689 F. Supp. 2d 1147 (D. Minn. 2010) ........................................4, 20

iv

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State*,
   659 F. Supp. 2d 1071 (D.S.D. 2009)......................................................................20

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ..........................................................................................8

*Springer v. Philippine Island*,
   277 U.S. 189 (1928) ............................................................................................17

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................9, 10

*Swan v. Clinton*,
   100 F.3d 973  (D.C. Cir. 1996) ...................................................................... 11, 12

*Thompson v. McCombe*,
   99 F.3d 352 (9th Cir. 1996)..................................................................................7

*United States v. Curtiss–Wright Export Corp.*,
   299 U.S. 304 (1936) ............................................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................ 16, 18, 20

*Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015) ........................................................................................16

*Zixiang Li v. Kerry*,
   710 F.3d 995 (9th Cir. 2013)................................................................................7

**Constitutions**

U.S. Const. art. II, § 1, cl. 1 ....................................................................................25

U.S. Const. art. II, § 3 .............................................................................................25

**Statutes**

5 U.S.C. § 702..........................................................................................................13

5 U.S.C. § 704..........................................................................................................13

5 U.S.C. §§ 701-706.................................................................................................13

16 U.S.C. § 1540(g)(1)(A).......................................................................................24

33 U.S.C. § 1365(a) .................................................................................................24

42 U.S.C. §§ 4332-4333 ..........................................................................................24

**Rules**

Fed R. Civ. P. 12(b)(1)...............................................................................7

**Regulations**

40 C.F.R. § 1508.12 ...............................................................................24

33 Fed. Reg. 11,741 (Aug. 20, 1968)...................................................4

69 Fed. Reg. 25,299 (Apr. 30, 2004) ....................................................4

84 Fed. Reg. 13,101 (Mar. 29, 2019)....................................................2

**Other Authorities**

44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1 (1875)..............................4

Green H. Hackworth, *Digest of International Law*, Vol. IV, § 350 (1942) ..............4

Marjorie E. Whiteman, *Digest of International Law*, Vol. 9 (1968)........................4

## INTRODUCTION

Plaintiffs challenge the decision of the President of the United States to issue a Permit allowing the Keystone XL Pipeline to cross the border from Canada into the United States.  Plaintiffs' challenge is based on a blatant mischaracterization of what the Permit actually does (and what it does not do), joined with a grossly lopsided view of the Constitution's allocation of authority between the President and Congress (essentially, that Congress has it all and the President has none). Putting aside Plaintiffs' overstatement, and acknowledging the President's inherent authority as evinced by both precedent and history, this is not a hard case.  The President's authority to issue a border-crossing Permit is well-established, that authority is not subject to judicial second-guessing, and Plaintiffs cannot plausibly argue any injury from the issuance of this Permit in any event.

First, in order to help with their standing problem and create a supposed constitutional conflict between the President and Congress, Plaintiffs engage in linguistic gymnastics to interpret the Permit as somehow "authoriz[ing] the balance of the 875-mile-long [] Project."  First Amended Compl. for Declaratory, Injunctive & Mandamus Relief ¶ 10, ECF No. 37 ("Compl.").  It does not.  The *border crossing* Permit on its own terms applies only to the "facilities *at the international border*;" it does not purport to somehow eliminate any requirements of federal or state law for the "*entire* 875-mile-long Project."  *Id.* ¶¶ 10-11. This

1

false assumption by Plaintiffs is fatal to their standing as their claimed injuries are tethered to the construction of the "the balance of the 875-mile long" pipeline far from the border crossing, not to the crossing itself. *Id*. ¶ 10.

Plaintiffs make a second false assumption that is similarly fatal to their constitutional claims: they assume that the border crossing Permit somehow eliminates TC Energy's requirement to comply with other federal laws passed by Congress. Again, this is wishful thinking. The Permit itself certainly does not purport to eliminate any additional federal or state requirements; quite the opposite, it affirmatively acknowledges that TC Energy remains "responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate." Authorizing TransCanada Keystone Pipeline Permit Art. 6(1), 84 Fed. Reg. 13,101 (Mar. 29, 2019) ("Permit); *see also id.* at art. 1(2) (noting that the construction of the "Facilities" must be "consistent with applicable law"). This is true even for the 1.2-mile portion of the pipeline actually covered by the Permit. *Id.* at 1. The idea that BLM, for example, is simply going to ignore applicable laws at some point in the future is baseless speculation.

Plaintiffs' Complaint thus sets up a false conflict between Congress's enumerated powers and the President's independent authority. And notwithstanding the absence of any regulatory involvement in the issuance of the challenged Permit, Plaintiffs also name a host of executive branch agencies and

2

officials as additional defendants, further evincing their erroneous view of executive branch authority, as well as their misconception of what the challenged border-crossing Permit actually does.

Plaintiffs' challenge to the Permit should be dismissed because this Court lacks jurisdiction and Plaintiffs' claims are without merit.  The law is clear that injunctive relief against the President is unavailable.  Plaintiffs fail to identify any actions taken by the Agency Defendants, and therefore all claims against the Agency Defendants must independently be dismissed for failure to state a claim and lack of final agency action.

The President appropriately exercised his Article II authority in issuing the border-crossing Permit.  Plaintiffs' argument to the contrary has no basis in law, is inconsistent with historical practice, and is contrary to the Constitution's shared allocation of authority between the two political branches.  For these reasons, as set further below, this Court should grant the United States' motion to dismiss.

## BACKGROUND

## I.     The Issuance of Border Crossing Permits.

The President's authority to issue a permit for border crossing facilities, including pipelines, derives from his independent constitutional authority over foreign affairs and national security.  For over a century, Presidents have exercised that inherent authority to authorize border crossing facilities without Congressional

action.  *See* Ex. 1, Green H. Hackworth, *Digest of International Law*, Vol. IV, §

350, at 247-56 (1942); Ex. 2, President Ulysses Grant's Seventh Annual Message

to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United

States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1 (Dec. 6, 1875); *Sierra

Club v. Clinton*, 689 F. Supp. 2d 1147, 1163 (D. Minn. 2010).  Long before they

delegated their permitting authority, Presidents personally signed and issued

permits for border crossing facilities.  *See* Ex. 3, Marjorie E. Whiteman, *Digest of

International Law*, Vol. 9, at 917-21 (1968).  This practice continued through the

1960s.  *Id.*  Plaintiffs' contentions that the President's permitting authority is

somehow either dependent on congressional authority or requires agency

participation runs headlong into over a century of practice.

In 1968, President Lyndon B. Johnson issued Executive Order 11,423,

which delegated to the Secretary of State the President's constitutional authority to

issue permits for border crossing facilities, including oil pipelines.  *See* Exec.

Order No. ("EO") 11,423 § 1(a), 33 Fed. Reg. 11,741 (Aug. 20, 1968).  In 2004,

President George W. Bush issued Executive Order 13,337, which revised this

delegation of authority with respect to oil pipelines.  EO 13,337 § 1(a), 69 Fed.

Reg. 25,299 (Apr. 30, 2004).

## II.    The 2017 Presidential Permit for the Keystone XL Pipeline and the Ensuing Litigation.

In March 2017, acting under the Constitutional authority of the President

delegated to the Secretary of State in Executive Order 13,337, the Under Secretary for Political Affairs issued the 2017 Keystone XL Permit.  Two sets of Plaintiffs challenged this decision.  *See Indigenous Envtl. Network v. U.S. Dep't of State*, No. 4:17-cv-29-BMM (D. Mont. filed Mar. 27, 2017); *N. Plains Res. Council v. Shannon*, No. 4:17-cv-31-BMM (D. Mont. filed Mar. 30, 2017).  The Court vacated the Under Secretary's decision, and enjoined any actions in furtherance of the construction of the pipeline but later clarified that injunction to allow TC Energy to undertake limited preparatory work.  *See* Order, *Indigenous Envtl. Network v. U.S. Dep't of State*, No. 4:17-cv-29-BMM (D. Mont. Nov. 8 and Dec. 7, 2018) (ECF Nos. 218 and 231).

### III.    The President's Issuance of the March 2019 Permit.

On March 29, 2019, the President himself issued a new Permit expressly superseding and revoking the permit issued by the Under Secretary in 2017.  *See* Permit at 1.  The President issued the Permit pursuant to the "authority vested in [the President] as President of the United States of America."  *Id.*  The Permit authorizes TC Energy to cross the international border for the purposes of construction and operation of pipeline facilities in an approximately 1.2-mile segment from the Canadian border to the first mainline shutoff valve in the United States.  *Id.* The Permit also specifies that "[t]he permittee is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations

as may become necessary or appropriate." *Id.* at 2 (Article 6).

## IV.   New Complaint

Just one week after the President issued the Permit, Plaintiffs filed this new suit challenging the Permit and then amended their Complaint on July 18. Plaintiffs' new Complaint raises two constitutional claims, alleging that the President's issuance of the Permit infringes on Congress's authority pursuant to the Property Clause and Commerce Clause of the United States Constitution. *See* Compl. ¶¶ 63-68, 70-78.  The Complaint also alleges that the Permit violates Executive Order 13,337. *Id.* ¶¶ 79-88.  The Prayer for Relief seeks a declaration that the President's actions in issuing the Permit violated the Property Clause, the Commerce Clause, and Executive Order 13,337.  Prayer for Relief ¶¶ 1-5.

Although Plaintiffs do not challenge any actions taken by the Department of State, the Army Corps of Engineers, the United States Fish and Wildlife Service, or the United States Bureau of Land Management, Plaintiffs have named as defendants those agencies and certain of their officials.  *See* Compl. ¶ 21.  And Plaintiffs asks this Court to enjoin *all* defendants from initiating any activities in furtherance of the pipeline that could result in any change to the physical environment.

## MOTION TO DISMISS STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint may be dismissed for lack of subject matter jurisdiction. The plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). When considering jurisdictional challenges, no presumption of truthfulness attaches to the plaintiff's allegations. *Id.* The district court "ha[s] authority to consider questions of jurisdiction on the basis of affidavits as well as the pleadings." *Land v. Dollar*, 330 U.S. 731, 735 (1947).

In contrast, "[d]ismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (citation omitted). A court evaluates Rule 12(b)(6) motions to dismiss under the familiar standards articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## ARGUMENT

### I.   Plaintiffs' Failure to Demonstrate Standing Deprives this Court of Jurisdiction.

Plaintiffs' Complaint should be dismissed for lack of standing. To demonstrate standing to sue, a plaintiff must show: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  Where, as here, standing is addressed at the pleading stage, "the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration in original) (citation omitted).  Plaintiffs failed to do so here and the complaint should be dismissed.

> ### A.    *Plaintiffs fail to demonstrate injury in fact.*

Plaintiffs' standing analysis fails at the threshold: they do not allege imminent, concrete, and particularized harm to their members.  Plaintiffs' "'threatened injury must be certainly impending to constitute injury in fact,'" and "[a]llegations of possible future injury are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *Coons v. Lew*, 762 F.3d 891, 898 (9th Cir. 2014). Plaintiffs cannot make this showing.

Plaintiffs fail to establish any concrete and particularized injury from the Permit.  It is particularly telling that in order for Plaintiffs to allege any injury in this case, they are forced to exaggerate what the challenged Permit actually does. Plaintiffs take language from the Permit out of context and wrongly assume that the reference to "pipeline facilities at the international border" is the logical

equivalent of the *entire* Project.  *See* Compl. ¶¶ 10-13.  That is because Plaintiffs

cannot allege any plausible injury from the part of the pipeline actually addressed

by the Permit—the 1.2 mile section of pipeline at the border crossing—and even

that is contingent upon further action by BLM for most of those 1.2 miles.  Instead,

they vaguely assert that they have members who have and intend to engage in

activities on lands and waters "within and adjacent to the proposed route of the

Project," *id*. ¶¶ 28-29, which they have defined as "an 875-mile long pipeline and

related facilities." *Id.* ¶ 1.

Plaintiffs fail to tether any of their alleged harms to the portion of the

proposed pipeline at the border crossing, which is the only area of the proposed

route the Permit addresses.  *See Id*. ¶¶ 28-29.  It is not enough that Plaintiffs'

members reside somewhere in the states along the "proposed route of the Project,"

or that they may use resources impacted somewhere by the 875-mile long pipeline.

*See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887-89 (1990) ("bare allegation of

injury" that plaintiff used land "in the vicinity" of the action failed to show

standing) (citation omitted).  They must allege a concrete and particularized harm

for the area covered by the Permit—the one-mile stretch at the border between the

United States and Canada.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 495

(2009).  In an attempt to circumvent their standing problem, Plaintiffs vaguely

allege harm from the "construction and operation of the Project," including the

"first 1.2 miles" at the border.  Compl. ¶¶ 28-30.  But the Permit does not authorize the Project or an 875-mile long pipeline.  It authorizes a border crossing within the first 1.2 miles of the pipeline contingent upon compliance with other applicable laws.  Plaintiffs' unsupported and conclusory reference to injuries at the border itself does not change the fact that the injuries Plaintiffs allege relate entirely to other areas along the pipeline route—not the border segment.  Vague allegations about hypothetical harms arising from the possible "construction and operation" of "the balance of the 875-mile-long" pipeline sometime down the road, and assuming various agencies issue additional approvals, do not demonstrate a legally-cognizable injury.

Moreover, none of the complained of proposed activities—let alone any injuries that might result—meet *Clapper*'s "certainly impending" requirement. Citing general concerns about pollution and oil spills, Plaintiffs fail to allege that any of their injuries are "certainly impending," but rather allege that the Project— in the future, assuming later approvals of other parts of the pipeline—might impair their enjoyment of the lands adjacent to the 875-mile pipeline route.  *Id*. ¶¶ 28-30. The Permit itself addresses barely over $1/10^{th}$ of 1% of that route.  There are several predicate steps that must occur before the entire Project could become operational.  TC Energy cannot construct and operate the "balance of the 875-mile-long project," or even the border segment, until applicable federal agencies have

completed their environmental review and permitting processes regarding certain
aspects of the pipeline, which could result either in the pipeline not being built or
in the modification of the pipeline in ways that might conceivably *avoid or
decrease the likelihood of* any injuries alleged in the complaint.  Among the
predicate steps is BLM's approval of TC Energy's application for a right-of-way
grant—in compliance with the National Environmental Policy Act ("NEPA") and
other applicable statutes—where the pipeline traverses federal lands (including
most of the 1.2 mile portion covered by the Permit).  *See, e.g., Missouri ex rel.
Koster v. Harris*, 847 F.3d 646, 654 (9th Cir. 2017) (noting the Supreme Court has
been "reluctant to endorse standing theories that require guesswork as to how
independent decisionmakers will exercise their judgment") (quoting and citing
*Clapper*, 568 U.S. at 413).  Under these circumstances, Plaintiffs cannot plausibly
allege an *imminent* injury in fact.  *Chapman v. Pier 1 Imps. (U.S.) Inc*., 631 F.3d
939, 954 (9th Cir. 2011).

> **B.** ***Plaintiffs' claims against the President are not redressable.***

Plaintiffs' requested equitable relief against the President fails because they
have not—and cannot—establish that declaratory and injunctive relief would
redress their injuries, or that the Court is likely to award such relief in violation of
governing separation of powers principles.  It would be improper to grant equitable
relief against the President here.  *See, e.g.*, *See Swan v. Clinton*, 100 F.3d 973, 976

n.1  (D.C. Cir. 1996) (noting that injunction against the President would present

separation of powers problems, and that "similar considerations regarding a court's

power to issue relief against the President himself apply to Swan's request for a

declaratory judgment"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C.

2005) (same).  By seeking a declaration that the President's actions have "no legal

force and effect," Prayer for Relief ¶¶ 1-3, Plaintiffs are asking the Court to render

ineffective the President's exercise of his foreign affairs and Commander-in-Chief

powers.  Plaintiffs' request thus raises precisely the separation of powers concerns

that animated courts to insulate the President from equitable relief.  *See Swan*, 100

F.3d at 976.  Even if Plaintiffs could point to some injury in fact from the border

Permit, their injuries could not be redressed by the injunctive or declaratory

remedies they seek against the President.  Plaintiffs' claims against the President

are thus doubly defective and should be dismissed.

## II.     The Claims Against  the Agency Defendants Should Be Dismissed Because Plaintiffs Have Failed to Allege Any Legal Violations by the Agencies and Fail to Identify Any Final Agency Actions.

None of Plaintiffs' claims actually challenge any action taken by the Agency

Defendants.  And nothing in the border crossing Permit purports to relieve the

Agency Defendants of any legal obligation.  To the contrary, the Permit expressly

requires TC Energy and federal agencies to act "consistent with applicable law."

Permit, Art. 1(2); *see also id.* at art. 6(1).  That alone is reason enough to dismiss

the Agency Defendants from this case; because the Complaint fails to allege any violation of law, or any abdication of a legal duty by any Agency Defendant, the portions of the Complaint addressing those Defendants must be dismissed for failure to state a claim.

The Agency Defendants should also be dismissed for lack of final agency action because the Complaint fails to identify any final agency action taken by the Agency Defendants.  The statutes that Plaintiffs claim have been violated do not provide a private right of action.  *See*, *e.g.*, *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006) (NEPA provides no right of action).  Therefore, Plaintiffs' claims against the agencies may proceed only in accordance with the APA, 5 U.S.C. §§ 701-706.  Section 702 of the APA provides a right of action for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]"  5 U.S.C. § 702.  It also provides a waiver of sovereign immunity for such actions.  *Id.*  In order to bring suit under the APA, however, a person must challenge an "[a]gency action made reviewable by statute and final agency action for which there [otherwise] is no adequate remedy in a court[.]"  5 U.S.C. § 704.  Thus, in order to assert claims arising from a statute against an agency under the APA, a party must challenge "agency action" within the meaning of the APA and that action must be a "final agency action."  *Lujan*, 497 U.S. at 882-83.

13

Plaintiffs' complaint refers to State, the Corps, FWS, and BLM, but the Complaint fails to identify any allegedly unlawful action taken by any of the Agency Defendants.  Compl. ¶¶ 73-74.  Accordingly, the claims against the Agency Defendants must be dismissed for lack of final agency action.  *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007).  Further, to the extent that Plaintiffs focus their claims on activities at the border crossing, any claims against BLM are not ripe because BLM has not yet reached a decision regarding a right-of-way.  *See* Order at 2, *Indigenous Envtl. Network v. U.S. Dept. of State*, No. 4:17-cv-29-BMM (D. Mont. Nov. 15, 2018) (ECF No. 219).

**III.    Plaintiffs Fail to Raise a Viable Constitutional Challenge to the Permit.**

To the extent the Court determines it has Article III jurisdiction over Plaintiffs' constitutional claims, it should dismiss those claims pursuant to Rule 12(b)(6).  Plaintiffs' two constitutional claims fail at the threshold because they depend on a cramped view of Executive power that is contrary to historical practice and precedent.  It is well established that the President's Article II power encompasses the authority to control border crossings into the United States.  For close to 150 years, Presidents have exercised authority over a wide range of physical connections between the United States and foreign countries pursuant to the President's powers over foreign affairs and as Commander in Chief.  Unlike in other areas where the Executive Branch receives its authority from laws

14

enacted by Congress, the President has never required a grant of authority from Congress to control border crossings.  And Congress has not disputed this.

Plaintiffs' constitutional claims also fail because neither the Property Clause nor the Commerce Clause explicitly constrain Presidential authority in the manner advanced by Plaintiffs.  If they did, the President would not have acted otherwise for more than a century with Congress's acquiesce.  Even assuming that Congress *could* use its Property or Commerce Clause powers to constrain the President's independent authority over foreign affairs, it has not done so.  There is no evidence that Congress intended any of the statutes cited by Plaintiffs, *see, e.g.* Compl. ¶ 64, to constrain the *President's* foreign affairs power, which is why courts have routinely held that the APA, for example, does not apply to the President.  Lastly, Plaintiffs' argument that the President is bound by previous executive orders is legally baseless.

### A. *The Issuance of a Presidential Permit is Within the Scope of Executive Power.*

Plaintiffs' challenge to the Permit turns on their view of Presidential power—and it is an exceedingly crabbed view unrecognizable in either historical practice or legal precedent.  A long line of cases confirms that the President possesses inherent constitutional authority to approve cross-border permits—an authority that Congress has not challenged in connection with Keystone XL.  Justice Jackson's three-part test from his concurrence in *Youngstown Sheet & Tube*

*Co. v. Sawyer*, provides the general framework for assessing a challenge to the exercise of Presidential power.  343 U.S. 579, 635-38 (1952) (Jackson, J. concurring).  *See, e.g., Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015).  First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635. Second, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain."  *Id*. at 637.  In this area, "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent Presidential responsibility."  *Id*.  And, "any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law."  *Id*.  Third, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject."  *Id*. at 637-38.

The Supreme Court has cautioned that while the *Youngstown* categories provide a useful analytical framework for evaluating executive action, "it is doubtless the case that executive action in any particular instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition." *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981); *see also id.* ("'[t]he great ordinances of the Constitution do not establish and divide fields of black and white'") (quoting *Springer v. Philippine Island*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting)).

Along this spectrum, this case falls safely within the first or second *Youngstown* categories for several reasons: (a) the President was acting pursuant to his independent constitutional authority; (b) Congress has long accepted the presidential authority over border crossing facilities; and (c) a long line of precedent affirms the President's powers.

i.   <u>The President Has Broad Executive Powers.</u>

The President's authority to issue the permit is rooted in his powers over foreign affairs and as Commander-in-Chief.  The President possesses inherent constitutional responsibility for foreign affairs.  *See, e.g., Chicago & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as

Commander–in–Chief and as the Nation's organ in foreign affairs"); *Youngstown,* 343 U.S. at 635–636, n. 2 (Jackson, J., concurring) (the President can "act in external affairs without congressional authority") (citing *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304 (1936); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations'") (quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)).  Thus, the President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."  *Curtiss–Wright Export Corp.*, 299 U.S. at 320; *Youngstown*, 343 U.S. at 635-36 n. 2 (the President can "act in external affairs without congressional authority").

A natural corollary of the President's foreign affairs powers is the authority to permit international border crossings.  Formal opinions by the Attorney General for more than one hundred years have recognized the President's independent permitting authority at the international border.  *See infra* at 24.  And "there is no statute that curtails or otherwise governs the President's discretion to issue presidential permits."  *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 112 (D.D.C. 2009); *Id*. at 109 ("Defendants have amply documented the long history of Presidents exercising their inherent foreign affairs power to

issue cross-border permits, even in the absence of any congressional
authorization.").

      ii.     <u>For Over a Century, Congress Has Never Disputed the
Executive's Assertion of Authority Over Cross-Border Permits.</u>

Congress has acquiesced to this long-standing practice.  In the nearly one
and a half centuries of executive exercise of authority over a wide range of cross-
border facilities, Congress has never questioned or sought to cabin the President's
authority.  Instead, it has either explicitly affirmed the Executive's authority over
specific types of border crossing facilities or has remained silent and thereby
accepted that authority.  *Kaplan v. Corcoran*, 545 F.2d 1073, 1077 (1976) ("Since
the promulgation of Executive Order 10096 on January 23, 1950, there has been
Congressional acquiescence in the order by the failure of Congress to modify or
disapprove it.").  As the Supreme Court has said, "[g]iven the President's
independent authority 'in the areas of foreign policy and national security . . .
congressional silence is not to be equated with congressional disapproval.'"
*Garamendi*, 539 U.S. at 429 (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)).

The President's claim of authority over border crossing facilities thus falls
within the first *Youngstown* category, where the President has acted pursuant to his
own independent powers *and* with the express or implied authorization of
Congress.  Even if it did not, the most that could be said is that the President's
border crossing authority falls within the second *Youngstown* "zone of twilight"

19

category, where the concurrent and unspecified distribution of powers between the Executive and Congress has been ratified in favor of the President's exercise through longstanding practice and congressional acquiescence. *See Youngstown*, 343 U.S. at 635, 637. Either way, Plaintiffs' claim that the President lacked authority to issue the border crossing Permit challenged in this case cannot be taken seriously.

      iii.    <u>A Long Line of Judicial Precedent Confirms the Executive's Power to Issue the Permit.</u>

Courts have universally recognized the President's powers to issue cross-border permits. In *Sierra Club v. Clinton*, plaintiffs challenged a pipeline border crossing permit and the district court concluded that it is "well recognized" that "the President's authority to issue" border crossing permits "comes by way of his constitutional authority over foreign affairs and authority as Commander in Chief." 689 F. Supp. 2d at 1162–63. The court also emphasized that "Congress has not attempted to exercise any exclusive authority over the permitting process" despite the many permits issued by past Presidents—that "inaction suggests that Congress has accepted the authority of the President to issue cross-border permits." *Id*. at 1163.

The *Sierra Club* decision followed two district court decisions likewise affirming the President's authority to issue a cross-border permit in connection with earlier iterations of the Keystone Pipeline. *Sisseton-Wahpeton Oyate v. U.S.*

20

*Dep't of State*, 659 F. Supp. 2d 1071, 1078 (D.S.D. 2009) (noting that, even if the permit were set aside, "the President would still be free to issue the permit again under his inherent Constitutional authority to conduct foreign policy on behalf of the nation."); *Nat. Res. Def. Council*, 658 F. Supp. 2d at 109 (same). Plaintiffs' allegations that the President lacked authority to issue the Permit is squarely at odds with this established precedent recognizing the President's inherent constitutional authority to do so.

### B.   Plaintiffs' Property Clause Claim Lacks Merit.

Plaintiffs assert that the President lacks authority to issue the permit because the Property Clause of the Constitution vests only Congress with the power to regulate and dispose of federal lands, and the Permit authorizes construction of pipeline facilities on land that Congress has directed BLM to manage, but without BLM approval. Compl. ¶¶ 63-67. This claim fails for at least two reasons.

*First*, as a threshold legal matter, the Complaint's focus on the Property Clause and BLM-managed lands elides the scope of the Permit: an international border crossing, not the "balance of the 875-mile-long Project." Compl. ¶ 10. The executive action before this Court is a cross border permit, not a right-of-way on domestic lands or other agency authorization to allow the proposed pipeline to cross federal lands. And the Property Clause does not somehow nullify the President's well-established foreign affairs power. *Kansas v. Colorado*, 206 U.S.

21

46, 89 (1907) (addressing *Article IV Section 3*: "Primarily . . . it is a grant of power

to the United States of control over its property.).

*Second*, if Plaintiffs' argument is that the Permit improperly supersedes or

otherwise overrides BLM's permitting process, Compl. ¶¶ 62-64, that is a claim at

once both inaccurate and premature.  The Permit is explicit that it does not

supplant other necessary authorizations, noting that "[t]he permittee is responsible

for acquiring any right-of-way grants or easements, permits, and other

authorizations as may become necessary or appropriate."  Permit, Art. 6(1).  The

permit thus does not relieve TC Energy of the duty to acquire "right-of-way grants

or easements, permits and other authorizations" required by law.  *Id*. TC Energy

would still need to obtain the requisite authorizations from BLM for the parts of

the pipeline that traverse federal lands, including a right-of-way over the federally

owned land within the 1.2-mile stretch covered by the border crossing Permit.  And

before it authorizes any activities on the land it manages, BLM would have to

assure itself that it complies with all applicable federal statutes.  Compl. ¶ 67.

Plaintiffs have no basis for contending that the Permit improperly displaces BLM's

regulatory authority or otherwise violates any federal statute.

   **C.     The Commerce Clause Neither Prohibits nor Conflicts with the
           Permit.**

Plaintiffs also contend that the President lacks authority to issue the Permit,

and that doing so infringed on Congress's authority under the Commerce Clause,

because it was issued without compliance with various environmental and other statutes that Congress has made applicable to agency action.  Here again, Plaintiffs are forced to grossly exaggerate what the Permit actually does in order to attack it. The Permit is an authorization to cross the international border; it does not exempt TC Energy or federal agencies from complying with federal statutes relevant to that border segment, much less other parts of the 875-mile-long pipeline.  The Permit is explicit that the permittee must acquire all necessary authorizations. Permit, Art. 6(1).  Therefore, the Permit neither conflicts with any laws enacted by Congress pursuant to its Commerce Clause authority nor otherwise arrogates that authority.  *See* Compl. ¶ 70.

To the extent Plaintiffs contend that the President's authorization of a border crossing itself infringes on Congress's authority under the Commerce Clause, this too is incorrect because, as discussed above, the President does not need legislation to act in this area.  Indeed, Plaintiffs assume that Presidents did not previously secure border crossings.  Compl. ¶ 71.  This is historically inaccurate.  The President first authorized border crossings because foreign countries and entities were undertaking cross-border projects without securing permission from the United States.  The President's exercise of independent authority, in the absence of Congressional action, is not only allowed but required to protect our territorial integrity.  Foreign Cables, 22 Op. Att'y Gen. 13, 13 (1898) ("The preservation of

our territorial integrity and the protection of our foreign interest is entrusted, in the first instance, to the President.").

Plaintiffs' argument that the President's issuance of the Permit runs afoul of "federal environmental and procedural laws . . . including FLPMA, NEPA, the ESA, the CWA and the APA" is also baseless because these laws explicitly do not apply to the President[1] and there is no viable waiver of sovereign immunity that would allow judicial review of the President's issuance of the Permit.  Compl. ¶ 74.  While the APA provides a general right of action that enables aggrieved persons to seek judicial review of agency action under NEPA and FLPMA, the President's actions are not subject to review under the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that, because "the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements"); *Dalton v. Specter*, 511 U.S. 462, 470 (1994) ("actions of the President . . .  are not reviewable under the APA").

Similarly, although the Endangered Species Act and Clean Water Act citizen suit provisions provide a waiver of sovereign immunity for persons seeking to enforce the terms of those acts, 16 U.S.C. § 1540(g)(1)(A), 33 U.S.C. § 1365(a), (g), those waivers must be narrowly construed, *see Department of Army v. Blue*

---

[1] NEPA applies to federal agencies, and NEPA's regulations define the term "Federal agency" to exclude "the President." 42 U.S.C. §§ 4332, 4333; 40 C.F.R. § 1508.12.

24

*Fox Inc.*, 525 U.S. 255, 261 (1999), and in this case neither statute explicitly waives sovereign immunity for suits against the President.  *See Franklin*, 505 U.S. at 800-01 ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President" to a statute.).

### D.     Executive Order 13,337 Cannot Bind the President.

Plaintiffs allege that the President lacks authority to issue the Permit because it violated Executive Order 13,337.  Compl. ¶ 80.  Here, President Trump expressly stated that he was issuing this Permit "notwithstanding Executive Order 13,337 of April 30, 2004."  Permit at 1.  Plaintiffs therefore base their challenge on the theory that once a President issues an Executive Order delegating the President's inherent constitutional authority to an agency, that Executive Order binds successive Presidents in their exercise of their constitutional powers.  But any such notion is clearly wrong.  Executive orders cannot bind future Presidents.

An executive order cannot constrain the President because it can be "withdrawn [by the President] at any time for any or no reason."  *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).  The President's broad authority to revisit, reverse, and undo prior decisions of the Executive Branch is inherent in the powers of the office vested by the Constitution. U.S. Const. art. II, § 1, cl. 1; *id.*, § 3 (the President "shall take Care that the Laws

be faithfully executed").  The President's authority to undo or modify prior Executive decisions is intrinsic in the executive power because the President is politically accountable for executing the laws.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010).  "Without such power" to modify or undo past decisions of the Executive Branch, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514.

Against this legal backdrop, Plaintiffs' attempt to enforce the requirements of Executive Order 13,337 against President Trump is futile.  Executive Order 13,337 expressly states that it was not intended to create any legal rights. EO 13,337 § 6.  In addition, the executive order was issued solely pursuant to the President's inherent constitutional authority—not statutory authority—and therefore the requirements of the executive order cannot be enforced in a private lawsuit.  *See Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 236 (8th Cir. 1975); *see also Chai v. Carroll*, 48 F.3d 1331, 1338-40 (4th Cir. 1995); *In re Surface Mining Regulation Litig*., 627 F.2d 1346, 1357 (D.C. Cir. 1980).

Because Executive Order 13,337 binds only the Secretary of State, a presidential permit issued by the President is not required to contain a "national interest" determination.  That does not mean, however, that TC Energy will proceed without federal agency regulation and oversight to ensure compliance with

various environmental and other statutes that Congress has made applicable to *agency action*. The Permit is an authorization to cross the international border; it does not exempt TC Energy or federal agencies from complying with federal statutes throughout the entire 875-mile-long pipeline, including at the border segment. Indeed, the Permit is explicit that the permittee must acquire all necessary authorizations. Permit, Art. 6(1). Any suggestion by Plaintiffs that the Permit allows the President—and, by extension, TC Energy—to sidestep judicial review, is unfounded.

Nor can Plaintiffs leverage the APA to require the President to provide a "reasoned explanation" for "his abrupt reversal of former Secretary of State John Kerry's" denial of a border crossing permit. Compl. ¶ 76. The APA requires that *federal agencies* provide a reasoned explanation when they reverse position, *Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), but the President is not a federal agency and, as discussed above, the APA does not apply to his actions. Rather, the Executive's policy choices are "beyond the competence of the courts to adjudicate." *Dalton*, 511 U.S. at 475-76. Presidents routinely reverse the policies of their predecessors without having to provide a "reasoned explanation." "[T]he very nature of executive decisions as to foreign policy is political, not judicial. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been

held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines*, 333 U.S. at 111.

Plaintiffs' attempts to enforce Executive Order 13,337 against the President are therefore without merit.

## CONCLUSION

For the reasons stated herein, this Court should dismiss this suit pursuant to Rules 12(b)(1) and 12(b)(6).

Respectfully submitted this 1st day of August, 2019,

LAWRENCE J. VANDYKE
Deputy Assistant Attorney General


*/s/ Marissa A. Piropato*_____
MARISSA A. PIROPATO
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
marissa.piropato@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

28

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2)(E), the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 6,413 words, excluding the tables, caption, signature, certificate of compliance, and certificate of service.

*/s/ Marissa A. Piropato*
MARISSA A. PIROPATO
U.S. Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2019, a copy of the foregoing Defendants'

Unopposed Motion for an Extension of Time to Respond to Plaintiffs' Complaint

was served on all counsel of record via the Court's CM/ECF system.

*/s/ Marissa A. Piropato*
MARISSA A. PIROPATO
U.S. Department of Justice