JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
    PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:    svolker@volkerlaw.com
          akrieg@volkerlaw.com
          sclarke@volkerlaw.com
          jvolker@volkerlaw.com

Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency; MARGARET EVERSON, in her | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ. No. CV 19-28-GF-BMM<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS AND TRANSCANADA'S MOTION TO DISMISS**<br><br>**Judge:  Hon. Brian M. Morris**<br>**Case Filed:  April 5, 2019** |

official capacity as Acting Director of the )
U.S. Fish and Wildlife Service; UNITED )
STATES BUREAU OF LAND )
MANAGEMENT, and DAVID )
BERNHARDT, in his official capacity as )
U.S. Secretary of the Interior, )
                                             **)**

           Defendants, **)**

                                             **)**

TRANSCANADA KEYSTONE PIPELINE,**)**
LP, a Delaware limited partnership, and TC **)**
ENERGY CORPORATION, a Canadian )
Public Company, **)**

                                             **)**

        Defendant-Intervenors. **)**
_____ **)**

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**I.    PLAINTIFFS HAVE STANDING**. . . . . . . . . . . . . . . . . . . . . . . . . . 15

**II.   PLAINTIFFS RAISE VIABLE CONSTITUTIONAL
        CHALLENGES TO THE 2019 PERMIT**. . . . . . . . . . . . . . . . . . . . . 21

     **A.    Defendants Greatly Exaggerate the Scope of
        Executive Power**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         **1.    Congress Has Exclusive Original Power to
        Permit Border Crossings**. . . . . . . . . . . . . . . . . . . . . . 22

         **2.    Congress Has Not Acquiesced to Unbridled
        Presidential Authority to Permit Cross-Border
        Facilities**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

         **3.    Trump's Claimed Judicial Precedent Is Unavailing**. . . . . 27

         **4.    Trump's Power Was at Its Lowest Ebb When
        He Issued the Permit**. . . . . . . . . . . . . . . . . . . . . . . . . . 29

     **B.    The 2019 Permit Violates the Commerce Clause**. . . . . . . . . . . 30

     **C.    The 2019 Permit Violates the Property Clause**. . . . . . . . . . . . . 32

**III.  THE 2019 PERMIT VIOLATES EO 13,337**. . . . . . . . . . . . . . . . . . 34

**IV.   PLAINTIFFS' ALLEGATIONS AGAINST THE AGENCY
        DEFENDANTS ARE PROPER**. . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**CERTIFICATE OF COMPLIANCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alaska v. Brown*
850 F.Supp. 821 (D.Ak. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30

*American Insurance Association v. Garamendi*
539 U.S. 396 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Animal Legal Defense Fund v. U.S. Department of Agriculture*
789 F.3d 1206 (11th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Anza v. Ideal Steel Supply Corp.*
547 U.S. 451 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Backcountry Against Dumps v. Chu*
215 F.Supp.3d 966 (S.D.Cal. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Canyon County v. Syngenta Seeds, Inc.*
519 F.3d 969 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Citizens for Smart Growth v. Secretary of the Department of Transportation*
669 F.3d 1203 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*City of Carmel-by-the-Sea v. U.S. Department of Transportation*
123 F.3d 1142 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*City of Dania Beach v. F.A.A.*
628 F.3d 581 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Clinton v. City of New York*
524 U.S. 417 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dames & Moore v. Regan*
453 U.S. 654. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*East Bay Sanctuary Covenant v. Trump*
909 F.3d 1219 (9th Cir, 2018), withdrawn and reissued with dissent,
2018 WL 8807133.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ex parte Mitsuye Endo*
323 U.S. 283 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Gilligan v. Jamco Development Corp.*
108 F.3d 246 (9th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Great Basin Mine Watch v. Hankins*
456 F.3d 955 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Haynes v. United States*
891 F.2d 235 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hawaii v. Trump*
859 F.3d 741 (9th Cir. 2017), dismissed as moot,
138 S.Ct. 337 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Indigenous Environmental Network v. United States Department of State*
317 F.Supp.3d 1118 (D.Mont. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Indigenous Environmental Network v. State*
2017 WL 5632435 *10 (11/22/17). . . . . . . . . . . . . . . . . . . . 10, 20, 25, 27

*Kansas v. Colorado*
206 U.S. 46 (1907). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Knievel v. ESPN*
393 F.3d 1068 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*League of Conservation Voters v. Trump*
363 F.Supp.3d 1013 (D.Ak. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . 20, 32

*Legal Aid Society of Alameda County v. Brennan*
608 F.2d 1319 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Leite v. Crane Co.*
749 F.3d 1117 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mendoza v. Zirkle Fruit Co.*
301 F.3d 1163 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Missouri ex rel. Koster v. Harris*
    847 F.3d 646 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Motor Vehicle Manufacturers Association of the United States, Inc.*
    *v. State Farm Mutual Automobile Insurance Co.*
    463 U.S. 29 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Native Ecosystems Council v. Dombeck*
    304 F.3d 886 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Protect Our Communities Foundation v. Chu*
    2014 WL 1289444 *6
    (S.D.Cal. No. 3:12-cv-03062-L-JLB, 3/27/14).. . . . . . . . . . . . . . . . . . 25

*Sierra Club v. Clinton*
    689 F.Supp.2d 1147 (D.Minn. 2010) . . . . . . . . . . . . . . . . . . . . 27, 28, 29

*Swan v. Clinton*
    100 F.3d 973 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Ohio Oil Co.*
    234 U.S. 548 (1914). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

*Wolfe v. Strankman*
    392 F.3d 358 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wyoming Wildlife Federation v. United States*
    792 F.2d 981 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 29, 38

## <u>REGULATIONS</u>

22 Code of Federal Regulations
    § 161.7(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

40 Code of Federal Regulations
    § 1502.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# CONSTITUTION

United States Constitution, Article I
 § 8, cl. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States Constitution, Article II. . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32

United States Constitution, Article III. . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 37

United States Constitution, Article IV
 § 3, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 32

# FEDERAL STATUTES

United States Code, Title 5
 §§ 701, *et seq.* (Administrative Procedure Act ("APA")). . . . . . . . . . . 10, 36

United States Code, Title 16
 §§ 1531 *et seq.* (Endangered Species Act ("ESA")). . . . . . . . . . . . . . . 10, 25

United States Code, Title 33
 §§ 1251 *et seq.* (Clean Water Act ("CWA")). . . . . . . . . . . . . . . . . . . . . . . 25

United States Code, Title 42
 §§ 4321 *et seq.* (National Environmental Policy Act
  ("NEPA")). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19, 25, 27, 29

# OTHER AUTHORITIES

33 Fed..Reg (5/20/68)
 11,741. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

69 Fed.Reg. (5/5/04)
 25299. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

82 Fed.Reg. (1/24/17)
 8663-8665. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

84 Fed.Reg. (4/3/19)
 13101-13103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

84 Fed.Reg. (4/15/19)
     15491-15493. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fed.R.Civ.P.
     12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15
     12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15

Pub. L. No. 112-78, 125 Stat. 1280 (2011)
     §§ 501(a)-(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28, 29

*Foreign Cables,* 22 U.S. Op. Atty. Gen. 13 (1898). . . . . . . . . . . . . . . . . . 23, 24, 28

Green H. Hackworth, *Digest of International Law,*
     Vol. IV, § 350 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

President Ulysses Grant's Seventh Annual Message to Congress,
     *reprinted in* Papers Relating to the Foreign Relations of the
     United States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1,
     Pt. 1 (Dec. 6, 1875). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**INTRODUCTION**

President Trump has now unlawfully approved the Keystone XL Pipeline ("Keystone" or "Project") twice.  On review of his first approval, issued March 2017, this Court issued a comprehensive sequence of well-reasoned rulings holding that the Trump Administration's 2017 Presidential Permit for Keystone ("2017 Permit") violated bedrock environmental laws.  Rejecting the Administration's motion to dismiss that case, the Court ruled that it has jurisdiction over presidential permits.[1]  This Court held that the 2017 Permit violated (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq., by failing to address Keystone's Main Line Alternative Route through Nebraska,[2] and (2) NEPA, the APA, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq.,  by ignoring the effects of current oil prices, the cumulative effects of greenhouse gas emissions, impacts on unsurveyed cultural resources, potential oil spills and recommended mitigation measures in light of updated modeling, impacts to endangered species in light of updated oil spill data, and former

---

[1] *Indigenous Environmental Network v. United States Department of State,* CV 17-29-GF-BMM ("*IEN v. State*"), 2017 WL 5632435 (11/22/17).

[2] *IEN v. State*, 317 F.Supp.3d 1118, 1123 (8/15/18).

Secretary of State John Kerry's detailed findings that Keystone would not serve the national interest.[3]

Based on these rulings, this Court enjoined TransCanada Keystone Pipeline, LP's (now TC Energy Corporation's, "TC Energy's") construction and surface-disturbing pre-construction activities to prevent irreparable environmental and cultural harm, and protect the public interest.[4]  The Court denied TC Energy's motion to stay the injunction pending appeal[5] and the Ninth Circuit denied TC Energy's motion to stay this Court's injunction.[6]

After losing on the merits, and failing to stay this Court's injunction on appeal, President Trump chose to evade rather than comply with these court orders and the environmental laws they enforced.  On March 29, 2019, President Trump issued a new Presidential permit ("2019 Permit") purportedly "grant[ing] permission" for TransCanada "to construct, connect, operate and maintain" Keystone *without compliance with the laws of the United States*.  (84 Fed.Reg 13101-13103 (April 3, 2019), attached as Exhibit 1 to Declaration of Stephan C. Volker in Support of Motion for Preliminary Injunction ("Volker Declaration") filed July 10, 2019 (ECF 27-22).)

---

[3] *IEN v. State*, 347 F.Supp.3d 561, 590-591 (11/8/18).

[4] *IEN v. State*, 369 F.Supp.3d 1045, 1049-1052 (12/7/18).

[5] *IEN v. State*, 2019 WL 652416 (2/15/19).

[6] *IEN v. State*, Ninth Circuit Case No. 18-36068, Order filed 3/15/19.

Trump and the other federal defendants (collectively, "Trump," and together with TC Energy, "Defendants") and TC Energy now attempt to evade the law yet again, by filing meritless motions to dismiss Plaintiffs' instant lawsuit in order to deprive this Court of its jurisdiction over Trump's illegal 2019 Permit.  Under Article III of the U.S. Constitution, President Trump's unlawful conduct is subject to this Court's review.

Through issuance of the 2019 Permit, Trump usurped Congress' exclusive authority over foreign commerce and federal lands under the U.S. Constitution's Commerce Clause (Article I, section 8, clause 3) and Property Clause (Article IV, section 3, clause 2), respectively.  The 2019 Permit also violates Executive Order 13,337.  And the Project it greenlights – Keystone – threatens irreparable harm to nationally-significant resources, including four of the nation's most celebrated rivers – the Missouri, Yellowstone, Cheyenne and Platte – and the Indigenous communities dependent on them.

Defendants argue in their motions to dismiss that Plaintiffs lack standing because there is no actual or imminent injury traceable to the 2019 Permit, and that their claims are not redressable.  Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiffs' Amended Complaint (ECF 52) ("Trump") 7-12; Memorandum in Support of Motion by TransCanada Keystone Pipeline, LP and TC Energy Corporation to Dismiss Plaintiffs' Complaint Pursuant to Fed.R.Civ.P. Rule 12(b)(1) or 12(b)(6) (ECF 33) ("TC

Energy") 10-13; Memorandum in Support of Supplemental Motion by TransCanada Keystone Pipeline, LP and TC Energy Corporation to Dismiss Plaintiffs' Complaint Pursuant to Fed.R.Civ.P. Rule 12(b)(1) or 12(b)(6) (ECF 50) ("TC Energy Supp.") 3.  This argument lacks merit because Plaintiffs are injured by the imminent construction of the 1.2-mile portion authorized by the 2019 Permit – as well as construction and operation of the remainder of the Project – and Plaintiffs' claims are redressable by this Court.

Defendants also argue that Plaintiffs fail to state a claim under the Property Clause, Commerce Clause, or Executive Order 13,337 because the President has broad executive power, a BLM right-of-way approval is still necessary for federal land, and other federal agencies must comply with relevant federal statutes. Trump 14-28; TC Energy 13-21.  But these arguments fail because Congress has the exclusive power to regulate foreign commerce and dispose of federal lands, and because there is only one congressionally sanctioned pathway to process TC Energy's permit application - the procedure set forth in EO 13,337.

Finally, Trump moves to dismiss Plaintiffs' claims against the federal agency defendants because the agency defendants are still subject to their other legal obligations.  Trump 12-14.  These claims likewise fail because these agencies were tasked with the responsibility of reviewing TC Energy's presidential permit application and failed to comply with that duty before Trump issued the 2019 Permit.

This Court should therefore deny Trump's and TC Energy's motions to dismiss.

## STANDARD OF REVIEW

Defendants' motions raise three primary arguments.  Each argument is reviewed under the standard applicable to motions to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6).

First, they argue that Plaintiffs lack standing to pursue their claims. Because these arguments "accept[] the truth of [IEN's] allegations but assert[] that they are insufficient on their face to" confer standing, this Court resolves this challenge "as it would a motion to dismiss under Rule 12(b)(6)."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014); *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2014).

Second, Trump and TC Energy argue that Plaintiffs fail to raise a viable claim under the Property Clause, the Commerce Clause, or Executive Order 13,337.  Trump 14-28; TC Energy 13-21.  Trump and TC Energy both admit that these arguments are made pursuant to Fed.R.Civ.P. 12(b)(6).  Trump 14; TC Energy 13, 15.

Third, Trump argues that "the portions of the Complaint addressing [the Agency] Defendants must be dismissed for failure to state a claim."  Trump 12-14. This argument also falls squarely within the standard applicable to motions to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6).

Under Fed.R.Civ.P. 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir.1997). Granting a motion to dismiss is only appropriate "'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1167 (9th Cir. 2002)).

Even if this Court were to determine that any of Defendants' claims are governed by Rule 12(b)(1), this Court must still "[a]ccept[] the Plaintiff's allegations as true and draw[] all reasonable inferences in the Plaintiff's favor." *Leite*, 749 F.3d at 1121; TC Energy 9. Defendants' motions to dismiss are facial attacks, and therefore this "court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)." *Id*.

## ARGUMENT

## I.   PLAINTIFFS HAVE STANDING

Article III standing requires (1) injury in fact that is (a) concrete and particularized, and (b) actual or imminent, (2) a causal connection between the injury and the conduct, and (3) that the injury is likely to be redressed by a

favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992);
Trump 7-8; TC Energy 10-11.  Plaintiffs have met all three requirements.

Defendants claim that Plaintiffs fail to "allege imminent, concrete, and
particularized harm to their members."  Trump 8-11; TC Energy 10-13.  While TC
Energy admits that Plaintiffs provide "numerous allegations of how construction
and operation of Keystone XL could harm Plaintiffs," (TC Energy 11, emphasis
omitted), both Trump and TC Energy assert that "Plaintiffs cannot allege any
plausible injury from the part of the pipeline actually addressed by the Permit – the
1.2 mile section of the pipeline at the border crossing."  Trump 9; TC Energy 11-
12.  Wrong.  Plaintiffs alleged their members "use and enjoy the land and water
resources and wildlife . . . that the Project would harm [and thus] would be directly
and irreparably harmed by the construction and operation of the Project, *including
its first 1.2 miles . . . ."*  First Amended Complaint (ECF 37) ("FAC") ¶¶ 28-30
(emphasis added).

Plaintiffs' FAC alleges "the Project, including its . . . first 1.2 miles," would
harm Plaintiffs' use and enjoyment of "land and water resources and wildlife,"
explaining that the "border" segment crosses a tributary of Whitewater Creek that
ultimately flows into the Missouri River, "a watercourse used by Plaintiffs for
drinking and farming among other uses."  FAC ¶¶ 16, 28-30; Declaration of Bill
Whitehead in Support of Plaintiffs' Motion for Preliminary Injunction (ECF 27-
26) ("Whitehead Declaration") at ¶ 6 and Exh. 1.  Keystone's Final SEIS admits

that at Milepost 1.1 Keystone would cross an unnamed tributary of the East Fork of Whitewater Creek – which ultimately drains into the Missouri – located on Montana State Trust Lands.[7]  "Should Keystone leak oil into a tributary of Whitewater Creek, the resulting contamination would flow downstream to the Missouri River," harming Plaintiffs.  FAC ¶ 16.

In any event, Plaintiffs' standing is not dependent on harms arising from the border segment.  The 2019 Permit is the headwaters permit from which flow all other pipeline permits; pipeline operation *anywhere* could not occur without it. *Backcountry Against Dumps v. Chu*, 215 F.Supp.3d 966, 976 (S.D.Cal. 2015) (presidential permit for transboundary transmission line caused plaintiffs' injuries even though project required additional approvals from other agencies); *cf.*, *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (interdependent projects must be analyzed together).  Even had Plaintiffs only alleged injury from Keystone *outside* its first 1.2 miles, that allegation would still suffice.  That Keystone "would not [be] built absent approval of [the cross-border presidential] permit . . . . demonstrate[s] that the Defendants' action [was] causal of the injury" to Plaintiffs despite the need for other agency approvals.  *Backcountry*, 215 F.Supp.3d at 976.

---

[7] Administrative Record in *IEN v. State*, CV 17-29-GF-BMM (*see* ECF 111-112, 158, 167) DOSKXLDMT0009652 ("DOS9652") (FSEIS Appendix D, Table 1 – "Waterbodies Crossed by the Project in Montana" at Milepost 1.11).

Furthermore, Defendants' claim that Plaintiffs will not suffer a concrete or imminent injury because construction of the pipeline "is contingent upon further action by BLM for *most* of those 1.2 miles," is misleading and ignores the remainder of the 1.2 mile portion where construction can begin immediately. Trump 9; TC Energy 13.  Between Mileposts 0.92 and 1.2, Keystone is located on Montana State Land.  Declaration of Diane M. Friez (ECF 43-1) ("Friez Declaration") at ¶ 9, Exh. 2 (ECF 43-3).  As TC Energy admits, Montana has approved construction of the pipeline across its state lands, including the land between Mileposts 0.92 and 1.2.  TC Energy's Opposition to Plaintiffs' Motion for a Preliminary Injunction (ECF42) at 7, n. 15; Reply Declaration of Stephan C. Volker in Response to Oppositions of TC Energy and Federal Defendants to Plaintiffs' Motion for Preliminary Injunction (ECF 55) ("Reply Volker Declaration") at ¶¶ 2-4, Exh. 1 (ECF 55-1), Exh. 2 (ECF 55-2), Exh. 3 (ECF 55-3). Those Montana approvals allow construction between Mileposts 0.92 and 1.2 *"upon . . . issuance of the Presidential Permit.*"  Reply Volker Declaration Exh. 1 at 4.  The 2019 Permit is the final approval needed to commence construction between Mileposts 0.92 and 1.2, which would cross a tributary of Whitewater Creek that ultimately flows into the Missouri River, threatening imminent harm to Plaintiffs.

Trump's claim that TC Energy "cannot construct . . . the 'balance of the 875-mile-long project' . . . until . . . federal agencies have completed their . . .

- 18 -

permitting processes," likewise fails.  TC Energy 10-11.  Unlike the case that Trump relies on, this Court would not need to indulge in "'guesswork as to how independent decisionmakers will exercise their judgment,'" because the federal agencies that must complete their permitting processes are not "independent." Trump 11 (quoting *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 654 (9th Cir. 2017)).  They report to Trump, who has already approved Keystone.

As TC Energy acknowledges, "this Court concluded that similar allegations justified injunctive relief" in *IEN v. State*, 4:17-cv-29-BMM.  TC Energy 11-12, citing *IEN v. State*, 2019 WL 652416 and *IEN v. State*, 369 F.Supp.3d 1045, 1049-1051 (D.Mont. 2018).  However, TC Energy erroneously claims that Plaintiffs' alleged injuries "are [now] too speculative" because the 2019 Permit "was issued directly by the President, and he is not subject to NEPA."  TC Energy 11-12.  But the fact that the FAC does not allege NEPA violations here is irrelevant, and Plaintiffs' standing is even more clear with regard to the 2019 Permit.  The 2019 Permit actually "authorizes the construction of pipeline facilities in a 1.2 mile corridor," including crossing a tributary of Whitewater Creek at Milepost 1.1 that ultimately flows into the Missouri River.  TC Energy 12; DOS9652; FAC ¶¶ 16, 28-30 ; Whitehead Declaration at ¶ 6 and Exh. 1.  And construction of this portion of the pipeline is not contingent upon any additional permits, as discussed above. Friez Declaration at ¶ 9, Exh. 2; Reply Volker Declaration Exh. 1 at 4, Exh. 2, Exh. 3.

Construction of the pipeline is a direct and imminent result of the 2019 Permit.  And Plaintiffs will suffer concrete, particularized, and actual or imminent harm as a result of the Permit, both from construction of the 1.2 mile portion, and the remainder of the Project which would not be built but for the 2019 Permit.

Finally, Trump claims that it "would be improper to grant equitable relief against the President here," because it would violate "the separation of powers concerns that animated courts to insulate the President from equitable relief." Trump 11-12 (citing *Swan v. Clinton*, 100 F.3d 973, 976 n. 1 (D.C. Cir. 1996)). But that assertion fails because numerous courts have vacated unlawful presidential decisions.  *League of Conservation Voters v. Trump* ("*LCV*"), 363 F.Supp.3d 1013, 1031 (D.Ak. 2019) ("vacat[ing] Section 5 of [EO] 13,795") (D.Ak. 2019); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (enjoining federal defendants despite presidential involvement), dismissed as moot, 138 S.Ct. 337 (2017); *Clinton v. City of New York*, 524 U.S. 417, 433, n. 22 (1998) (voiding president's line-item veto); *IEN v. State*, 2017 WL 5632435 *6 (11/22/17) (allowing claims against State Department despite presidential involvement); *IEN v. State*, 347 F.Supp.3d 561, 591 (D.Mont. 2018) (vacating 2017 Permit despite Trump's involvement), vacated as moot, 9th Cir. 18-36068, June 6, 2019 Order. So too here, Plaintiffs' injuries are redressable because this Court has the authority to vacate the 2019 Permit.

Because Plaintiffs will suffer a concrete, particularized, and actual or imminent injury, which is traceable to the contested action, and is redressable by this Court, Plaintiffs have standing here, just as they did in *IEN v. State*, 4:17-cv-29-BMM.

## II.   PLAINTIFFS RAISE VIABLE CONSTITUTIONAL CHALLENGES TO THE 2019 PERMIT

In issuing the 2019 Permit, Trump plainly sought to circumvent the 51-year-old practice of requiring State Department review of cross-border permits in compliance with Congress' comprehensive scheme for regulating environmental protection, and to sidestep this Court's previous – and correct – rulings enforcing those environmental laws.  But Trump is not above the law.  The 2019 Permit is unconstitutional for two reasons.  First, it is "incompatible with the expressed [*and*] implied will of Congress," which has ultimate authority to regulate cross-border facilities under the Commerce Clause.  *Youngstown Sheet & Tube Co. v. Sawyer* ("*Youngstown*"), 343 U.S. 579, 635-638 (1952) (Jackson, J. concurring).  Second, the 2019 Permit violates the Property Clause by usurping Congress' exclusive authority and purporting to dispose of federal land.  Defendants' motions to dismiss Plaintiffs' Commerce Clause and Property Clause claims rely on a greatly exaggerated scope of executive power, and must accordingly fail.

### A.   Defendants Greatly Exaggerate the Scope of Executive Power

Trump contends that the "President's Article II power encompasses the authority to control border crossings into the United States," citing the President's

foreign affairs powers, Congress' purported acquiescence to the President's assertion of authority, and a supposed long line of judicial precedent.  Trump 14 (quote), 15-21.  Yet Trump conveniently fails to mention Congress' *exclusive* power over foreign commerce, Congress' explicit direction to the President to follow EO 13,337 on Keystone permitting, and the long-standing practice of requiring State Department review of cross-border permits.  Accounting for these factors demonstrates that the President's power was "at its lowest ebb" when he issued the 2019 Permit.  *Youngstown*, 343 U.S. at 637.

### 1.    Congress Has Exclusive Original Power to Permit Border Crossings

Trump contends that the "authority to permit international border crossings" is a "natural corollary of the President's foreign affairs powers."  Trump 18. Wrong.  "Congress is vested with the principal power to control the nation's borders."  *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1231 (9th Cir, 2018), withdrawn and reissued with dissent, 2018 WL 8807133.  While the "President has a degree of independent authority to act" in foreign affairs, "Congress holds *express authority* to regulate public and private dealings with other nations in its . . . foreign commerce powers."  *American Insurance Association v. Garamendi* ("*Garamendi*"), 539 U.S. 396, 414 (2003) (emphasis added).  The cross-border transport of foreign oil is a quintessential matter of foreign commerce.  *United States v. Ohio Oil Co.*, 234 U.S. 548, 560 (1914) (affirming Congress' power under the Commerce Clause to regulate the

transportation of oil); *Alaska v. Brown*, 850 F.Supp. 821, 827 (D.Ak. 1994) (regulating oil exportation is within Congress' "plenary power over foreign commerce").

Defendants counter that Attorney General opinions and other authorities have "for more than one hundred years recognized the President's independent permitting authority at the international border."  Trump 18 (quote), 23-24 (citing *Foreign Cables*, 22 U.S. Op. Atty. Gen. 13, *13 (1898)), 3-4 (citing Green H. Hackworth, *Digest of International Law*, Vol. IV, § 350, at 247-256 (1942)); President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1 (Dec. 6, 1875)); TC Energy 5.  But the authorities they cite demonstrate to the contrary that (1) the President's authority to regulate cross-border facilities has long been suspect, and (2) to the extent Trump has any authority, it exists at the mercy of Congress, which has expressly *withdrawn* that authority here.

President Grant, for example, stated in his seventh annual message to Congress in 1875 that the "right to control the conditions for the laying of a cable within the jurisdictional waters of the United States . . . pertains exclusively to the Government of the United States, *under such limitations and conditions as Congress may impose*." Trump, Ex. 2 at 28 (emphasis added).  The Attorney General's opinion on foreign cables likewise acknowledges that the President's

- 23 -

purported power "to control the landing of foreign submarine cables on the shores of the United States" exists *only "in the absence of legislation by Congress."* 22 U.S. Op. Att'y. Gen. 13, *13 (1898) (emphasis added).

Equally illuminating is Green Hackworth's treatise on international law. Trump, Ex. 1.  Hackworth quotes from a 1921 opinion by the federal District Court for the Southern District of New York, in which Judge Hand denied a motion for preliminary injunction filed by the United States against a telegraph company to prevent it from connecting a submarine cable between Cuba and Florida.  Trump, Ex. 1 at 5-7.  Judge Hand notes the prevailing view over the preceding 50 years that the President has some authority to regulate cross-border facilities *in the absence of legislative direction*.  But he also opines that the "*original* power of the President in such matters is *questionable*."  Trump, Ex. 1 at 6 (internal quotations omitted; emphasis added).  And he notes that President Cleveland "declined to exercise the power" because "presidential action would not be binding upon Congress" and the "President was without power."  *Id*. (internal quotations omitted).  Ultimately, Judge Hand denied the government's preliminary injunction motion because Congress had already taken action in the matter and thereby "occupied the field" to the exclusion of the President.  *Id*. at 7 (internal quotations omitted).

Here, Congress has similarly exercised its exclusive power.  In 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act ("TPTCCA"),

which directed the President, through the State Department, to either deny or

"grant a permit *under* Executive Order No. 13,337" for Keystone within 60 days.

Pub. L. No. 112-78, §§ 501(a)-(b), 125 Stat. 1280 (2011) (emphasis added).  In

addition, between 1968 and 1977, Congress enacted a comprehensive scheme for

environmental protection, including NEPA (1969), the ESA (1973) and the Clean

Water Act (1972; 33 U.S.C. §§ 1251 *et seq.*), all of which cabin executive branch

permitting of cross-border facilities.  *See IEN v. State*, 2017 WL 5632435 *10

(11/22/17) ("State Department's obligation to study the environmental impacts of

its decision fundamentally does not stem from the foreign relations power");

*Protect Our Communities Foundation v. Chu*, 2014 WL 1289444 *6 (S.D.Cal. No.

3:12-cv-03062-L-JLB, 3/27/14).

### 2.   Congress Has Not Acquiesced to Unbridled Presidential Authority to Permit Cross-Border Facilities

Trump asserts that Congress has "acquiesced" to – and "never questioned or

sought to cabin" – the President's authority to permit cross-border facilities.

Trump 19.  Wrong.  As just discussed, Congress has exercised its authority over

border crossings both directly and indirectly, including directing the President in

the TPTCCA to follow EO 13,337 on Keystone Permitting.

Trump quotes *Garamendi*, 539 U.S. at 429, for the proposition that

"[c]ongressional silence is not to be equated with congressional disapproval."

Trump 19.  But Congress has not been silent.  And in any event, *Garamendi* is

inapposite.  *Garamendi* involved executive actions falling squarely within the

President's foreign affairs bailiwick - executive agreements with foreign countries regarding claims of American nationals stemming from the Holocaust. *Garamendi*, 539 U.S. at 415.  As the Supreme Court explained, "[m]aking executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice," and one which has never required "ratification by the Senate or approval by Congress."  *Id*.  It thus stands to reason that it would take more than congressional silence to override the President's foreign affairs power and preempt the executive agreements at issue. *Id.* at 428-429.

The circumstances here are far different from those in *Garamendi*.  First, this case does not involve an issue of foreign affairs historically committed to presidential authority.  It involves an issue squarely within Congress' exclusive power to regulate foreign commerce – the permitting of private cross-border oil pipelines.  As the *Garamendi* Court emphasized, while the "President has a degree of independent authority to act" in foreign affairs, "Congress holds express authority to regulate public and private dealings with other nations in its . . . foreign commerce powers."  *Garamendi*, 539 U.S. at 414.

Second, Congress has expressed its will here as to how cross-border pipelines should be permitted, as just discussed in Section II(A)(1).  By contrast, in *Garamendi*, Congress had "done nothing" to direct the President's policy. *Garamendi*, 539 U.S. at 429.

Furthermore, even had Congress not expressed its will through legislation, past presidential "practice does not, by itself, create power." *Dames & Moore v. Regan*, 453 U.S. 654, 686.  And to the extent Congress could be deemed to have acquiesced to anything, it would be the "long-continued practice" of State Department review and permitting of cross-border oil pipelines, subject to the requirements of Congress' comprehensive scheme of statutory environmental protections.  *Id*.  That practice continued unabated for over 50 years between 1968 – when President Johnson issued EO 11,423 (33 Fed.Reg. 11,741) – and 2019.  *See* 22 C.F.R. § 161.7(c)(1) ("Issuance of permits for construction of . . . pipeline[s]" are actions "normally requiring [at least] environmental assessments," citing EO 11,423); *IEN v. State*, 2017 WL 5632435 *10 (11/22/17) (recognizing that the State Department's NEPA regulations antedate and are not abrogated by EO 13,337); *Sierra Club v. Clinton* ("*Sierra Club*"), 689 F.Supp.2d 1147 (D.Minn. 2010) (State Department had conducted NEPA review for both cross-border oil pipelines at issue).  Defendants have not, and cannot, show that Congress acquiesced to anything less.

### 3.    Trump's Claimed Judicial Precedent Is Unavailing

Trump argues that courts have "universally recognized the President's powers to issue cross-border permits."  Trump 20.  But Trump conflates original and plenary power with circumstantial power exercised at the mercy of Congress.

Trump's power is the latter, as demonstrated above.  And the authorities Trump relies on do not prove otherwise.

Trump relies primarily on *Sierra Club*, 689 F.Supp.2d at 1162-1163.  The court there held that the State Department's issuance of a permit pursuant to EO 13,337 for another cross-border oil pipeline did not violate the Commerce Clause. But *Sierra Club* is inapt for at least three reasons.

First, the court failed to properly caveat its imprecise statement that the "President's authority to issue the border-crossing Permit comes by way of his constitutional authority over foreign affairs and authority as Commander in Chief."  *Sierra Club*, 689 F.Supp.2d at 1163.  Whatever authority the President may have to regulate cross-border facilities is exercised *at the mercy of Congress*, which possesses ultimate authority over matters of foreign commerce.  Even the authorities cited by the *Sierra Club* court acknowledge this.  For example, the Attorney General's opinion on foreign cables acknowledges that the President's purported power exists only "in the absence of legislation by Congress."  *Foreign Cables*, 22 U.S. Op. Atty. Gen. 13, *13 (1898).

Second, the *Sierra Club* court relied on the fact that "Congress ha[d] not attempted to exercise any exclusive authority over the permitting process."  *Sierra Club*, 689 F.Supp.2d at 1163.  Here, by contrast, Congress specifically directed the President to comply with EO 13,337 in permitting Keystone.  Pub. L. No. 112-78, 125 Stat. 1280 (2011) §§ 501(a)-(b).

Third, in *Sierra Club*, the State Department had in fact followed the process required by EO 13,337, including conducting NEPA review.  Here, by contrast, President Trump issued the 2019 Permit "notwithstanding EO 13,337" and without any of the required environmental reviews.  2019 Permit 1.

### 4.     Trump's Power Was at Its Lowest Ebb When He Issued the 2019 Permit

Under the three-part *Youngstown* framework for assessing the constitutionality of presidential actions, the President's authority is at its "lowest ebb" when the "President takes measures incompatible with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 637.  Here, Trump's authority is at its "lowest ebb" because the 2019 Permit contravenes both the expressed and implied will of Congress.  It sidesteps EO 13,337, which Congress had specifically directed the President to follow in processing the Keystone permit application. Pub. L. No. 112-78, §§ 501(a)-(b), 125 Stat. 1280 (2011).  And it eschews the long-standing practice, embodied in EO 11,423 and EO 13,337, of State Department review and permitting of cross-border oil pipelines pursuant to Congress' comprehensive scheme of statutory environmental protections.

All Trump can rely on, then, is "his own constitutional powers minus any constitutional powers of Congress over the matter."  *Youngstown*, 343 U.S. at 637. But that cannot save the 2019 Permit.  While the "President has a degree of independent authority to act" in foreign affairs, "Congress holds *express authority*

to regulate public and private dealings with other nations in its . . . foreign commerce powers." *Garamendi*, 539 U.S. at 414.

### B.      The 2019 Permit Violates the Commerce Clause

Congress possesses exclusive authority under the Commerce Clause to regulate foreign commerce, including the cross-border transportation of foreign oil. *United States v. Ohio Oil Co.*, 234 U.S. at 560; *Alaska v. Brown*, 850 F.Supp. at 827. The 2019 Permit violates the Commerce Clause because it contravenes the will of Congress by sidestepping the long-standing – and congressionally sanctioned – practice of requiring State Department review of cross-border permits and ensuring compliance with federal environmental laws.

Trump attempts to minimize the effect of the 2019 Permit by treating it as just "an authorization to cross the international border." Trump 23. The text of the Permit belies counsel's *post hoc* re-interpretation, as discussed below in Section II(C). But the 2019 Permit would still violate the Commerce Clause even if the Permit had only authorized the border crossing itself. Congress has exclusive authority over matters of foreign commerce, like cross-border permits, as discussed above.

Trump asserts that he did not need congressional approbation to issue the 2019 Permit because Congress has historically acquiesced to presidential permitting of border crossings and because presidential action is "required to protect our territorial integrity." Trump 23. Doubly wrong.

First, as demonstrated in Section II(A), Congress has *not* acquiesced to unbridled presidential permitting of border crossings.  The President had only one congressionally sanctioned pathway to process TC Energy's permit application - the procedure set forth in EO 13,337.  But the President failed to abide by that process, as discussed in Section III.

Second, rather than "protect our territorial integrity," Trump has actively undermined it.  He first *invited* TC Energy to reapply for – and then approved – a permit that the federal government had already determined was not in the national interest.  82 Fed. Reg. 8663-8665 (January 24, 2017).  And now –  after this Court vacated the 2017 Permit because the State Department failed to explain its changed position and comply with the laws Congress enacted to protect the environment – Trump has attempted through the 2019 Permit to evade our congressionally enacted bulwarks against environmental harm.

Trump implies that issuing a cross-border permit without environmental review has no practical impact.  He needs to pull his head out of the sand. The cross-border permit is the headwaters permit on which the entire project and all other permits depend.  Congress intended for environmental review to be conducted at that headwaters moment, not piecemeal at each successive permitting juncture.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 897 (9th Cir. 2002); 40 C.F.R. §§ 1502.5, 1508.7.

### C.    The 2019 Permit Violates the Property Clause

Under the Property Clause, Congress holds the *sole* "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Constitution, Article IV, section 3, clause 2.  Yet Trump purported to "grant permission" to TC Energy to "construct, connect, operate, and maintain" a "36-inch diameter [oil] pipeline" within the first "1.2 miles from the international border," and apparently also for the balance of Keystone's 875 miles in the U.S..  2019 Permit 1-2 (quotes); TC Energy 14.  That violates the Property Clause.

Trump asserts that the Property Clause does not "nullify" the President's foreign affairs power.  Trump 21.  But nothing in the President's foreign affairs power authorizes him to dispose of United States property.  "Although the President has the constitutional authority under Article II to provide for national security and conduct foreign affairs, the President's authority to dispose of [federal lands] can arise only by delegation from Congress."  *LCV*, 363 F.Supp.3d at 1017 n. 20.  The only authority Trump cites is entirely inapposite. *Kansas v. Colorado* concerns the relative role of Congress versus the *states* in regulating and disposing of lands within the United States.  206 U.S. 46, 89 (1907).  The *President's* foreign affairs power was irrelevant to the case and not mentioned once.

Trump also contends that the 2019 Permit does not violate the Property Clause because it does not, in fact, dispose of U.S. territory.  Trump argues that the 2019 Permit is a "cross-border permit, not a right-of-way on domestic lands or other agency authorization to allow the proposed pipeline to cross federal lands." Trump 21.  But counsel cannot rewrite the 2019 Permit to pass constitutional muster.  *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 49-50 (1983).  The Permit clearly "grant[s] permission" to TC Energy to "construct, connect, operate, and maintain" the Keystone oil pipeline facilities within at least the first "1.2 miles from the international border."  2019 Permit 1-2; TC Energy 14.

Defendants also argue that the 2019 Permit does not violate the Property Clause because "it does not supplant other necessary authorizations."  Trump 22 (quote); TC Energy 14.  Wrong for two reasons.  First, the 2019 Permit does not purport to *require* anything, let alone specify the additional authorizations required.  Article 6 of the permit merely states that "[t]he permittee is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as *may* become necessary or appropriate."  2019 Permit 3 (emphasis added).  "May" is permissive, not mandatory.  *Haynes v. United States*, 891 F.2d 235, 239-240 (9th Cir. 1989).

Second, regardless of the Permit's caveat about potential additional authorizations, the fact remains that it purports to authorize Keystone's

construction and operation across at least the first "1.2 miles from the international border." 2019 Permit 2.  That authorization, no matter how heavily conditioned, violates the Property Clause.

In any event, the 2019 Permit would still violate the Commerce Clause even if it had only authorized the border crossing itself, as discussed in Section II(B). The President had only one congressionally sanctioned pathway to process TC Energy's permit application - the procedure set forth in EO 13,337.  The President failed to abide by that process, as shown below.

## III.    THE 2019 PERMIT VIOLATES EO 13,337

Defendants argue that executive orders do not bind the President because they can be withdrawn at any time.  TC Energy 20-21; TC Energy Supp. 3; Trump 25-26.  False.  Executive orders that, as here, implement a congressional mandate can and do bind the President. *Legal Aid Society of Alameda County v. Brennan*, 608 F.2d 1319, 1329-1331 (9th Cir. 1979); *City of Carmel-by-the-Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1166 (9th Cir. 1997); *Wyoming Wildlife Federation v. United States*, 792 F.2d 981, 985 (10th Cir. 1986) (upholding fee award for lawsuit enforcing EO 11,990, which protects wetlands); *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 591 (D.C. Cir. 2010) (reaching merits of claims that agency violated EO 11,990); *Citizens for Smart Growth v. Secretary of the Department of Transportation*, 669 F.3d 1203, 1214 (11th Cir. 2012) (reaching merits of agency's compliance with EO 11,988 and 11,990).

Moreover, even if presidents could circumvent executive orders by withdrawing them, it would not save Trump here.  The President issued the March 29, 2019 Permit *before* purporting to withdraw EO 13,337.  84 Fed. Reg. 15491-15493 (April 15, 2019).

Defendants argue that the timing of the withdrawal does not matter because the President granted the 2019 permit "notwithstanding Executive Order 13337." 2019 Permit 1.  Wrong.  The President did not have independent authority to determine whether and how to permit Keystone.  Congress has exclusive authority in the foreign commerce arena, as discussed above.  Since enacting its comprehensive statutory scheme for environmental protection beginning in 1968, Congress has sanctioned the permitting of cross-border oil pipelines through an established process involving State Department review and consultation, as set forth in EO 11,423 and EO 13,337.  President Trump thus lacked authority to issue the 2019 Permit outside the EO 13,337 process *at all*, regardless of timing.

Defendants argue that section 6 of EO 13,337 precludes judicial review of the President's compliance with EO 13,337.  Not so.  Section 6 never mentions "judicial review."  Compare that to section 6-609 (entitled "Judicial Review") of EO 12,898, which directs that EO 12,898 "shall not be construed to create any right to judicial review . . . ."  Presidents know how to draft executive orders to preclude judicial review.  Here, Trump chose not to.  *Animal Legal Defense Fund v. U.S. Department of Agriculture*, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where

Congress knows how to say something but chooses not to, its silence is controlling"); *Ex parte Mitsuye Endo*, 323 U.S. 283, 298 (1944) (executive orders are construed like legislation).

Defendants also introduce a number of red herring arguments. For example, TC Energy argues that the President had no duty to provide a reasoned explanation for deviating from the previous permit denial because that requirement is imposed by the APA, which does not apply to the President. TC Energy Supp. 4. But Plaintiffs do not contend that the President had a duty to comply with the APA or any of the other statute. Rather, Plaintiffs have demonstrated – and the law requires – that the President comply with EO 13,337, which in turn requires the State Department to comply with the relevant statutes. Similarly, Plaintiffs do not argue that the President himself was required to issue a national interest determination. Trump 26. That is the State Department's duty under EO 13,337. And the President had no authority to circumvent the process specified in EO 13,337.

## IV.   PLAINTIFFS' ALLEGATIONS AGAINST THE AGENCY DEFENDANTS ARE PROPER

Trump alleges that plaintiffs' claims against the Department of State, Army Corps of Engineers, Fish and Wildlife Service, and Bureau of Land Management should all be dismissed for "fail[ure] to identify any allegedly unlawful action." Trump 12-14. But this argument entirely ignores EO 13,337. As discussed above, EO 13,337 directs the Secretary of State, and other relevant agencies, to review

applications for a presidential permit "for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels to or from a foreign country."  69 Fed.Reg. 25299 (May 5, 2004).  Because EO 13,337 was in effect when Trump issued the 2019 Permit, each of these federal agencies had duties to review and consult on the Keystone Project before it could be permitted. Because those agencies failed to fulfill those duties before Trump issued the 2019 Permit, they are properly named by Plaintiffs in this lawsuit.

## CONCLUSION

Trump's attempt to evade Congress' will, and to defy this Court's previous rulings, cannot stand.  Even the President is not above the law.  This Court has jurisdiction over this matter and should therefore deny Trump's and TC Energy's meritless motions to dismiss.

Plaintiffs possess Article III standing because they will suffer an injury in fact that is clearly traceable to the 2019 Permit and is redressable by this Court's order.  Furthermore, plaintiffs raise viable challenges to the 2019 Permit under the Commerce Clause, the Property Clause and EO 13,337.  The 2019 Permit undermines the separation of powers and threatens the "equilibrium established by

///

///

our constitutional system." *Youngstown*, 343 U.S. at 638.  Trump's and TC

Energy's motions to dismiss must accordingly be denied.


Dated:  August 22, 2019        PATTEN, PETERMAN, BEKKEDAHL &
GREEN, PLLC

                                     s/ *James A. Patten*
JAMES A. PATTEN


                                     LAW OFFICES OF STEPHAN C. VOLKER

                                     s/ *Stephan C. Volker*
STEPHAN C. VOLKER (Pro Hac Vice)

                                     Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE

## CERTIFICATE OF COMPLIANCE

Pursuant to Montana District Court, Civil Rule 7.1(d)(2)(B), I certify that

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS AND TC ENERGY'S MOTION TO DISMISS** contains 6,474 words, excluding caption and certificate of service, as counted by WordPerfect X7, the word processing software used to prepare this brief.

s/ *Stephan C. Volker*　　　　

## CERTIFICATE OF SERVICE

I, Stephan C. Volker, am a citizen of the United States.  I am over the age of 18 years and not a party to this action.  My business address is the Law Offices of Stephan C. Volker, 1633 University Avenue, Berkeley, California 94703.

On August 22, 2019 I served the following documents by electronic filing with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to the email addresses registered in the above entitled action:

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS AND TC ENERGY'S MOTION TO DISMISS**

I declare under penalty of perjury that the foregoing is true and correct.

s/ *Stephan C. Volker*
STEPHAN C. VOLKER (Pro Hac Vice)