## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, | |
| Plaintiffs, | **CV-19-28-GF-BMM** |
| v. | |
| PRESIDENT DONALD J. TRUMP, et al., | |
| Defendants, | **ORDER** |
| and | |
| TC ENERGY CORPORATION, et al., | |
| Defendant-Intervenors. | |

Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA") (collectively, "Plaintiffs") bring this action against President Donald J. Trump and various government agencies and agents in their official capacities ("Federal Defendants"). Plaintiffs allege that President Trump violated the Property Clause of the United States Constitution, the Commerce Clause of the United States Constitution, and Executive Order 13337 when he issued a Presidential Permit in 2019 ("2019 Permit") authorizing defendant-intervenors TransCanada Keystone Pipeline, LP and TC Energy Corporation (collectively, "TC

Energy") to construct a cross-border segment of the oil pipeline known as Keystone XL ("Keystone").

Plaintiffs seek a preliminary injunction to stay all permits that the Federal Defendants have issued that allow for TC Energy's construction of the Keystone pipeline. Plaintiffs also seek to enjoin TC Energy's construction and preconstruction activities pending this Court's adjudication of the merits of this action. Federal Defendants and TC Energy move to dismiss this action for lack of jurisdiction and for failure to state a claim.

## BACKGROUND

### I.   Executive Orders Concerning Cross-Border Pipeline Permitting on the United States's Borders

President Lyndon B. Johnson issued Executive Order 11423 in 1968 ("1968 Executive Order"). Providing for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States, Exec. Order 11423, 33 Fed. Reg. 11741 (Aug. 20, 1968). President Johnson noted that "the proper conduct of the foreign relations of the United States requires" applicants to obtain executive permission for constructing and maintaining facilities at the United States border connecting the United States with a foreign country. *Id.* President Johnson sought to "provide a systematic method in connection with the issuance of permits for the

construction and maintenance" of facilities that connect the United States with a foreign country. *Id.*

The 1968 Executive Order designated and empowered the Secretary of State to "receive all applications for permits for the construction, connection, operation, or maintenance, at the borders of the United States, of . . . pipelines . . . for the exportation or importation of . . . petroleum products." *Id.* The 1968 Executive Order required the Secretary of State to request the views of various departments and agencies, including "the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of the Interior, the Secretary of Commerce, the Secretary of Transportation, the Interstate Commerce Commission, and the Director of the Office of Emergency Planning." *Id.* The 1968 Executive Order instructed the Secretary of State to consider the departments' and agencies' views to determine whether the issuance of a permit "would serve the national interest." The Secretary of State would recommend permit issuance if the permit would serve the national interest and recommend application denial if the permit would not serve the national interest. *Id.*

The 1968 Executive Order governed cross-border pipeline facilities until 2004, when President George W. Bush issued Executive Order 13337 ("2004 Executive Order"). Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of

the United States, Exec. Order No. 13337, 69 Fed. Reg. 25299 (April 30, 2004).

President Bush sought to "expedite reviews of permits as necessary to accelerate

the completion of energy production and transmission projects, and to provide a

systematic method for evaluating and permitting the construction and maintenance

of certain border crossings for land transportation." Notably, President Bush

sought to do so "while maintaining safety, public health, and environmental

protections." *Id.*

The 2004 Executive Order revised portions of the 1968 Executive Order, but

maintained the same general approval procedure for cross-border pipeline

facilities. The 2004 Executive Order similarly empowered the Secretary of State to

receive all applications, seek the views of various agencies and departments, and

then determine whether issuance of a permit to the applicant would serve the

national interest. The Secretary of State would recommend permit issuance if the

permit would serve the national interest and recommend application denial if the

permit would not serve the national interest. *Id.* at 25300. The 2004 Executive

Order further provided that the order did not affect the authority of any department

or agency, supersede or replace other laws, or "relieve a person from any

requirement to obtain authorization from any other department or agency of the

United States Government in compliance with applicable laws and regulations

subject to the jurisdiction of that department or agency." *Id.* at 25301.

The 2004 Executive Order remained in effect until April 10, 2019, when President Trump issued Executive Order 13867 ("2019 Executive Order"). Issuance of Permits with Respect to Facilities and Land Transportation Crossings at the International Boundaries of the United States, Exec. Order 13867, 84 Fed. Reg. 15491 (April 10, 2019). The 2019 Executive Order revokes the 1968 Executive Order and the 2004 Executive Order. *Id.* at 15492. President Trump noted in the 2019 Executive Order that "executive actions, Federal regulations, and policies of executive departments and agencies" have "unnecessarily complicated the Presidential permitting process" of cross-border infrastructure permits. *Id.* at 15491. President Trump concluded that those complications hindered the United States's economic development and undermined the United States's efforts "to foster goodwill and mutually productive economic exchanges with its neighboring countries." *Id.*

The 2019 Executive Order revises the process in the 2004 Executive Order for issuing permits of certain facilities at the border of the United States. The 2019 Executive Order designates the Secretary of State to receive all applications for the issuance or amendment of permits for cross-border "pipelines . . . and similar facilities for exportation or importation of all products to or from a foreign country." *Id.* The 2019 Executive Order instructs the Secretary of State to advise the President as to whether the President should request the views of any agency

5

heads. *Id.* at 15492. Agency heads whose opinion the President requests must provide their views and render assistance as requested. The Secretary of State also may solicit advice from State, tribal, and local and foreign governments, "as the President may deem necessary." *Id.*

The Secretary of State, after collecting any information that the President requests, must determine whether issuance of the permit would "serve the foreign policy interests of the United States." The Secretary of State shall advise the President regarding the Secretary of State's opinion of whether issuance of the permit would "serve the foreign policy interests of the United States." *Id.* The 2019 Executive Order provides that permitting decisions "shall be made solely by the President." The 2019 Executive Order notes that existing permits "shall remain in full effect in accordance with their terms unless and until modified, amended, suspended, or revoked by the appropriate authority." *Id.*

## II.     Permitting the Keystone Pipeline

### A. The Keystone Pipeline

TC Energy proposed Keystone as an expansion to its existing pipeline system in 2008. *Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV-17-29-GF-BMM, 2017 WL 5632435, at *1 (D. Mont. Nov. 22, 2017) (hereinafter "*IEN November 2017 Order*"). Keystone would transport up to 830,000 barrels per day

of crude oil from Alberta, Canada and the Bakken shale formation in Montana to existing pipeline facilities in Nebraska. *Id.*

TC Energy first applied for a presidential permit in September of 2008 ("2008 Application"). *Id.* The 2004 Executive Order governed cross-border oil pipelines at that time, and provided the State Department with the authority to issue presidential permits for cross-border oil pipelines if issuance of the permit to the applicant "would serve the national interest." 69 Fed. Reg. at 25300.

The State Department recognized that its consideration of TC Energy's 2008 Application would represent a "major Federal action" that required a detailed environmental analysis. *IEN November 2017 Order*, 2017 WL 5632435, at *3 (citing Notice of Intent to Prepare an EIS, 74 Fed. Reg. 5019-02 (Jan. 28, 2009)); *see* 42 U.S.C. § 4332(2)(C) (requiring agencies to prepare detailed statements on "major Federal actions" effect on the environment). The State Department issued a draft environmental impact statement ("EIS") regarding TC Energy's 2008 Application in April 2010. *IEN November 2017 Order*, 2017 WL 5632435, at *1. The State Department supplemented the EIS in April 2011. *Id.* The State Department issued a final EIS in August 2011. *Id.*

Congress passed the Temporary Payroll Tax Cut Continuation Act ("TPTCCA") four months later. Pub. L. No. 112-78, 125 Stat. 1280 (December 23, 2011). The TPTCCA directed the President, acting through the State Department,

to render a final decision on TC Energy's 2008 Application within sixty days. *Id.*
The State Department denied TC Energy's application in early 2012. *IEN
November 2017 Order*, 2017 WL 5632435, at \*2. The State Department explained
that the arbitrary sixty-day deadline did not provide it with enough time to consider
fully Keystone's potential environmental impacts. *Id.*

TC Energy submitted a new application to the State Department for a
Presidential Permit on May 4, 2012 ("2012 Application"). *Id.* The State
Department reviewed the 2012 Application for potential environmental effects and
released its Final Supplemental Environmental Impact Statement ("FSEIS") in
January 2014.  *Id.* The Secretary of State denied the 2012 Application on
November 6, 2015. *Id.* The Secretary of State determined that issuing a
Presidential Permit for Keystone would not serve the national interest as required
by the 2004 Executive Order. *Id.*

### B. The 2017 Presidential Permit

President Trump issued a Presidential Memorandum Regarding Construction
of the Keystone XL Pipeline on January 24, 2017. *See* Construction of the
Keystone XL Pipeline, 82 Fed. Reg. 8663 (Jan. 24, 2017). The Memorandum
invited TC Energy to reapply for a Presidential Permit. The President instructed the
State Department to exercise the President's delegated authority to issue the
Presidential Permit within sixty days if the State Department determined, as

required by the 1968 Executive Order and the 2004 Executive Order, that issuance of the Presidential Permit would serve the national interest. *Id.* at 8663.

TC Energy filed a renewed application to the State Department on January 26, 2017 ("2017 Application"). *IEN November 2017 Order*, 2017 WL 5632435, at *2. At that time, the 2004 Executive Order remained in effect, and the State Department needed to find that the permit "would serve the national interest." 69 Fed. Reg. at 25300.

Under Secretary of State Thomas A. Shannon published a Record of Decision ("ROD") and a National Interest Determination ("NID") on March 23, 2017. Under Secretary of State Shannon recommended that the State Department approve a Presidential Permit granting TC Energy the authority to construct, connect, operate, and maintain an 875-mile long pipeline. *IEN November 2017 Order*, 2017 WL 5632435, at *1. The State Department issued an accompanying Presidential Permit on April 4, 2017 ("2017 Permit"). *See* Notice of Issuance of a Presidential Permit to TransCanada Keystone Pipeline, L.P., 82 Fed. Reg. 16467-02 (Apr. 4, 2017).

### C. Plaintiffs' Challenge to the 2017 Permit

Plaintiffs challenged the State Department's publication of the ROD/NID and its decision to issue the 2017 Permit. *IEN November 2017 Order*, 2017 WL 5632435, at *2. Plaintiffs sought to force Federal Defendants to withdraw their

FSEIS and Keystone approvals, including the ROD/NID and Presidential Permit, until Federal Defendants had complied with the National Environmental Policy Act ("NEPA"). *Id.* Plaintiffs also sought to force Federal Defendants to withdraw the completed Biological Assessment ("BA") and the completed Biological Opinion ("BiOp") until Federal Defendants had complied with the Endangered Species act ("ESA") and the Administrative Procedure Act ("APA"). *Id.* Plaintiffs further sought a declaration that Federal Defendants violated various environmental statutes and regulations. Plaintiffs also sought permanent injunctive relief that would prevent Federal Defendants and TC Energy from initiating any activities in furtherance of Keystone. *Id.*

Plaintiffs, Federal Defendants, and TC Energy filed motions for summary judgment. *Indigenous Envtl. Network v. U.S. Dep't of State*, 317 F. Supp. 3d 1118, 1119 (D. Mont. 2018) (hereinafter "*IEN August 2018 Order*"). The Court initially ordered Federal Defendants to supplement the 2014 EIS to consider the Mainline Alternative Route as approved by the Nebraska Public Service Commission. *IEN August 2018 Order*, 317 F. Supp. 3d at 1123. The Court later granted, in part, and denied, in part, each party's summary judgment motion. *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 591 (D. Mont. 2018). The Court vacated the State Department's ROD and NID. *Id.* The Court remanded the matter to the State Department for further consideration. *Id.*

The Court also granted injunctive relief to Plaintiffs. *Id.* The Court enjoined Federal Defendants and TC Energy from engaging in any activity in furtherance of the construction or operation of Keystone and associated facilities until the State Department had completed a supplement to the 2014 SEIS that complied with the requirements of NEPA and the APA. *Id.* All parties appealed the Court's decisions to the United States Court of Appeals for the Ninth Circuit. TransCanada Notice of Appeal, *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 591 (D. Mont. 2018) (No. CV-17-29-GF-BMM); Indigenous Environmental Network Notice of Appeal, *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018) (No. CV-17-29-GF-BMM); United States Notice of Appeal, *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018) (No. CV-17-29-GF-BMM). The Court denied, in large part, TC Energy's motion for a stay pending appeal. *See Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV-17-29, 2019 WL 652416, at *11 (D. Mont. Feb. 15, 2019). The Court clarified that TC Energy could engage in specific preconstruction activities associated with Keystone. *Id.*

### D. The 2019 Presidential Permit

President Trump issued the 2019 Permit on March 29, 2019. Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United

States and Canada, 84 Fed. Reg. 13101 (March 29, 2019). The President issued the 2019 Permit pursuant to the "authority vested in [him] as President of the United States of America." *Id.* at 13101

The 2019 Permit grants TC Energy permission, subject to certain conditions, "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada . . . for the import of oil from Canada to the United States." The 2019 Permit expressly supersedes and revokes the 2017 Permit. *Id.* The 2019 Permit grants TC Energy permission to construct the cross-border pipeline facilities "notwithstanding" the 2004 Executive Order. *Id.*

The 2019 Permit defines two terms. The 2019 Permit defines the term "Facilities" as that portion of the Keystone project in the United States associated with the application that TC Energy submitted to the State Department on May 4, 2012, and then resubmitted to the State Department on January 26, 2017. The 2019 Permit also defines the term "Border facilities" as "those parts of the Facilities consisting of a 36-inch diameter pipeline extending from the international border between the United States and Canada . . . to and including the first mainline shut-off valve in the United States located approximately 1.2 miles from the international border." *Id.*

The 2019 Permit also imposes various conditions. The 2019 Permit states that the "construction, connection, operation, and maintenance of the Facilities (not

including the route) shall be, in all material respects and as consistent with applicable law, as described in" the application that TC Energy submitted to the State Department on May 4, 2012, and then resubmitted to the State Department on January 26, 2017.

President Trump's issuance of the 2019 Permit prompted TC Energy and Federal Defendants to move to dismiss their pending appeals regarding the 2017 Permit. *See Indigenous Envtl. Network v. U.S. Dep't of State*, 2019 WL 2542756, at *1 (9th Cir. June 6, 2019). The Ninth Circuit granted the motions, dismissed the appeal, and remanded the action to this Court with instructions to vacate the injunction and dismiss the matter as moot. *Id.* The Ninth Circuit never reached the merits of any of the issues raised by the parties on appeal.

President Trump issued the 2019 Executive Order a few weeks after he issued the 2019 Permit. 84 Fed. Reg. at 15491. The 2019 Executive Order provides the President with complete authority to approve or deny cross-border pipeline permits. *Id.* at 15492. In this regard, the 2019 Executive Order clarifies that applicants do not need State Department or agency permission to obtain cross-border pipeline permits. *Id.*

**E. Plaintiffs' Current Challenge to the 2019 Permit**

Plaintiffs now bring this action to challenge the 2019 Permit. (Doc. 37.) Plaintiffs allege that the 2019 Permit violates the Property Clause and the

13

Commerce Clause of the United States Constitution. (Doc. 37 at 24, 27 (citing U.S. Const. art. IV, § 3, cl. 2; U.S. Const. art. I, § 8, cl. 3).) Plaintiffs also allege that the 2019 Permit violates the 2004 Executive Order. (Doc. 37 at 31.)

Plaintiffs seek an adjudication and declaration from this Court that President Trump's issuance of the 2019 Permit violates the United States Constitution and the 2004 Executive Order, and, therefore, is *ultra vires* and of no legal force or effect. (Doc. 37 at 32-33.) Plaintiffs also seek a preliminary and permanent injunction that would enjoin all Defendants, including TC Energy, from initiating any activities in furtherance of Keystone that could result in any change or alteration of the physical environment until the Defendants comply with the Constitution, the 2004 Executive Order, and other applicable law. (*Id.*)

## DISCUSSION

### I.     Standing

To invoke this Court's jurisdiction, Plaintiffs must establish that they possess standing to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992). Plaintiffs must demonstrate an injury-in-fact fairly traceable to the challenged action and that likely would be redressed by a favorable court decision in order to establish standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). TC Energy and Federal Defendants assert that Plaintiffs lack standing to bring this lawsuit. (Docs. 33 at 17 and 52 at 14.)

Standing represents an "indispensable part of [a] plaintiff's case." *Lujan*, 504 U.S. at 561. A plaintiff must support each element of standing in successive stages of the litigation "with the same manner and degree of evidence required" for any other matter at that stage. *Id.* "General factual allegations" prove sufficient to satisfy standing requirements at the pleading stage. *Id.* Courts "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *accord Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009).

### A. An Injury-In-Fact Fairly Traceable to the 2019 Permit

To demonstrate injury-in-fact, Plaintiffs must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). If an alleged injury is threatened, not actual, the threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Allegations of possible future injury are not sufficient. *Id.*

The 2019 Permit grants TC Energy permission "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada . . . for the import of oil from Canada to the United States." 84

Fed. Reg. at 13101. The parties do not dispute that the 2019 Permit purportedly authorizes TC Energy to construct, connect, and maintain a 1.2-mile segment of pipeline that extends from the United States-Canada border to and including the first mainline shut-off valve. (Doc. 37 at 25; Doc. 42 at 9; Doc. 43 at 9-10.) Plaintiffs assert that the 2019 Permit further authorizes TC Energy to construct and operate an additional 875 miles of pipeline in the United States. (Doc. 37 at 25.)

The 2019 Permit grants TC Energy permission to construct, connect, operate, and maintain pipeline that extend approximately 1.2 miles from the United States-Canada border to and including the first mainline shut-off valve. The 2019 Permit references TC Energy's past permit applications to the State Department when it defines the term "Facilities" and when it provides that the construction "of the Facilities (*not including the route*) shall be" as described in TC Energy's 2012 Application and 2017 Application. 84 Fed. Reg. at 13101-02 (emphasis added). The 2019 Permit's references to TC Energy's 2012 Application to the State Department and 2017 Application to the State Department appear to direct TC Energy to construct, operate, and maintain the authorized 1.2-mile cross-border pipeline segment consistent with the proposals contained in those applications.

Plaintiffs have demonstrated an injury sufficient to survive Defendants' motions to dismiss even if the Court were to construe the permit as authorizing only the 1.2-mile pipeline segment. Plaintiffs' First Amended Complaint describes

16

their members' interests in the 1.2-mile segment of land. (Doc. 37 at 16.) Plaintiffs assert that the 2019 Permit allows TC Energy to construct an oil pipeline on a 1.2-mile segment of land on which they live, work, recreate, and otherwise enjoy. (*Id.* at 15.) Plaintiffs claim that the pipeline will pass by or otherwise impact waters, habitat, and plant and animal species within the first 1.2-mile segment. (*Id.*) Plaintiffs assert that they would be directly and irreparably harmed by construction and operation of the first 1.2-mile pipeline segment. (Docs. 37 at 15-17 & 57 at 16.) Plaintiffs assert additional injuries and note that all other pipeline permits flow from the 2019 Permit and that the remainder of the pipeline could not operate without the 2019 Permit. (Doc. 57 at 17 (citing *Backcountry Against Dumps v. Chu*, 215 F. Supp. 3d 966, 976 (S.D. Cal. 2015)).) Plaintiffs have alleged sufficiently a concrete and particularized invasion of their legally protected interests. *See Spokeo, Inc.*, 136 S. Ct. at 1548.

Plaintiffs also have alleged sufficiently that the injury is certainly impending and fairly traceable to the 2019 Permit. *See Clapper*, 568 U.S. at 409. Plaintiffs note that the State of Montana, not the federal government, owns portions of the 1.2-mile land segment. (Doc. 57 at 18.) Plaintiffs represent that the State of Montana already has approved Keystone on that state land. (*Id.*) Plaintiffs contend that TC Energy immediately may begin pipeline construction on the land owned by the State of Montana pursuant to the 2019 Permit. (*Id.*) Plaintiffs further allege that

pipeline construction on federal land is certainly impending because any federal agencies that may have to approve additional permits report directly to the President and do not function independently. (Doc. 53 at 15.) Plaintiffs have pled facts sufficient to allege a certainty impending injury-in-fact that is fairly traceable to the 2019 Permit at this stage of the proceeding. *See Clapper*, 568 U.S. at 409.

### B. Redressability

Plaintiffs must demonstrate that a favorable decision likely would redress their alleged injuries. *Summers*, 555 U.S. at 493. Plaintiffs seek a declaration from this Court that President Trump's issuance of the 2019 Permit violates the United States Constitution and the 2004 Executive Order, and, therefore, is *ultra vires* and of no legal force or effect. (Doc. 37 at 32-33.) Plaintiffs also seek a preliminary and permanent injunction that would enjoin all defendants, including President Trump, from initiating any activities in furtherance of Keystone that could result in any change or alteration of the physical environment. (Doc. 37 at 33.)

Federal Defendants and TC Energy argue that any alleged injury would not be redressable. They claim that this Court cannot enjoin the President without violating the separation of powers. (Doc. 43 at 8.) Federal Defendants assert that Plaintiffs' requested relief invades the President's power over foreign affairs and power as Commander-in-Chief. (Doc. 52 at 18-19 (citing *Swan v. Clinton*, 100

F.3d 973, 976 n.1 (D.C. Cir. 1996).) Without the power to enjoin the President, they contend, this Court cannot redress Plaintiffs injuries.

The Court must address, therefore, whether it possesses the authority to enter an injunction against the President. Separation-of-power principles generally counsel against courts granting injunctive and declaratory relief against the President in the performance of his official duties. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality). Courts have not hesitated, however, to grant injunctive and declaratory relief when the Court determines that the President has no authority to act in the first place. *See id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)). Various courts have vacated unlawful presidential decisions. *See, e.g.*, *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1031 (D. Alaska 2019); *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998). A court's power to enjoin the President extends to enjoining portions of an executive order where the order "exceeds the statutory authority delegated by Congress and constitutional boundaries." *Hawaii v. Trump*, 859 F.3d 741, 768 (9th Cir. 2017), *dismissed as moot*, 138 S. Ct. 377 (2017); *League of Conservation Voters*, 363 F. Supp. 3d at 1031.

Courts retain the ability to enjoin the President in these situations because even where the President has broad discretion over an issue, "that discretion is not

boundless" and "may not transgress constitutional limitations." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986). Further, it remains firmly "the duty of the courts, in cases properly before them, to say where th[e] . . . constitutional boundaries lie." *Id.*

This Court can review President Trump's actions for lawfulness and enjoin his actions if it were to determine that President Trump acted unlawfully when he issued the 2019 Permit. In other words, if Plaintiffs prevail on their merits arguments, this Court possesses the ability to redress the harm that Plaintiffs allege that the 2019 Permit caused. Plaintiffs have demonstrated redressability. *See Summers*, 555 U.S. at 493.

## II.    Defendants' Motions to Dismiss

Federal Defendants and TC Energy move to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 22, 32, 49, & 51.) A party may bring a motion to dismiss challenging the Court's jurisdiction pursuant to Rule 12(b)(1), as either a facial attack on the sufficiency of the pleadings, or as a factual attack contesting the complaint's allegations. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Federal Defendants and TC Energy bring a facial attack. In resolving a facial attack, the Court must accept as true factual allegations as it would in resolving a Rule 12(b)(6) motion. *Id.* The Court assumes that a plaintiff's factual allegations

are true in deciding a motion to dismiss for failure to state a claim under Rule

12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must state "a

claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).

### A. Plaintiffs' Commerce Clause Claim

Plaintiffs have alleged that the President's action in issuing the 2019 Permit

violates the Foreign and Interstate Commerce Clauses of the United States

Constitution. (Doc. 37 at 28.) Plaintiffs point out that President Trump granted TC

Energy permission in the 2019 Permit to construct the 1.2-mile cross-border

segment of pipeline "for the import of oil from Canada to the United States." 84

Fed. Reg. at 13101. Plaintiffs characterize the import of oil into the United States

as a matter of foreign commerce. Plaintiffs assert that President Trump's unilateral

authorization of the cross-border pipeline conflicts with Congress's exclusive

power to regulate foreign and interstate commerce. (Doc. 37 at 28.)

"The President's authority to act, as with the exercise of any governmental

power, 'must stem either from an act of Congress or from the Constitution

itself[,]'" or from a combination of the two. *Medellin v. Texas*, 552 U.S. 491, 524

(2008) (quoting *Youngstown*, 343 U.S. at 585). Federal Defendants and TC Energy

assert that President Trump issued the 2019 Permit pursuant to his constitutional

authority over foreign affairs and as Commander-in-Chief. Both sides raise valid

arguments regarding the President's authority—or lack thereof—over cross-border pipeline permit issuance.

Plaintiffs raise persuasive arguments regarding Congress's authority to regulate cross-border pipeline permits under the Foreign Commerce Clause. The United States Constitution expressly grants Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. The boundaries of congressional power under the Foreign Commerce Clause admittedly lack any well-defined parameters. *United States v. Baston*, 818 F.3d 651, 667 (11th Cir. 2016). Little case law exists on the Foreign Commerce Clause, and the Supreme Court has never "thoroughly explored [its] scope." *Id.*

The cases show, however, that Congress possesses broad authority to regulate commerce with foreign nations, as long as a nexus or connection exists to the United States. The Supreme Court has described Congress's foreign commerce power as "exclusive and plenary." *Board of Trustees of Univ. of Ill. v. United States*, 298 U.S. 48, 56-57 (1933) (citing *Gibbons v. Ogden*, 9 Wheat. 1, 196–200 (1824)). In this regard, the Supreme Court has noted that Congress's power under the Foreign Commerce Clause "may be broader than when exercised as to interstate commerce." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932).

The Court agrees that cross-border transportation of crude oil through a pipeline constitutes a form of foreign commerce. *See United States v. Ohio Oil Co.*, 234 U.S. 548, 560 (1914); *Board of Trustees*, 289 U.S. at 57 ("The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted."); *State v. Brown*, 850 F. Supp. 821, 827 (D. Alaska 1994). There can be no dispute that a connection exists to the United States when a party seeks to build a cross-border pipeline facility that physically connects the United States and Canada. Even employing a narrow definition of commerce, that it "consist[s] of selling, buying, and bartering, as well as transporting for these purposes," the transportation of crude oil from Canada to the United States falls within Congress's power to regulate foreign commerce. *U.S. v. Lopez*, 514 U.S. 549, 585 (1995) (Thomas, J., concurring).

TC Energy and Federal Defendants, on the other hand, identify presidential constitutional powers relevant to cross-border pipeline permitting. Federal Defendants and TC Energy assert that President Trump exercised his power over foreign affairs and as Commander-in-Chief when he issued the 2019 Permit.

There are strong arguments that the President cannot exercise a foreign affairs power granted to Congress. The text of the Constitution grants limited foreign affairs powers to the political branches. Congress retains powers like the Foreign Commerce Clause, and the powers "[t]o establish an uniform Rule of

Naturalization," "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations," and "[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water." U.S. Const. art. I, § 8.

The President retains other powers, including the power to, "by and with the Advice and Consent of the Senate," "appoint Ambassadors," and "to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2. The Constitution also assigns to the President certain duties with respect to foreign affairs. These duties include the President serving as "Commander in Chief of the Army and Navy of the United States," *id.*, and "receiv[ing] Ambassadors and other public Ministers," U.S. Const. art. II, § 3.

When both political branches must be involved in an area of foreign affairs, the Constitution says so explicitly. For example, the Constitution empowers the President "to make Treaties," but only "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2. These specific powers do not account, however, for all the foreign affairs powers that the Federal Government exercises. *See Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2097 (2015) (Thomas, J., concurring in part and dissenting in part).

To account for this lack of textual authority, courts have applied a "historical gloss" to Article II's vesting clause. *American Ins. Ass'n v. Garamendi*, 539 U.S.

396, 414 (2003). This gloss recognizes the President's "vast share of responsibility for the conduct of our foreign relations." *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952)). In sum, the text of the Constitution gives some foreign affairs powers to Congress, some to the Executive Branch, and some to both branches. Courts have given the remainder of the foreign affairs powers to the Executive Branch. *See American Ins.*, 539 U.S. at 414 (noting the "historical gloss" that courts place on Article II's vesting clause); *Zivotofsky,* 135 S. Ct. at 2097 (Thomas, J., concurring in part and dissenting in part) (recognizing that the Constitution's allocation of foreign affairs powers "cannot account for the entirety of the foreign affairs powers exercised by the Federal Government").

The Constitution's explicit allocation of foreign affairs powers between Congress and the President and the allocation of implicit powers by courts to these two branches raises questions of whether Congress and the President possess concurrent authority in matters of foreign commerce. When the Constitution wanted both branches to be involved in an area of foreign affairs, it said so. Without more, it is unclear that the President would possess any authority to exercise control over an area of foreign affairs that falls explicitly within Congress's foreign affairs powers. It can be argued that the "Constitution's allocation of specific foreign affairs powers or roles to Congress or the Senate are properly read as assignments away from the President." *See* Saikrishna B. Prakash

& Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231, 253-54 (2001).

Courts occasionally must reconcile the President's asserted authority with Congress's asserted authority. In these situations, a court must review the President's actions and determine where lie the constitutional boundaries between the President and Congress. Justice Jackson's concurrence in the challenge to President Truman's order in the steel seizure case provides some guidance. *See Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring).

"When the President acts pursuant to an express or implied authorization of Congress" in a manner that proves consistent with the will of Congress, "his [overall] authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* at 635. Justice Jackson noted that in these circumstances, "and in these only, may he be said (for what it may be worth), to personify the federal sovereignty." *Id.* at 635-36. The strongest of presumptions support the President's action in that context. *Id.* at 637. A court must afford "the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Id.*

By contrast, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers." *Id.* When the President acts in that circumstance, there exists "a zone of twilight in

26

which he and Congress may have concurrent authority, or in which its distribution

is uncertain." *Id.* In this category, "'congressional inertia, indifference or

quiescence may' invite the exercise of executive power." *Zivotofsky*, 135 S. Ct. at

2084 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Finally,

"[w]hen the President takes measures incompatible with the expressed or implied

will of Congress, his power is at its lowest ebb, for then he can rely only upon his

own constitutional powers minus any constitutional powers of Congress over the

matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

No single precedent resolves the question of whether the President possesses

the inherent authority to permit cross-border pipelines, and, if the President does

possess the power, how far the power extends. *See Zivotofsky*, 135 S. Ct. at 2088.

This situation exists, in part, because the President and Congress both exercised

some authority over cross-border pipeline permits before President Trump

unilaterally issued the 2019 Permit "notwithstanding" the 2004 Executive Order.

The Supreme Court places "significant weight upon historical practice" in

analyzing separation-of-powers cases. *Zivotofsky*, 135 S. Ct. at 2090 (quoting *Nat'l

Labor Relations Bd. v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014)). The long-

standing practice involved the Secretary of State reviewing cross-border permit

applications, as required by the 1968 Executive Order and the 2004 Executive

Order. The Secretary of State remained responsible for obtaining the views of

27

various federal agencies and departments and then determining whether issuance

of the permit would "serve the national interest." 69 Fed. Reg. at 25300. The State

Department essentially possessed complete control over cross-border permit

applications and the obligation to ensure that those permits maintained "safety,

public health, and environmental protections." *See* 69 Fed. Reg. at 25299.

It could be argued that Congress implicitly approved of the system

established by the 1968 Executive Order and the 2004 Executive Order whereby

the Secretary of State reviewed cross-border permits and the Secretary of State

made the national interest determination. By contrast, Congress's enactment of the

TPTCCA in 2011 evidences its intent to exercise authority over cross-border

pipeline permitting. The TPTCCA provided that "the President, acting through the

Secretary of State, shall grant" TC Energy's 2008 Application within 60 days. 125

Stat. at 1289. Congress further provided that nothing in the TPTCCA required the

President to grant the permit if Keystone would not serve the national interest. *Id.*

The Keystone XL Pipeline Approval Act, S. 1, 114th Cong. §§ 1-6 (2015),

further shows the tug and pull between Congress and the Executive branch when it

comes to authority over cross-border pipelines. Congress attempted to assert

additional authority in the area of Keystone permitting in 2015, when it passed the

Keystone XL Pipeline Approval Act. The Keystone XL Pipeline Approval Act

granted TC Energy permission to "construct, operate, and maintain the pipeline

and cross-border facilities" as described in TC Energy's 2012 Application. S. 1, 114th Cong. § 2(a). The Keystone XL Pipeline Approval Act provided that the Secretary of State's January 2014 FSEIS "shall be considered to fully satisfy" all NEPA requirements and "any other provision of law that requires Federal agency consultation or review." S. 1, 114th Cong. § 2(b)(1)-(2).

President Obama vetoed the Keystone XL Pipeline Approval Act on February 24, 2015. Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act, 2015 WL 758544 (2015). President Obama noted that Congress was attempting "to circumvent longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest." *Id.* President Obama further stated that the Keystone XL Approval Act conflicted "with established executive branch procedures" and cut short "thorough consideration of issues that could bear on our national interest—including our security, safety, and environment . . . ." *Id.* The TPTCCA of 2011 and the unenacted Keystone XL Pipeline Approval Act of 2015 reflect some of the presidential-congressional interplay that existed regarding cross-border oil pipeline permit applications when President Trump ignored those historical practices and unilaterally issued the 2019 Permit.

Plaintiffs have pled a plausible claim that the President's issuance of the 2019 Permit was *ultra vires*, or outside the bounds of his legal authority. Congress

29

has demonstrated its intent to regulate cross-border pipelines pursuant to its powers under the Foreign Commerce Clause. President Trump completely removed the State Department and other federal agencies from considering cross-border permit applications when he issued the 2019 Permit. Plaintiffs have pled a plausible claim that merits further argument and analysis. The Court will deny Federal Defendants' and TC Energy's motions to dismiss Plaintiffs' Commerce Clause claim.

### B. Plaintiff's Property Clause Claim

Plaintiffs allege that President Trump lacks the authority to grant TC Energy permission to construct the 1.2-mile pipeline segment across portions of federal land. Plaintiffs contend that only Congress, not the President, possesses the constitutional power to dispose and make rules and regulations respecting federal lands. (Doc. 37 at 26.) Plaintiffs argue that the 2019 Permit allows construction on federal land without State Department review or compliance with NEPA and other environmental laws enacted by Congress. (*Id.* at 26-27.)

The Property Clause of the United States Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Property Clause provides Congress "the power over the public lands 'to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may

obtain rights in them.'" *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (quoting

*Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917)). The Supreme

Court further described Congress's authority under the Property Clause as

"complete power" over public lands. *Id.* at 540.

The 2019 Permit, issued by President Trump, granted TC Energy permission

to construct, connect, operate, and maintain a segment of pipeline extending 1.2

miles from the United States-Canada border, to and including, the first mainline

shut-off valve. 84 Fed. Reg. at 13101. Portions of that 1.2-mile segment would

cross land owned by the federal government. The Court does not interpret the 2019

Permit as excusing TC Energy from obtaining a BLM right-of-way or any other

federal permits or authorizations as it seeks to construct portions of the 1.2-mile

pipeline segment that would cross federal land.

An entity that seeks to occupy and use federal land first must obtain a right-

of-way as required by the Federal Land Policy Management Act ("FLPMA"), 43

U.S.C. §§ 1701 *et seq.* Congress requires BLM to manage federal land in

accordance with the FLPMA. To manage federal land in compliance with the

FLPMA, BLM must comply with the requirements of NEPA, the ESA, the APA,

the National Historic Preservation Act, and the Clean Water Act. (Doc. 37 at 26.)

The 2019 Permit affirmatively acknowledges that TC Energy must obtain

rights-of-way, permits, and other authorizations as may become necessary. 84 Fed.

Reg. at 13102. TC Energy represents to the Court that it similarly views the 2019 Permit as requiring, not excusing, compliance with applicable federal laws. (Docs. 23 at 9 & 42 at 8.) The 2019 Permit ignores, however, the 2004 Executive Order's national interest determination by the Secretary of State and excuses TC Energy's Keystone project from comprehensive State Department review.

The United States District Court for the District of Alaska determined in *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1031 (D. Alaska 2019), that President Trump's issuance of an executive order interfered with Congress's authority under the Property Clause. Congress enacted the Outer Continental Shelf Lands Act (OCSLA) pursuant to its constitutional authority under the Property Clause. *League of Conservation Voters*, 363 F. Supp. 3d at 1016 (citing Pub. L. No. 83-212, 67 Stat. 462 (1953) (codified at 43 U.S.C. § 1331 *et seq.*)). OCSLA provides that the President may withdraw from leasing "any of the unleased lands of the Outer Continental Shelf." *Id.* at 1020.

President Obama had withdrawn certain areas of the Outer Continental Shelf from leasing in 2015 and 2016. *Id.* at 1016. President Trump subsequently issued an executive order that purported to revoke President Obama's withdrawals of those lands from potential leasing. *Id.* at 1016-17. The district court acknowledged that Congress retained the authority to revoke prior presidential withdrawals. President Trump's executive order interfered with Congress's exclusive authority

32

to regulate public lands under the Property Clause. *Id.* at 1029. The district court deemed President Trump's purported revocation unlawful and invalid. *Id.* at 1031. The district court vacated the executive order. *Id.*

*League of Conservation Voters*, although factually distinct, provides some instructive reasoning. No definitive statutory framework governs the cross-border permit issue in the same manner as the OCSLA governed in *League of Conservation Voters*. Congress has not been entirely silent, however, on the issuance of cross-border pipeline permitting process, particularly regarding the Keystone project.

As described above, in enacting the TPTCCA, Congress exercised its authority in the area of cross-border pipeline permitting by directing the President, "acting through the Secretary of State," to render a final decision within 60 days on TC Energy's application for a permit to build Keystone pursuant to the 2004 Executive Order. 125 Stat. at 1289. Congress expressly conditioned its instruction that the Secretary of State evaluate the Keystone permit based on the procedures set forth in the 2004 Executive Order. Namely, the TPTCCA required the State Department to review TC Energy's 2008 Application and make a national interest determination. *Id.* The process outlined in the 2004 Executive Order, and cited by Congress in the TPTCCA in 2011, ensured that the pipeline permitting review incorporated the views and expertise of various federal agencies and departments.

Congress possesses "complete control" over federal land under the Property Clause. The cross-border permitting of pipelines that will cross federal land implicates Congress's authority over that land. *See Kleppe*, 426 U.S. at 540. Congress has demonstrated its intent to control the cross-border pipeline permitting process, specifically as it relates to the Keystone project. *See* 125 Stat. at 1289. Congress also has demonstrated its intent for the State Department to ensure that cross-border pipeline permits comply with all applicable laws and that the pipeline would serve the national interest. *Id.* President Trump arguably interfered with Congress's constitutional power to manage federal lands by issuing the 2019 Permit without requiring the congressionally-approved comprehensive State Department review process set forth in the 2004 Executive Order. Plaintiffs have presented plausible claims that President Trump's issuance of the 2019 Permit violated the Property Clause. The Court denies TC Energy's and Federal Defendants' motions to dismiss Plaintiffs' Property Clause claim.

### C. The 2019 Permit's Violation of the 2004 Executive Order

Plaintiffs assert that President Trump violated numerous provisions of the 2004 Executive Order when he issued the 2019 Permit. (Doc. 37 at 6-7.) For example, Plaintiffs allege that President Trump issued the 2019 Permit without having obtained the views of various federal agencies and without the Secretary of State's determination of whether issuance of the permit would serve the national

interest. (Doc. 37 at 31-32.) Plaintiffs further assert that the 2019 Permit violates the 2004 Executive Order because the 2019 Permit relieves TC Energy from complying with other applicable laws and regulations. (*Id.*) Federal Defendants and TC Energy respond that the President cannot violate an executive order as a matter of law. (Doc. 33 at 27; Doc. 52 at 32.)

The President may issue executive orders over foreign policy matters when he acts pursuant to his constitutional authority "as Commander-in-Chief and as the Nation's organ for foreign affairs." *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). Courts have reasoned that the President may withdraw "at any time for any or no reason" a prior executive order that the President issued solely pursuant to his inherent constitutional authority. *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965); *see id.* (reasoning that the president could have withdrawn a prior executive order that was not "required to effectuate any statute" and that had no "specific foundation in Congressional action"). The President does not possess the same liberty over a prior executive order that implemented certain statutory foundations. *See, e.g.*, *League of Conservation Voters*, 363 F. Supp. 3d at 1029-31; *see also City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1165–66 (9th Cir. 1997) (noting that courts may treat an executive order "with specific statutory foundation" as agency action and review the executive order under the Administrative Procedure Act);

*Legal Aid Soc. of Alameda Cty. v. Brennan*, 608 F.2d 1319, 1330 (9th Cir. 1979) (limiting judicial review of an executive order to the non-discretionary aspects of agency action). Thus, a court may review an executive order that implements statutory foundations and whether a President acted beyond his Constitutional or statutory authority in issuing the executive order. *See League of Conservation Voters*, 363 F. Supp. 3d at 1030-31 (vacating President Trump's executive order because the order interfered with Congress's exclusive authority to regulate public lands under the Property Clause).

President Trump purported to issue the 2019 Permit "notwithstanding" the 2004 Executive Order. 84 Fed. Reg. at 13101. Plaintiffs have asserted, however, that the President lacks the inherent constitutional authority unilaterally to approve cross-border pipeline permits. Further, as explained above, Congress has approved of the permitting process set forth in the 2004 Executive Order. Plaintiffs' assertion that the President lacks the inherent constitutional authority to issue the 2019 Permit, combined with Congress's approval of the 2004 Executive Order's permitting process through the TPTCCA, sufficiently supports Plaintiffs' claim that the 2019 Permit violated the 2004 Executive Order at this stage in the litigation. The Court denies Federal Defendants' and TC Energy's motions to dismiss Plaintiffs' claim that the 2019 Permit violated the 2004 Executive Order.

The 2004 Executive Order governed cross-border pipeline permitting when TC Energy submitted its 2017 Application and when President Trump issued the 2019 Permit on March 29, 2019. 84 Fed. Reg. at 13101. The Court remains aware that President Trump purported to revoke the 2004 Executive Order and change the cross-border pipeline permitting process when he issued the 2019 Executive Order on April 10, 2019. 84 Fed. Reg. at 15491. President Trump claimed to issue the 2019 Executive Order pursuant to "the authority vested in [him] as President by the Constitution . . . which gives the President authority over foreign affairs." 84 Fed. Reg. at 15491. If the 2019 Permit proves *ultra vires* because President Trump lacked the inherent constitutional authority to issue the permit, the 2019 Executive Order likely would be unlawful for similar reasons. Plaintiffs' claims currently before the Court do not directly present the question of whether the 2019 Executive Order proves lawful.

TC Energy and Federal Defendants would be responsible for complying with either the permitting process set forth in the 2004 Executive Order, or the permitting process set forth in the 2019 Executive Order, depending on its applicability and constitutionality, if the Court were to determine that President Trump acted *ultra vires* in his issuance of the 2019 Permit. Plaintiffs have stated a plausible claim that the 2019 Permit violated the 2004 Executive Order at this point in the litigation. The Court denies TC Energy's and Federal Defendants'

motion to dismiss Plaintiffs' claims that the 2019 Permit violated the 2004 Executive Order.

### D. Agency Defendants

Federal Defendants ask the Court to dismiss the Department of State, the Army Corps of Engineers, Fish and Wildlife Service, and BLM (collectively, "Agency Defendants"). (Doc. 52 at 19.) Federal Defendants contend that Plaintiffs have not alleged that the Agency Defendants violated any law and that Plaintiffs have not identified any final agency actions. (Doc. 52 at 19.) Federal Defendants further assert that, to the extent Plaintiffs' claims focus on BLM's decision regarding a right-of-way on federal land that the 1.2-mile pipeline segment would cross, those claims are not ripe because BLM has not yet reached a decision regarding that right-of-way. (Doc. 52 at 21.) Plaintiffs respond that they properly present claims against the Agency Defendants because the 2004 Executive Order requires the Agency Defendants to review pipeline presidential permit applications. (Doc. 57 at 37.)

The Agency Defendants remain appropriately included at this stage in the litigation. Plaintiffs have asserted that at least one of the Agency Defendants, BLM, has not demonstrated compliance with applicable federal law. (Doc. 37 at 66.) Further, Plaintiffs have asserted plausible claims for relief under the Foreign Commerce Clause, the Property Clause, and for violation of the 2004 Executive

Order. TC Energy's 2017 Application remains potentially subject to the 2004

Executive Order's permitting process if the Court were to conclude that President

Trump acted *ultra vires* when he issued the 2019 Permit. The 2004 Executive

Order requires that the Agency Defendants participate in the cross-border pipeline

permitting process. 69 Fed. Reg. at 25299-25300.

It would prove premature for the Court to dismiss Agency Defendants at this

point. The Court therefore denies Federal Defendants' motions to dismiss the

Agency Defendants without prejudice. Federal Defendants remain free to re-file

their motion should the relationship of the Agency Defendants to the litigation and

circumstances change as the case proceeds.

## III.    Preliminary Injunction

Plaintiffs seek a preliminary injunction pending final determination of this

action. (Doc. 27.) Preliminary injunctions serve to preserve the status quo pending

final determination of an action. *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d

781, 786 (9th Cir. 2001). A plaintiff seeking a preliminary injunction must

establish that it likely will succeed on the merits, that it likely will to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities

tips in its favor, and that an injunction will serve the public interest. *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A court applies a sliding scale

approach to a plaintiff's request for a preliminary injunction, whereby the

reviewing court balances the elements "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Plaintiffs have not demonstrated that a preliminary injunction is required to preserve the status quo at this stage of the proceedings. TC Energy submitted a status report to the Court on September 20, 2019, detailing its plans regarding various pre-construction activities, specifically weed eradiation, pipe transport, worker camp preparation, right-of-way mowing, pump station mowing, tree-felling, and road maintenance. (Doc. 62.) TC Energy represented to the Court on October 9, 2019, that it had completed weed eradication and would soon complete road maintenance. (Doc. 68 at 6.) TC Energy stated that it would not conduct any further preconstruction activities for the remainder of 2019. (Doc. 68 at 6.) TC Energy reported that it is focused on securing outstanding permits and acquiring land. (Doc. 68 at 7.) TC Energy anticipates resuming preconstruction activities during the second quarter of 2020.

The Court therefore finds it appropriate to deny Plaintiffs' motion for a preliminary injunction at this stage in the proceeding, when TC Energy is not currently engaged in any activities that alter the status quo. Plaintiffs remain free to renew their request for a preliminary injunction should TC Energy's future activities interfere with the status quo.

## CONCLUSION

Plaintiffs have alleged plausible claims to relief under the Commerce Clause, the Property Clause, and the 2004 Executive Order. The Court denies TC Energy's and Federal Defendant's motions to dismiss. Agency Defendants remain appropriately included at this stage of the litigation. Plaintiffs have not demonstrated that a preliminary injunction proves necessary to preserve the status quo at this time. The Court accordingly denies Plaintiffs' Motion for a Preliminary Injunction.

## ORDER

Accordingly, it is **HEREBY ORDERED** that Federal Defendants' Motions to Dismiss (Docs. 22 and 51) are **DENIED**.

It is **FURTHER ORDERED** that TC Energy's Motions to Dismiss (Docs. 32 and 49) are **DENIED**.

It is **ALSO ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 27) is **DENIED WITHOUT PREJUDICE**.

DATED this 20th day of December, 2019.

Brian Morris
United States District Court Judge