Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT  59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
        mstermitz@crowleyfleck.com
        jroth@crowleyfleck.com

Peter R. Steenland
Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
Telephone: 202-736-8000
Email:  psteenland@sidley.com
        pwhitfield@sidley.com

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, <br><br> Plaintiffs, <br><br> vs. <br><br> PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers; UNITED STATES FISH AND WILDLIFE SERVICE, a  federal agency; GREG SHEEHAN, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; UNITED STATES BUREAU OF LAND MANAGEMENT, and DAVID BERNHARDT, in his official | CV 19-28-GF-BMM <br><br> **MEMORANDUM OF TRANSCANADA KEYSTONE PIPELINE, LP AND TC ENERGY CORPORATION IN RESPONSE TO THE COURT'S ORDER OF DECEMBER 20, 2019 (DOCUMENT 74) AND IN SUPPORT OF RENEWAL OF THEIR MOTION TO DISMISS (DOCUMENT 49)** |

capacity as Acting U.S. Secretary of the
Interior,

                      Defendants,

TRANSCANADA KEYSTONE PIPELINE,
LP, a Delaware limited partnership, and TC
ENERGY CORPORATION, a Canadian
Public company,

                      Defendant-Intervenors.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

RESPONSE TO QUESTION 1 .................................................................1

I.  The Text Of The 2019 Permit Demonstrates That It Is Limited to 1.2 Miles ...............................................................................................2

II.  Past Presidential Permits Authorize Only Border-Crossing Facilities...........4

III.  The Actions Of The United States And TC Energy Confirm That The Permit Only Authorizes Border-Crossing Facilities. ..................................................5

RESPONSE TO QUESTIONS 2(a)-(e)......................................................6

I.  The Constitution's Allocation Of Authority To Regulate Cross-Border Oil Pipeline Facilities.......................................................................6

II.  The 2011 Temporary Act Does Not Require The President To Comply With Executive Order No. 13337 ...........................................................9

III.  Congress Has Not Impliedly Required The President To Comply With Executive Order No. 13337 ............................................................17

RESPONSE TO QUESTION 3 ..............................................................23

CONCLUSION ....................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Board of Trustees of Univ. of Ill. v. United States*,
   289 U.S. 48 (1933)..................................................................................6

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981)........................................................................18, 19, 20

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)........................................................................16, 17, 21

*League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013 (D.
   Alaska 2019), *appeal docketed*, No. 19-35460 (9th Cir. May 29,
   2019) ......................................................................................................22

*Manhattan-Bronx Postal Union v. Gronouski*,
   350 F.2d 451 (D.C. Cir. 1965) ...............................................................23

*Springer v. Philippine Islands*,
   277 U.S. 189 (1928)..................................................................................8

*Walling v. Michigan*,
   116 U.S. 446 (1886)................................................................................25

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)..................................................................................8

*Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2014)............................................................................8

**Constitution**

U.S. Const. art. II ......................................................................................7

**Statutes and Regulations**

Act of May 27, 1921, ch. 12, 42 Stat. 8 ............................................11, 12

Iran Freedom Support Act of 2006, Pub. L. No. 109-293, 120 Stat.
   1344..............................................................................................10, 12, 13

Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No.
112-78, 125 Stat. 1280 ................................................................... *passim*

15 U.S.C. § 717f ................................................................................ 23

16 U.S.C. § 1540 .............................................................................. 21

25 U.S.C. § 323 ................................................................................ 24

25 U.S.C. § 324 ................................................................................ 24

30 U.S.C. § 185 ................................................................................ 24

33 U.S.C. § 404 ................................................................................ 23

33 U.S.C. § 408 ................................................................................ 23

33 U.S.C. § 1344 .............................................................................. 23

33 U.S.C. § 1365 .............................................................................. 21

42 U.S.C. § 4332 .............................................................................. 21

42 U.S.C. § 4333 .............................................................................. 21

43 U.S.C. § 1761 .............................................................................. 24

49 U.S.C. app. § 1 (1988) ................................................................ 24

49 U.S.C. § 60102 ............................................................................ 23

49 U.S.C. § 60502 ............................................................................ 24

40 C.F.R. § 1508.12 .......................................................................... 21

49 C.F.R. pt. 195 .............................................................................. 23

Executive Order 11423,
33 Fed. Reg. 11,741 (Aug. 20, 1968) .............................. 18, 19, 20, 22

Executive Order 13337,
69 Fed. Reg. 25,299 (May 5, 2004) ............................................ *passim*

Presidential Permit for Detroit River Pipeline,
79 Fed. Reg. 32,601 (June 5, 2014) .................................................. 5

Presidential Permit for Express Pipeline LLC,
80 Fed. Reg. 45,695 (July 31, 2015)....................................................5

Presidential Permit for Kinder Morgan Cochin Pipeline (Renville County, ND facilities),
78 Fed. Reg. 73,582 (Dec. 6, 2013)......................................................4

Presidential Permit for Lines 16, 18, 19,
80 Fed. Reg. 6,791 (Feb. 6, 2015) ........................................................5

Presidential Permit for Line 20 Permit,
78 Fed. Reg. 53,493 (Aug. 29, 2013) ...................................................5

Presidential Permit for Line 39,
80 Fed. Reg. 6,789 (Feb. 6, 2015) ........................................................5

Presidential Permit for Magellan Pipeline Company, L.P.,
80 Fed. Reg. 45,697 (July 31, 2015)....................................................4

Presidential Permit for Murphy Oil Corp.,
31 Fed. Reg. 6,204 (Apr. 22, 1966) ....................................................18

Presidential Permit for Plains Pipeline, L.P.,
80 Fed. Reg. 51,861 (Aug. 26, 2015) ...................................................5

Presidential Permit for Vantage Pipeline US, LP,
78 Fed. Reg. 46,402 (July 31, 2013).....................................................5

Presidential Permit of March 29, 2019,
84 Fed. Reg. 13,101 (Apr. 3, 2019) ............................................2, 3, 5

**Legislative History**

157 Cong. Rec. 12032 (daily ed. July 26, 2011) ...................................14

157 Cong. Rec. 12042 (daily ed. July 26, 2011) ...................................14

157 Cong. Rec. 19906 (daily ed. Dec. 13, 2011)...................................14

S. 1, 114th Cong. (2015) ........................................................................16

**Advisory Opinion**

*Proposals Regarding an Independent Attorney General*,
1 Op. O.L.C. 75 (1977) ........................................................................23

**Other Authorities**

Marjorie Whiteman, Digest of International Law, Vol. 9 (1968) ............................18

TC Energy submits this memorandum pursuant to the direction of this Court in its December 20, 2019 order. (Doc. 74). Earlier that same day, the Court denied Defendants' motions to dismiss, stating that Plaintiffs' constitutional claims warranted "further argument and analysis." (Doc. 73 at 30). Because the Court's order for supplemental briefing appears to request the "further argument and analysis" identified in the order denying the motion to dismiss, TC Energy understands these two orders to invite, or at least to permit, Defendants to renew their motion to dismiss Plaintiffs' claims based on this additional briefing. Accordingly, because this supplementation demonstrates that Plaintiffs cannot prevail on their claims as a matter of law, TC Energy submits that the Court should dismiss the First Amended Complaint. In the event that this supplemental filing cannot be used as a vehicle for such relief, TC Energy is separately filing a motion for summary judgment on all of Plaintiffs' claims.

## RESPONSE TO QUESTION 1

The 2019 Presidential Permit ("2019 Permit") authorizes construction of only the 1.2-mile segment of Keystone XL pipeline facilities that cross the U.S. border in Montana. This is clear from the plain text of the 2019 Permit itself, the conduct of current and past administrations in authorizing cross-border projects,

and the conduct of all federal agencies interpreting the permit and TC Energy's application for other authorizations.

## I. The Text Of The 2019 Permit Demonstrates That It Is Limited to 1.2 Miles

In the 2019 Permit's opening paragraph, the President grants permission to "construct, connect, operate, and maintain pipeline facilities *at the international border* of the United States and Canada at Phillips County, Montana." Presidential Permit of March 29, 2019, 84 Fed. Reg. 13101 (Apr. 3, 2019). The italicized text clearly limits the scope of the President's authorization to the pipeline's facilities at the border. Indeed, the Permit defines "Border facilities" as including only the "pipeline extending from the international border between the United States and Canada at a point in Phillips County, Montana, to and including the first mainline shut-off valve in the United States located approximately 1.2 miles from the international border, and any land, structures, installations, or equipment appurtenant thereto." *Id.*

Plaintiffs' contention that the 2019 Permit authorizes the full pipeline route cannot be squared with the 2019 Permit's terms. After defining "Border facilities," the 2019 Permit then provides, in Article 1, that the "Border facilities" be subject to certain terms, and that substantial changes in the "Border facilities" cannot be made absent notification and approval by the President. *Id.* Article 2 requires TC Energy to allow the government to access and inspect only the "Border facilities."

2

*Id.* at 13102. And Article 3 states that upon "termination, revocation, or surrender" of the permit, TC Energy is responsible for removing just the Border facilities. Articles 4, 5, 7, 8, 9, and 10 are also limited to just the Border facilities. *Id.* Given the limitations in the terms of the 2019 Permit, it cannot be read to authorize the entirety of Keystone XL.

As this Court has noted, December 20, 2019 Order at 16, the 2019 Permit also states that the "construction, connection, operation, and maintenance of the Facilities (not including the route) shall be, in all material respects and as consistent with applicable law, as described in the permittee's application for a Presidential permit filed on May 4, 2012, and resubmitted on January 26, 2017." 84 Fed. Reg. at 13101-02. The 2017 application, however, clearly "requests a Presidential Permit" only for "the specific border crossing facilities associated with the Proposed Keystone XL Project," which it describes as the 1.2 mile segment that "extend[s] downstream from the United States border, in Phillips County, Montana up to and including the first pipeline isolation valve, located at Milepost 1.2." TransCanada Keystone Pipeline, L.P., Application for Presidential Permit for Keystone XL Pipeline Project, at 6 (Jan. 26, 2017), https://www.state.gov/wp-

content/uploads/2019/02/Application-for-Presidential-Permit-for-Keystone-XL-Pipeline-Project.pdf.

In all events, even if this clause is understood to address facilities beyond the 1.2 mile border-crossing segment, it is a *condition* on the permission to build that 1.2 mile segment, *i.e.* TC Energy can build the border segment as long as it constructs and operates facilities outside that segment in accordance with the description in its application. This provision is not an *authorization* to build facilities outside the border segment.

## II.    Past Presidential Permits Authorize Only Border-Crossing Facilities

Plaintiffs' interpretation of the scope of the 2019 Permit is also inconsistent with other presidential permits for pipeline projects. In general, such permits cover only the portion of the project from the international border to the first shut-off valve. The presidential permit for the Cochin Pipeline governed the portion of the project from the US-Canada border to the first block valve located 14.5 miles from the border.[1] Similarly the presidential permit for a Magellan pipeline covered only the US-Mexico border crossing to the first shut-off valve (a distance of only 600 feet).[2] Other presidential permits for transboundary pipelines such as the

---

[1] Presidential Permit for Kinder Morgan Cochin Pipeline (Renville County, ND facilities), 78 FR 73582 (Dec. 6, 2013).

[2] Presidential Permit for Magellan Pipeline Company, L.P., 80 FR 45,697 (July 31, 2015).

Diamondback Pipelines, Vantage Pipeline, Line 20, St. Clair River Pipelines,

Detroit River Pipeline, Lines 16, 18, and 19, Line 39, Express Pipeline, and Plains

Pipeline did not specify exact distances, but clarified that they authorized only the

border crossing to the first shut-off or block valve—not the entire project.[3]

## III.   The Actions Of The United States And TC Energy Confirm That The Permit Only Authorizes Border-Crossing Facilities.

Plaintiffs' theory that the 2019 Permit authorizes the full pipeline route is

one they concocted without evidence in order to manufacture challenges to the

2019 Permit. But neither the United States nor TC Energy interprets the 2019

Permit to authorize construction of the entire pipeline or to exempt TC Energy

from obtaining any other authorization required for pipeline construction. The

2019 Permit makes clear that TC Energy must acquire "right-of-way grants or

easements, permits and other authorizations" required by law to construct even the

1.2-mile border-crossing segment. *See* 84 Fed. Reg. at 13,102, art. 6(1).

Consequently, TC Energy has applied for and the Secretary of the Interior has

---

[3] Presidential Permit for TransMontaigne Partners, L.P. (Razorback L.L.C.), Diamondback Pipelines, FR citation not found (issuance date is October 6, 2010); Presidential Permit for Vantage Pipeline US, LP, 78 FR 46402 (July 31, 2013); Presidential Permit for Line 20 Permit, 78 FR 53,493 (Aug. 29, 2013);Presidential Permit for Detroit River Pipeline, 79 FR 32601 (June 5, 2014); Presidential Permit for Lines 16, 18, 19, 80 FR 6791 (Feb. 6, 2015); Presidential Permit for Line 39, 80 FR 6789 (Feb. 6, 2015); Presidential Permit for Express Pipeline LLC, 80 FR 45,695 (July 31, 2015); Presidential Permit for Plains Pipeline, L.P., 80 FR 51,861 (Aug. 26, 2015).

issued a Record of Decision approving issuance of a right-of-way grant over federal land within the 1.2-mile border crossing segment.[4] This review included a full environmental analysis of relevant impacts, including a Supplemental Environmental Impact Statement previously required by this Court. Additionally, TC Energy has obtained from the State of Montana permission to construct Keystone XL over the State's land within the 1.2-mile border segment. The actions of the parties, which Plaintiffs cannot dispute, contradict Plaintiffs' interpretation of the 2019 Permit's scope.

## RESPONSE TO QUESTIONS 2(a)-(e)

### I.    The Constitution's Allocation Of Authority To Regulate Cross-Border Oil Pipeline Facilities.

Under both the Domestic and Foreign Commerce Clauses, Congress has plenary and exclusive power over cross-border trade. *Board of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 56-57 (1933). And, as this Court has noted, the importation of oil into the United States plainly involves both domestic and foreign commerce. December 20, 2019 Order at 23. Thus, Congress has plenary power to

---

[4] U.S. Dep't of the Interior, Bureau of Land Mgmt;, Record of Decision, Keystone XL Pipeline Project Decision to Grant Right-of-way and Temporary Use Permit on Federally-Administered Land (Jan. 22, 2020), https://eplanning.blm.gov/epl-front-office/projects/nepa/1503435/20011555/250015801/Keystone_ROD_Signed.pdf.

regulate cross-border pipelines under its power over domestic and foreign commerce.

This does not mean, however, that such importation is *exclusively* a matter of domestic or foreign commerce. As the State Department has noted, importation of crude oil implicates "global energy security," which is "a vital part of U.S. national security." 2015 Record of Decision/National Interest Determination at 23; *see also id.* at 24.[5] And importing oil from Canada implicates relations with "one of the United States' closest strategic allies." *Id.* at 25. The President has constitutional authority to promote the nation's security and to address its foreign relations under the "Commander in Chief" clause and his authority to "receive Ambassadors and other public Ministers." U.S. Const. art. II, §§ 2 & 3.

In its recent order, this Court suggested that the President's foreign affairs powers may not provide a basis for concurrent authority over matters concerning foreign commerce, absent language in the Constitution empowering both political branches "to be involved in an area of foreign affairs." December 20, 2019 Order at 25. But as just shown, the importation of oil from a strategic ally also implicates matters of foreign relations and national security, and the Constitution assigns both political branches responsibility with respect to these matters. Accordingly, in light

---

[5] Available at https://2012-keystonepipeline-xl.state.gov/documents/organization/249450.pdf.

of Congress's plenary and exclusive authority over foreign commerce, TC Energy submits that the President can issue permits for cross-border oil pipeline facilities as long as doing so accords with the "expressed or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring); *see also Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2014) (noting that "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue").

Ultimately, however, it is unnecessary to take on the complex challenge of "attempting to define the President's powers comprehensively," or "to delineate what belongs to him by virtue of his office beyond the power even of Congress to contract; what authority belongs to him until Congress acts; what kind of problems may be dealt with either by the Congress or by the President or by both." *Youngstown*, 343 U.S. at 597 (Frankfurter, J., concurring). *See also Springer v. Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting) ("The great ordinances of the Constitution do not establish and divide fields of black and white"). As TC Energy demonstrates below, Plaintiffs would not be entitled to the relief they seek if this Court were to conclude that Congress's exclusive and plenary power over foreign and domestic commerce deprives the President of any power to regulate cross-border oil pipelines. Such a conclusion—which would cast doubt on the validity of presidential actions dating back to 1875—would simply

8

mean that the Keystone XL pipeline can be built across the international border without any presidential permit authorizing construction and operation of its cross-border facilities. *See infra* at 22-25.

Accordingly, in order to obtain any relief based on the alleged invalidity of the 2019 Permit, Plaintiffs must show that the President *has* authority to issue permits for cross-border pipeline facilities, but that Congress has somehow *restricted* the manner in which the President does so, and that the 2019 Permit was issued in contravention of such restrictions. Plaintiffs apparently recognize this, which is why they claim that the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, 125 Stat. 1280, 1289 (the "2011 Temporary Act") "specifically directed the President to comply with EO 13,337 in permitting Keystone." Docket 57 at 28; *see also id.* at 22, 25. Alternatively, they claim that, by silently acquiescing in issuance of presidential permits under E.O. 13337, Congress somehow prohibited the President from issuing permits in any other manner. As TC Energy explains below, these claims are legally untenable.

## II. The 2011 Temporary Act Does Not Require The President To Comply With Executive Order No. 13337

In claiming that the 2011 Temporary Act required the President to comply with E.O. 13337, Plaintiffs are effectively arguing that the Act codified that Executive Order. But the Act did no such thing. It imposed a one-time deadline to force President Obama to act on what Congress viewed (eight years ago) as undue

9

delay with respect to the Keystone XL pipeline application for a cross-border permit. There is no plausible basis for adopting Plaintiffs' contrary reading.

To begin with, Congress knows how to codify all or parts of Executive Orders and does so expressly when that is its intent. Thus, for example, in the Iran Freedom Support Act of 2006, Congress provided that, "[e]xcept as otherwise provided in this section, United States sanctions with respect to Iran imposed pursuant to sections 1 and 3 of Executive Order No. 12957, sections 1(e), (1)(g), and (3) of Executive Order No. 12959, and sections 2, 3, and 5 of Executive Order No. 13059 (relating to exports and certain other transactions with Iran) as in effect on January 1, 2006, shall remain in effect." Pub. L. No. 109-293, § 101(a), 120 Stat. 1344, 1344-45 ("Iran Sanctions Codification").

Similarly, Congress codified an earlier Executive Branch practice concerning permits for cross-border commercial facilities. As the parties have previously noted, in 1875, President Grant asserted the authority to prohibit or allow foreign cables to enter the United States. In doing so, he considered whether: (1) the country of the foreign cable company allowed U.S. cables "to land and freely connect with and operate through its land"; (2) the foreign cable company was a monopoly; (3) the lines gave "precedence in the transmission of the official messages of the governments of the two countries"; and (4) the two governments had the power "to fix a limit to the charges to be demanded for the transmission of

10

messages" from their shores. *See* President Ulysses Grant's Seventh Annual Message to Congress, Rosebud Docket No. 67-2, pp. 15-16.

In 1921, Congress codified the President's role with respect to such facilities and modified some of the substantive criteria. It provided that no foreign cable could connect to the United States "unless a written license to land or operate such cable has been issued by the President." May 27, 1921, ch. 12 § 1, 42 Stat. 8, 8 ("Kellogg Act"). The President could withhold or revoke a license based on a determination, "after due notice and hearing," that the license would "assist in securing rights for the landing or operation of cables in foreign countries, or in maintaining the rights or interests of the United States or of its citizens in foreign countries, or will promote the security of the United States." *Id.* § 2, 42 Stat. at 8. Congress further empowered the President to impose conditions "to assure just and reasonable rates," but prohibited the granting of "exclusive rights of landing or of operation in the United States," and preserved the authority of the Interstate Commerce Commission to regulate transmission rates. *Id.*

The 2011 Temporary Act does not bear the slightest resemblance to a codification of an Executive Order or an Executive Branch practice. Instead, it was limited to a single project and was a blunt directive to the President to grant TC Energy's application for the Keystone XL pipeline within 60 days. *See* § 501(a), 125 Stat. at 1289. The Act allowed the President to decline to grant the application

11

if he determined that it "would not serve the national interest," but required him to explain any such determination to various committees and members of Congress. *See* § 501(b)(1)-(2), 125 Stat. at 1289-90. It further provided that, if the President failed to act within the 60-day period, a permit for the Keystone XL pipeline "shall be in effect by operation of law," provided it satisfied various other conditions. § 501(b)(3), 125 Stat. at 1290-91.

Thus, the 2011 Temporary Act does not provide that "the interagency process and national interest standard in section 1 of Executive Order No. 13337 shall remain in place." *Cf.* Iran Sanctions Codification, § 101(a), 120 Stat. at 1344-45. It does not even institutionalize the President's role in permitting cross-border pipeline facilities, by prohibiting construction of cross-border oil pipeline facilities "unless a written license … has been issued by the President." *Cf.* Kellogg Act, § 1, 42 Stat. at 8. It does not require that the President engage in any process in order to grant a permit, *cf. id.* § 2, 42 Stat. at 8 (authorizing issuance of license "after due notice and hearing"); forbid issuance of a license in any circumstances, *cf. id.* (no "exclusive rights of landing or of operation in the United States"); or empower the President to impose conditions on a permit, *cf. id.*(authorizing conditions "to assure just and reasonable rates").

In nevertheless claiming that the Act "specifically directed the President to comply with EO 13,337 in permitting Keystone," Docket 57 at 28, Plaintiffs rely

on the fact that the Act directed the President to "grant a permit *under* Executive

Order No. 13337." *Id.* at 25 (emphasis added). But this phrase cannot possibly bear

the weight Plaintiffs ascribe to it.

The sentence from which Plaintiffs selectively quote states, in material part:

> Except as provided in subsection (b), not later than 60
> days after the date of enactment of this Act, the
> President, acting through the Secretary of State, *shall
> grant* a permit under Executive Order No. 13337 … for
> the Keystone XL pipeline project *application filed on
> September 19, 2008 (including amendments)*.

§ 501(a), 125 Stat. at 1289 (emphases added). The italicized language makes clear

that Congress was directing the President to issue a permit "under" E.O. 13337

because that was the process being used to evaluate the Keystone XL pipeline's

"application." The fact that subsection (a) directed the President to "*grant* a

permit"—not simply to "make a decision about the Keystone XL pipeline project

application"—demonstrates that, in this provision, Congress was *commandeering*

the E.O. 13337 process and *dictating* the outcome Congress desired. It was not

binding President Obama (and all future Presidents) to adhere to that process, by

specifying that the process in section 1 of E.O. 13337 "shall remain in place." *Cf.*

Iran Sanctions Codification, § 101(a), 120 Stat. at 1344-45.[6]

---

[6] Similarly, because the phrase on which Plaintiffs rely directs the President, acting through State, to "*grant* a permit under Executive Order No. 13337," § 501(a), 125 Stat. at 1289 (emphasis added), it is plainly not an "instruction that the Secretary of State *evaluate the Keystone permit*," much less do so "based on the procedures set

Indeed, the legislative history underscores this purpose. Opponents of an earlier version of the measure that was included in 2011 Temporary Act, *see* 157 Cong. Rec. 12042 (daily ed. July 26, 2011) H.R. 1938, the North American-Made Energy Security Act (Sec. 3. Expedited Approval Process), objected that Congress was "overriding" the Executive Order. Representative Waxman stated that the permitting process "was established by Executive orders issued by President Johnson and President George W. Bush . . . . *The bill overrides the Executive orders and other Federal law, it short-circuits the decisionmaking process*." 157 Cong. Rec. 12032 (daily ed. July 26, 2011) (statement of Rep. Waxman). He made the same point with respect to the provision that was included in the 2011 Temporary Act itself, saying that it "would have the whole process short-circuited by *demanding* that [President Obama] come to the conclusion [to approve Keystone XL]." 157 Cong. Rec. 19906 (daily ed. Dec. 13, 2011) (statement of Rep. Waxman) (emphasis added); *see also id.* at 19918 (the bill would "*usurp* Presidential authority and *approve the Keystone [XL] pipeline* without proper review") (statement of Rep. Stark) (emphasis added).

The rest of the Act provides further confirmation, if any were needed, that it did not mandate compliance with E.O. 13337. First, the action-forcing mechanism

---

forth in the 2004 Executive Order." December 20, 2019 Order at 33 (emphasis added).

Congress chose is the antithesis of a codification of that Executive Order. If President Obama failed to make any decision within 60 days, the permit for Keystone XL would "be in effect by operation of law." § 501(b)(3), (c), 125 Stat. at 1290-91. Thus, Congress dictated that, if the President did nothing, the permit would become operative *without regard to* E.O. 13337's substantive "national interest" standard or its procedural requirements.

Indeed, the Act did *not* state that a permit issued under subsection (b)(3) "satisfies the national interest requirement of E.O. 13337"—language it would have included if it were codifying this standard. Instead, the Act refers to the "national interest" standard only when requiring the President to justify a decision *not* to grant the permit. § 501(b)(2), 125 Stat. at 1289. Thus, far from demonstrating that Congress wanted "the State Department to ensure that … the pipeline would serve the national interest," December 20, 2019 Order at 34, the structure of the 2011 Temporary Act presumed that the Keystone XL pipeline was in the national interest and required to the President to explain why he believed otherwise.

Similarly, the Act does not provide that a (b)(3) permit should be deemed to have satisfied the E.O. 13337's interagency consultation process. In fact, the Act never mentions the inter-agency process that Plaintiffs now claim Congress codified. Instead, it set forth an entirely different process that would have required

15

the President to coordinate review with Nebraska concerning the pipeline's route through that state. *See* § 501(d)(3), 125 Stat. at 1291.

Section 501(b)(2)'s reporting requirement likewise confirms the Act's time-limited purpose. This provision required the President to explain a decision not to grant a permit so that Congress could decide what to do next. And Congress later responded to President Obama's decision to deny the permit by passing a statute directly approving Keystone XL. Keystone XL Pipeline Approval Act, S. 1, 114th Cong. §§ 1-6 (2015). Significantly, if the 2011 Temporary Act had mandated that any permit for Keystone XL (as well as for all future cross-border oil pipelines) be issued by the State Department in compliance with E.O. 13337, the 2015 Approval Act should and would have stated that, "[N]otwithstanding the requirements of the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. 112-78, 125 Stat. 1280, Title V, and the requirements of Executive Order No. 13337, the application filed on May 4, 2012 by TransCanada Keystone Pipeline, L.P. is hereby approved." The fact that the 2015 legislation included no such language reflects Congress's understanding that the 2011 Temporary Act had no continuing legal effect, much less governed all future cross-border pipeline applications.

Finally, *Franklin v. Massachusetts*, 505 U.S. 788 (1992), forecloses Plaintiffs' reading of the 2011 Temporary Act. There, the Supreme Court explained that "[we] would require an express statement by Congress before

16

assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion." *Id.* at 800-01. That principle applies with even greater force here, where Plaintiffs do not merely claim that a statute authorizes judicial review of the President's performance of statutory duties, but that a statute (1) overrode a longstanding assertion of inherent presidential authority and (2) dictates how the President performs a function that Congress had left unregulated for decades. Thus, even if the language of the 2011 Temporary Act were ambiguous and could plausibly be read to mandate compliance with E.O. No. 13337—neither or which is true—Plaintiffs' reading would still have to be rejected. Language directing President Obama to "*grant* a permit under Executive Order No. 13337 … for the Keystone XL pipeline project application," § 501(a), 125 Stat. at 1289 (emphasis added), is manifestly *not* a clear statement *prohibiting* Presidents from granting a permit for Keystone XL (or any other oil pipeline) *unless* they comply with the requirements of E.O. 13337. There is simply no plausible basis for claiming that the 2011 Temporary Act includes the express statement necessary to convert the requirements of E.O. 13337 into binding statutory commands.

## III.   Congress Has Not Impliedly Required The President To Comply With Executive Order No. 13337

Plaintiffs' alternative theory is that, insofar as Congress acquiesced in the presidential practice of granting permits for cross-border oil pipelines, it did so

"subject to the requirements of Congress' comprehensive scheme of statutory environmental protections." Docket 57 at 27. *See also* December 20, 2019 Order at 28 (suggesting that it "could be argued that the Congress implicitly approved of the system established by the 1968 Executive Order and the 2004 Executive Order whereby the Secretary of State reviewed cross-border permits and the Secretary of State made the national interest determination"). This theory is, if anything, even more untenable.

First, it rests on an impermissibly myopic view of the historical record. Congressional acquiescence can be inferred from "a systematic unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned." *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)). Plaintiffs attempt to limit the relevant practice to actions taken since August 1968, when E.O. 11423 delegated authority to the State Department to issue permits for cross-border oil pipelines following consultation with other agencies. *See* 33 Fed. Reg. 11,741 (Aug. 20, 1968). But Presidential Permits for cross-border oil pipelines have been granted since at least as early as 1918. *See* Whiteman, *Digest of International Law*, Vol. 9, p. 920 (1968). And prior to E.O. 11423, the President himself granted such permits. *See* 31 Fed. Reg. 6204 (Apr. 22, 1966) (President Johnson signing permit for cross-border oil pipeline). Thus, the relevant "*unbroken*" executive practice is

simply one in which some executive branch official grants permits for cross-border oil pipeline facilities. The particular officials who granted such permits, and the particular means by which they did so, have varied since 1918, and thus cannot be considered part of an "unbroken" practice.

Moreover, the only unbroken practice that Congress had "never before questioned," *Dames & Moore*, 453 U.S. at 686, was one in which the executive branch *approved* cross-border pipelines. *See* E.O. 11423, 33 Fed. Reg. 11,741 (noting that "permission has from time to time been sought *and granted* in the form of Presidential permits for … such border crossing facilities as … oil pipelines")(emphasis added). It was not until the State Department failed to act on the Keystone XL application for over three years that Congress first passed legislation concerning a cross-border permit for an oil pipeline, and the 2011 Temporary Act directed the President to *grant* the application or explain why it was not in the national interest to do so. Several years later, Congress itself authorized construction of the Keystone XL pipeline.

In short, there is no basis for concluding that, from 1918 until 2019, Congress acquiesced in a process in which the President always delegated issuance of permits for cross-border oil pipeline facilities to the State Department, and that Congress expected and wanted that agency to deny such permits based on a multifactor analysis of the "national interest."

19

Second, even if it were proper to ignore 50 years of a century-old practice, Plaintiffs' theory rests on a fundamental misconception about congressional acquiescence, which operates to *permit* presidential action, not to *regulate* it. Congressional acquiescence in a long-continued and well-known practice raises "'a presumption that the [action] had been [taken] in pursuance of [Congress'] consent.'" *Dames & Moore*, 453 U.S. at 686 (first two alterations in original) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)). Congress can always override that presumption, by passing legislation to stop a presidential practice or to modify it, as it did with respect to presidential permitting of submarine cables in the Kellogg Act. But Plaintiffs cite no authority for the proposition that Congress' *silence* in the face of an assertion of presidential authority somehow *requires* the President to continue to exercise that purported presidential authority for all times in precisely the same manner. Indeed, under plaintiffs' theory, E.O. 11423 was itself illegal—prior to 1968, Congress had consented to the President directly issuing permits for cross-border oil pipeline facilities, thereby (on Plaintiffs' view) barring him from delegating that task to the State Department.

Finally, the fact that Congress enacted the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA") in the years after President Johnson adopted E.O. 11423, *see* Docket No.

20

57 at 25, is irrelevant. None of these statutes includes the "express statement" necessary to show that Congress intended to subject the President himself to the requirements of these laws. *Franklin*, 505 U.S. at 800-01.[7] The most that can be said about them, therefore, is that they require the President to make a choice. He can exercise an inherent constitutional power himself, free of the constraints of these statutes (and of judicial review under the Administrative Procedure Act ("APA")). Alternatively, he can delegate that power to an agency. This Court has held that, when the President makes the latter choice, the delegate/agency is subject to the requirements of NEPA, the CWA, and to ESA, and to judicial review even when exercising inherent presidential authority. Order, *Indigenous Envtl. Network v. U.S. Dep't of State*, No. 4:17-cv-00029-BMM (D. Mont. Nov. 22, 2017), Docket 99.[8] Even assuming *arguendo* the correctness of that holding, it necessarily means that the President can choose to avoid the burdens imposed by

---

[7] NEPA applies to "agencies of the Federal Government," 42 U.S.C. §§ 4332, 4333, and NEPA regulations define "Federal agency" to exclude "the President." 40 C.F.R. § 1508.12. The CWA and ESA, like the APA, do not expressly authorize suits against the President. *See* 16 U.S.C. § 1540(g)(1)(A) (ESA: authorizing suit against "any person, including the United States and any other governmental instrumentality or agency"); 33 U.S.C. § 1365(a)(1) (CWA: authorizing suit against "any person (including (i) the United States, and (ii) any other governmental instrumentality or agency").

[8] As the Court is aware, TC Energy does not agree with the Court's ruling in this regard. Because issuance of the 2019 Permit mooted the litigation in which the Court rendered that ruling, the Ninth Circuit did not have an opportunity to address the issue. TC Energy reserves its right to contest the Court's ruling, should the need arise in the future.

the foregoing statutes by exercising his constitutional authority directly, which is precisely what President Trump did when he issued the 2019 Permit. There is no conceivable basis for claiming that, simply by enacting generally applicable laws like NEPA, the CWA, or the ESA—none of which expressly applies to the President—Congress somehow (1) barred the President from revoking E.O. 11423 or any similar subsequent Executive Order, (2) barred the President himself from ever issuing a presidential permit for cross-border oil pipeline facilities, and (3) required that such permits only be issued by the State Department (or another agency subject to the foregoing laws).

* * *

In short, the President had the authority to issue a permit for the Keystone XL pipeline, and Congress neither explicitly nor impliedly restricted that authority by requiring permits for cross-border oil pipeline facilities to be issued only by the State Department (or any other agency) and only in accordance with any specified procedures or substantive standards, including the requirements of federal environmental laws. And, because E.O. 13337 did not implement any statute, much less any statute that authorized implementing Executive Orders and prohibited their subsequent revocation, *cf. League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013 (D. Alaska 2019), *appeal docketed*, No. 19-35460 (9th Cir. May 29, 2019), the President was free to revoke or supersede E.O. 13337

22

at any time, for any reason, and in any manner he chose. *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965); *Proposals Regarding an Independent Attorney General*, 1 Op. O.L.C. 75, 77 (1977).

## RESPONSE TO QUESTION 3

If the President has *no* authority to issue cross-border permits for oil pipelines, then any substantive or procedural defects in the 2019 Permit are legally irrelevant. The absence of any presidential authority means that TC Energy does not need a presidential permit to construct cross-border facilities for the Keystone XL pipeline. It can build such facilities as long as it complies with all relevant federal and state requirements for such construction. Simply put, Plaintiffs cannot claim that the President has improperly allowed TC Energy to construct cross-border pipeline facilities if he has no authority to permit or block such construction in the first place.

Congress has passed no law barring the construction of oil pipeline facilities across the United States border. As TC Energy has previously explained, Congress authorized the Federal Energy Regulatory Commission to regulate the construction of gas pipelines under section 7 of the Natural Gas Act, 15 U.S.C. § 717f(c)(1)(A), but did not do the same for oil pipelines. Instead, federal law controls only oil pipeline design and construction standards,[9] rates and access to pipeline

---

[9] 49 U.S.C. § 60102(a); 49 C.F.R. pt. 195.

transportation,[10] and approvals for the construction of discrete segments of an oil pipeline (if any) that cross wetlands or navigable waters, affect federal civil works projects,[11] or cross federally-owned land[12] or land held in trust for individual Indians or tribes.[13] TC Energy has sought all necessary federal authorizations to construct Keystone XL over federal land and across waters of the United States.

Accordingly, if the Court were to find that the President lacks authority to permit construction of Keystone XL across the international border, then no additional federal authorization is needed. No implicit prohibition on such construction can be derived from notions of federal sovereignty. If such an implicit prohibition existed, it would not have been necessary for Presidents since Ulysses Grant to have asserted authority to regulate the construction of cross-border facilities.

Indeed, the necessary presumption under the Constitution is the opposite— cross-border facilities are permitted unless barred. As the Supreme Court explained over a century ago, "so long as Congress does not pass any law to regulate

---

[10] *See* 49 U.S.C. § 60502; 49 U.S.C. app. § 1 (1988).

[11] *See* 33 U.S.C. §§ 404, 408, 1344.

[12] *See* 30 U.S.C. § 185; 43 U.S.C. § 1761 (authorizing Interior Department to grant right-of-way).

[13] *See* 25 U.S.C. §§ 323, 324 (authorizing Interior to grant right-of-way across land held in trust for Indian tribes or individual Indians).

commerce among the several states, it thereby indicates its will that such commerce shall be free and untrammeled." *Walling v. Michigan*, 116 U.S. 446, 455 (1886); *id.* (Justice Johnson's "whole argument [concurring in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 222 (1824)] … is based on the idea that the power to regulate commerce with foreign nations … must necessarily be exclusive, and that where Congress has failed to restrict such commerce, it must necessarily be free"). Here, as noted, Congress has taken various actions with respect to oil pipeline design and safety standards, rates and access, and construction across federal lands and waters. The presumption here, therefore, is that Congress deems oil pipelines built and operated in compliance with these standards to be beneficial to the nation—a presumption further bolstered by its efforts in 2011 and 2015 to approve the Keystone XL pipeline itself. *See supra*.

In short, if the President lacks authority to grant permits for cross-border oil pipeline facilities, the validity of the 2019 permit President Trump granted for the Keystone XL pipeline is legally irrelevant, and TC Energy can construct the cross-border facilities without any presidential permit, provided of course that it obtains permission (which it has sought) to construct those facilities on lands owned by the federal government.

## CONCLUSION

For all of the foregoing reasons, TC Energy submits that the Court should

dismiss Plaintiffs' amended complaint for failure to state any claim for relief.

January 24, 2020                         Respectfully Submitted,


CROWLEY FLECK PLLP                 SIDLEY AUSTIN LLP

*/s/ Jeffery J. Oven*                      */s/ Peter R. Steenland, Jr.*
Jeffery J. Oven                         Peter R. Steenland, Jr.
Mark L. Stermitz                        Peter C. Whitfield
Jeffrey M. Roth                         1501 K Street, N.W.
490 North 31st Street, Ste. 500         Washington, DC 20005
Billings, MT 59103-2529                 Telephone: 202-736-8000
Telephone: 406-252-3441                 Email: psteenland@sidley.com
Email: joven@crowleyfleck.com                  pwhitfield@sidley.com
        mstermitz@crowleyfleck.com
        jroth@jcrowleyfleck.com

*Counsel for TransCanada Keystone Pipeline LP and TC Energy Corporation*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E) of the United States Local Rules, I certify that this brief contains 5,946 words, excluding caption and certificates of service and compliance, printed in at least 14 point and is double-spaced, including footnotes and indented quotations.

*/s/ Jeffery J. Oven*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's

CM/ECF system on all counsel of record.

*/s/ Jeffery J. Oven*