JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
    PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

STEPHAN C. VOLKER (Pro hac vice)
ALEXIS E. KRIEG (Pro hac vice)
STEPHANIE L. CLARKE (Pro hac vice)
JAMEY M.B. VOLKER (Pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:      svolker@volkerlaw.com
            akrieg@volkerlaw.com
            sclarke@volkerlaw.com
            jvolker@volkerlaw.com

Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | | |
|---|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, | ) ) ) | Civ. No. CV 19-28-GF-BMM |
| Plaintiffs, | ) ) ) ) ) ) | **PLAINTIFFS' BRIEF IN RESPONSE TO THE COURT'S DECEMBER 20, 2019 ORDER, ECF 74** |
| vs. | ) | |
| PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency; MARGARET EVERSON, in her | ) ) ) ) ) ) ) ) ) ) ) ) | **Judge:  Hon. Brian M. Morris** **Case Filed:  April 5, 2019** |

official capacity as Acting Director of the )
U.S. Fish and Wildlife Service; UNITED )
STATES BUREAU OF LAND )
MANAGEMENT, and DAVID )
BERNHARDT, in his official capacity as )
U.S. Secretary of the Interior, )
                                                          )
                    Defendants, **)**
                                                          **)**
TRANSCANADA KEYSTONE PIPELINE,**)**
LP, a Delaware limited partnership, and TC **)**
ENERGY CORPORATION, a Canadian )
Public Company, **)**
                                                          **)**
                    Defendant-Intervenors. **)**
_____ **)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    SCOPE OF THE 2019 PERMIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    The Scope of the 2019 Permit Is Not Limited to the 1.2
       Mile Border Facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    The 2019 Permit Authorizes the Entire Keystone XL Pipeline. . 15

II.   CONGRESS HAS EXCLUSIVE ORIGINAL POWER TO
    PERMIT BORDER CROSSINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    The President Does Not Have the Authority to Issue
       Cross-Border Pipeline Permits Under His Foreign Affairs
       or Commander-in-Chief Powers. . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.    The Power to Regulate Cross-Border Pipelines Falls Under
       Congress' Foreign Commerce Clause Powers. . . . . . . . . . . . . . 20

    C.    Regulation of Cross-Border Pipelines Has Always Required
       Congressional Approval, and Congress Has Approved the
       State Department Review Procedure. . . . . . . . . . . . . . . . . . . . . 23

    D.    Congress Retains the Ultimate Power to Regulate Cross-
       Border Pipelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    E.    The President May Not Usurp Congress' Power to
       Regulate Cross-Border Pipelines. . . . . . . . . . . . . . . . . . . . . . . 29

III.  THE PROJECT CANNOT PROCEED WITHOUT A
    LEGALLY ISSUED PRESIDENTIAL PERMIT. . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## CASES

*Alaska v. Brown*
     850 F.Supp. 821 (D.Ak. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*American Insurance Association v. Garamendi*
     539 U.S. 396 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 23, 26

*Atlantic Cleaners & Dyers, Inc. v. United States*
     286 U.S. 427 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Backcountry Against Dumps v. Chu*
     215 F.Supp.3d 966 (S.D.Cal. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Board of Trustees of Univ. of Ill. v. United States*
     298 U.S. 48 (1933). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28

*Dames & Moore v. Regan*
     453 U.S. 654 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*East Bay Sanctuary Covenant v. Trump*
     932 F.3d 742 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Gibbons v. Ogden*
     22 U.S. 1 (1824). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Great Basin Mine Watch v. Hankins*
     456 F.3d 955 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hawaii v. Trump*
     859 F.3d 741 (9th Cir. 2017)
     (*dismissed as moot*, 138 S.Ct. 377 (2017)). . . . . . . . . . . . . . . . . . . . . . . 32

*IEN v. State*
     317 F.Supp.3d 1118 (D.Mont. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*IEN v. State*
     347 F.Supp.3d 561 (D.Mont. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*IEN v. State*
    369 F.Supp.3d 1045 (D.Mont. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*IEN v. State*
    2019 WL 652416 (D.Mont. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*IEN v. State*
    Ninth Circuit Case No. 18-36068, Order filed 3/15/19. . . . . . . . . . . . . . . . 9

*Kleppe v. New Mexico*
    426 U.S. 529 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*League of Conservation Voters v. Trump*
    363 F.Supp.3d 1013 (D.Ak. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Medellin v. Texas*
    552 U.S. 491 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 32

*Sierra Club v. Clinton*
    689 F.Supp.2d 1147 (D.Minn. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

*United States v. Midwest Oil Co.*
    236 U.S. 459 (1915). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*United States v. Ohio Oil Co.*
    234 U.S. 548 (1914). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Utah Power & Light Co. v. United States*
    243 U.S. 389 (1917). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Youngstown Street & Tube Co. v. Sawyer*
    343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24, 28, 30, 34

## U.S. CONSTITUTION

Article I
    § 8, cl. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20, 27

Article IV
    § 3, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

United States Code, Title 5
       §§ 701, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 33

United States Code, Title 16
       §§ 1531, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 25, 32, 33

United States Code, Title 33
       §§ 1251 *et seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

United States Code, Title 42
       §§ 4321, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States Code, Title 43
       §§ 1701 *et seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

United States Code, Title 54
       §§ 300101 et *seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## REGULATIONS

Code of Federal Regulations, Title 22
       § 161.7(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## RULES

Federal Rules of Civil Procedure
       12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
       12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## FEDERAL REGISTER

33 Fed.Reg. 11741-11742 (Aug. 20, 1968). . . . . . . . . . . . . . . . . . . 24, 26-27
69 Fed.Reg. 25299-25301 (May 5, 2004). . . . . . . . . . . . . . . . . . . . 23, 24, 25
82 Fed.Reg. 8663-8665 (January 30, 2017). . . . . . . . . . . . . . . . . . . . . . . 27
84 Fed.Reg. 13101-13103 (April 3, 2019). . . . . . . . . . . . . . . . . . . . . . *passim*

## OTHER AUTHORITIES

Green H. Hackworth, *Digest of International Law*
Vol. IV, § 350, at 247-256 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*
111 Yale L.J. 231 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

President Ulysses Grant's Seventh Annual Message to Congress,
*reprinted in* Papers Relating to the Foreign Relations of the
United States Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1
(Dec. 6, 1875). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Temporary Payroll Tax Cut Continuation Act
Pub. L. No. 112-78, 125 Stat. 1280 (2011)
§§ 501(a)-(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 34

U.S. Attorney General Opinion, Foreign Cables
22 U.S. Op. Atty. Gen. 13, 1898 WL 427 (1898). . . . . . . . . . . . . . . . . 19, 29

Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act,
2015 WL 758544 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## INTRODUCTION

Plaintiffs Indigenous Environmental Network and North Coast Rivers Alliance ("Plaintiffs") filed this action on April 5, 2019 because Defendant President Donald Trump attempted to sidestep this Court's previous orders and thereby evade important environmental laws by unlawfully approving the Keystone XL Pipeline ("Keystone" or "Project") a second time.  On March 29, 2019, President Trump issued a new Presidential permit ("2019 Permit") purportedly "grant[ing] permission" for TransCanada "to construct, connect, operate and maintain" Keystone *without compliance with the laws of the United States*.  84 Fed.Reg 13101-13103 (April 3, 2019), attached as Exhibit 1 to Declaration of Stephan C. Volker in Support of Motion for Preliminary Injunction ("Volker Declaration") filed July 10, 2019 (ECF 27-22).

On review of his first approval, issued March 2017, this Court issued a comprehensive sequence of well-reasoned rulings holding that the Trump Administration's 2017 Presidential Permit for Keystone ("2017 Permit") violated bedrock environmental laws.  Rejecting the Administration's motion to dismiss that case, the Court ruled that it has jurisdiction over Presidential permits.[1]  This Court held that the 2017 Permit violated (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq., by failing to address Keystone's Main Line

---

[1] *Indigenous Environmental Network v. United States Department of State,* CV 17-29-GF-BMM ("*IEN v. State*"), 2017 WL 5632435 (11/22/17).

Alternative Route through Nebraska,[2] and (2) NEPA, the APA, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq., by ignoring the effects of current oil prices, the cumulative effects of greenhouse gas emissions, impacts on unsurveyed cultural resources, potential oil spills and recommended mitigation for them in light of updated modeling, impacts to endangered species in light of updated oil spill data, and former Secretary of State John Kerry's detailed findings that Keystone would not serve the national interest.[3]

Based on these rulings, this Court enjoined TransCanada Keystone Pipeline, LP's (now TC Energy Corporation's ("TC Energy's")) construction and surface-disturbing pre-construction activities to prevent irreparable environmental and cultural harm, and protect the public interest.[4]  The Court denied TC Energy's motion to stay the injunction pending appeal[5] and the Ninth Circuit denied TC Energy's motion to stay this Court's injunction.[6]

Trump and the Army Corps of Engineers, Fish and Wildlife Service, and the Bureau of Land Management ("BLM") (collectively with Trump, "Trump") and TC Energy (together with Trump, "Defendants") attempted to circumvent the law

---

[2]  *IEN v. State*, 317 F.Supp.3d 1118, 1123 (8/15/18).

[3]  *IEN v. State*, 347 F.Supp.3d 561, 590-591 (11/8/18).

[4]  *IEN v. State*, 369 F.Supp.3d 1045, 1049-1052 (12/7/18).

[5]  *IEN v. State*, 2019 WL 652416 (2/15/19).

[6]  *IEN v. State*, Ninth Circuit Case No. 18-36068, Order filed 3/15/19.

yet again, by filing meritless motions to dismiss Plaintiffs' instant lawsuit in order
to deprive this Court of its jurisdiction over Trump's illegal 2019 Permit.
Memorandum in Support of Motion by TransCanada Keystone Pipeline, LP and
TC Energy Corporation to Dismiss Plaintiffs' Complaint Pursuant to Fed.R.Civ.P.
Rule 12(b)(1) or 12(b)(6) (ECF 33) ("TC Energy"); Memorandum in Support of
Supplemental Motion by TransCanada Keystone Pipeline, LP and TC Energy
Corporation to Dismiss Plaintiffs' Complaint Pursuant to Fed.R.Civ.P. Rule
12(b)(1) or 12(b)(6) (ECF 50) ("TC Energy Supp."); Trump's Memorandum of
Points and Authorities in Support of Motion to Dismiss Plaintiffs' Amended
Complaint (ECF 52) ("Trump").

Upon review of those motions, this Court issued another well-reasoned
order rejecting Defendants' claims.  First, this Court ruled that Plaintiffs have
standing to bring this action.  Order Denying Motions to Dismiss, December 20,
2019 (ECF 73) ("Order") at 14-20.  Second, the Court held that Plaintiffs raised
plausible claims for relief under the U.S. Constitution's Commerce Clause (Article
I, section 8, clause 3) and Property Clause (Article IV, section 3, clause 2), as well
as Executive Order 13,337.  Order at 20-38.  Third, this Court ruled that the Army
Corps of Engineers, Fish and Wildlife Service, and BLM (collectively, "Agency
Defendants") "remain appropriately included at this stage in the litigation."  Order
at 38-39.

Through issuance of the 2019 Permit, Trump usurped Congress' exclusive
authority over foreign commerce and federal lands under the Commerce Clause

and Property Clause, respectively.  Congress has the exclusive power to regulate foreign commerce and dispose of federal lands, and there is only one congressionally sanctioned pathway to process TC Energy's permit application: the procedure set forth in Executive Order 13,337, which requires the Secretary of State's determination – following his consultation with prescribed federal agencies and full compliance with applicable environmental laws including NEPA – whether the Project serves the national interest.

The Court also requested additional briefing on eight issues:  (1-a) whether the 2019 Permit authorizes only the 1.2 mile border facility; (1-b) whether the 2019 Permit authorizes the entire Keystone XL Pipeline project; (2-a) whether the power to issue permits for cross-border pipeline facilities falls under the President's foreign affairs or Commander-in-Chief powers; (2-b) whether the power to regulate cross-border pipelines falls under Congress' foreign commerce clause powers; (2-c) how the political branches historically have addressed the question of authority over cross-border pipeline facilities; (2-d) whether those historical practices weigh in favor of ruling that the power to deal with cross-border pipeline facilities falls under the President's or Congress' powers; (2-e) whether the President may issue cross-border pipeline permits even if Congress has the power to regulate cross-border pipelines under the Foreign Commerce Clause; and (3) whether TC Energy is able to construct the Project without a Presidential Permit if the President lacks the authority to permit a cross-border pipeline facility, and how that would impact this litigation.  Order

Requesting Additional Briefing, December 20, 2019 (ECF 74) ("Briefing Order"), at 1-2.

In accordance with this Court's Briefing Order, Plaintiffs show below that (1-a) the scope of the 2019 Permit is not limited to the 1.2 mile border facilities; (1-b) the 2019 Permit authorizes the entire Keystone XL Pipeline; (2-a) the President does not have the authority to issue cross-border pipeline permits under his foreign affairs or Commander-in-Chief powers; (2-b) the power to regulate cross-border pipelines falls under Congress' Foreign Commerce Clause powers; (2-c) regulation of cross-border pipelines has always required Congressional approval, and Congress has approved the State Department review procedure; (2-d) Congress retains the ultimate power to regulate cross-border pipelines; (2-e) the President may not usurp Congress' power to regulate cross-border pipelines; and (3) the Project cannot proceed without a legally issued Presidential Permit.

## ARGUMENT

## I.    SCOPE OF THE 2019 PERMIT

On March 29, 2019, President Trump issued the 2019 Permit to "grant permission . . . to [TC Energy], to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada . . . for the import of oil from Canada to the United States."  84 Fed.Reg. 13101 (April 3, 2019); Order at 12.  The Permit defines "Facilities" as "the portion in the United States of the international pipeline project associated with [TC Energy's] application for a Presidential permit . . . and any land, structures, installations, or

equipment appurtenant thereto."  84 Fed.Reg. 13101 (April 3, 2019); Order at 12. The "Border facilities" discussed in the Permit are "those parts of the Facilities consisting of a 36-inch diameter pipeline extending from the international border between the United States and Canada . . . to and including the first mainline shutoff valve in the United States located approximately 1.2 miles from the international border."  84 Fed.Reg. 13101 (April 3, 2019); Order at 12.

The 2019 Permit commands that the "construction, connection, operation, and maintenance of the *Facilities* (not including the route) *shall be . . . as described* in [TC Energy's] application for a Presidential Permit . . . ."  84 Fed.Reg. 13101-13102 (April 3, 2019) (emphasis added); Order at 12-13. As discussed below, the 2019 Permit is not limited to approval of the 1.2 miles from the international border to the first mainline shut-off valve; it also purports to authorize TC Energy's construction and operation of the balance of Keystone.

### A.   The Scope of the 2019 Permit Is Not Limited to the 1.2 Mile Border Facilities

The authorization granted by the 2019 Permit is not limited to the first 1.2 miles after the pipeline enters the United States.  As noted above, the 2019 Permit defines "Facilities" as "*the portion in the United States* of the international pipeline project associated with [TC Energy's] application for a Presidential permit . . . and any land, structures, installations, or equipment appurtenant thereto."  84 Fed.Reg. 13101 (April 3, 2019) (emphasis added); Order at 12. Because the Permit purports to approve "the portion [of the pipeline] in the United

States" as a whole, it is the entirety of the pipeline that is being authorized under the 2019 Permit, not merely the first 1.2 miles.

The Permit purports to grant TC Energy permission to "construct, connect, operate, and maintain pipeline *facilities*," and commands that "construction, connection, operation, and maintenance of the *Facilities* (not including the route) *shall be, . . . as described in the permitee's application . . . .*" *Id.* (emphasis added). TC Energy's application describes the whole of the pipeline. It states that "[i]f this application is approved, the Project will allow transportation of crude oil production from the Western Canadian Sedimentary Basin ("WCSB") and the Bakken supply basin in Montana and North Dakota, to a point located on the existing Keystone Pipeline system at Steele City, Nebraska." Application at 1, 7-8.[7] It notes that "[t]here will be 18 pump stations *along the pipeline route in the U.S.*" and discusses the design, construction procedures, and financing for the route as a whole. Application at 9, 12-14 (emphasis added).[8]

The 2019 Permit's clear definition of "Facilities" – which include "the portion in the United States" – shows that the Permit authorized more than just the first 1.2 miles of the Project. In fact, the 2019 Permit authorized the entirety of the Project.

---

[7] TC Energy's January 26, 2017 Application for its 2017 Permit, at pp. 1, 7-8; Department of State Administrative Record filed in *IEN v. State*, at DOSKXLDMT0001175, 1201-1202.

[8] DOSKXLDMT0001203, 1206-1208.

**B.      The 2019 Permit Authorizes the Entire Keystone XL Pipeline**

As shown above, the 2019 Permit authorizes more than just the first 1.2 miles of the Project.  However, even if the plain language of the Permit limits authorization to the 1.2 mile border facilities – which it does not – the Permit also effectively authorizes the entire pipeline because the remainder of the Project would not be built but for the 2019 Permit.

The 2019 Permit is the headwaters permit from which flow all other pipeline permits; pipeline operation *anywhere* could not occur without it. *Backcountry Against Dumps v. Chu* ("*Backcountry*"), 215 F.Supp.3d 966, 976 (S.D.Cal. 2015) (presidential permit for transboundary transmission line caused plaintiffs' injuries even though project required additional approvals from other agencies); *cf.*, *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (interdependent projects must be analyzed together).  It is undisputed that Keystone could not operate without the 2019 Permit, because that Permit is what sets the Project's oil transmission in motion.  Without the first 1.2 miles of the Project, the remainder of the pipeline could not be built.  Therefore construction of and impacts from the entire Keystone pipeline is traceable to the 2019 Permit. *Backcountry*, 215 F.Supp.3d at 976 (that a project "would not have been built absent . . . approval of [a cross-border Presidential] permit . . . . demonstrate[s] that the Defendants' [approval was] causal of [plaintiffs'] injury" although other

agency approvals were also required).  *But for* the 2019 Permit, Keystone could not be built.

Furthermore, the 2019 Permit makes clear that its purpose is to authorize TC Energy to construct the Keystone "pipeline facilities" for the purpose of "import[ing] oil from Canada to the United States."  84 Fed.Reg. 13101 (April 3, 2019).  This purpose would be thwarted without the remainder of the pipeline. Trump purported to "grant permission" to TC Energy to "construct, connect, operate, and maintain" a "36-inch diameter [oil] pipeline" not just within the first "1.2 miles from the international border," but also for the balance of the "pipeline facilities," which extend 875 miles in the United States.  84 Fed.Reg. 13101-13102 (April 3, 2019).  The 1.2-mile border facilities and the balance of the Project are two links in the same chain that cannot be separated one from the other, and the 2019 Permit approves both.

## II.    CONGRESS HAS EXCLUSIVE ORIGINAL POWER TO PERMIT BORDER CROSSINGS

### A.    The President Does Not Have the Authority To Issue Cross-Border Pipeline Permits Under His Foreign Affairs or Commander-in-Chief Powers

As this Court noted in its December 20 Order, "'[t]he President's authority to act, as with the exercise of any governmental power, "must stem either from an act of Congress or from the Constitution itself[,]"'" or from a combination of the two."  Order at 21, citing *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting

*Youngstown Street & Tube Co. v. Sawyer* ("*Youngstown*"), 343 U.S. 579, 585 (1952)).  "[T]he text of the Constitution gives some foreign affairs powers to Congress, some to the Executive Branch, and some to both branches."  Order at 25.  But "the President's executive foreign affairs power is residual, encompassing only those executive foreign affairs powers not allocated elsewhere by the Constitution's text."  Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs* ("*Prakash*"), 111 Yale L.J. 231, 253 (2001).

"When the Constitution wanted both branches to be involved in an area of foreign affairs, it said so.  Without more, it is unclear that the President would possess any authority to exercise control over an area of foreign affairs" – like cross-border pipelines – "that falls explicitly within Congress's foreign affairs powers."  Order at 25.  The executive branch foreign affairs powers are subject to substantial limitations.  *Prakash*, 111 Yale L.J. at 262.  Notably, "[t]he powers explicitly conveyed to Congress by the Constitution are conveyed away from the President and are not in any sense shared powers . . . the President has no appropriations power, and . . . the President has no independent lawmaking authority in foreign affairs but depends upon Congress (or the Senate) to give presidential foreign affairs initiatives the force of law."  *Id*.  Indeed, as this Court noted, "the 'Constitution's allocation of specific foreign affairs powers or roles to Congress or the Senate are properly read as assignments away from the President.'"  Order at 25-26, citing *Prakash*, 111 Yale L.J. at 253-54.

- 17 -

While the "President has a degree of independent authority to act" in foreign affairs, "Congress holds *express authority* to regulate public and private dealings with other nations in its . . . foreign commerce powers." *American Insurance Association v. Garamendi* ("*Garamendi*"), 539 U.S. 396, 414 (2003) (emphasis added). The Constitution "specifically assigned [foreign commerce] to Congress." *Prakash*, 111 Yale L.J. at 263. Therefore any authority the President retains in dealing with foreign commerce is residual and is bound by Congressional direction.

Defendants have argued that "[f]ormal opinions by the Attorney General for more than one hundred years have recognized the President's independent permitting authority at the international border." Trump 3-4 (citing Green H. Hackworth, *Digest of International Law*, Vol. IV, § 350, at 247-256 (1942)); President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1 (Dec. 6, 1875)); TC Energy at 5. But the authorities they cite demonstrate to the contrary that (1) the President's authority to regulate cross-border facilities has long been suspect, and (2) to the extent Trump has any authority, it exists at the mercy of Congress, which has expressly *withdrawn* that authority here.

President Grant stated in his seventh annual message to Congress in 1875 that the "right to control the conditions for the laying of a cable within the jurisdictional waters of the United States . . . pertains exclusively to the

Government of the United States, *under such limitations and conditions as Congress may impose*."  Exhibit 2 in Support of Trump Motion to Dismiss (ECF 48-2) at 28 (emphasis added).  The Attorney General's opinion on foreign cables likewise acknowledges that the President's purported power "to control the landing of foreign submarine cables on the shores of the United States" exists *only "in the absence of legislation by Congress."*  22 U.S. Op. Atty. Gen. 13, *13 (1898) (emphasis added).

Equally illuminating is Green Hackworth's treatise on international law. Exhibit 1 in Support of Trump Motion to Dismiss (ECF 48-1).  Hackworth quotes from a 1921 opinion by the federal District Court for the Southern District of New York, in which Judge Hand denied a motion for preliminary injunction filed by the United States against a telegraph company to prevent it from connecting a submarine cable between Cuba and Florida.  ECF 48-1 at 5-7.  Judge Hand notes the prevailing view over the preceding 50 years that the President has some authority to regulate cross-border facilities *in the absence of legislative direction*. But he also opines that the "*original* power of the President in such matters is *questionable*."  ECF 48-1 at 6 (internal quotations omitted; emphasis added).  And he notes that President Cleveland "declined to exercise the power" because "presidential action would not be binding upon Congress" and the "President was without power."  *Id*. (internal quotations omitted).  Ultimately, Judge Hand denied the government's preliminary injunction motion because Congress had already

taken action in the matter and thereby "occupied the field" to the exclusion of the President.  *Id*. at 7 (internal quotations omitted).

Because the President's foreign affairs powers are limited to those not specifically assigned to Congress, and as discussed further below, the Constitution specifically assigned foreign commerce powers to Congress, the authority to issue cross-border permits does not fall under either the President's foreign affairs power or his Commander-in-Chief power.  Therefore, the President's actions in issuing a Presidential permit for cross-border facilities are subordinate to and bound by the limitations Congress has imposed.  Any approvals that the President makes outside those limitations are *ultra vires*.

### B.   The Power to Regulate Cross-Border Pipelines Falls Under Congress' Foreign Commerce Clause Powers

Congress has the exclusive power to regulate foreign commerce and dispose of federal lands.  *Garamendi*, 539 U.S. at 414 ("Congress holds express authority to regulate public and private dealings with other nations in its . . . foreign commerce powers"); Order at 34 ("Congress possesses "complete control" over federal land under the Property Clause," citing *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976)).

"The United States Constitution expressly grants Congress the power to 'regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes.'" Order at 22, quoting U.S. Const. art. I, § 8, cl. 3.  "Congress is vested with the principal power to control the nation's borders."  *East Bay*

- 20 -

*Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1231 (9th Cir. 2018), withdrawn and reissued with dissent, 932 F.3d 742, 755 (9th Cir. 2018).  "Congress possesses broad authority to regulate commerce with foreign nations, as long as a nexus or connection exists to the United States.  The Supreme Court has described Congress's foreign commerce power as 'exclusive and plenary.'  *Board of Trustees of Univ. of Ill. v. United States*, 298 U.S. 48, 56-57 (1933) (citing *Gibbons v. Ogden*, 22 U.S. 1, 196–200 (1824)).  In this regard, the Supreme Court has noted that Congress's power under the Foreign Commerce Clause 'may be broader than when exercised as to interstate commerce.'  *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932)."  Order at 22.

The cross-border transport of foreign oil is a quintessential matter of foreign commerce.  *United States v. Ohio Oil Co.*, 234 U.S. 548, 560 (1914) (affirming Congress' power under the Commerce Clause to regulate the transportation of oil); *Alaska v. Brown*, 850 F.Supp. 821, 827 (D.Ak. 1994) (regulating oil exportation is within Congress' "plenary power over foreign commerce").  "There can be no dispute that a connection exists to the United States when a party seeks to build a cross-border pipeline facility that physically connects the United States and Canada."  Order at 23.  "Even employing a narrow definition of commerce, . . . the transportation of crude oil from Canada to the United States falls within Congress's power to regulate foreign commerce."  Order at 23.

"Congress has demonstrated its intent to regulate cross-border pipelines" – including the Keystone Project – "pursuant to its powers under the Foreign

Commerce Clause." Order at 29-30 (quote), 34. For example, Congress enacted

the Temporary Payroll Tax Cut Continuation Act ("TPTCCA") in 2011, which

requires that "the President, act[] through the Secretary of State," in determining if

Keystone would serve the national interest. 125 Stat. at 1289; Order st 28. The

TPTCCA "expressly conditioned its instruction that the Secretary of State evaluate

the Keystone permit based on the procedures set forth in [Executive Order

13,337]," including State Department review in order to make a national interest

determination, to "ensur[e] that the pipeline permitting review incorporated the

views and expertise of various federal agencies and departments." Order at 33.

Congress' intent to exclusively regulate cross-border pipeline permits is clear.

Congress' exclusive authority to regulate foreign commerce necessarily

includes the exclusive authority to regulate cross-border transportation of foreign

oil. *United States v. Ohio Oil Co.*, 234 U.S. at 560; *Alaska v. Brown*, 850 F.Supp.

at 827. Accordingly, this Court has already ruled "that cross-border transportation

of crude oil through a pipeline constitutes a form of foreign commerce." Order at

23.

As with Congress' power over foreign commerce, Congress' Property

Clause powers are likewise exclusive. They include the cross-border permitting of

pipelines that will cross federal land. Order at 34. "The Property Clause provides

Congress 'the power over the public lands "to control their occupancy and use, to

protect them from trespass and injury, and to prescribe the conditions upon which

others may obtain rights in them."' *Kleppe*, 426 U.S. at 540 (quoting *Utah Power*

& *Light Co. v. United States*, 243 U.S. 389, 405 (1917)).  The Supreme Court further described Congress's authority under the Property Clause as "complete power" over public lands.  *Id.* at 540."  Order at 30-31.  The permitting of cross-border pipelines implicates "Congress'[] constitutional power to manage federal lands."  Order at 34.  Therefore, the power to regulate cross-border pipelines also falls under Congress' Property Clause powers.

Because the Commerce Clause and Property Clause powers are specifically allocated to Congress, Congress has exclusive jurisdiction to regulate cross-border pipelines.  And, as this Court has already ruled, there is only one "congressionally-approved" pathway to process cross-border pipeline permits – the procedure set forth in Executive Order 13,337.  Order at 28, 33, 34 (quote), 36; 69 Fed.Reg. 25299-25301 (May 5, 2004).

C.    **Regulation of Cross-Border Pipelines Has Always Required Congressional Approval, and Congress Has Approved the State Department Review Procedure**

As discussed, "Congress holds *express authority* to regulate public and private dealings with other nations in its . . . foreign commerce powers." *Garamendi*, 539 U.S. at 414.  That includes the authority to regulate the construction and operation of cross-border facilities, like Keystone here.  Despite the fact that Congress has not enacted a comprehensive permitting scheme for every type of cross-border facility, the political branches have historically agreed over the past 150 years that (1) Congress retains the ultimate authority to do so, and (2) any regulatory process promulgated by the President is subject to that

- 23 -

authority and must not contravene the "express or implied will of Congress," as demonstrated above in section II.A. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

With specific regard to cross-border oil pipelines, the history is much shorter. The first attempt by either Congress or the President to implement a comprehensive permitting scheme was when President Johnson issued Executive Order 11,423 (33 Fed.Reg. 11741 (Aug. 20, 1968)) in 1968. Executive Order 11,423 instituted the system of State Department review and permitting of cross-border oil pipelines that continued unabated for over 50 years until Trump unilaterally purported to approve Keystone through the 2019 Permit, without State Department review or compliance with federal environmental laws. *See* Order at 3, 6, 27-28, 29.

The only changes to that permitting scheme during that 50-plus-year span were introduced by President Bush in 2004 via Executive Order 13,337 (69 Fed.Reg. 25299 (May 5, 2004)). *See* Order at 4. But those changes were relatively minor (e.g. adding a 15-day timeline for officials to notify the Secretary of State that they disagree with the proposed national interest determination). Executive Order 13,337 reaffirmed the general State Department review framework. Order at 4 (Executive Order 13,337 "maintained the same general approval procedure for cross-border pipeline facilities"). And it also reaffirmed that the State Department permitting system does not "supersede or replace the requirements established under any other provision of law," such as those

- 24 -

established under Congress' comprehensive scheme for regulating environmental protection, including NEPA and the ESA.  69 Fed.Reg. 25301 (quote), 25299 (amendments to Executive Order 11,423 intended to "expedite reviews of permits as necessary to accelerate the completion of energy . . . transmission projects . . . , while maintaining safety, public health, and environmental protections") (May 5, 2004); *see also* 22 C.F.R. § 161.7(c)(1) ("Issuance of permits for construction of . . . pipeline[s]" are actions "normally requiring [at least] environmental assessments," citing Executive Order 11,423); *Sierra Club v. Clinton* ("*Sierra Club*"), 689 F.Supp.2d 1147 (D.Minn. 2010) (State Department had conducted NEPA review for both cross-border oil pipelines at issue).

The fact that the practice of State Department review continued unabated for over 50 years without congressional override indicates that the system effectively accommodated congressional mandates and priorities.  Order at 28 ("Congress implicitly approved of the system"), 34 (Trump interfered with the "congressionally-approved comprehensive State Department review process"), 36 ("Congress has approved of the permitting process").  But this Court need not speculate on whether Congress acquiesced to that "long-continued practice," because Congress also *explicitly* expressed its will that Keystone be permitted pursuant to Executive Order 13,337.  *Dames & Moore v. Regan* ("*Dames & Moore*"), 453 U.S. 654, 686 (1981) (internal quotations and citation omitted).  In 2011, Congress enacted the TPTCCA, which directed the President, through the State Department, to either deny or "grant a permit *under* Executive Order No.

13,337" for Keystone within sixty days.  Pub. L. No. 112-78, §§ 501(a)-(b) 125 Stat. 1280 (2011) (emphasis added).

Congress' later abortive attempt to directly permit Keystone is inapposite because it never became law.  "Congress holds express authority to regulate public and private dealings with other nations in its . . . foreign commerce powers," but its power is exercised through its adoption of laws.  *Garamendi*, 539 U.S. at 414. And here, Congress failed to vote to overcome President Obama's veto of the 2015 Keystone XL Pipeline Approval Act, which therefore *never became law*. Because Congress failed to overcome this veto, it preserved the State Department review process that since 1968 had ensured "thorough consideration of issues that could bear on our national interest – including our security, safety, and environment" in compliance with Congress' comprehensive environmental and other regulatory schemes.  Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act, 2015 WL 758544 at *1 (2015).

In sum, the system of State Department review and permitting of cross-border oil pipelines continued unabated for the entire 50-plus-year history of federal cross-border oil pipeline regulation until Trump purported to approve Keystone himself through the 2019 Permit.  Indeed, Trump himself originally hewed to the State Department review process.  In his January 24, 2017 Memorandum inviting TransCanada (now TC Energy) to "re-submit its application to the Department of State for a Presidential permit" for Keystone, Trump made clear that review was to be conducted "in accordance with Executive

- 26 -

Order 11423 of August 16, 1968, as amended, and Executive Order 13337 of April 30, 2004." 82 Fed.Reg. 8663 (Jan. 30, 2017). He only attempted to depart from that congressionally and historically sanctioned course after this Court vacated the 2017 Permit. But as discussed above, this Court properly set aside that permit because the State Department had failed to provide the reasoned explanation required by the EO 13,337 process and informed by compliance with the laws Congress enacted to protect the environment. Trump's attempt to defy the established permitting process approved by Congress – and thereby evade congressionally enacted bulwarks against environmental harm – violates the Commerce Clause.

**D.      Congress Retains the Ultimate Power to Regulate Cross-Border Pipelines**

The historical practices described in section II.C. confirm that Congress has exclusive power over the regulation of foreign commerce. The Constitution grants to Congress alone the power to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. "Past [executive branch] practice does not, by itself, create power." *Dames & Moore*, 453 U.S. at 686. Consequently, the President cannot regulate foreign commerce without congressional approval.

"'[L]ong-continued [executive branch] practice, known to and acquiesced in by Congress,'" such as the State Department review process provided in Executive Order 13,337, "'would raise a presumption that the action had been [taken] in pursuance of its consent.'" *Dames & Moore*, 453 U.S. at 686 (quoting *United*

*States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)).  But when the "President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  And in the context of foreign commerce regulation, Congress has "exclusive and plenary" constitutional authority.  *Board of Trustees of Univ. of Ill. v. United States*, 298 U.S. at 56-57.

Trump has relied on *Sierra Club* as the sole case to "squarely address[]" the "President's authority to issue a border-crossing permit for a pipeline."  Trump 8. But *Sierra Club* merely stands for the same legal principle just discussed, namely, that Congress can be deemed to consent to long-standing executive branch practice known to Congress where Congress has not directed a different course of action through enacted legislation.  *Sierra Club*, 689 F.Supp.2d at 1163.  The court noted that "despite the fact that cross-border permits for pipelines have been issued by Presidents in the past" under EO 11,423 and EO 13,337, Congress had not enacted a different "permitting process."  *Id*.  The court therefore ruled that "Congress's inaction suggests that Congress has accepted" the procedure used by the President (in that case, EO 13,337), and that the issuance of the permit for the AC Pipeline was not unconstitutional.  *Id*.

The authorities cited by the *Sierra Club* court likewise support the constitutional principle that Congress possesses the ultimate authority over regulation of cross-border facilities, and that any executive branch efforts to

regulate those facilities are taken *at the mercy of Congress*.  For example, the Attorney General's opinion on the landing of commercial telegraph cables from Cuba acknowledges that the "grounding of a cable upon the soil of the United States . . . is under the sovereign control of this Government, such control to be exercised by Congress," and that "executive department" regulation can only occur "in the absence of Congressional action."  22 U.S. Op. Atty. Gen. 514, 515 (1899) (quotes); 30 U.S. Op. Atty. Gen. 217 (1913) (only "[i]n the absence of legislation by Congress," may the President regulate the importation of electrical power); 38 U.S. Op. Atty. Gen. 163, 163-164 (1935) ("I have found no statute relating particularly to [gas] pipe lines, but the practice [of presidential licensing] in such cases appears to be based upon the principle stated in the Attorney General's opinion of January 18, 1898 (22 Op. 13, 27), that *in the absence of legislative enactment* the President may control the landing of submarine cables" (emphasis added)); 24 U.S. Op. Atty. Gen. 100 (similar implication for regulation of wireless telegraph systems).

### E.    The President May Not Usurp Congress' Power to Regulate Cross-Border Pipelines

As discussed above, Congress both acquiesced in and affirmatively directed the President to utilize the State Department review procedure set forth in Executive Order 13,337 in determining whether to issue a Presidential permit for Keystone.  As a result, the President may *only* issue cross-border pipeline permits

*pursuant to the Executive Order 13,337 review procedure.*  Congress has yet to sanction – explicitly or implicitly – any other type of permitting process.

Contrary to this settled law, the President purported to approve Keystone himself in the 2019 Permit, without State Department review or compliance with federal environmental laws.  84 Fed.Reg 13101 (April 3, 2019) (permit issued "notwithstanding EO 13,337" and the "Presidential Memorandum of January 24, 2017"); Order at 5-6, 30 ("President Trump completely removed the State Department and other federal agencies from considering cross-border permit applications when he issued the 2019 Permit").  Trump's 2019 Permit thus stands in stark contrast to the Presidential permit for the cross-border AC Pipeline that was held to be constitutional in *Sierra Club*.  In *Sierra Club*, the State Department had in fact followed – rather than circumvented – the process required by EO 13,337, including conducting NEPA review.  And there, unlike here (with the TPTCCA), Congress had not even specifically directed the President to comply with EO 13,337.  Pub. L. No. 112-78, §§ 501(a)-(b) 125 Stat. 1280 (2011).

In sum, Trump's 2019 Permit violates the Commerce Clause because it contravenes both the "expressed [and] implied will of Congress" under its exclusive foreign commerce powers.  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

//

//

### III.   THE PROJECT CANNOT PROCEED WITHOUT A LEGALLY ISSUED PRESIDENTIAL PERMIT

That the 2019 Permit is constitutionally invalid does not negate the need for TC Energy to obtain a Presidential permit prior to construction and operation of the Project.  Order at 37 (TC Energy is "responsible for complying with either the permitting process set forth in [Executive Order 13,337], or . . . Executive Order [13,867], depending on its applicability and constitutionality").  TC Energy's assertion that the invalidity of the 2019 Permit "would be self-defeating because TC Energy could construct the pipeline without a permit if the President lacks the authority to grant a cross-border pipeline facility permit[]" misapprehends Plaintiffs' argument and misstates applicable law.  The President is empowered to issue a Presidential permit only to the extent that he has received delegated authority to do so from Congress, and only if he complies with the limitations that Congress has prescribed.  Because Trump's 2019 Permit failed to comply with Congress' direction, that Permit is invalid.  These points are elucidated below.

First, contrary to TC Energy's premise, Plaintiffs do not claim the President lacks authority to issue a Presidential permit altogether.  Rather, Plaintiffs contend that the President has authority to issue such a permit *only to the extent he has received delegated authority to do so from Congress*, and *complies with Congress' limitations* on that authority.  First Amended Complaint (ECF 37) at 3-4, 24-32; Plaintiffs' Memorandum of Points and Authorities in Opposition to Motions to Dismiss (ECF 57) at 12, 21-36.  As this Court has ruled, the President may issue

- 31 -

such permits, but only if he complies with Congress' direction.  Order 21, quoting *Medellin v. Texas*, 552 U.S. at 524 ("'The President's authority to act, as with the exercise of any governmental power, 'must stem from either an act of Congress or from the Constitution itself'").

The authority that Congress has granted the President to issue Presidential permits is not absolute.  As the Court noted in its Order, "Congress' enactment of the TPTCCA in 2011 evidences its intent to exercise authority over cross-border pipeline permitting."  Order 28.  The TPTCCA required that the Department of State review and approve such permits pursuant to the procedures set forth in Executive Order 13,337.  Those procedures, in turn, trigger compliance with Congress' environmental mandates including NEPA, the ESA, the Federal Land Policy Management Act (43 U.S.C. section 1701 *et seq.* ("FLPMA")), the Clean Water Act (33 U.S.C. section 1251 *et seq.* ("CWA")), and the National Historic Preservation Act (54 U.S.C. section 300101 et *seq.* ("NHPA").  If the President fails to comply with these statutory procedures and standards, as here, any permit he purports to issue is *ultra vires*.  Order 19-20 (courts may "enjoin the President . . . where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries'") (quoting *Hawaii v. Trump*, 859 F.3d 741, 768 (9th Cir. 2017) (*dismissed as moot*, 138 S.Ct. 377 (2017)) and citing *League of Conservation Voters v. Trump*, 363 F.Supp.3d 1013, 1031 (D.Ak. 2019).

Second, contrary to Congress' direction, Trump issued the 2019 Permit without consulting the Secretary of State as required by the TPTCCA and

Executive Order 13,337.  The 2019 Permit simply ignores the TPTCCA, and openly defies Executive Order 13,337's requirement that the permit conform to the laws that govern Department of State permits such as NEPA, the APA, the ESA, FLPMA, the CWA, and the NHPA.  Contrary to those laws, the 2019 Permit attempts to evade compliance with their procedural and substantive requirements by prescribing in Article 1, section 2 that the "Facilities" (i.e., per the Permit's definitions, the entire 875 miles) "*shall* be in *all* material respects and as consistent with applicable law, *as described* in the permittee's application for a Presidential permit filed on May 4, 2012 and resubmitted on January 26, 2017." 84 Fed.Reg. 13101-13102 (April 3, 2019) (emphasis added).

As this Court has ruled, Congress directed that issuance of a Presidential permit, in this circumstance,  requires:  consultation with the Secretary of State, the Secretary's determination that the Project serves the national interest, and compliance with the environmental laws that Congress has prescribed for the Secretary's review as well for the approvals required by other federal agencies. Congress enacted those procedures and standards pursuant to the Commerce Clause and the Property Clause, to protect the environment and ensure proper management of federal lands and waters.  The required consultation never took place, the required national interest determination was never made, and there was no compliance with the applicable environmental laws.

While the Permit does provide that "construction, connection, operation, and maintenance of the Facilities" be "consistent with applicable law," that

- 33 -

general reference does not save the Permit's constitutionality because the Permit's exclusion of the State Department from the permitting process *completely changes the "applicable law*."  The laws that would otherwise govern State Department reviews – such as NEPA – no longer apply.  Because the 2019 Permit is specifically intended and written to *circumvent* State Department review "notwithstanding Executive Order 13337," it impermissibly evades the environmental laws that would *otherwise* be applicable.  84 Fed.Reg. 13101 (April 3, 2019).   As discussed above, the entire purpose of the 2019 Permit was to evade the Court's previous judgment and injunction overturning the 2017 Permit and the Administrative Procedure Act's requirement that the Secretary of State make a national interest determination based on compliance with our nation's bedrock environmental laws.  The 2019 Permit is thus deliberately, specifically, directly and patently contrary to Congress' mandate.  It roars defiance, and presages tyranny.

As this Court has noted, Trump's authority is at its "lowest ebb" because the 2019 Permit contravenes both the expressed and implied will of Congress.  It sidesteps Executive Order 13,337, which Congress had specifically directed the President to follow in processing the Keystone permit application.  Pub. L. No. 112-78, §§ 501(a)-(b), 125 Stat. 1280 (2011); Order 27, quoting *Youngstown*, 343 U.S. at 637.  And it departs from the long-standing practice – embodied in Executive Order 11,423 and Executive Order 13,337 and consistently followed for 51 years – of State Department review and permitting of cross-border oil pipelines

pursuant to Congress' comprehensive statutory scheme of environmental protection.

In summary, a Presidential permit is required for the Project to proceed, but it must be one issued in compliance with Congressional direction and the governing law.

## CONCLUSION

Our Founding Fathers intended that our nation be governed by laws, not men. Our nation's most fundamental law is its Constitution. To guard against tyranny, our Constitution wisely provides a system of checks and balances whereby Congress and the Judiciary provide critical "checks" on the otherwise unbridled power of the President. Only through judicious balancing of the powers given these three branches can this Court safeguard our democracy.

As shown above, President Trump has attempted to evade the Constitution's carefully-ordained system of checks and balances by approving the Keystone Pipeline in a manner intended to defy this Court's previous orders. In doing so, President Trump also impermissibly evaded the statutory safeguards imbedded in the established pathway for permitting cross-border pipelines that Congress has prescribed.

//

//

//

Accordingly, this Court should, consistent with its December 20, 2019 Order, declare unlawful and set aside President Trump's 2019 Permit.


Dated: January 24, 2020       PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC

s/ *James A. Patten*
JAMES A. PATTEN


LAW OFFICES OF STEPHAN C. VOLKER

s/ *Stephan C. Volker*
STEPHAN C. VOLKER (Pro Hac Vice)

Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE

## CERTIFICATE OF COMPLIANCE

Pursuant to Montana District Court, Civil Rule 7.1(d)(2)(E), and this Court's December 20, 2019 Order, I certify that **PLAINTIFFS' BRIEF IN RESPONSE TO THE COURT'S DECEMBER 20, 2019 ORDER, ECF 74** contains 6,703 words, excluding caption and certificate of service, as counted by WordPerfect X7, the word processing software used to prepare this brief.

Dated:  January 24, 2020                *s/ Stephan C. Volker*

## CERTIFICATE OF SERVICE

I, Stephan C. Volker, am a citizen of the United States.  I am over the age of 18 years and not a party to this action.  My business address is the Law Offices of Stephan C. Volker, 1633 University Avenue, Berkeley, California 94703.

On January 24, 2020 I served the following documents by electronic filing with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to the email addresses registered in the above entitled action:

### PLAINTIFFS' BRIEF IN RESPONSE TO THE COURT'S DECEMBER 20, 2019 ORDER, ECF 74

I declare under penalty of perjury that the foregoing is true and correct.

s/ *Stephan C. Volker*
STEPHAN C. VOLKER (Pro Hac Vice)