MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Ph: (406) 247-4667; Fax: (406) 657-6058
mark.smith3@usdoj.gov

PRERAK SHAH
Acting Deputy Assistant Attorney General
MARISSA A. PIROPATO (MA BAR 65160)
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
marissa.piropato@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, *et al.*,<br><br>Defendants,<br><br>and<br><br>TC ENERGY CORP., *et al.*<br><br>Defendant-Intervenors. | CV 19-28-GF-BMM<br><br><br>**DEFENDANTS' RESPONSES TO THE COURT'S QUESTIONS IN ITS DECEMBER 20, 2019 ORDER** |

# TABLE OF CONTENTS

1.  As related to the scope of President Trump's March 29, 2019 Memorandum "Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada," *see* 84 Fed. Reg. 13101-03: ...................................................................................1

    a.  Address whether the permit authorizes only the 1.2 mile border facility and provide supporting authority; and ......................................1

    b.  Address separately whether the permit authorizes the entire Keystone XL Pipeline project and provide supporting authority. ........4

2.  As related to the separation of powers, ..........................................................6

    a.  Address whether the power to issue permits for cross-border pipeline facilities falls under the President's foreign affairs or Commander-in-Chief powers; ................................................................6

    b.  Address separately whether the power to regulate cross-border pipelines falls under Congress' foreign commerce clause powers; ....13

    c.  How the political branches historically have addressed the question of authority over cross-border pipeline facilities; ...............14

    d.  Whether those historical practices weigh in favor of ruling that the power to deal with cross-border pipeline facilities falls under the President's or Congress' powers; and ...........................................19

    e.  Whether the President may issue cross-border pipeline permits even if Congress has the power to regulate cross-border pipelines under the Foreign Commerce Clause. ................................................23

i

# TABLE OF AUTHORITIES

## Cases

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) .................................................................... 7, 21, 23, 24

*Ashwander v. Tenn. Valley Auth.,*
    297 U.S. 288 (1936) ....................................................................................3, 4

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.,*
    333 U.S. 103 (1948) ........................................................................................6

*Commc'ns Workers of Am. v. Beck,*
    487 U.S. 735 (1988) ........................................................................................3

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ................................................................................. 19, 21

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988) ........................................................................................3

*Green Cty. Planning Bd. v. Fed. Power Comm'n,*
    528 F.2d 38 (1975) ........................................................................................11

*Haig v. Agee,*
    453 U.S. 280 (1981) ......................................................................................21

*Kaplan v. Corcoran,*
    545 F.2d 1073 (7th Cir. 1976) ......................................................................19

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................................7

*Nat. Res. Def. Council v. U.S. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009) ..............................................................12

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ........................................................................................6

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014) ....................................................................................7

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
    557 U.S. 193 (2009) ........................................................................................3

*Public Citizen v. U.S. Dep't of Justice,*
    491 U.S. 440 (1989) .....................................................................................4, 8

*Sierra Club v. Clinton*
   689 F. Supp. 2d 1147 (D. Minn. 2010) ......................................................... 12, 21

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State*,
   659 F. Supp. 2d 1071 (D.S.D. 2009) ..................................................................12

*United States v. Curtiss–Wright Export Corp.,*
   299 U.S. 304 (1936) ...........................................................................................6, 7

*United States v. La Compagnie Francaise Des Cables Telegraphiques*,
   77 F. 495 (S.D.N.Y. 1896) .............................................................................. 9, 11

*United States v. Midwest Oil Co.,*
   236 U.S. 459 (1915) ..............................................................................................7

*United States v. W. Union Tel. Co.*
   260 U.S. 754 (1922) ............................................................................................11

*United States v. W. Union Tel. Co.*
   272 F. 893 (2d Cir. 1921) ............................................................................... 9, 11

*United States v. W. Union Tel. Co.,*
   272 F. 311 (S.D.N.Y 1921) ........................................................................... 9, 11

*Watt v. Alaska,*
   451 U.S. 259 (1981) ..............................................................................................6

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ................................................... 6, 7, 8, 19, 24, 25

*Zivotofsky v. Kerry*,
   135 S. Ct. 2076 ............................................................................................ 7, 24

**Statutes**

33 U.S.C. § 535b ................................................................................................ 13, 14

47 U.S.C. § 35 ............................................................................................ 11, 13, 14

Pub. L. No. 112-78, 125 Stat. 1280 (2011)..................................................................17

**Regulations**

31 Fed. Reg. 6204 (Apr. 10, 1966) ..........................................................................15

33 Fed. Reg. 11,741 (Aug. 20, 1968) ............................................................. 16, 20

69 Fed. Reg. 25,299 (Apr. 30, 2004) ............................................................. 16, 20

77 Fed. Reg. 5,679 (Jan. 18, 2012) ..........................................................................22

84 Fed. Reg. 13,101 (Mar. 29, 2019) ..........................................................1

84 Fed. Reg. 15,491 (Apr. 10, 2019) .........................................................20

**Other Authorities**

H.R. Doc. No. 1, Pt. 1 (Dec. 6, 1875) .........................................................8

S. 1, 114th Cong. § 2(a)-(b) (2015) ...........................................................22

S. Rep. No. 114-1, at 1 (2015) ..................................................................22

Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act,
    2015 WL 758544 (White House Feb. 24, 2015) ....................................18

On December 20, 2019, this Court ordered the parties to provide additional briefing in response to eight questions. *See* Order, ECF No. 74. The Court's questions and Defendants' responses are set forth below.[1]

1.      As related to the scope of President Trump's March 29, 2019 Memorandum "Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada," *see* 84 Fed. Reg. 13101-03:

     a.      Address whether the permit authorizes only the 1.2 mile border facility and provide supporting authority; and

President Trump's Permit, by its express terms, only authorizes the 1.2 mile border facility. *See* Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada, 84 Fed. Reg. 13,101, 13,101 (Mar. 29, 2019) ("Permit"). The Permit grants TC Energy, subject to certain conditions, permission "to construct, connect, operate, and maintain pipeline facilities at *the international border of the United States and Canada at Phillips County, Montana*, for the import of oil from Canada to the United States." *Id.* (emphasis added).

---

[1] In light of the Court's instructions to provide this supplemental briefing relevant to Defendants' motion to dismiss, it is unclear whether that motion has been finally resolved. Accordingly, Defendants have not yet filed an answer. Should the Court indicate that Defendants' motion to dismiss is, in fact, fully resolved, Defendants will submit an answer in accordance with the time period allowed by the Federal Rules of Civil Procedure or, if necessary, seek additional time to do so.

These "pipeline facilities at the international border" are referenced throughout the Permit as "Border facilities," which in turn are expressly defined as consisting of only the 1.2 mile border pipeline, rather than the whole pipeline:

> The term "Border facilities," as used in this permit, means those parts of the Facilities consisting of a 36-inch diameter pipeline extending from the international border between the United States and Canada at a point in Phillips County, Montana, to and including the first mainline shut-off valve in the United States located approximately 1.2 miles from the international border, and any land, structures, installations, or equipment appurtenant thereto.

*Id.*  In contrast, the Permit defines "facilities" more broadly to include in its sweep the entire pipeline in the United States as set forth in TC Energy's May 4, 2012 application including any "land, structures, installations, or equipment appurtenant thereto." *Id*.

Because the Permit makes clear that it only "grants []permission" for "pipeline facilities *at the international border of the United States and Canada*," and because it further clarifies that these Border facilities consist only of those facilities extending 1.2 miles from the international border, *id.*, there can be no question that the Permit authorizes only that discrete portion of the Keystone XL pipeline project.  Even as to those Border facilities, moreover, the Permit is clear that "the permittee is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate," *id.* art. 6(1).  There is, accordingly, no basis for Plaintiffs' contention

2

that the Permit authorizes Project-related facilities other than the narrowly defined
"Border facilities," or that the Permit displaces the Bureau of Land Management's
("BLM") regulatory authority under the Mineral Leasing Act to grant rights-of-
way across federal public lands.[2]

Even if the permit were ambiguous on its scope, to the extent the Court finds
that Plaintiffs' reading raises constitutional concerns, then the constitutional
avoidance canon of construction would support the Defendants' narrow reading.
*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568, 575 (1988); *see generally Ashwander v. Tenn. Valley Auth.,* 297
U.S. 288, 347 (1936) (Brandeis, J., concurring); *Nw. Austin Mun. Util. Dist. No.
One v. Holder*, 557 U.S. 193, 205 (2009); *Communications Workers of Am. v.
Beck*, 487 U.S. 735, 762 (1988).  The United States and TC Energy both agree that
the only rational reading of the Permit is that it authorizes the border segment and
no more.[3]  *See* Reply Mem. In Supp. of Suppl. Mot. 1, ECF No 60; Defs.' Reply

---

[2] Among the predicate steps is BLM's approval of TC Energy's application for a
right-of-way grant—in compliance with the National Environmental Policy Act
("NEPA") and other applicable statutes—where the pipeline traverses federal lands
(including most of the 1.2-mile portion covered by the Permit).  BLM issued a
right-of-way to TC Energy on January 22, 2020.

[3] By way of example, TC Energy received a right-of-way grant from BLM to
construct facilities within the 1.2-mile border crossing segment and the State
Department issued a Supplemental Environmental Impact Statement.  The actions
of TC Energy and the United States evince the limited grant in the Permit.

Mem. in Supp. of Mot. to Dismiss Pls' Am. Compl. 1, ECF No. 61.  And this

narrow reading of the Permit — the only reading of the Permit advanced by the

parties bound by it — does not present the constitutional arguments raised by

Plaintiffs that this Court found to be "plausible," including the argument that the

President was acting *ultra vires*.  ECF No. 73 at 29-30, 34.   Moreover, a court's

"reluctance to decide constitutional issues is especially great where, as here, they

concern the relative powers" of other officers of the government.  *Public Citizen v.*

*U.S. Dep't of Justice,* 491 U.S. 440, 466 (1989) (citation omitted).  The prospect of

this Court declaring unconstitutional an act of the President based on an

interpretation of the Permit that is subject to substantial doubt raises the profound

separation-of-powers concerns that lie at the core of the principle of constitutional

avoidance, *see, e.g.*, *Ashwander*, 297 U.S. at 347, and accordingly weighs heavily

in favor of interpreting the Permit as limited to the 1.2 mile border segment.

      b.    Address separately whether the permit authorizes the entire Keystone
               XL Pipeline project and provide supporting authority.

The Permit does not authorize anything other than the Border facilities of the

Keystone XL Pipeline project, which are unambiguously defined as consisting of

only the 1.2 mile border segment.  *See* section 1.a., *supra*.  Insofar as the Permit

references facilities other than the Border facilities, none of the provisions include

any affirmative *grant* of authority.  Rather, they reinforce the fact that the Permit

does not give TC Energy carte blanche to construct the pipeline and that TC

4

Energy will be still subject to the limitations enumerated in its application for the border crossing.  Specifically, the Permit requires that the construction, connection, operation, and maintenance of non-border facilities adhere to the terms and conditions included in the application TC Energy submitted to the State Department on May 4, 2012, and resubmitted on January 26, 2017.  *See* Permit, art 1(2).[4]

The Permit is also explicit that TC Energy must secure all requisite approvals from local, state and federal entities, specifying that "[t]he permittee is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate."  Permit art. 6(1) (applying to both Border facilities and non-border facilities). Thus, far from authorizing the entire Keystone CL pipeline, the Permit merely confirms that TC Energy cannot construct and operate any aspect of the project—even the border segment—until applicable federal agencies have completed the corresponding environmental review and permitting processes required by law.

---

[4] Among the conditions listed in the permit are that it will be constructed consistent with (1) the regulations of the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration, (2) conditions included in all applicable permits, and (3) the 1994 National Economic Council White Paper, "Staff Recommendations on the Task Force on Border Infrastructure and Facilities for Improved U.S. Border Operations." TransCanada Keystone Pipeline, L.P., Application for Presidential Permit for Keystone XL Pipeline Project, January 26, 2017, p. 7, 13 & 18.

In short, the Permit only refers to other portions of the Keystone XL pipeline—outside the 1.2 mile border crossing—to confirm limitations on TC Energy's operations, and it never affirmatively authorizes any part of the pipeline except that 1.2 mile border crossing. Nor does it exempt any part of the pipeline from applicable Federal law.  *Cf. Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 662 (2007) ("repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest" quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)).

2.    As related to the separation of powers,

    a.    Address whether the power to issue permits for cross-border pipeline facilities falls under the President's foreign affairs or Commander-in-Chief powers;

The President's authority to issue a cross-border pipeline permits falls under both his foreign affairs and Commander-in-Chief powers.  Indeed, the President possesses inherent constitutional responsibility in these areas.  *See, e.g., Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander–in–Chief and as the Nation's organ in foreign affairs"); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–36 n.2 (1952) (Jackson, J., concurring) (the President can "act in external affairs without congressional authority") (citing *United States v. Curtiss–Wright Export Corp.,*

6

299 U.S. 304, 309 (1936)); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations'") (quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)).  Thus, the President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."  *Curtiss–Wright Export Corp.*, 299 U.S. at 320; *Youngstown*, 343 U.S. at 635-36 n.2 (the President can "act in external affairs without congressional authority").

This Court "need not consider whether, as an original question," the President's Article II authority encompasses the power to control border-crossing facilities because the Executive has long exercised such power.  *United States v. Midwest Oil Co.*, 236 U.S. 459, 469 (1915).  In separation-of-powers cases, the Supreme Court "has often 'put significant weight upon historical practice.'" *Zivotofsky*, 135 S. Ct. at 2091 (quoting *NLRB v. Noel Canning*, 134 S. Ct. 2550, 259 (2014)).  Although past practice does not, by itself, create constitutional power, a "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that [it] had been made in pursuance of [congressional] consent or of a recognized [] power of the Executive."  *Midwest Oil Co.*, 236 U.S. at 474; *see also Mistretta v. United States*, 488 U.S. 361, 401 (1989) (observing

that "'traditional ways of conducting government . . . give meaning' to the Constitution" (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring))).

There is a long history of Presidents issuing cross-border permits under their foreign affairs power and authority as Commander-in-Chief.  In 1867, Congress authorized the landing of a telegraph cable from Cuba.  *See* Moore, *Dig. of Int'l Law*, Vol. II, at 453 (1906), Ex. 1.   In 1869, however, in the absence of Congressional action, President Grant authorized the landing of a telegraph cable from France subject to certain conditions.  *Id.* at 454-55; *see also* President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1 (Dec. 6, 1875), Ex. 2.

This practice of authorizing border crossings was continued by subsequent Presidents.  *See* Moore, *Dig. Int't Law*, Vol. II, at 461 ("It thus appears that from 1869 to August, 1893, during the terms of Grant, Hayes, Garfield, Arthur, Cleveland (first term), and Harrison, it was held by the Presidents and their Secretaries of State that the Executive has the power, in the absence of legislation by Congress, to control the landing, and, incidentally, regulate the operation of foreign submarine cables in the protection of the interests of this Government and its citizens.") (quoting Foreign Cables, 22 Op. Att'y. Gen. 13, 25 (1898)).  The only break in this constant Executive position was during President Cleveland's

second term, when his two Secretaries of State held a different view.  *See* 22 Op.

Att'y Gen. at 23-24; *see also United States v. W. Union Tel. Co.*, 272 F. 311, 317

(S.D.N.Y 1921), *aff'd* 272 F. 893 (2d Cir. 1921), *rev'd and dismissed by*

*stipulation of the parties*, 260 U.S. 754 (1922).  As a result, a French company

landed a cable at Coney Island, New York from Haiti without the Government's

permission.  22 Op. Att'y Gen. at 24.  The Attorney General immediately brought

suit to prevent the landing and operation of the cable, *id*., but the court declined to

issue an injunction because the cable had been laid.  *See United States v. La*

*Compagnie Francaise Des Cables Telegraphiques*, 77 F. 495 (S.D.N.Y. 1896).

In 1898, in the context of the potential landing of a telegraph cable on

United States shores, Acting Attorney General Richards grounded the President's

authority over border-crossings in the President's authority over foreign affairs

power and his authority as Commander-in-Chief.  As the Acting Attorney General

explained, the President must be allowed to approve or deny a border crossing in

the absence of Congressional action:

> The attitude taken by [President Cleveland's State] Department under
> Mr. Gresham has resulted in the landing of two foreign cables upon
> our shores without permission of this Government and subject to no
> limitations or restrictions whatever. Must this condition continue? Is
> the President powerless to act until Congress legislates?

22 U.S. Op. Att'y Gen. at 25.

Acting Attorney General Richards further explained that the Constitution

9

authorizes the President to act to preserve the integrity of the United States'

borders:

> The Constitution, established by the people of the United States as the
> fundamental law of the land, has conferred upon the President the
> executive power; has made him the commander in chief of the Army
> and Navy; has authorized him, by and with the consent of the Senate, to
> make treaties, and to appoint ambassadors, public ministers, and
> consuls; and has made it his duty to take care that the laws are
> faithfully executed. In the protection of these fundamental rights,
> which are based upon the Constitution and grow out of the jurisdiction
> of this nation over its own territory and its international rights and
> obligations as a distinct sovereignty, the President is not limited to the
> enforcement of specific acts of Congress.

*Id.* at 25-26. Thus, for almost 150 years, the Executive Branch has located the

decision of whether to authorize border crossings in both the President's foreign

affairs power and his authority as Commander-in-Chief.

Cases discussing the authority of the President in this area recognize that

the President has the authority to approve border-crossing facilities.  The exercise

of this authority was upheld in 1896, when the United States sought to enjoin the

French Company's landing of the telegraph cable.  In resolving the dispute, Judge

LaCombe stated:

> It is thought that the main proposition advanced by complainant's
> counsel is a sound one, and that, without the consent of the general
> government, no one, alien or native, has any right to establish a
> physical connection between the shores of this country and that of any
> foreign nation.  Such consent may be implied as well as expressed,
> and whether it shall be granted or refused is a political question,
> which, in the absence of congressional action, would seem to fall
> within the province of the executive to decide.

*United States v. La Compagnie Francaise des Cables Telegraphiques*, 77 F. 495,

496 (S.D.N.Y. 1896). Thus, *La Compagnie Francaise* supports the authority of the

President to authorize a border crossing in the absence of congressional action.

*See also* Hackworth, *Dig. Int'l Law*, Vol. IV, at 251 (1942), Ex. 3.

Subsequently, in 1921, Judge Hand denied the United States' motion to

enjoin the landing of a telegraph cable on the grounds that the cables were

authorized by existing acts of Congress. *United States v. W. Union Telegraph Co.*,

272 F. 311, 323 (S.D.N.Y. 1921), *aff'd*, 272 F. 893 (2d Cir. 1921), *rev'd*, 260 U.S.

754 (1922). Judge Hand agreed with Judge LaCombe, however, that in the absence

of Congressional action, the President had the authority to approve or deny a

physical connection to the territory of the United States and such an action would

not be a justiciable matter. *Id.* at 318-19. The decision was upheld by the Second

Circuit and, following a subsequent appeal to the Supreme Court, was vacated per

stipulation of the parties. *W. Union Telegraph*, 260 U.S. at 754;[5] *see also Green*

*Cty. Planning Bd. v. Fed. Power Comm'n*, 528 F.2d 38, 46 (1975) (recognizing

that the President's authority over border-crossings is "rooted in the President's

---

[5] Congress subsequently enacted legislation regarding the landing of submarine
cables, but it has not done so in the area of cross-border pipelines. *See* Submarine
Cable Landing Licensing Act of 1921, 47 U.S.C. § 35 (recognizing the President's
authority to grant or revoke licenses for the landing of cables if such action will
maintain "the rights or interests of the United States . . . or will promote the
security of the United States").

power with respect to foreign relations if not as Commander in Chief of the Armed Forces").

More recently, courts have confirmed the President's authority to issue cross-border permits for pipelines based on both his foreign affairs authority and his authority as Commander-in-Chief.  In *Sierra Club v. Clinton*, plaintiffs challenged a pipeline border crossing permit and the district court concluded that it is "well recognized" that "the President's authority to issue" border crossing permits "comes by way of his constitutional authority over foreign affairs and authority as Commander in Chief."  689 F. Supp. 2d 1147, 1162–63 (D. Minn. 2010).  The court also emphasized that "Congress has not attempted to exercise any exclusive authority over the permitting process" despite the many permits issued by past Presidents—which "suggests that Congress has accepted the authority of the President to issue cross-border permits."  *Id*.

The *Sierra Club* decision followed two district court decisions likewise recognizing the President's authority to issue cross-border permit in connection with earlier iterations of the Keystone Pipeline.  *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1078 (D.S.D. 2009) (noting that, even if the permit were set aside, "the President would still be free to issue the permit again under his inherent Constitutional authority to conduct foreign policy on behalf of the nation"); *Natural Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d

12

105, 109 (D.D.C. 2009) ("Defendants have amply demonstrated the long history of Presidents exercising their inherent foreign affairs power to issue cross-border permits, even in the absence of congressional authorization.").

In sum, the President's authority to issue cross-border permits for oil pipelines is well-recognized and based both on his constitutional authority over foreign affairs power and his authority as Commander-in-Chief, and has long been recognized by the courts.

      b.    Address separately whether the power to regulate cross-border pipelines falls under Congress' foreign commerce clause powers;

Congress has the authority to enact legislation regulating cross-border oil pipelines under its foreign Commerce Clause powers.  It has not done so, however, in any manner that conflicts with the President's exercise of authority here. Instead, Congress has passed legislation regarding border-crossings for other types of facilities and, in two instances, has proposed legislation relating only to the Keystone XL Pipeline.

Congress's inaction with respect to cross-border oil pipelines stands in contrast to its action with respect to other types of border-crossings.  For example, as noted above, Congress enacted legislation governing the landing of submarine cables.  *See* 47 U.S.C. § 35.  Congress has also passed legislation regarding international bridges.  *See* International Bridge Act of 1972, 33 U.S.C. § 535b. Notably, in each of the instances where Congress has enacted legislation regarding

13

border crossings, it has—out of respect for the President's authority over such border-crossings—been careful not to infringe upon the President's authority and instead preserved the President's role in approving or denying an entity the right to cross the United States border.  *See* 47 U.S.C. § 35 (recognizing the President's authority to grant or revoke licenses for the landing of cables if such action will maintain "the rights or interests of the United States . . . or will promote the security of the United States"); 33 U.S.C. § 535b (recognizing the President's authority to approve the construction of bridges at the United States border).

But Congress has not passed legislation governing border crossings for oil pipelines.  As explained below, *see* section 2.c., *infra*, Congress has passed and proposed legislation relating specifically to the Keystone XL Pipeline, but neither of those bills apply to the Permit issued by the President and neither evince an intent by Congress to enact a statutory scheme governing border crossings for oil pipelines generally.

      c.      How the political branches historically have addressed the question of authority over cross-border pipeline facilities;

As discussed above, *see* section 2.a., *supra*, Presidents have exercised the authority to approve or deny various types of border crossings for nearly 150 years, including border-crossings for pipelines.  *See* Whiteman, *Dig. Int'l Law*, Vol. 9, at 917-22 (1968), Ex. 4.  Examples of presidential permits for cross-border pipelines reflected in Whiteman include the following:

1. An oil pipeline under the Saint Clair River issued on June 10, 1918.

2. A pipeline under the Detroit River issued on February 5, 1919.

3. An oil pipeline under the Saint Clair River issued on April 28, 1953.

4. An oil pipeline under the Rio Grande issued on July 30, 1953.

5. A crude oil pipeline under the Niagara River issued on October 18, 1962.

6. A crude condensate pipeline from Cut Bank, Montana, to Alberta, Canada, issued on October 18, 1962.

7. A crude oil pipeline from a point near North Troy, Vermont, to a point in Quebec, Canada, issued on January 13, 1965.

8. A crude oil pipeline from a point in Toole County, Montana, to a point in Alberta, Canada, issued on April 10, 1966. (31 Fed. Reg. 6204.)

*Id.* at 920-21 (brackets omitted).

In addition, State Department records reflect at least three other instances where a president authorized a cross-border oil pipeline.  In 1953, 1962, and 1968, Presidents Eisenhower, Kennedy, and Johnson (respectively) issued three separate Presidential permits to the Lakehead Pipeline Company for cross-border oil pipelines. *See* Exs. 6 & 7.  For 50 years, Presidents exercised their inherent authority to authorize border crossings for oil pipelines without action by Congress and without delegating the responsibility for issuing such permits to an agency official.  *See* Whiteman, *Dig. Int'l Law*, Vol. 9, at 920-22.

Beginning in 1968—and for over 50 years thereafter—Presidents delegated

15

the authority to issue cross-border permits for oil pipelines to the Secretary of State.  In that year, President Lyndon B. Johnson issued Executive Order 11,423, which authorized the Secretary of State to issue permits for border crossing facilities, including oil pipelines.  *See* Exec. Order No. ("EO") 11,423 § 1(a), 33 Fed. Reg. 11,741 (Aug. 20, 1968).  Between 1968 and 2004, various Under Secretaries of State issued several Presidential Permits for cross-border oil pipelines.  *See* Compilation of Historical Presidential Permits, Ex. 8.  In 2004, President George W. Bush issued Executive Order 13,337, which continued the practice of delegating the responsibility for issuing cross-border permits for oil pipelines to the Secretary of State and revised this delegation of authority in some respects.  EO 13,337 § 1(a), 69 Fed. Reg. 25,299 (Apr. 30, 2004).  That executive order was intended to "expedite reviews of permits as necessary to accelerate the completion of energy production and transmission projects, and to provide a systematic method for evaluating and permitting the construction and maintenance of certain border crossings," including crossings for oil pipelines.  *Id.* at 25,299.

In 2019, President Trump ended the modern practice of delegating the authority for the issuance of cross-border permits to the Secretary of State.  *See* Exec. Order No. 13,867, 84 Fed Reg. 15,491 (Apr. 10, 2019).  In this executive order, the President noted that, "Presidents have long exercised the authority to permit or deny the construction, connection, operation, or maintenance of

infrastructure projects as an international border." *Id.* at 15,491.  Finding that the practice of delegating the authority over border-crossings to agency heads over the preceding decades had "unnecessarily complicated the Presidential permitting process," the President revoked EO 11,423 and EO 13,337.  *Id.* at 15,491-92 (EO 13,867 § 2(k)).

In the face of this extensive and long-running Presidential practice of authorizing cross-border pipelines, Congress has not passed any legislation seeking to curtail the practice.  Indeed, the two instances where Congress sought to intervene with respect to the Keystone XL Pipeline reinforce, rather than undermine, the President's role as the appropriate authorizing federal officer.

First, Congress enacted the Temporary Payroll Tax Cut Continuation Act ("TPTCCA") of 2011, Pub. L. No. 112-78, 125 Stat. 1280 (2011).  In section 501 of the act, Congress required the President either to approve the issuance of a presidential permit for the Keystone XL Pipeline within sixty days or deny the permit within that time, in which case he was required to provide a report to Congress regarding the grounds for denial of the permit.  *Id.* § 501(a)-(b), 125 Stat. at 1289-90.  Crucially, though, the TPTCCA did not disturb the President's authority to make the final determination as to whether a permit for the Keystone XL Pipeline would "serve the national interest," thus acceding to the standard articulated by the President in Executive Order 13,337, which was then in effect.

17

*Id.* § 501(b)(1)-(2).  The instruction in the TPTCCA that the President "act[]
thorough the Secretary of State," *id.* § 501(a), merely serves to underscore that
Congress was directing the President to follow the procedure that was already in
place solely at the prerogative of the President, not based on an act of Congress.
Congress left the decision whether to approve the Keystone XL Pipeline entirely to
the President out of respect for the long history of Presidents exercising their
Article II powers to authorize such permits on their own.

Second, in 2015, Congress passed the Keystone XL Pipeline Approval Act,
S. 1, 114th Cong. §§ 1-6 (2015).  *See* S.1., Keystone XL Pipeline Approval Act
("Approval Act") (Jan. 6, 2015), Ex. 9.  The Approval Act would have approved
the Keystone XL Pipeline without additional analysis under the National
Environmental Policy Act and also would have limited judicial review to the courts
of appeals.  *See id.* § 2(b).  But the bill was never enacted into law because it was
vetoed by President Obama.  *See* Veto Message to the Senate: S. 1, Keystone XL
Pipeline Approval Act, 2015 WL 758544 (White House Feb. 24, 2015).  Insofar as
the never enacted bill has any relevance, it is that a majority of Congress would
have preferred to immediately authorize the border crossing at issue here.  Nothing
in the Approval Act supports Plaintiffs' contention that Congress intended to
establish a new procedure for approving cross-border pipelines.

d.     Whether those historical practices weigh in favor of ruling that the power to deal with cross-border pipeline facilities falls under the President's or Congress' powers; and

The historical practice of Presidential permitting of cross-borders pipelines weighs strongly in favor of ruling that the President has the authority to approve cross-border facilities in the absence of any Congressional action to the contrary. Although neither Congress nor the President has exclusive authority over the permitting of cross-border facilities, Presidents, rather than Congress, have historically issued permits for various cross-border facilities, including pipelines. Congress has acquiesced to this long-standing practice by not legislating in this area.  Congress' acquiescence to Presidential authority to approve cross-border pipelines is a prototypical example of a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (quoting *Youngstown*, 343 U.S. at 610–11 (Frankfurter, J., concurring)).

In the nearly one and a half centuries of Executive exercise of authority over a wide range of cross-border facilities, Congress has never questioned the President's authority.  *See* section 2.a., *supra*.  Instead, it has either explicitly affirmed the Executive's authority over specific types of border-crossing facilities, *e.g.*, telegraph cables and international bridges, or has remained silent and thereby accepted the President's authority.  *Kaplan v. Corcoran*, 545 F.2d 1073, 1077 (7th

19

Cir. 1976) ("Since the promulgation of Executive Order 10096 on January 23, 1950, there has been Congressional acquiescence in the order by the failure of Congress to modify or disapprove it.").

As discussed above, *see* section 2.a., *supra*, Presidents issued cross-border permits for oil pipelines from 1918 to 1968 (a period of 50 years) on their own, without the involvement of State Department or other agency officials, including two in Montana. *See* Whiteman, *Dig. Int'l Law*, Vol. 9, at 920-22. The President then delegated authority to the Secretary of State, and over the next 50 years, either the Secretary of State or an Under Secretary of State has issued presidential permits for oil pipelines, through procedures devised solely by the Executive Branch. *See* section 2.A., *supra*. Presidents have unilaterally changed the process for permit review three times without intervention by Congress. *See id.*; *see also* EO 11,423 § 1(a), 33 Fed. Reg. 11,741 (Aug. 20, 1968); EO 13,337 § 1(a), 69 Fed. Reg. 25,299 (Apr. 30, 2004); EO 13,867 § 2, 84 Fed. Reg. 15,491 (Apr. 10, 2019). In over a hundred years of Presidents either issuing, or delegating the authority to issue, cross-border permits for oil pipelines, Congress has never stepped in to enact, or even propose, legislation that would govern how cross-border pipelines are permitted.

Continuing the long tradition of Presidents issuing such permits, in March 2019, the President issued the Presidential Permit authorizing the border crossing

for the Keystone Pipeline.  And consistent with its general pattern over the past

century, Congress has again remained silent.  As the Supreme Court has said,

"[g]iven the President's independent authority 'in the areas of foreign policy and

national security . . . congressional silence is not to be equated with congressional

disapproval.'" *Garamendi*, 539 U.S. at 429 (quoting *Haig v. Agee*, 453 U.S. 280,

291 (1981); *see also Dames & Moore*, 453 U.S. at 678 (same).  Thus, the historical

practice of issuing presidential permits, coupled with Congressional inaction,

strongly supports Defendants' position that the President has the authority to issue

such permits.  *See Sierra Club*, 689 F. Supp. 2d at 1163 ("Congress's inaction

suggests that Congress has accepted the authority of the President to issue cross-

border permits.").

    In its order denying the motion to dismiss, the Court relied heavily on

Congress's enactment of the TPTCCA in 2011 and the proposed Keystone XL

Approval Act in 2015.  *See* Dec. 20, 2019 Order at 28-29, ECF No. 73 ("MTD

Order").  But neither support the view that Congress has exercised any authority to

regulate cross-border oil pipelines. The TPTCCA, although it indicated an intent

that the pipeline be approved, left the decision to the President to determine

whether the border-crossing for the pipeline should be approved.  *See* TPTCCA §

501(b)(1)–(2), 125 Stat. at 1289-90.  And when President Obama nonetheless

determined that "the Keystone XL pipeline project, as presented and analyzed at

21

this time, would not serve the national interest" and directed the denial of the permit, Congress did not challenge the President's determination.  Implementing Provisions of the Temporary Payroll Tax Cut Continuation Act of 2011 Relating to the Keystone XL Pipeline Permit, 77 Fed. Reg. 5,679, 5,679 (Jan. 18,2012). Therefore, the TPTCCA does not show that Congress has sought to encroach on the President's historic role in deciding whether to authorize border-crossings for oil pipelines, and it certainly cannot be used as evidence of Congressional will *against* approval of the Keystone XL Pipeline.

As for the Approval Act, which was proposed in 2015, it also does not support the view that Congress has exercised its authority to regulate cross-border oil pipelines.  The bill proposed that the Keystone XL Pipeline be approved without additional NEPA analysis.  *See* S. 1, 114th Cong. § 2(a)-(b) (2015).  But the bill did not propose any regulatory scheme for cross-border oil pipelines generally and did not seek to undermine the President's authority over such border-crossings.  The Senate majority report supporting the bill affirmed that "the President has, for more than a century, asserted authority to approve energy and telecommunication facilities that cross international borders pursuant to the President's constitutional authority over foreign affairs."  S. Rep. No. 114-1, at 1 (2015), Ex. 10.  And, of course, the Approval Act did not become law—a fundamental requirement for Congress to have actually exercised its authority.

Accordingly, neither the TPTCCA nor the Approval Act support the position that Congress intended to interfere with the President's historic role in issuing permits for cross-border pipelines.  The very limited nature of these two bills (one enacted and one not), underscores the long tradition of Presidents permitting pipelines with Congressional acquiescence or approval.  This longstanding precedent weighs in favor of upholding the constitutionality of presidential approval of cross-border pipelines.  Finally, it is worth noting that both times Congress has acted with respect to the Keystone XL Pipeline, the legislation has evinced a desire that the pipeline be approved.  Therefore, these Congressional pronouncements contain no support for the Court's conclusion that Congress intended for there to be additional procedural requirements before the Keystone XL Pipeline is approved.

      e.     Whether the President may issue cross-border pipeline permits even if Congress has the power to regulate cross-border pipelines under the Foreign Commerce Clause.

The President may issue cross-border pipeline permits even if Congress possesses regulatory power under the Commerce Clause over cross-border pipelines.  Congress has authority to regulate foreign commerce, but the President's shared authority over foreign affairs is just as well-established.  *See*, *e.g.*, *Garamendi*, 539 U.S. at 414.  Moreover, the Permit does not merely encompass foreign *commerce*, but also concerns complicated questions of foreign

23

affairs, territorial integrity and national security.  *See* section 2.a., *supra*.  The

President's authority to grant or deny a border-crossing permit is rooted in his

inherent constitutional authority under Article II, not the Commerce Clause.  *See*

*Garamendi*, 539 U.S. at 414.

Because Congress has passed no laws relating to the permitting of cross-

border pipelines, the President can issue cross-border pipeline permits under

Justice Jackson's three-part test from his concurrence in *Youngstown Sheet & Tube*

*Co. v. Sawyer*, which provides the framework for assessing a challenge to the

exercise of Presidential power in areas where Congress too may have authority.

343 U.S. at 635-38 (Jackson, J. concurring); *see, e.g., Zivotofsky v. Kerry*, 135 S.

Ct. 2076, 2083-84 (2015).

Under that framework, first, "[w]hen the President acts pursuant to an

express or implied authorization of Congress, his authority is at its maximum, for it

includes all that he possesses in his own right plus all that Congress can delegate."

*Youngstown*, 343 U.S. at 635 (Jackson, J. concurring).  Second, "[w]hen the

President acts in absence of either a congressional grant or denial of authority, he

can only rely upon his own independent powers, but there is a zone of twilight in

which he and Congress may have concurrent authority, or in which its distribution

is uncertain."  *Id*. at 637.  In this area, "congressional inertia, indifference or

quiescence may sometimes, at least as a practical matter, enable, if not invite,

measures on independent presidential responsibility." *Id.* Third, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter," and the Court can sustain his actions "only b[y] disabling the Congress from acting upon the subject." *Id.* at 637-38.

The President's claim of authority over border crossing facilities falls within the first *Youngstown* category, where the President has acted pursuant to his own independent powers *and* with the express or implied authorization of Congress. Moreover, even if it did not fall squarely within the first category, the most that could be said is that the President's authority falls within the second *Youngstown* "zone of twilight" category, where the concurrent and unspecified distribution of powers between the Executive and Congress has been ratified in favor of the President's exercise through longstanding practice and congressional acquiescence. *See id.* at 635, 637. Either way, the President may issue cross-border permits even if Congress also has authority to regulate cross-border facilities under the Foreign Commerce Clause.

Finally, this is not a category three situation because the President's claim of authority does not conflict with Congress' express or implied will. *Id.* at 637–38. Thus, this is not a case where the Court must determine the precise contours of

constitutional authority that the Framers assigned to the Executive and Legislative Branches; nor does the Court need to subtract the President's authority from Congress' authority.  There is no conflict between the Branches.  To the contrary, the President's power to issue a cross-border permit is supported by almost 150 years of government practice—a period during which Congress has never sought to restrain the President's repeated exercise of this authority.

3.      The question of TC Energy's assertion that Plaintiffs' theory of constitutional invalidity would be self-defeating because TC Energy could construct the pipeline without a permit if the President lacks the authority to grant a cross-border pipeline facility permitting, as long as TC Energy obtains the requisite permits and authorizations under other federal laws. (*See* Doc. 33 at 23.)

        TC Energy is correct that if the Court were to find the Permit unconstitutional, TC Energy could construct the pipeline without a Presidential Permit, so long as it secures all the other necessary permits and authorizations under other laws.  But that outcome, if countenanced, would be detrimental to the United States. The presidential permitting process protects territorial integrity. Presidents first permitted border crossings because entities were building cross-border projects without the United States' consent.  *See* section 2.a., *supra*. Plaintiffs' theory of constitutional invalidity would therefore not only be self-defeating, but it would also undermine national security.

26

Respectfully submitted this 24th day of January, 2020,

PRERAK SHAH
Acting Deputy Assistant Attorney General


*/s/ Luther L. Hajek*_____
MARISSA A. PIROPATO
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
marissa.piropato@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(d)(2)(E), the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 6,342 words, excluding the tables, caption, signature, certificate of compliance, and certificate of service.

> */s/ Luther L. Hajek*
> LUTHER L. HAJEK
> U.S. Department of Justice

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2020, a copy of the foregoing

Defendants' Responses to the Court's Questions in Its December 20, 2019 Order

was served on all counsel of record via the Court's CM/ECF system.

> */s/ Luther L. Hajek*
> LUTHER L. HAJEK
> U.S. Department of Justice

29