MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Ph: (406) 247-4667; Fax: (406) 657-6058
mark.smith3@usdoj.gov

PRERAK SHAH
Deputy Assistant Attorney General

MARISSA A. PIROPATO (MA BAR 65160)
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
marissa.piropato@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK, *et al.*,<br><br>           Plaintiffs,<br>v.<br><br>PRESIDENT DONALD J. TRUMP, *et al.*,<br><br>           Defendants. | CV 19-28-GF-BMM<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND .....................................................................................................2

STANDARD OF REVIEW .....................................................................................2

ARGUMENT ..........................................................................................................3

I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims.........................3

    A.    Plaintiffs Have Failed to Demonstrate Standing. .......................3

    B.    The Claims Against the Agencies Fail for Lack of Final Agency Action. ...........................................................................9

    C.    Plaintiffs' Claims Against the President Are Barred by Sovereign Immunity................................................................10

    D.    Plaintiffs Identify No Cause of Action that Would Allow Their Claims...............................................................................11

II.    Plaintiffs' Claims Challenging the Presidential Permit Fail on the Merits..................................................................................................12

    A.    The Issuance of Presidential Permits is Within the Scope of Executive Power. ...............................................................13

    B.    Plaintiffs' Commerce Clause Claim Lacks Merit Because Congress Has Enacted No Legislation that Conflicts with the President's Issuance of the Permit. ....................................17

    C.    Plaintiffs' Property Clause Claim Lacks Merit. .......................19

    D.    Executive Order 13,337 Cannot Bind the President.................22

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Trump*,
  753 F. App'x 201 (5th Cir. 2018).........................................................................11

*Allen v. Wright*,
  468 U.S. 737 (1984) .............................................................................................6

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ..................................................................................... 14, 15

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015).............................................................................................11

*Ashwander v. Tenn. Valley Auth.*,
  297 U.S. 288 (1936) ..................................................................................... 21, 22

*Backcountry Against Dumps v. Chu*,
  215 F. Supp. 3d 966 (S.D. Cal. 2015) ..................................................................7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..........................................................................................2, 3

*Chai v. Carroll*,
  48 F.3d 1331 (4th Cir. 1995)..............................................................................23

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
  333 U.S. 103 (1948) ...........................................................................................14

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997).............................................................................23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .............................................................................. 3, 4, 5, 6

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..............................................................................................8

*Commc'ns Workers of Am. v. Beck*,
  487 U.S. 735 (1988) ...........................................................................................21

*Coons v. Lew*,
  762 F.3d 891 (9th Cir. 2014)................................................................................5

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ...................................................................................16

*Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ...................................................................................12

*Dunn & Black, P.S. v. United States*,
    492 F.3d 1084 (9th Cir. 2007)....................................................................10

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ...................................................................................21

*Facchiano Constr. Co. v. U.S. Dep't of Labor*,
    987 F.2d 206 (3d Cir. 1993)........................................................................23

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .......................................................................... 8, 10, 11

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) .......................................................................... 12, 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .....................................................................................3

*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006)........................................................................7

*Greene Cty. Planning Bd. v. Fed. Power Comm'n*,
    528 F.2d 38 (1975) .....................................................................................16

*Haig v. Agee*,
    453 U.S. 280 (1981) ...................................................................................15

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017)........................................................................7

*Indep. Meat Packers Ass'n v. Butz*,
    526 F.2d 228 (8th Cir. 1975)......................................................................23

*Kaplan v. Corcoran*,
    545 F.2d 1073 (7th Cir. 1976).....................................................................15

*Kentucky v. Graham*,
    473 U.S. 159 (1985) ...................................................................................10

*Lane v. Pena*,
    518 U.S. 187 (1996) ...................................................................................10

*League of Conservation Voters v. Trump*,
363 F. Supp. 3d 1013 (D. Alaska 2019) .......................................................... 7, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ....................................................................................... 6

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ....................................................................................... 5, 9

*Manhattan-Bronx Postal Union v. Gronouski*,
350 F.2d 451 (D.C. Cir. 1965) ...................................................................... 22, 24

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
774 F.3d 895 (6th Cir. 2014) ......................................................................... 12

*Michigan v. Thomas*,
805 F.2d 176 (6th Cir. 1986) ......................................................................... 23

*Mississippi v. Johnson*,
71 U.S. 475 (1866) ........................................................................................ 8

*Mistretta v. United States*,
488 U.S. 361 (1989) ...................................................................................... 15

*Muckleshoot Tribe v. Lummi Indian Tribe*,
141 F.3d 1355 (9th Cir. 1998) ...................................................................... 5

*Nat. Res. Def. Council v. Sw. Marine, Inc.*,
236 F.3d 985 (9th Cir. 2000) ......................................................................... 6

*Nat. Res. Def. Council v. U.S. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) ............................................................. 17

*Navajo Nation v. Dep't of the Interior*,
876 F.3d 1144 (9th Cir. 2017) ...................................................................... 9

*NLRB v. Noel Canning*,
573 U.S. 513  (2014) ..................................................................................... 15

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
557 U.S. 193 (2009) ...................................................................................... 21

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ...................................................................................... 22

*Raines v. Byrd*,
521 U.S. 811 (1997) ...................................................................................... 4

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ...................................................................9

*Sierra Club v. Clinton*,
  689 F. Supp. 2d 1147 (D. Minn. 2010) .................................................16

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State*,
  659 F. Supp. 2d 1071 (D.S.D. 2009) .....................................................17

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...........................................................................4, 6

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) .................................................................9

*Tarpey v. United States*,
  No. CV-17-94-B-BMM, 2019 WL 1255098 (D. Mont. Mar. 19, 2019) ...........2, 3

*Torres v. City of Madera*,
  648 F.3d 1119 (9th Cir. 2011) .................................................................2

*United States v. Curtiss–Wright Exp. Corp.,*
  299 U.S. 304 (1936) ...............................................................................14

*United States v. La Compagnie Francaise des Cables Telegraphiques*,
  77 F. 495 (S.D.N.Y. 1896) .....................................................................16

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915) .......................................................................... 14, 15

*United States v. W. Union Tel. Co.*,
  272 F. 311 (S.D.N.Y. 1921) ...................................................................16

*United States v. W. Union Tel. Co.,*
  272 F. 893 (2d Cir. 1921) ......................................................................16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .......................................................................... 13, 14

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ...........................................................................11

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  135 S. Ct. 2076 (2015) ...................................................................... 13, 15

**Statutes**

33 U.S.C. § 535b ...........................................................................................17

47 U.S.C. § 35 ................................................................................17

5 U.S.C. § 702 ...............................................................................10

5 U.S.C. § 704 ............................................................................ 9, 11

Pub. L. No. 112-78, 125 Stat. 1280 (2011) ...............................18

**Regulations**

77 Fed. Reg. 5,679 (Jan. 18, 2012) ............................................18

84 Fed. Reg. 13,101 (Mar. 29, 2019) ...................................... 8, 20

**Other Authorities**

Executive Order 10096 (Jan. 23, 1950) .....................................15

Executive Order 13,337 (Apr. 30, 2004) ...................................23

Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act,
  2015 WL 758544 (White House Feb. 24, 2015) ...................18

# EXHIBIT INDEX

Exhibit 1 – Moore, *Digest of International Law*, Vol. II (1906) (excerpt)[1]

Exhibit 2 – President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Doc. No. 1, Pt. 1 (Dec. 6, 1875) (excerpt)

Exhibit 3 – Hackworth, *Digest of International Law*, Vol. IV, § 350 (1942) (excerpt)

Exhibit 4 – Whiteman, *Digest of International Law*, Vol. 9 (1968) (excerpt)

Exhibit 5 – Presidential Permit Authorizing the Lakehead Pipe Line Company Inc. ("Lakehead") to Construct, Operate, Maintain, and Connect Facilities for the Transportation and Exportation to Canada of Oil, President Dwight D. Eisenhower (April 28, 1953)

Exhibit 6 – Presidential Permit Authorizing the Lakehead Pipe Line Company Inc. to Connect, Construct, Operate, and Maintain a Pipeline at the International Boundary Line Between the United States and Canada, President John F. Kennedy (October 18, 1962)

Exhibit 7 – Presidential Permit Authorizing the Lakehead Pipe Line Company Inc. to Connect, Construct, Operate, and Maintain a Pipeline at the International Boundary Line Between the United States and Canada, President Lyndon B. Johnson (January 22, 1968)

Exhibit 8 – Compilation of Historical Presidential Permits

Exhibit 9 – S.1, Keystone XL Pipeline Approval Act (Jan. 6, 2015)

Exhibit 10 – S. Rep. No. 114-1, Keystone XL Pipeline (Jan. 12, 2015)

---

[1] Exhibits 1 through 10 are attached to Defendants' Responses to the Court's Questions in Its December 20, 2019 Order, ECF No. 81.  Exhibits 11 through 14 are attached to Defendants' Statement of Undisputed Facts, accompanying this memorandum.

Exhibit 11 – Department of State Record of Decision and National Interest
Determination, TransCanada Keystone Pipeline, L.P. Application for
a Presidential Permit (November 3, 2015)

Exhibit 12 – TransCanada Keystone Pipeline, L.P. Application for Presidential
Permit for Keystone XL Pipeline Project (May 4, 2012)

Exhibit 13 – Memorandum of January 24, 2017, Construction of Keystone XL
Pipeline

Exhibit 14 – TransCanada Keystone Pipeline, L.P. Application for Presidential
Permit for Keystone XL Pipeline Project (January 26, 2017)

# INTRODUCTION

Plaintiffs challenge the decision of the President of the United States to issue a Permit allowing the Keystone XL Pipeline to cross the border from Canada into the United States.  Plaintiffs' challenge is based on a mischaracterization of what the Permit actually does and an unsupported view of the Constitution's allocation of authority between the President and Congress.

Plaintiffs' suit is directed against the President for a presidential action within the historic understanding of his core power over foreign affairs and his role as Commander-in-Chief, in the absence of any conflict with Congress.  Yet Plaintiffs cannot satisfy the basic requirements for this Court to assert Article III jurisdiction, including the requirement to demonstrate standing.  Likewise, Plaintiffs cannot assert a proper cause of action under which to seek relief against the President, nor can they articulate a personal interest protected by the Commerce and Property Clauses.  The Court should dismiss this case outright and decline to resolve the constitutional issues raised by Plaintiffs.

Plaintiffs' constitutional claims also fail on the merits.  Ever since President Grant authorized the landing of a telegraph cable on the shores of the United States in 1875, Presidents have authorized border crossings for a variety of facilities. And while Congress has enacted its own requirements for some types of border

crossings, it has never done so for oil pipelines.  Thus, the purported conflict with Congress's authority that Plaintiffs allege simply does not exist.

Accordingly, summary judgment should be granted to Defendants on all claims.

## BACKGROUND

The factual background is set forth in Defendants' separately filed Statement of Undisputed Facts.  The history of, and the legal basis for, the issuance of border crossing permits by the President is also set forth in Defendants' Responses to the Court's Questions in its December 20, 2019 Order, ECF No. 81 ("Defs.' Resp."), which is incorporated by reference.

## STANDARD OF REVIEW

"Summary Judgment is appropriate where the movant demonstrates that no genuine dispute exists 'as to any material fact' and the movant is 'entitled to judgment as a matter of law.'"  *Tarpey v. United States*, No. CV-17-94-B-BMM, 2019 WL 1255098, at *2 (D. Mont. Mar. 19, 2019) (quoting Fed. R. Civ. P. 56(a)); *Torres v. City of Madera,* 648 F.3d 1119, 1123 (9th Cir. 2011).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion. . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the moving party satisfies that burden, summary judgment shall be granted unless the non-moving party demonstrates 'specific facts showing that there is a genuine issue for

trial.'" *Tarpey*, 2019 WL 1255098, at *2 (quoting *Celotex Corp.*, 477 U.S. at 324).

## ARGUMENT

### I.   The Court Lacks Jurisdiction Over Plaintiffs' Claims.

#### A.   Plaintiffs Have Failed to Demonstrate Standing.

Plaintiffs have failed to demonstrate standing for their claims against the President and the agencies.  None of Plaintiffs' alleged injuries relate to the 1.2-mile segment of the pipeline at the border, which is all that the President's border-crossing Permit authorized.  The allegations of harm due to the construction of the pipeline as a whole are not caused by the President's action in issuing the cross-border Permit, and no action by the agencies is challenged.  Their alleged injuries are also not redressable because enjoining the President would violate the separation of powers doctrine.

To demonstrate standing to sue, a plaintiff must show: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000).  "'[T]hreatened injury must be *certainly impending* to constitute injury in fact,'" and "'[a]llegations of *possible* future injury' are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568

3

U.S. 398, 409 (2013) (second alteration in the original) (internal quotation omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009).

Although a federal court must always assure itself of jurisdiction, the specific nature of Plaintiffs' suit—challenging presidential action in the arena of foreign affairs and national security—demands heightened scrutiny of their standing assertions. *See Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) (observing that the Court's standing inquiry "has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."); *Clapper*, 568 U.S. at 408-09 (observing that the Court has "often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs").

Plaintiffs have not met their burden.  They fail to demonstrate any injury caused by the authorization of border facilities.  Instead, they allege injuries to their members that they believe will result from the construction and operation of other parts of the pipeline the Permit will allegedly encourage.  *See* Mem. of P. & A. in Supp. of Pls.' Mot. for Prelim. Inj. 29-34, ECF No. 27-2 ("Pls.' Mem."); Decl. of Joy Braun ¶¶ 5-7, ECF No. 27-4 (describing potential future injuries from the future construction and operation of workers' camps along the pipeline route); Decl. of Tom B. Goldtooth ¶¶ 10-19, ECF No. 27-10 (alleging future potential

injury from construction and operation of the pipeline); Decl. of Elizabeth Lone Eagle ¶¶ 10-11, ECF No. 27-15 ("Lone Eagle Decl.") (describing harm to "future generations" from future potential oil spill).  Plaintiffs' "'[a]llegations of possible future injury' are not sufficient" to establish standing.  *Clapper*, 568 U.S. at 409 (alteration in original) (internal quotation omitted); *see also Coons v. Lew*, 762 F.3d 891, 898 (9th Cir. 2014).

Even after two rounds of briefing, Plaintiffs fail to offer any actual or imminent, concrete and particularized injury that is fairly traceable to the border-crossing Permit itself.  Rather, Plaintiffs unequivocally state that the complained-of activities will occur near their members' reservations, which are not located near the small and discrete area subject to the Permit.  *See*, *e.g.*, Lone Eagle Decl. ¶ 6; Decl. of LaVae High Elk Red Horse ¶ 5, ECF No. 27-19; *see also Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1358 n.4 (9th Cir. 1998) (court "may take judicial notice of undisputed geographical facts.").  It is not enough that Plaintiffs' members reside somewhere in the states along the "proposed route of the Project," or that they may use resources impacted somewhere by the 875-mile long pipeline.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887-89 (1990) ("bare allegation of injury" that plaintiff used land "in the vicinity" of the action failed to show standing) (quotation omitted).  Instead, they must allege a concrete

and particularized harm traceable to the issuance of the Permit—and not merely an injury traceable to the entire pipeline project.  *See Summers*, 555 U.S. at 495.

There are too many links in the "chain of causation" between Plaintiffs' alleged harms at the Missouri River and their fear that the Permit could lead to pollution of an unnamed tributary at the border-crossing.  *Allen v. Wright*, 468 U.S. 737, 759 (1984) *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014); *Clapper*, 568 U.S. at 410–11.  Plaintiffs must establish a genuine nexus between their alleged injury and Defendants' conduct to show that it is fairly traceable to the Permit.  *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 994–95 (9th Cir. 2000).  That causal connection has not been sufficiently alleged here.

Instead, Plaintiffs ask the Court to speculate that there will be some future pollution event related to the border crossing that will travel through no fewer than five bodies of water.  This "speculative chain of possibilities" does not establish injury fairly traceable to the Permit—indeed, it does not establish injury at all.  *Clapper*, 568 U.S. at 414.  Nor can Plaintiffs dispense with the causation inquiry by relying on the circular argument that without the "headwaters" border-crossing permit, they would not be injured by the Project.  Plaintiffs' theory that a single permit — one issued by the President no less — is linked to every municipal, state, and private action taken on non-federal lands related to the pipeline is without

precedent.  Unlike *Backcountry Against Dumps v. Chu,* on which they previously relied, Plaintiffs allege harms that are too many steps removed from the border-crossing Permit itself to establish causation.  215 F. Supp. 3d 966, 976 (S.D. Cal. 2015) *modified on reconsideration,* No. 3:12-cv-03062-L-JLB, 2017 WL 2988273 (S.D. Cal. 2017), *appeal dismissed,* No. 17-56636, 2018 WL 1989500 (9th Cir. Apr. 9, 2018) & No. 17-56637, 2018 WL 5733669 (9th Cir. June 12, 2018).[2]

Finally, out of respect for the separation of powers, the Court cannot enjoin the President's issuance of the Permit.  As this Court has recognized, "[s]eparation of power principles generally counsel against courts granting injunctive and declaratory relief against the President in the performance of his official duties."  Dec. 20, 2019 Order at 19, ECF No. 73 ("Order").  And while this Court is correct that courts have, in limited circumstances, "vacated unlawful presidential decisions," *id.*, none of the cases relied upon by the Court address the question of whether an injunction can issue directly against the President himself.  *Cf. League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1029–31 (D. Alaska 2019) (finding President's act was inconsistent with "text and context" of statute) *appeal docketed,* Nos. 19-35460, 19-35461, 19-35462 (9th Cir. May 29, 2019)[3]; *Hawaii v.*

_____

[2] And because there can be no National Environmental Policy Act ("NEPA") claim here, NEPA's theory of interdependent projects is irrelevant.  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006).

[3] The United States appealed the district court decision in *League of Conversation Voters* and that appeal is pending before the Ninth Circuit.  *See League of*

*Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (per curiam) (finding redressability

through relief against defendants other than the President) *vacated and remanded*,

138 S. Ct. 377 (2017); *Clinton v. City of New York*, 524 U.S. 417, 448–49 (1998)

(overturning legislation affording President line item veto).  It has been settled for

more than a century that the answer to that question is no.  Federal courts "ha[ve]

no jurisdiction of a bill to enjoin the President in the performance of his official

duties."  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see Franklin v.*

*Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion); *id.* at 827 (Scalia,

J., concurring in part and concurring in the judgment) ("The apparently unbroken

historical tradition supports the view, which I think implicit in the separation of

powers established by the Constitution, that the principals in whom the executive

and legislative powers are ultimately vested — viz., the President and the Congress

(as opposed to their agents) — may not be ordered to perform particular executive

or legislative acts at the behest of the Judiciary.  For similar reasons, I think we

cannot issue a declaratory judgment against the President.") (footnote omitted).

The Permit was issued solely by the President.  *See* TransCanada Keystone

Pipeline Authorization, 84 Fed. Reg. 13,101, 13,101 (Mar. 29, 2019) ("Permit").

---

*Conservation Voters v. Trump*, No. 19-35460 (9th Cir., docketed May 29, 2019).
The issues on appeal related to the justiciability of the suit, including the propriety
of suing the President and the Court's finding invalid an Executive Order
untethered to agency action.

Plaintiffs' request thus raises precisely the separation of powers concerns that have animated courts to insulate the President from equitable relief. *See Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996).

Accordingly, all of Plaintiffs' claims fail for lack standing.

**B.    The Claims Against the Agencies Fail for Lack of Final Agency Action.**

The claims against the U.S. Department of State, U.S. Department of the Interior, U.S. Bureau of Land Management, U.S. Army Corps of Engineers, and U.S. Fish and Wildlife Service, *see* First Am. Compl. ¶¶ 32-39, ECF No. 37, fail because Plaintiffs do not challenge final agency action.  5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171-72 (9th Cir. 2017).  Plaintiffs allege that the agencies have various responsibilities associated with the approval of the pipeline, but they fail to challenge any final agency actions by the agencies.  At the time the complaint was filed, however, none of those actions, including BLM's approval of a right-of-way in late January, had been taken, and none are identified in the lawsuit.  *See* First Am. Compl. ¶ 65 ("BLM has not issued any approval of the Project for the BLM lands . . . .").  Therefore, the claims against the agencies fail for lack of final agency action.  *See Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) (finding no final agency action).

## C.     Plaintiffs' Claims Against the President Are Barred by Sovereign Immunity.

Sovereign immunity bars suits against the United States and its officials sued in their official capacity unless Congress expressly waives that immunity.  *Lane v. Pena*, 518 U.S. 187, 192 (1996).  A plaintiff suing the United States must establish that its suit "falls within an unequivocally expressed waiver of sovereign immunity by Congress. . . ."  *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007).  An "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Thus, absent a congressional waiver, sovereign immunity extends to any suit against a federal official in an official capacity.

Plaintiffs have sued the President for an official action—issuing a Presidential permit.  But Plaintiffs have not identified any waiver of sovereign immunity because Congress has not enacted one.  Although the Administrative Procedure Act ("APA") waives sovereign immunity for non-monetary relief against the United States, 5 U.S.C. § 702, that waiver does not apply to suits against the President.  *Franklin*, 505 U.S. at 800–01.  The Court should dismiss Plaintiffs' suit on sovereign immunity grounds.  Dismissal does not necessarily insulate the challenged presidential action from review:  "Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers

who attempt to enforce the President's directive." *Id.* at 828 (Scalia, J., concurring in part).  Plaintiffs have not done so here.

### D.    Plaintiffs Identify No Cause of Action that Would Allow Their Claims.

Even if Plaintiffs could satisfy the requirements for Article III jurisdiction—which they cannot—they have failed to articulate a proper cause of action to support the Court's jurisdiction.  This is also fatal to their suit.  Neither the Constitution nor any statute provides an express cause of action for alleged violations of the Commerce and Property Clauses.  *See, e.g.*, *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) (per curiam) ("Although there have been a few notable exceptions, the federal courts . . . have been hesitant to find causes of action arising directly from the Constitution." (internal quotation omitted)), *cert. denied*, 139 S. Ct. 1200 (2019).  The APA's cause of action, 5 U.S.C. § 704, is unavailable here because APA review of action by the President or the agencies is unavailable for the reasons explained above.  *See* section I.C., *supra*.  And this is not "a proper case" for courts to provide the "judge-made remedy" of an implied cause of action in equity to enjoin unconstitutional action by public officials.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (internal quotation omitted); *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

"[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief . . . depend on traditional principles of

11

equity jurisdiction," which depends on whether the relief request "was traditionally accord by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (alteration in original) (quotation omitted). Equitable suits against the government traditionally have been recognized where a party seeks *preemptively to assert a defense* that would otherwise be available to it in an anticipated enforcement action by the government. *See Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014); *see*, *e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487, 491 n.2 (2010). There are no circumstances here that would fall within the sweep of traditional equity jurisdiction.

Plaintiffs' failure to identify a viable cause of action to support their claims also mandates entry of summary judgment in Defendants' favor.

## II.    Plaintiffs' Claims Challenging the Presidential Permit Fail on the Merits.

It is well established that the President has the authority to issue border-crossing permits based on his authority under Article II of the Constitution over foreign affairs and his authority as Commander-in-Chief. Presidents have exercised this authority for nearly 150 years, and Congress enacted no legislation that would undermine the President's authority in this area. Therefore, Plaintiffs' constitutional claims fail as a matter of law.

### A.    The Issuance of Presidential Permits is Within the Scope of Executive Power.

Plaintiffs' Commerce Clause and Property Clause claims fail because the President possesses inherent constitutional authority to approve cross-border permits.  Congress has never enacted legislation attempting to curtail that authority, in connection with Keystone XL or otherwise.

Justice Jackson's three-part test from his concurrence in *Youngstown Sheet & Tube Co. v. Sawyer* provides the general framework for assessing a challenge to the exercise of presidential power.  343 U.S. 579, 635-38 (1952) (Jackson, J. concurring).  *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015).  *First*, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).  *Second*, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain."  *Id*. at 637.  *Third*, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb. . . ."  *Id.* at 637-38.  As discussed below, the President's authority over

13

border-crossing permits for oil pipelines falls within the first or second

*Youngstown* category.

The President's authority to issue the Permit is rooted in his inherent

constitutional responsibility for foreign affairs and as Commander-in-Chief.  *See,*

*e.g., Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948)

("The President . . . possesses in his own right certain powers conferred by the

Constitution on him as Commander-in-Chief and as the Nation's organ in foreign

affairs"); *Youngstown,* 343 U.S. at 635 & 635 n. 2 (Jackson, J., concurring) (the

President can "act in external affairs without congressional authority") (citing

*United States v. Curtiss–Wright Exp. Corp.,* 299 U.S. 304, 319-320 (1936)); *Am.*

*Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the

'executive Power' vested in Article II of the Constitution has recognized the

President's 'vast share of responsibility for the conduct of our foreign relations'")

(quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)).  Thus, the

President's power in the field of international relations "does not require as a basis

for its exercise an act of Congress. . . ."  *Curtiss–Wright Exp. Corp.*, 299 U.S. at

319-320; *Youngstown*, 343 U.S. at 635-36, 635 n. 2.

This Court "need not consider whether, as an original question," the

President's Article II authority encompasses the power to control border-crossing

facilities because the Executive has long exercised such power.  *United States v.*

*Midwest Oil Co.*, 236 U.S. 459, 469 (1915).  In separation-of-powers cases, the Supreme Court "has often 'put significant weight upon historical practice.'" *Zivotofsky*, 135 S. Ct. at 2091 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014)).  Although past practice does not, by itself, create constitutional power, a "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that [it] had been made in pursuance of [congressional] consent or of a recognized . . . power of the Executive." *Midwest Oil Co.*, 236 U.S. at 474; *see also Mistretta v. United States*, 488 U.S. 361, 401 (1989).

Several Presidents over a 100-year span dating back to 1918 have issued cross-border permits for oil pipelines. *See* Communications, Transportation & Travel, Telecommunications, 9 Whiteman Digest, at 920-22, ECF No. 81-4; Defs.' Resp. at 14-16.  During that time, Congress has acquiesced to this practice by not legislating in this area. *See Kaplan v. Corcoran*, 545 F.2d 1073, 1077 (7th Cir. 1976) ("Since the promulgation of Executive Order 10096 on January 23, 1950, there has been Congressional acquiescence in the order by the failure of Congress to modify or disapprove it.").  As the Supreme Court has said, "[g]iven the President's independent authority 'in the areas of foreign policy and national security, . . . congressional silence is not to be equated with congressional disapproval.'" *Garamendi*, 539 U.S. at 429 (ellipses in original) (quoting *Haig v.*

*Agee*, 453 U.S. 280, 291 (1981)); *see also Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981).

A long line of cases recognizes the President's authority over border crossings specifically.  In 1896, in a dispute involving the landing of a telegraph cable, Judge LaCombe explained that the question of whether a physical connection to this country should be allowed "is a political question, which, in the absence of congressional action, would seem to fall within the province of the executive to decide."  *United States v. La Compagnie Francaise des Cables Telegraphiques*, 77 F. 495, 496 (S.D.N.Y. 1896); *see also United States v. W. Union Tel. Co.*, 272 F. 311, 323 (S.D.N.Y. 1921) (recognizing the President's authority to approve or deny a border crossing in the absence of Congressional action), *aff'd*, 272 F. 893 (2d Cir. 1921), *rev'd on other grounds*, 260 U.S. 754 (1922); *Greene Cty. Planning Bd. v. Fed. Power Comm'n*, 528 F.2d 38, 46 (1975) (recognizing that the President's authority over border-crossings is "rooted in the President's power with respect to foreign relations if not as Commander in Chief of the Armed Forces").

More recently, courts have confirmed the President's authority to issue cross-border permits for pipelines based on both his foreign affairs power and authority as Commander-in-Chief.  *See Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1162–63 (D. Minn. 2010) (concluding that it is "well recognized" that "the

16

President's authority to issue" border crossing permits "comes by way of his

constitutional authority over foreign affairs and authority as Commander in Chief"

and that "Congress has accepted the authority of the President to issue cross-border

permits"); *see also Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d

105, 109 (D.D.C. 2009) ("Defendants have amply documented the long history of

Presidents exercising their inherent foreign affairs power to issue cross-border

permits, even in the absence of congressional authorization."); *Sisseton-Wahpeton*

*Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1078 (D.S.D. 2009) (same).

### B. Plaintiffs' Commerce Clause Claim Lacks Merit Because Congress Has Enacted No Legislation that Conflicts with the President's Issuance of the Permit.

Congress has enacted no legislation that conflicts with the President's

authority to issue cross-border permits for oil pipelines.[4]  The two instances where

Congress sought to intervene concerning the Keystone XL Pipeline reinforce,

rather than undermine, the President's role as the appropriate authorizing federal

officer.

First, Congress enacted the Temporary Payroll Tax Cut Continuation Act  of

---

[4] Congress has enacted legislation regarding other types of border-crossings, and when it has done so, it has acknowledged the President's inherent constitutional authority over border-crossings.  *See* Submarine Cable Landing License Act of 1921, 47 U.S.C. § 35 (recognizing the President's authority to license the landing of submarine cables); International Bridge Act of 1972, 33 U.S.C. § 535b (recognizing the President's authority to approve the construction of cross-border bridges).

2011 ("TPTCCA"), Pub. L. No. 112-78, 125 Stat. 1280.  Although the TPTCCA indicated an intent that the pipeline be approved, it left the actual decision to the President to determine whether the border-crossing for the pipeline would "serve the national interest" and therefore should be approved.  *See id.* § 501(b)(1)–(2), 125 Stat. at 1289-90.  When President Barack H. Obama nonetheless determined that pipeline "would not serve the national interest" and denied the permit, Congress did not challenge the President's determination.  *See* 77 Fed. Reg. 5,679, 5,679 (Jan. 18, 2012).  Thus, far from showing that Congress sought to encroach on the President's historic role in deciding whether to authorize border-crossings for oil pipelines, the TPTCCA took that role as a given.

Second, in 2015, Congress passed the Keystone XL Pipeline Approval Act, S. 1, 114th Cong. §§ 1-6 (1st Sess. 2015).  *See* S.1., Keystone XL Pipeline Approval Act (Jan. 6, 2015), ECF No. 81-9 ("Approval Act").  The bill proposed that the Keystone XL Pipeline be approved without additional analysis under the National Environmental Policy Act.  *See id.* § 2(a)-(b).  But the bill was never enacted into law because it was vetoed by President Obama.  *See* Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act, 2015 WL 758544 (White House Feb. 24, 2015).  Therefore, Congress never actually exercised its authority. Moreover, the bill did not propose any regulatory scheme for cross-border oil pipelines and did not question the President's authority over such border-crossings.

Indeed, the Senate majority report supporting the bill affirmed that "the President has, for more than a century, asserted authority to approve energy and telecommunication facilities that cross international borders pursuant to the President's constitutional authority over foreign affairs."  S. Rep. No. 114-1, at 1 (2015), ECF No. 81-10.

In sum, the President's issuance of a cross-border permit for the Keystone XL Pipeline did not infringe upon Congress's Commerce Clause authority—an authority that Congress has not exercised with respect to cross-border pipelines.

### C.    Plaintiffs' Property Clause Claim Lacks Merit.

Plaintiffs' Property Clause claim is similarly devoid of merit.  Plaintiffs insist that the Permit infringes on Congress's power to regulate and dispose of federal lands because the Permit authorizes construction of pipeline facilities on land that Congress has directed BLM to manage.  Pls.' Mem. at 20-22.  This claim fails for at least three reasons.

First, Plaintiffs' argument that the President "lacked the power to authorize the balance of the Project," *id.* at 21, distorts what the permit actually authorizes— an international border crossing.  The executive action challenged in this case is a cross-border permit – not a right-of-way on domestic lands.  The narrow scope of the Permit is confirmed by TC Energy's application, which explicitly defines the border facilities as the 1.2 mile border segment.  *See* TC Energy's 2012

Application (excerpt) at 6 & Ex. B, attached as Ex. 12; *see also* TC Energy's 2017 Application at 6 & Ex. B, attached as Ex. 14.

Second, far from improperly overriding Congress's Property Clause power, the Permit affirms and respects BLM's congressionally delegated authority over federal lands.  The Permit explicitly does not supplant other necessary authorizations, noting that "[t]he permittee is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate."  Permit, 84 Fed. Reg. at 13,102 (art. 6(1)).  The Permit thus does not relieve TC Energy of the duty to acquire "right-of-way grants or easements, permits and other authorizations" required by law.  *See id.*

In fact, TC Energy applied for, and in late January received, from BLM the approval of a right-of-way across federal lands along the pipeline route, including a portion of the 1.2-mile border segment.  BLM's grant of a right-of-way (which is not challenged in this suit) demonstrates the limited scope of the Permit. Moreover, BLM's completion of environmental analyses in compliance with NEPA and other environmental statutes belies Plaintiffs' assertion that the Permit obviates the need for BLM and other agencies to comply with applicable laws.  *See* Pls.' Mem. at 22.

Nor does *League of Conservation Voters* provide "instructive reasoning," Order at 32-33, because the district court in that case addressed the legality of an

Executive Order that it deemed inconsistent with the *express terms* of Congress's delegation of authority to the President.  363 F. Supp. 3d at 1017 n.20.

Third, even if the Court finds "plausible" an argument that the Permit—contrary to its plain text—sweeps broader than the 1.2-mile border segment and could thus potentially conflict with the Property Clause, it should nonetheless adopt Defendants' reading of the Permit to avoid an unnecessary constitutional conflict.  Under the principle of constitutional avoidance, the Court should not adopt an interpretation of the Permit that raises constitutional concerns.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see generally Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 762 (1988).

The best reading of the Permit (espoused by both the government and TC Energy) is that it authorizes the border segment and no more.  *See* Reply Mem. in Supp. of Suppl. Mot. 1, ECF No 60; Defs.' Reply Mem. in Supp. of Mot. to Dismiss Pls' Am. Compl. 1, ECF No. 61.  And this reading of the Permit—the only reading advanced by the parties bound by it—avoids the constitutional concerns this Court found to be "plausible," including the concern that the Permit

21

may violate the Property Clause or that the President may be acting *ultra vires.*
Order at 29-30, 34.

A court's "reluctance to decide constitutional issues is especially great
where, as here, they concern the relative powers" of other officers of the
government. *Pub. Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 466 (1989)
(citation omitted). The prospect of this Court declaring unconstitutional an act of
the President based on an interpretation of the Permit that is subject to substantial
doubt raises the profound separation-of-powers concerns that lie at the core of the
principle of constitutional avoidance, *see, e.g.*, *Ashwander*, 297 U.S. at 347, and
accordingly weighs heavily in favor of rejecting Plaintiffs' expansive interpretation
of the Permit.

### D.     Executive Order 13,337 Cannot Bind the President.

Plaintiffs also contend that the President lacks authority to issue the Permit
because it violated Executive Order 13,337. This claim lacks merit because a
president cannot be bound by an executive order issued by a prior president. *See
Free Enter. Fund*, 561 U.S. at 497 ("The President can always choose to restrain
himself in his dealings with subordinates. He cannot, however, choose to bind his
successors by diminishing their powers . . . ."). Rather, an executive order can be
"withdrawn [by the President] at any time for any or no reason." *Manhattan-
Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). President

Trump explicitly stated that the Permit was not subject to Executive Order 13,337, thus superseding that Order to the extent necessary. *See* Permit, 84 Fed. Reg. at 13,101 (issuing the Permit "notwithstanding Executive Order 13,337 of April 30, 2004 . . . .").

While this Court's December 20, 2019 Order discussed cases in which an executive order implementing a statute may be enforceable against an agency, *see* Order at 35-36; *see also*, *e.g.*, *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1165-66 (9th Cir. 1997), those cases are inapplicable for two reasons. First, Executive Order 13,337 did not implement the requirements of any statute—instead, the procedures established by President Bush for issuing cross-border permits for oil pipelines were based solely on the President's inherent constitutional authority and thus cannot be enforced in a private lawsuit. *See* Exec. Order 13,337, 69 Fed. Reg. 25,299, 25,299 (Apr. 30, 2004); *see Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 236 (8th Cir. 1975); *Chai v. Carroll*, 48 F.3d 1331, 1338-40 (4th Cir. 1995); *Facchiano Constr. Co. v. U.S. Dep't of Labor*, 987 F.2d 206, 210 (3d Cir. 1993); *Michigan v. Thomas*, 805 F.2d 176, 187 (6th Cir. 1986). Executive Order 13,337 itself says as much. Executive Order 13,337 § 6 ("This order is not intended to, and does not, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or

23

entities, its officers or employees, or any other person.").

Second, the President is not "an agency."  Plaintiffs here do not challenge agency action because it deviates from the requirements of an enforceable executive order; they instead seek to cabin President Trump's exercise of inherent constitutional authority based on an executive order issued by a predecessor.  This is plainly improper.  *See Gronouski*, 350 F.2d at 456.

Nevertheless, Plaintiffs insist that they may enforce Executive Order 13,337 against the President because the TPTCCA provides a statutory basis for enforcing the Order's requirements.  This is incorrect.  Although the TPTCCA indicated an intent that the pipeline be approved, it left the actual decision whether to approve the border-crossing to the President.  *See* TPTCCA § 501(b)(1)–(2), 125 Stat. at 1289-90; *see* section II.B., *supra*.  The TPTCCA did not adopt the procedures set forth in Executive Order 13,337 into law.  Instead, the instruction in the TPTCCA that the President "act[] thorough the Secretary of State," *id.* § 501(a), 125 Stat. at 1289, merely underscores that Congress intended to defer to the procedures established by the Office of the President.  Thus, the TPTCCA imposes no procedural restrictions on the President's issuance of cross-border permits under his foreign affairs and Commander in Chief powers.  This understanding is bolstered by the subsequent Approval Act, which made no reference to the procedural requirements of Executive Order 13,337.  *See* Approval Act § 2.

In sum, Plaintiffs' claim that the President was require to comply with Executive Order 13,337 also fails.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of Defendants on all claims.

Respectfully submitted this 25th day of February, 2020,

MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Ph: (406) 247-4667; Fax: (406) 657-6058
mark.smith3@usdoj.gov

PRERAK SHAH
Deputy Assistant Attorney General

*/s/ Marissa Piropato*
MARISSA A. PIROPATO
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
marissa.piropato@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(d)(2)(E), the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 5,728 words, excluding the tables, caption, signature, certificate of compliance, and certificate of service.

*/s/ Marissa Piropato*
MARISSA PIROPATO
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2020, a copy of the foregoing

Defendants' Memorandum in Support of Motion for Summary Judgment was

served on all counsel of record via the Court's CM/ECF system.


*/s/ Marissa Piropato*
MARISSA PIROPATO
U.S. Department of Justice