**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, | **4:19-cv-00028-BMM** |
| Plaintiffs, | |
| vs. | **ORDER** |
| PRESIDENT DONALD J. TRUMP, et al., | |
| Defendants, and | |
| TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TC ENERGY CORPORATION, a Canadian Public Company, | |
| Defendant-Intervenors. | |

**INTRODUCTION**

Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA") (collectively, "Plaintiffs") brought this action against President Donald J. Trump and various government agencies and agents in their official capacities ("Federal Defendants"). Plaintiffs allege that President Trump violated

the Property Clause of the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and Executive Order 13,337 when he issued a Presidential Permit in 2019 ("2019 Permit") to Defendant-Intervenors TransCanada Keystone Pipeline, LP and TC Energy Corporation (collectively, "TC Energy") to construct a cross-border segment of the oil pipeline known as Keystone XL ("Keystone").

## BACKGROUND

Plaintiffs filed this action on April 5, 2019, to challenge President Trump's issuance of the 2019 Permit to construct the cross-border segment of Keystone. (Doc. 1). The Court described the factual history of this case in detail in a previous Order denying Motions to Dismiss and a Motion for a Preliminary Injunction. (Doc. 73 at 2–14). All Parties have filed motions since that Order. TC Energy filed a Motion for Summary Judgment on January 24, 2020. (Doc. 77). Plaintiffs filed a Renewed Motion for Preliminary Injunction and Application for Temporary Restraining Order on January 31, 2020. (Doc. 82). Federal Defendants and Plaintiffs both filed Motions for Summary Judgment on February 25, 2020. (Docs. 95, 100). Plaintiffs filed for Leave to File a Second Amended Complaint on March 3, 2020. (Doc. 108). Plaintiffs filed another Renewed Request for a Preliminary Injunction and Application for Temporary Restraining Order on April 14, 2020. (Doc. 136). And Plaintiffs filed a Motion for Leave to File a Third Amended Complaint on August 21, 2020. (Doc. 142).

This case presents novel and complex questions of constitutional law and statutory interpretation. The Court therefore sought supplemental briefing on certain issues. (Doc. 74). The Court held a motion hearing on April 16, 2020, to hear arguments on the supplemental briefing as well as motions pending at that time. This Order will resolve many of the pending motions before the Court and narrow the scope of the litigation. Certain issues will remain pending additional briefing.

## ANALYSIS

## I.    Scope of the 2019 Presidential Permit

The 2019 Permit grants TC Energy permission "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada . . . for the import of oil from Canada to the United States." Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada, 84 Fed. Reg. 13,101, 13,101 (March 29, 2019). The Parties do not dispute that the 2019 Permit purportedly authorizes TC Energy to construct, connect, and maintain a 1.2-mile segment of pipeline that extends from the United States-Canada border up to and including the first mainline shut-off valve. (Doc. 37 at 25; Doc. 42 at 9; Doc. 43 at 9–10).

Plaintiffs assert that the 2019 Permit further authorizes TC Energy to construct and operate an additional 875 miles of pipeline in the United States. (Doc. 37 at 25; Doc. 99 at 1–9). The Court sought additional briefing on "whether the permit authorizes only the 1.2-mile border facility" or "whether the permit authorizes the entire Keystone XL Pipeline project." (Doc. 74 at 1). Plaintiffs argued that the 2019 Permit purports to approve "the portion [of the pipeline] in the United States" as a whole. (Doc. 80 at 13-14). Plaintiffs point to TC Energy's application as describing "the whole of the pipeline." *Id.* at 14. Plaintiffs finally contend that the 2019 Permit "effectively authorizes the entire pipeline" as the remainder of the project would not be built "but for the 2019 Permit." *Id.* at 15. The Court disagrees with Plaintiffs' interpretation.

The 2019 Permit by its plain language applies only to the 1.2 miles from the United States-Canada border, up to and including, the first mainline shut-off valve. The first paragraph of the 2019 Permit grants permission to "construct, connect, operate, and maintain pipeline facilities *at the international border* of the United States and Canada at Phillips County, Montana." 84 Fed. Reg. at 13,101 (emphasis added). The text of this initial permission, as well as the remainder of the permit, relates to authorization of pipeline facilities at the border. The 2019 Permit goes on to define "Border facilities" to include "those parts of the Facilities consisting of a 36-inch diameter pipeline extending from the international border between the

4

United States and Canada . . . *to and including the first mainline shut-off valve in the United States located approximately 1.2 miles from the international border*." *Id.* (emphasis added). Each permit condition explicitly limits the "Border facilities" term only. *See id.* at 13,101–03.

The 2019 Permit defines a broader "Facilities" term as the "portion in the United States of the international pipeline project associated with the permittee's application for a Presidential permit . . . and any land, structures, installations, or equipment appurtenant thereto." *Id.* at 13,101. This broader term certainly encompasses the full Keystone project. The 2019 Permit uses the term "Facilities" only once -- to direct that the construction "of the Facilities (*not including the route*) shall be, in all material respects and as consistent with applicable law," as described in TC Energy's 2012 Application and 2017 Application for a Presidential Permit. *Id.* at 13,101–02 (emphasis added). This "Facilities" term purports to require TC Energy to comply with applicable laws throughout the Keystone project. It does not in itself authorize the full Keystone project.

The 2017 Application provides further evidence for this reading. TC Energy wrote in that application that it "requests a Presidential Permit" for "the specific border crossing facilities associated with the Proposed Keystone XL Project." The application describes "border crossing facilities" as the 1.2 mile segment that "extend[s] downstream from the United States border, in Phillips County, Montana

up to and including the first pipeline isolation valve, located at Milepost 1.2."
TransCanada Keystone Pipeline, L.P., Application for Presidential Permit for
Keystone XL Pipeline Project, at 6 (Jan. 26, 2017).

Recent history and practice further support the Court's limited reading of the
2019 Permit. Past presidential permits for border-crossing pipelines applied to the
project from the border crossing, up to and including, the first shut-off valves.
Examples include the permits for the Cochin Pipeline (authorizing 14.5 miles) and
the Magellan Pipeline (authorizing 600 feet). *See* Presidential Permit for Kinder
Morgan Cochin Pipeline (Renville County, ND facilities), 78 Fed. Reg. 73,582
(Dec. 6, 2013); Presidential Permit for Magellan Pipeline Company, L.P., 80 Fed.
Reg. 45,697 (July 31, 2015).

Older examples prove less clear in their terms, but they similarly indicate a
focus on border facilities and do not exempt projects from applicable laws. *See,
e.g.*, Authorizing the Murphy Oil Corp. to Connect, Operate and Maintain a
Pipeline at the International Boundary Line Between the United States and Canada,
31 Fed. Reg. 6,204 (Apr. 21, 1966) (conditioning the "effectiveness of this permit
to authorize connection of the U.S. facilities at the international boundary line with
the facilities located in Canada" to the company's compliance with Canadian,
federal, state, and local law).

The 2019 Permit, though limited in its scope, places important conditions on Keystone. It requires all Facilities to be built "consistent with applicable law," and that TC Energy acquire "any right-of-way grants or easements, permits, and other authorizations" necessary to build the Border facilities. 84 Fed. Reg. at 13,101–02. The 2019 Permit grants no exemptions to laws governing public land use or that may require environmental analysis before authorizing a pipeline project. Those public land use laws still apply to the Keystone XL project when it requires federal actions—including over federal lands in that first 1.2-mile segment.

TC Energy sought and received a right-of-way from the U.S. Bureau of Land Management ("BLM") for the 1.2-mile segment. *See* BLM, Record of Decision: Keystone XL Pipeline Project Decision to Grant Right-of-Way and Temporary Use Permit on Federally Administered Land, DOI-BLM-MT-C020-2020-0022-OTHER_NEPA (Jan. 22, 2020). BLM's decision to grant the right-of-way remains subject to other litigation in this Court. *See Bold All. v. U.S. Dep't of the Interior*, 4:20-cv-00059-BMM-JTJ (D. Mont.); *Assiniboine & Sioux Tribes of the Ford Peck Indian Rsrv. v. U.S. Dep't of the Interior*, 4:20-cv-00044-BMM-JTJ (D. Mont.).

## II.  Resolution of Select Pending Motions

The Court's analysis regarding the scope and content of the 2019 Permit resolves, in turn, several pending motions before the Court.

**a. Motions for Temporary Restraining Order and Preliminary Injunction**

Plaintiffs filed three motions seeking a preliminary injunction and temporary restraining order. (Docs. 27, 82, 136). The Court denied the first motion without prejudice. (Doc. 73). The second and third motions remain pending. A court may grant a preliminary injunction or temporary restraining order to preserve the status quo pending final determination of an action. *See Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). The issuance of a preliminary injunction or temporary restraining order represent extraordinary remedies, that should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).

A plaintiff who seeks a preliminary injunction or temporary restraining order must establish four elements: 1) that it likely will succeed on the merits; 2) that it likely will to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in its favor; and 4) that an injunction will serve the public interest. *See id.* at 20.

Courts in the Ninth Circuit apply a sliding scale approach to preliminary relief. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The reviewing court must balance the elements "so that a stronger showing of one element may offset a weaker showing of another." *Id.* Even "serious

questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The public interest and the balance of the equities factors merge when the government stands as a party. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

### i.   Success on the merits

Plaintiffs fail at this juncture to show that they likely will succeed on the merits. The Court retains serious questions regarding Plaintiffs' legal claims. Although the Court previously has ruled that Plaintiffs provide plausible claims that survive a Motion to Dismiss, (Doc. 73), the complex and novel legal issues raised in this dispute require further briefing for elucidation. The Court will seek further briefing on the constitutional issues involved in this case. This kind of legal uncertainty weighs heavily against granting preliminary injunctive relief. *All. for the Wild Rockies*, 632 F.3d at 1135 (clarifying that "serious questions" regarding legal merits can only be overcome when the balance of hardship "tips sharply" in plaintiffs' favor).

### ii.   Irreparable injury

Plaintiffs fail to show that they are likely to suffer irreparable injury in the absence of preliminary relief. Plaintiffs' filings blurred the lines between the impact of the 1.2-mile border-crossing segment of the pipeline and the impact of the full pipeline. For example, Plaintiffs noted that Keystone construction will impact habitat for a variety of animals, including migratory birds, the American Burying Beetle, and the Northern Long-Eared Bat. (Doc. 82-1 at 5–14). These alleged injuries appear to occur entirely outside the 1.2-mile border-crossing segment and would not arise from construction activities within the 1.2-mile border-crossing segment. (Doc. 82-1 at 5–14; Doc. 92 at 17–18). Any alleged irreparable injuries caused by construction outside the 1.2-mile border-crossing segment go beyond the scope of the relief available because the permit only covers the border segment. The proper "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Court must set aside those injuries for purposes of injunctive relief analysis at this point.

Plaintiffs claim two irreparable injuries within the 1.2-mile border-crossing segment: potential oil leaks caused by the operation of the pipeline and the "social costs" related to worker camps including increased drug use and sexual violence. (Doc. 92 at 17). Each of these claimed injuries can result directly from the

construction and eventual operation of the border crossing. Plaintiffs have not

demonstrated, however, the likelihood, rather than mere possibility, of injury.

*Winter*, 555 U.S. at 21 (directing that a plaintiff "must demonstrate a likelihood of

irreparable injury—not just a possibility—in order to obtain preliminary relief.").

The pipeline project is not yet operational.

Finalized relief remains available before any risk resulting from pipeline

rupture may be realized. Keystone also will not operate in the immediate future

because the Court vacated certain permits required to complete Keystone in

another case. *See Northern Plains Resource Council et al. v. U.S. Army Corps of

Engineers, et al.*, CV-19-44-GF-BMM (D. Mont. Apr. 15, 2020), 2020 WL

3638125; *U.S. Army Corps of Engineers, et al. v. Northern Plains Resource

Council, et al.*, ___ S.Ct. ___, 2020 WL 3637662 (granting application for stay, in

part, and denying, in part). The 2019 Permit does not authorize worker camp

planning, placement, and operation. Plaintiffs cannot enjoin activities based on

irreparable injuries that occur outside the scope of the 2019 Permit. *Cf. Save Our

Sanoran, Inc. v. Flowers*, 408 F.3d 1113, 1123 (9th Cir. 2005) ("The authority to

enjoin development extends only so far as the Corps' permitting authority.").

### iii.   Balance of equities and public interest

Both sides in this dispute can and do make valid arguments for their side in

the balance of equities and public interest. Plaintiffs point to the environmental

harms relating to construction and eventual operation of Keystone including anthropogenic climate change. (Doc. 82-1 at 5–14; Doc. 91 at 19–20). TC Energy points to significant investment made in the project over the last decade, potential economic and tax revenue impacts, as well as current construction activities at the border. (Doc. 86 at 27–28). Federal Defendants point to national interests in supporting "energy security and maintaining strong bilateral relations with Canada." (Doc. 87 at 27). The weight of these factors remains unclear and fails to compel the granting of preliminary relief.

TC Energy filed several status reports that detail its plans and implementation of construction activities. (Docs. 62, 75, 83, 135). TC Energy represented to the Court that it began construction of the border-crossing segment of the pipeline on April 4, 2020. (Doc. 135-1 at 3). TC Energy further represented that it anticipated completing the construction of that segment in May 2020. (Doc. 135-1 at 4). Construction will slow or stop with the winter months. The facts on the ground suggest further ambiguity, and even potential mootness, when weighing the equities involved in preliminary relief.

Preliminary injunctive relief represents an extraordinary remedy. *Winter*, 555 U.S. at 22. Plaintiffs carry the burden to provide a "clear showing" that they are "entitled to such relief." *Id*. Plaintiffs have failed to meet their burden because serious merit questions remain, Plaintiffs have not shown irreparable harm, and the

balance of equities and public interest provide ambiguous guidance. The Court will deny Plaintiffs' Renewed Motions for Preliminary Injunction and Temporary Restraining Orders (Docs 82, 136) for the above reasons.

### b. Motion for Leave to File Second and Third Supplemental Complaints

Plaintiffs filed their Complaint on April 5, 2019. (Doc. 1). Plaintiffs then filed their First Amended Complaint on July 18, 2019. (Doc. 37). Plaintiffs represent that they submitted those amendments to "clarify[] certain allegations and separately stat[e] a Third Claim for Relief alleging violation of Executive Order 13,337." (Doc. 109 at 3). Plaintiffs have since filed two additional motions to amend their Complaint. (Docs. 108, 142).

Rule 15(a)(2) provides that leave to amend a complaint should be given "when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision whether to grant leave to amend "is entrusted to the sound discretion of the trial court." *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1324 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982). Courts consider five factors when determining whether to grant leave to amend: 1) bad faith; 2) undue delay; 3) prejudice to the opposing party; 4) futility of the amendment; and 5) any previous amendments. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

### i.   Proposed Second Amended Complaint

President Trump issued Executive Order 13,867 ("2019 Executive Order") shortly after this litigation began. Issuance of Permits with Respect to Facilities and Land Transportation Crossings at the International Boundaries of the United States, Exec. Order 13,867, 84 Fed. Reg. 15,491 (April 10, 2019). The 2019 Executive Order revoked two previous Executive Orders that controlled the presidential permitting process for pipeline border crossings. *See id.* at 15,492. Plaintiffs filed a Motion for Leave to File a Second Amended Complaint to add the 2019 Executive Order to their Complaint. (Doc. 108).

The addition of a claim regarding the 2019 Executive Order would be futile because it no longer remains at issue in this case. Plaintiffs' original Complaint and First Amended Complaint challenged President Trump's issuance of the 2019 Permit. (Docs. 1, 37). The 2019 Permit was not issued pursuant to the 2019 Executive Order. Plaintiffs lack standing to challenge the 2019 Executive Order because they have not been injured by the 2019 Executive Order.

Plaintiffs successfully claimed standing to challenge the 2019 Permit because they "alleged sufficiently a concrete and particularized invasion of their legally protected interests." (Doc. 73 at 16–17 (citing *Spokeo, Inc. v. Robins*, ___ U.S. ___, ___, 136 S. Ct. 1540, 1548 (2016)). The 2019 Permit grants TC Energy permission to "construct, connect, operate, and maintain pipeline facilities at the

international border." 84 Fed. Reg. at 13,101. The pipeline segment crosses "land on which [the Plaintiffs] live, work, recreate, and otherwise enjoy." (Doc. 73 at 17). It will "pass by or otherwise impact waters, habitat, and plant and animal species." *Id.* Plaintiffs cannot identify a similar set of injuries connected to the 2019 Executive Order that would satisfy the standing requirements.

Plaintiffs argue that should the Court invalidate the 2019 Permit, "it seems likely that Trump would, in response, just reissue the 2019 Permit again" through the 2019 Executive Order process. (Doc. 109 at 4). Plaintiffs could certainly challenge the lawfulness of the 2019 Executive Order in such a case. This scenario is not currently before the Court. Plaintiffs' concern remains a theoretical injury, rather than an injury-in-fact, as required to satisfy the standing requirements. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992) ("The party invoking federal jurisdiction bears the burden of establishing these elements.").

Plaintiffs filed this Motion after a previous opportunity to add the 2019 Executive Order to their Complaint. Plaintiffs filed this motion almost a year after President Trump issued the 2019 Executive Order. Plaintiffs already had amended their Complaint at that point and failed to add the 2019 Executive Order in that first amendment. "Undue delay is a valid reason for denying leave to amend." *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991) (citation omitted); *see Komie v. Buehler Corp.*, 449 F.2d 644, 648 (9th Cir. 1971); *but see Bowles v.*

*Reade*, 198 F.3d 752, 758 (9th Cir. 1999) ("Undue delay by itself, however, is insufficient to justify denying a motion to amend.").

Plaintiffs repeatedly cite a previous Order of this Court that they claim prompted their motion. (Doc 109 at 2, 4; Doc 122 at 2–5). The Court noted in that Order: "If the 2019 Permit proves *ultra vires* because President Trump lacked the inherent constitutional authority to issue the permit, the 2019 Executive Order likely would be unlawful for similar reasons. Plaintiffs' claims currently before the Court do not directly present the question of whether the 2019 Executive Order proves lawful." (Doc. 73 at 37). Plaintiff seems to have overread the Court's dicta. The Court did not intend to invite the parties to expand the scope of litigation at this late stage.

The Court will reject the Motion for Leave to File a Second Amended Complaint (Doc. 108) due to the futility of amendment, Plaintiffs' undue delay, and Plaintiffs' previous opportunity to amend the Complaint. *See Johnson*, 356 F.3d at 1077.

### ii.   Proposed Third Amended Complaint

TC Energy sought and received a right-of-way permit from BLM for the 1.2-mile border-crossing segment as well as approximately 43 other miles of federal land. *See* U.S. Bureau of Land Management, Record of Decision: Keystone XL Pipeline Project Decision to Grant Right-of-Way and Temporary Use Permit on

Federally Administered Land, DOI-BLM-MT-C020-2020-0022-OTHER_NEPA (Jan. 22, 2020). BLM issued their record of decision ("2020 ROD") regarding the Keystone right-of-way on January 22, 2020. *Id.* The 2020 ROD relies, in turn, on the findings of a Final Supplemental Environmental Impact Statement for the Keystone XL Project ("2019 FSEIS"), 84 Fed. Reg. 70,187, 70,188 (Dec. 20, 2019), in response to a previous Order by the Court. *See IEN v. U.S. Department of State, et al.*, 347 F.Supp.3d 561 (D. Mont. 2018). Plaintiffs filed a Motion for Leave to File a Third Amended Complaint to add claims regarding the 2020 ROD and 2019 FSEIS to their Complaint. (Doc. 142).

Plaintiffs seek to add these new claims four months after the existing claims had been briefed, argued, and submitted to the Court for final ruling. Their motion also comes nine months after BLM issued the 2019 FEIS and seven months after BLM issued the 2020 ROD. Such undue delay in seeking amendment weighs against allowing leave. *Schlacter-Jones v. Gen. Telephone of Cal.*, 936 F.2d 435, 443 (9th Cir. 1991) (noting that timing of a motion to amend after summary judgment brief had been fully briefed weighed heavily against allowing leave to amend complaint); *see also Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994) (upholding the denial of a motion to amend where leave was sought at the summary judgment stage). The proposed amendment would additionally delay the resolution of existing claims.

17

The addition of new claims would unfairly prejudice Federal Defendants and TC Energy. "The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed." *Keith v. Volpe*, 858 F.2d 467, 473–74 (9th Cir. 1988) (quoting *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1981)). "While leave to permit supplemental pleading is 'favored,' *Keith*, 858 F.2d at 473, it cannot be used to introduce a 'separate, distinct and new cause of action.'" *Planned Parenthood of S. Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997) (per curiam) (citation omitted). The introduction of new claims at this stage would require the introduction of a new administrative record, new briefing, and new argument. These prejudicial burdens at this late stage of the litigation weigh against granting leave.

Judicial economy further supports denial of this motion for leave. The 2019 FEIS and 2020 ROD are already the subjects of two other lawsuits before the Court. *See Bold All. v. U.S. Dep't of the Interior*, 4:20-cv-00059-BMM-JTJ (D. Mont.); *Assiniboine & Sioux Tribes of the Ford Peck Indian Rsrv. v. U.S. Dep't of the Interior*, 4:20-cv-00044-BMM-JTJ (D. Mont.). Those cases remain in the early stages of litigations. Plaintiffs may seek to intervene in one of these two cases or may file a separate action that can be heard on similar schedule to these existing

lawsuits. Denial of this motion will not cause undue burden or prejudice to Plaintiffs under these circumstances.

The Court will reject the Motion for Leave to File a Third Amended Complaint (Doc. 142) to prevent undue delay and prejudice, and to promote judicial economy. *See Johnson*, 356 F.3d at 1077.

## III.   Additional Briefing on Authority for the 2017 Presidential Permit

Plaintiffs raised three claims in their Complaint: that President Trump's issuance of the 2019 Permit 1) violated the Property Clause of the U.S. Constitution; 2) violated the Commerce Clause of the U.S. Constitution; and 3) violated Executive Order 13,337. (Doc. 37 at 24, 27, 31). These claims implicate novel and complex separation of powers questions. The Court earlier sought supplemental briefing on separation of powers among other issues. (Doc. 93). The Court now seeks to narrow the constitutional analysis. The Court will require further briefing, however, in an effort to distinguish the exact contours of presidential and congressional authority over pipeline border-crossing permits.

### a.  The *Youngstown* Framework

The President wields significant authority, particularly in the "era of presidential administration." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2246 (2001). This significant authority comes with critical limitations intended to safeguard our constitutional system—particularly when the

President takes unilateral action. *See Youngstown Sheet & Tube v. Sawyer*, 343

U.S. 579, 634 (1952) (Jackson, J., concurring) (cautioning the dangers of a

strengthened executive on the "balanced power structure of our Republic"). These

safeguards include the separation of powers between the coordinate branches, the

qualified delegation of authority from Congress, and federalism. *See, e.g.,*

*Mistretta v. United States*, 488 U.S. 361, 380 (1989) (noting that the constitutional

principle of separation of powers embodies "the central judgment of the Framers of

the Constitution that, within our political scheme, the separation of governmental

powers into three coordinate Branches is essential to the preservation of liberty" in

order to preventing aggrandizement by one branch encroaching into the sphere of

authority of another); *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (per curiam) ("The

Framers regarded the checks and balances that they had built into the tripartite

Federal Government as a self-executing safeguard against the encroachment or

aggrandizement of one branch at the expense of the other.").

A court may determine whether a unilateral presidential action went beyond

the bounds of the executive power and infringed on the enumerated powers of

Congress. Even where the President has broad discretion over an issue, "that

discretion is not boundless" and "may not transgress constitutional limitations."

*Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986). It remains "the duty of

the courts, in cases properly before them, to say where th[e] . . . constitutional

boundaries lie." *Id.* Justice Jackson established a three-category framework to assess the constitutionality of an executive action. *See Youngstown Sheet & Tube*, 343 U.S. at 635–37 (Jackson, J., concurring).

In the first category, "[w]hen the President acts pursuant to an express or implied authorization [from Congress], his authority is at its maximum." *Id.* at 635. When Congress legislates to give the President authorization to act on a subject, the President personifies "the federal sovereignty," and his actions are presumptively valid. *Id.* at 636–37. Few cases apply this first category. In those cases that do exist, the U.S. Supreme Court tends to find both express and implied authorization as reinforcing factors placing the executive action into this category. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2407–08 (2018); *Dames & Moore v. Regan*, 453 U.S. 670, 669 (1981).

In the second category, when the "President acts in absence of either a congressional grant or denial of authority" relying on "his own independent powers" then "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility." *Youngstown*, 343 U.S. at 637. Still fewer cases exist involving this second category of executive action. *See, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1059, 1088–94 (2015); *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915).

21

In the third category, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637. In such a case, Presidents may rely *only on* their own independent power, after "subtraction of such powers as Congress may have over the subject." *Id.* at 639. Several examples of this third category exist. *See, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1059, 1088–94 (2015); *Medellín v. Texas*, 552 U.S. 491, 525–29 (2008).

The three *Youngstown* categories prove useful, but they serve only as guides. Executive actions "in any particular instance fall[] not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition." *Dames & Moore v. Regan*, 453 U.S. 670, 669 (1981). "[T]he great ordinances of the Constitution do not establish and divide fields of black and white." *Id.* at 669 (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting).

In separation of powers cases, the U.S. Supreme Court "has often 'put significant weight upon historical practice.'" *Zivotofsky*, 135 S. Ct. at 2091 (quoting *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014)). The history of the pipeline permitting process involved a string of executive actions. The constitutionality of any particular executive action must be analyzed in its own

context, and each executive decision over the history of a particular policy may fall at a unique point on the *Youngstown* framework spectrum.

The Supreme Court provided a model for historical analysis of a particular power in *Zivotofsky*. Justice Anthony Kennedy systematically analyzed the history of the legislative and executive contest over the power to recognize foreign nations. *See Zivotofsky*, 576 U.S. at 23-28. Justice Kennedy meticulously categorized a series of historical recognition decisions within the *Youngstown* framework in order to contextualize the particular recognition decision before the Supreme Court. *See id.* This model for separation of powers analysis proves useful and applicable to the case before the Court today.

### b. Supplemental Briefing

The history of presidential permits for pipelines—and for Keystone in particular—provides a new example of historical inter-branch conflict. This Court previously sought additional briefing to inform its analysis of the separations of powers questions implicated in this case. (Doc. 74). The Court now seeks additional briefing with more specific direction.

The Court seeks briefing on the application of *Youngstown* to the timeline of pipeline border-crossing permits. The Parties should assume that the Foreign Commerce Clause, the Property Clause, and the various executive and legislative powers relating to foreign affairs remain relevant to this analysis. (Doc. 73 at 21–

34). The Parties should center analysis on border-crossing pipeline permits, *not border-crossing permits in general*.

1. Where on the *Youngstown* spectrum do each of the following individual executive actions lie:

   a. Issuance of pre-1968 cross-border pipeline permits;

   b. Issuance of Executive Order 11423, Providing for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States, Exec. Order 11423, 33 Fed. Reg. 11741 (Aug. 20, 1968);

   c. Executive Order 13,337, Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States, Exec. Order No. 13,337, 69 Fed. Reg. 25299 (April 30, 2004);

   d. State Department Denial of TC Energy's application following Congress' passage of the Temporary Payroll Tax Cut Continuation Act ("TPTCCA"), Pub. L. No. 112-78, 125 Stat. 1280 (December 23, 2011);

e.  President Barack Obama's veto of the Keystone XL Pipeline
    Approval Act. Veto Message to the Senate: S. 1, Keystone XL
    Pipeline Approval Act, 2015 WL 758544 (2015); and

f.  President Donald Trump's issuance of the 2019 Permit.

2.  Address the following additional questions that will inform the Court's
    *Youngstown* analysis:

    a.  Did TPTCCA endorse the EO 13,337 process generally?

    b.  Did TPTCCA endorse the EO 13,337 process only for Keystone?

    c.  Assuming TPTCCA endorsed the EO 13,337 process for Keystone,
        how could TC Energy obtain a permit once President Obama denied
        the permit?

    d.  How should the Court interpret the passage of the Keystone XL
        Pipeline Approval Act?

### ORDER

Accordingly, **IT IS ORDERED** that:

- Plaintiffs' Renewed Motion for Preliminary Injunction and
  Application for Temporary Restraining Order (Doc. 82) is **DENIED**;

- Plaintiffs' Renewed Request for a Preliminary Injunction and
  Application for Temporary Restraining Order (Doc. 136) is **DENIED**;

- Plaintiffs' Motion for leave to file a Second Amended Complaint (Doc. 108) is **DENIED**;

- Plaintiffs' motion for leave to file a Third Amended Complaint (Doc. 142) is **DENIED**;

- The Parties shall file simultaneous briefing, not to exceed 10,000 words, on the issues listed in Part III.b of this Order within 30 days of the issuance of this Order.

Dated the 16th day of October, 2020.

_____

Brian Morris, Chief District Judge
United States District Court