Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
         mstermitz@crowleyfleck.com
         jroth@crowleyfleck.com

Peter C. Whitfield
Joseph R. Guerra
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
Telephone: 202-736-8000
Email:  pwhitfield@sidley.com
            jguerra@sidley.com

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE, <br>          Plaintiffs, <br><br>    vs. <br><br> PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GENERAL TODD T. SEMONITE, Commanding General and Chief of Engineers; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency; GREG SHEEHAN, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; UNITED STATES BUREAU OF LAND MANAGEMENT, and | Civil Action No. 4:19-cv-00028-BMM <br><br><br><br> **TC ENERGY CORPORATION AND TRANSCANADA KEYSTONE PIPELINE, LP'S RESPONSE TO THE COURT'S ORDER OF OCTOBER 16, 2020** |

DAVID BERNHARDT, in his official
capacity as Acting U.S. Secretary of the
Interior,

                      Defendants,

TRANSCANADA KEYSTONE PIPELINE,
LP, a Delaware limited partnership, and TC
ENERGY CORPORATION, a Canadian
Public company,

                    Intervenor-Defendants.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

RESPONSE TO THE COURT'S SPECIFIC INQUIRIES ......................................3

I.      The Youngstown Framework ....................................................3

II.     The Specific Executive Actions .................................................5

      A.      Pre-1968 Cross-Border Pipeline Permits. ...........................5

      B.      Executive Order 11423 ................................................8

      C.      Executive Order 13337 ...............................................12

      D.      The 2012 Denial of TC Energy's Application. ....................13

      E.      The Keystone XL Pipeline Approval Act and the President's Veto...15

      F.      Issuance of the 2019 Permit for Keystone XL. ...................16

III.    The Court's Additional Questions ..............................................18

      A.      Did the TPTCCA Endorse The Executive Order 13337 Process
            Generally? ..............................................................18

      B.      Did TPTCCA Endorse the EO 13337 Process Only For Keystone? ..25

      C.      Assuming TPTCCA Endorsed the EO 13,337 Process For Keystone,
            How Could TC Energy Obtain A Permit Once President Obama
            Denied The Permit? ..................................................26

      D.      How Should The Court Interpret The Passage Of The Keystone XL
            Pipeline Approval Act? ...............................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Bd. of Trs. of Univ. of Ill. v. United States*,
    289 U.S. 48 (1933)...................................................................................................4

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981).................................................................................................17

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)............................................................................................19

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009)...................................................................................................2

*Presidio Bridge Co. v. Sec'y of State*,
    486 F. Supp. 288 (W.D. Tex. 1978) ......................................................................11

*TransCanada Keystone Pipeline, LP v. Kerry*,
    No. 4:16-cv-0036 (S.D. Tex. Apr. 6, 2017)............................................................5

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)........................................................................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    135 S. Ct. 2076 (2014).............................................................................................4

**Statutes and Regulations**

Act of May 27, 1921, ch. 12, 42 Stat. 8 (codified at 47 U.S.C. §§ 34-
    35) .............................................................................................................................7

Iran Freedom Support Act of 2006, Pub. L. No. 109-293, 120 Stat.
    1344........................................................................................................................19

Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No.
    112-78, 125 Stat. 1280 ....................................................................................*passim*

3 U.S.C. § 301 ...............................................................................................9, 12, 19

33 U.S.C. § 535a ...............................................................................................10

33 U.S.C. § 535b...........................................................................................10, 11

Executive Order 11423,
33 Fed. Reg. 11,741 (Aug. 20, 1968) ...........................................................*passim*

Executive Order 13337,
69 Fed. Reg. 25,299 (Apr. 30, 2004) ...........................................................*passim*

Executive Order 13867,
84 Fed. Reg. 15,491 (Apr. 15, 2019) ...............................................................17

Presidential Permit for Murphy Oil Corp.,
31 Fed. Reg. 6,204 (Apr. 22, 1966) ...................................................................6

**Legislative History**

157 Cong. Rec. 12032 (daily ed. July 26, 2011) (statement of Rep.
Waxman) ..............................................................................................................23

157 Cong. Rec. 12042 (daily ed. July 26, 2011) ...................................................23

157 Cong. Rec. 19771 (daily ed. Dec. 13, 2011) (statement of Sen.
Tester) .................................................................................................................22

157 Cong. Rec. 19829 (daily ed. Dec. 13, 2011) (statement of Rep.
Cravaack) ............................................................................................................22

157 Cong. Rec. 19840 (daily ed. Dec. 13, 2011) (statement of Rep.
Lankford) ............................................................................................................22

157 Cong. Rec. 19850 (daily ed. Dec. 13, 2011) (statement of Rep.
Royce) .................................................................................................................22

157 Cong. Rec. 19851 (daily ed. Dec. 13, 2011) (statement of Rep.
Terry) ..................................................................................................................22

157 Cong. Rec. 19906 (daily ed. Dec. 13, 2011) (statement of Rep.
Waxman) ..............................................................................................................23

157 Cong. Rec. 19918 (daily ed. Dec. 13, 2011) (statement of Rep.
Stark) ..................................................................................................................23

Keystone XL Pipeline Approval Act,
S. 1, 114th Cong. (1st Sess. 2015) ..............................................................16, 27

Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval
    Act, 2015 WL 758544 (White House Feb. 24, 2015).........................................16

**Advisory Opinions**

*Status of Presidential Memorandum Addressing the Use of
    Polygraphs*, 2009 WL 153263 (O.L.C. Jan. 14, 2009) ......................................29

## INTRODUCTION

TC Energy submits this brief in response to the Court's order of October 16, 2020, which directed the parties to address questions concerning the historical practice of issuing Presidential Permits for cross-border oil pipelines and the import of legislation pertaining to the Keystone XL Pipeline. *IEN* Dkt. 147 at 24-25. The answers to these questions confirm that the President had the authority to issue the 2019 Permit for Keystone XL, because issuance of the permit was consistent with the "expressed or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

As explained in more detail below, Presidents have long asserted, in the absence of federal legislation, authority to issue permits for cross-border oil pipelines. For decades, Presidents personally issued these permits. In 1968, the President changed the presidential permitting process in an executive order delegating his authority to the Department of State on a revocable-at-will basis. The President did not change his view on the underlying authority for issuing such permits, nor did Congress. In fact, the relevant presidential and congressional actions demonstrate that Congress acquiesced in the President's assertion of the authority to grant permits and recognized the President's prerogative to delegate his authority to State on a revocable-at-will basis. Nothing in the Temporary Payroll Tax Cut Continuation Act of 2011 ("TPTCCA"), Pub. L. No. 112-78, 125

Stat. 1280, or the Keystone XL Pipeline Approval Act restrict the President's prerogative to revoke the delegation of authority to State and to issue the 2019 Permit directly. And both acts expressed the will of Congress that construction and operation of Keystone XL be authorized without further review by State or any other agency under any federal law.

Plaintiffs' contrary position is unprecedented and plainly mistaken. Over the last century, oil pipelines have received presidential permits without any objection from Congress, whether those permits were issued by the President directly or indirectly through State under delegated authority. In fact, the only conflict between the branches concerning cross-border oil pipelines arose when State failed to grant a presidential permit to Keystone XL. In that circumstance, Congress sought to *override* the permitting process set forth in Executive Order 13337 and to authorize the Keystone XL border-crossing facilities *without* the additional environmental reviews that plaintiffs claim are required.

In light of this history, the Court need not determine the full scope of presidential power over cross-border oil pipelines to resolve this case. Whatever the outer limits of the President's authority, issuance of the 2019 Permit for Keystone XL did not exceed it. *See Youngstown*, 343 U.S. at 597 (Frankfurter, J., concurring) ("[t]he issue before us can be met, and therefore should be, without attempting to define the President's powers comprehensively"); *Nw. Austin Mun.*

2

*Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009) (courts should "avoid the unnecessary resolution of constitutional questions"). Plaintiffs' constitutional claims—which have already been the subject of full briefing on motions to dismiss, cross-motions for summary judgment, and prior supplemental briefing— should be rejected and judgment entered for defendants.

## RESPONSE TO THE COURT'S SPECIFIC INQUIRIES

### I.  The *Youngstown* Framework

The Court has asked the parties to explain "[w]here on the *Youngstown* spectrum" certain "individual executive actions lie." *IEN* Dkt. 147 at 24. TC Energy submits that the issuance of permits for cross-border oil pipelines—both before and after 1968—generally falls within Justice Jackson's second category – *i.e.*, Presidential action done (1) in the "absence of either a congressional grant or denial of authority"; (2) in an area in which the President and Congress have some "concurrent authority" (although here, the President's power is plainly subservient to that of Congress); and thus (3) where "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). This conclusion follows from several principles.

The importation of oil into the United States involves both domestic and foreign commerce. Because Congress has plenary and exclusive power over cross-

border trade under the Domestic and Foreign Commerce Clauses, *e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 56-57 (1933), Congress has plenary power to regulate cross-border oil pipelines.

In the absence of congressional action, the President has asserted concurrent authority to permit cross-border oil pipelines in the exercise of his power under Article II. The State Department has asserted that the importation of oil implicates "global energy security," which is "a vital part of U.S. national security." 2015 Record of Decision/National Interest Determination at 23 (*Rosebud* Dkt. 110-1); *see also id.* at 24. And State has further asserted that importing oil from Canada implicates relations with "one of the United States' closest strategic allies." *Id.* at 25.

The President's powers, however, are subservient to Congress' plenary authority. With the exception of certain narrow areas where the President enjoys exclusive authority—such as the power to recognize foreign governments— "Congress' powers, and its central role in making laws, give it substantial authority regarding many of the policy determinations" to be made with respect to both foreign relations and national security. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2087 (2014) (citing, *inter alia*, Congress' constitutional authority to regulate foreign commerce, declare war, and regulate the armed forces). Thus, the President "is not free from the ordinary controls and checks of Congress merely

because foreign affairs are at issue," and instead "may be bound by any number of laws Congress enacts." *Id.* at 2088, 2090.

This means that a Presidential action with respect to a cross-border oil pipeline will fall outside of Justice Jackson's second category and will be within Justice Jackson's third category if it is "incompatible with the expressed or implied will of Congress." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).[1] But the history surrounding Court's list of executive actions demonstrates that the President's issuance of a permit for the Keystone XL pipeline in 2019 was consistent "with the expressed or implied will of Congress," *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring), and thus permissible.

## II.     The Specific Executive Actions

### A.       Pre-1968 Cross-Border Pipeline Permits.

Presidents issuing cross-border permits for oil pipelines prior to 1968 acknowledged Congress' plenary authority over foreign commerce but acted

---

[1] Indeed, TC Energy challenged the 2015 denial of its application for a presidential permit on the ground that that specific action was inconsistent with the express and implied will of Congress, as reflected in the Keystone XL Pipeline Approval Act and the policies in federal statutes regulating trade with Canada, pipeline safety and operations, and greenhouse gas emissions. *See TransCanada Keystone Pipeline, LP v. Kerry*, No. 4:16-cv-0036 (S.D. Tex. Apr. 6, 2017), ECF No. 75 (dismissed as moot). TC Energy maintains all the positions it asserted there, but issuance of the 2019 Permit for Keystone XL is clearly within the President's power because it is consistent with the express and implied will of Congress and the issuance of presidential permits for other oil pipelines over the past century.

pursuant to their constitutional authority to fill the void created by congressional inaction. As the Court is aware, from 1918 until 1968, Presidents from Woodrow Wilson to Lyndon Johnson personally issued permits for cross-border oil pipelines. *See Rosebud* Dkts. 134-2 to 134-7. Each of these permits was signed by the President himself. None refers to any role that the State Department, or any other agency, played in the issuance of the permit, much less identifies any inter-agency process that preceded issuance of the permit.[2]

Beginning with the second permit that President Wilson issued, each permit that TC Energy is aware of expressly acknowledged Congress' plenary authority over cross-border oil pipelines. President Wilson's 1919 permit stated that it was subject to any action by Congress "confirming, revoking, or modifying in whole or in part the conditions and terms upon which this consent is granted." *Rosebud* Dkt. 134-3. The permit President Eisenhower issued in 1953 stated that "[t]he construction, operation, maintenance, and connections hereby permitted of facilities for the transportation of crude oil, it is understood, shall be in all respects subject to the power of Congress under its authority to permit or prohibit the

---

[2] IEN previously claimed that "State *grant[ed]* permission to construct, operate, and maintain" a cross-border oil pipeline in 1966. *IEN* Dkt. 98 at 17-18 (emphasis added, brackets in original). That is untrue. State's "Notice of Issuance of Presidential Permit," 31 Fed. Reg. 6204 (Apr. 22, 1966), said that State had "transmitted" a Presidential Permit, dated April 10, 1966, *id.*, not that State had granted it. In fact, the permit was signed by President Johnson and stated that it was granted "[b]y virtue of the authority vested in me as President," *id*.

maintenance and operation of such facilities and to regulate commerce as applied to the business of this Permittee." *Rosebud* Dkt. 134-4. Similarly, four permits issued by Presidents Kennedy and Johnson defined the "United States facilities" of pipeline projects as the portion of the cross-border facilities in the United States, and recognized in Article 4 that the "transportation of crude oil or other fluid hydrocarbons through the United States facilities shall be in all respects subject to the power of Congress under its authority to regulate commerce as applied to the business of this permittee." *See Rosebud* Dkts. 101-7, 134-5 to 134-7.[3]

Significantly, Congress invited the issuance of these permits through inertia, and it was unquestionably aware of them. In 1875, President Grant had noted the absence of legislation addressing the landing of foreign cables in the United States, stated that he would act in the absence of such legislation, and invited Congress to address the issue. *See Rosebud* Dkt. 101-2. Congress did so with respect to submarine cables when it passed the Kellogg Act in 1921, which authorized the President to grant and revoke licenses for the landing of submarine cables connected to a foreign country. *See* May 27, 1921, ch. 12 § 1, 42 Stat. 8 (codified at 47 U.S.C. §§ 34-35). The Senate Report on the hearings for that legislation reprinted the two permits that President Wilson had issued for cross-border oil

---

[3] One permit referred to the transportation of "crude condensate," as that was the nature of the pipeline itself. *See Rosebud* Dkt. 134-7 [Oct. 1962 permit] at 1 and 3-4.

pipelines in 1918 and 1919. *Rosebud* Dkt. 134-2 to 134-3. But for decades after the Kellogg Act, Congress passed no law governing the permitting of cross-border oil pipelines.

Thus, the historical practice from 1918 to 1968 demonstrates that the President understood and recognized Congress' plenary authority over cross-border oil pipelines and acted in the absence of any exercise of that congressional power. For its part, Congress was aware of the Presidents' actions—all of which involved the President personally granting, not denying, permits for such facilities—and acquiesced in those actions.

### B.   Executive Order 11423.

In 1968, President Johnson changed the process for issuing presidential permits through Executive Order 11423, but the underlying legal authority remained the same. Executive Order 11423 "Provid[ed] for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States." 33 Fed. Reg. 11741, 11741 (Aug. 16, 1968). Congress was aware of, and acquiesced in, the President's delegation to State of his authority to grant permits for cross-border facilities, including oil pipelines. The actions of both the President and Congress make clear they understood the delegation to be entirely discretionary, and revocable at any time by the President.

8

Executive Order 11423 recites that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country." *Id.* Moreover, President Johnson signed the Executive Order based on "the authority vested in me as President of the United States and Commander in Chief of the Armed Forces of the United States and in conformity with the provisions of Section 301 of Title 3, United States Code." *Id.* Section 301 authorizes the President to delegate duties to certain department and agency officials if he so chooses, and states that such delegations "*shall be revocable at any time* by the President in whole or in part." 3 U.S.C. § 301 (emphasis added).

The Executive Order's recitals thus make clear that President Johnson did not believe he was implementing any statutory mandate. Instead, by grounding the Order in his inherent constitutional authority—and by making a delegation that was, as a matter of law, revocable at will—the President made clear that Executive Order 11423's processes were entirely discretionary and were adopted for his convenience. This is underscored by Executive Order 11423's statement that the "authority of the Secretary of State hereunder is supplemental to, and does not supersede, existing authorities … relating to importation … from a foreign country." 33 Fed. Reg. at 11742. The revocable authority the President delegated

9

to State thus was merely supplementary to his own asserted power to grant permission for cross-border oil pipelines. *Id.* at 11741.

Congress was fully aware of Executive Order 11423 and its procedures, and enacted no law prohibiting the President from modifying those procedures or mandating that State have any particular role in the issuance of permits for oil pipelines. To the contrary, the modifications Congress made to a different aspect of Executive Order 11423 underscored its view that the President has complete discretion to consult or not with federal agencies when issuing permits for cross-border infrastructure.

Specifically, Executive Order 11423 addressed permits for international bridges that do not require congressional approval. The International Bridge Act of 1972 (IBA) authorized U.S. states to enter agreements with Mexican or Canadian governmental entities to build cross-border bridges, and provided that (1) the State Department must approve such agreements and (2) the President must approve the construction of the bridge itself. *See* 33 U.S.C. §§ 535a, 535b. Congress further provided that:

> In the course of determining whether to grant such approval, the President shall secure the advice and recommendations of (1) the United States section of the International Boundary and Water Commission, United States and Mexico, in the case of a bridge connecting the United States and Mexico, and (2) the heads of such departments and agencies of the Federal Government *as*

10

> *he deems appropriate* to determine the necessity for such
> bridge.

*Id.* § 535b (emphasis added). When Congress wrote this language, it was aware of Executive Order 11423. *See Presidio Bridge Co. v. Sec'y of State*, 486 F. Supp. 288, 295-96 (W.D. Tex. 1978) (the International Bridge Act "was passed by a Congress that was well aware of both the provisions in that Order [E.O. 11423] and the reason for its existence").

Thus, Congress knew that, under Executive Order 11423, State approved permits for various cross-border facilities, including oil pipelines. But Congress did not codify State's role—either for international bridges or for any other cross-border infrastructure. Instead, Congress codified a different, and discrete, role for State (approving agreements between U.S. states and Canadian or Mexican governmental entities). Moreover, in requiring that the President approve international bridges, Congress did not require the President to consult with State or any other agency about his decision. By instead providing that he could consult the heads of any department or agency as he "deem[ed] appropriate," *id.*, Congress (a) recognized that the consultation procedures set forth in Executive Order 11423 for international bridges was discretionary and revocable at will, and (b) *preserved* the President's ability to alter or revoke those procedures. Having preserved that discretion for the part of Executive Order 11423 that Congress affirmatively modified, it necessarily follows that Congress understood and blessed the

President's discretion to alter or amend the parts of EO 11423 that Congress did not modify.

### C.   Executive Order 13337.

In 2004, President George W. Bush issued Executive Order 13337, which governed "Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States." 69 Fed. Reg. 25299 (Apr. 30, 2004). Executive Order 13337 "amend[ed] Executive Order 11423 of August 16, 1968, … to expedite reviews of permits as necessary to accelerate the completion of energy production." *Id.* In issuing Executive Order 13337 and amending Executive Order 11423, President Bush, like President Johnson, invoked his inherent constitutional authority as President, as well as 3 U.S.C. § 301. *Id.*[4]

Thus, Executive Order 13337 confirmed the executive branch's then 86-year-old position that the President has inherent authority to grant permits for cross-border oil pipelines. It also confirmed the executive branch's then 36-year-old position that the President can make revocable-at-will delegations of this authority and can specify, in his unfettered discretion, the processes that his delegates should follow in exercising that authority.

---

[4] The President also referred to the authority vested in him by "the laws of the United States," *id.*, but did not cite any laws other than Section 301.

**D.     The 2012 Denial of TC Energy's Application.**

Before addressing the next executive action on the Court's list—the 2012

denial of TC Energy's application for a Presidential Permit for Keystone XL—it is

necessary to discuss the TPTCCA. Contrary to plaintiffs' contention, this statute

did not mandate compliance with the inter-agency process set forth in Executive

Order 11423, as amended by Executive Order 13337. Instead, that law reflected

Congress' impatience with the delays occasioned by that process and sought to cut

the process short.

The TPTCCA, which was enacted in December 2011, reflected Congress'

understanding that the Keystone XL application for a Presidential Permit had been

pending for over three years (since September 18, 2008), and that a final

environmental impact statement (FEIS) had been issued for it in August 2011. *See*

TPTCCA § 501(a), (c)(4), 125 Stat. at 1289-90. The statute provided that, "not

later than 60 days after the date of enactment of this Act, the President, acting

through the Secretary of State, *shall grant* a permit under Executive Order No.

13337 … for the Keystone XL pipeline project." *Id.* § 501(a), 125 Stat. at 1289

(emphasis added). The President could decline to grant a permit if he determined

that it would not serve the national interest. *Id.* § 501(b)(1), 125 Stat. at 1289

(emphasis added). But if the President failed to act within 60 days, the permit

would "be in effect by operation of law." *Id.* § 501(b)(3), 125 Stat. at 1290. And

another provision precluded further environmental review for the project. *See id.* § 501(c)(4), 125 Stat. at 1290 (for a permit granted under § 501(a), the existing FEIS "satisfies all requirements of" NEPA, and "no further Federal environmental review shall be required").

Thus, nothing in the TPTCCA compelled compliance with the procedures set forth in Executive Order 11423, as amended by Executive Order 13337, or prohibited the President from exercising his long-asserted and congressionally recognized right to revoke those procedures. Frustrated by State's inaction, Congress simply directed the President to promptly grant a permit for Keystone XL or explain why it was not in the national interest to do so. Indeed, congressional opponents of the law argued that it improperly overrode the process set out in Executive Order 13337, not that it enshrined that process. *See infra* 23.

In response to the TPTCCA, the State Department "recommended to President Obama that the presidential permit for the proposed Keystone XL Pipeline be denied," and he "concurred with the Department's recommendation." Office of the Spokesperson, Denial of the Keystone XL Permit Application, U.S. Dep't of State (Jan. 18, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/01/181473.htm. Thus, while State formally denied the permit, it recognized that the decision to grant or deny a permit for a cross-border oil pipeline was ultimately the President's to make. State further explained that its recommendation "was

predicated on the fact that the Department does not have sufficient time to obtain the information necessary to assess whether the project, in its current state, is in the national interest." *Id.* Like congressional opponents of the law, therefore, State asserted that the TPTCCA *short-circuited* the process by which it made national interest determinations; it nowhere suggested that the law *codified* or *compelled compliance with* that process for all future applications for presidential permits for oil pipelines.

### E.   The Keystone XL Pipeline Approval Act and the President's Veto.

In 2015, Congress again expressed its disapproval of State's failure to grant a permit for Keystone XL. Following the January 2012 denial of its original application, TC Energy submitted a new application in May 2012. Over two and a half years later, this second application was still pending. In January 2015, Congress bypassed the President completely, and approved the application itself. The Keystone XL Pipeline Approval Act authorized TC Energy to "construct, connect, operate, and maintain the pipeline and cross-border facilities described in the application filed on May 4, 2012," and further provided that the Final Supplemental Environmental Impact Statement issued by State in January 2014 "shall be considered to fully satisfy … all requirements of [NEPA]; and … any other provision of law that requires Federal agency consultation or review

(including the consultation or review required under Section 7(a) of the [ESA]." Keystone XL Pipeline Approval Act, S. 1, 114th Cong. § 2 (1st Sess. 2015).

President Obama vetoed this legislation. In doing so, he asserted that the law "attempts to circumvent longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest," and "conflicts with established executive branch procedures." Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act, 2015 WL 758544 (White House Feb. 24, 2015). Congress failed to muster the two-thirds majority in each chamber necessary to override that veto, so it did not become law. But the Act nevertheless reflected the express will of Congress that Keystone XL be permitted without any further review under any law, including the environmental laws that plaintiffs say the President impermissibly avoided by issuing the 2019 Permit directly.

### F.   Issuance of the 2019 Permit for Keystone XL.

Congress has remained silent following the issuance of presidential permits in 2017 and 2019 for Keystone XL. As the Court is aware, after President Obama vetoed the Keystone XL Approval Act, State denied TC Energy's application. Following the 2016 election, President Trump invited TC Energy to re-apply for a permit and, in 2017, State granted a permit. Thereafter, this Court invalidated the 2017 permit and, while appeals from that decision were pending, President Trump

rescinded the 2017 permit and personally issued a new permit for Keystone XL in 2019.

"[I]mportantly, Congress has not disapproved of the [President's] action…." *Dames & Moore v. Regan*, 453 U.S. 654, 687 (1981). Indeed, consistent with its prior efforts to expedite approval of Keystone XL, "Congress has not enacted legislation, or even passed a resolution, indicating its displeasure with" the 2019 permit. *Id.* Moreover, after he issued the 2019 permit, President Trump formally rescinded Executive Order 13337 and issued Executive Order 13867, in which he asserted the right to grant other cross-border permits on his own. 84 Fed. Reg. 15491 (Apr. 15, 2019). In the year and a half since, Congress likewise "has not enacted legislation, or even passed a resolution, indicating its displeasure with" this new procedure. *Dames & Moore*, 453 U.S. at 687.

* * *

In sum, the history of relevant presidential and congressional actions demonstrates that (1) in the absence of a statute generally governing the permitting of cross-border oil pipelines, the President has asserted inherent authority to issue such permits; (2) the President has exercised this authority directly himself, and he has also made revocable-at-will delegations of this authority to State; (3) Congress acquiesced in the assertion of the President's authority to grant such permits directly himself; (4) Congress likewise recognized—and implicitly blessed in the

IBA—the President's prerogative to delegate to State the authority to grant permits for cross-border infrastructure on a revocable-at-will basis; and (5) most recently, Congress (a) expressed its will that construction and operation of Keystone XL be authorized without further review by any agency under any federal law, and (b) acquiesced in the President's issuance of a permit for Keystone XL without involving State and his re-assertion of the authority to issue such permits himself.

The only conflict between the branches concerning cross-border oil pipelines arose when State failed to grant an application to Keystone XL on a timely basis. In that circumstance, Congress sought to override—not to enshrine—the process that Presidents had established to exercise their inherent presidential authority.

## III.   The Court's Additional Questions

### A.   Did the TPTCCA Endorse The Executive Order 13337 Process Generally?

In enacting the TPTCCA, Congress did not generally "endorse" the Executive Order 13337 process, and it certainly did nothing to make that process binding on the President. The statute neither prohibits the President from rescinding Executive Order 13337, nor reflects an express or implied congressional will that presidential permits for cross-border oil pipelines may be issued only the through Executive Order 13337 process.

In issuing Executive Orders 11423 and 13337, Presidents Johnson and George W. Bush each invoked their inherent constitutional authority and section

18

301, a statute in which Congress expressly provided that any delegations the President makes to agency or department heads "*shall be revocable at any time by the President* in whole or in part." 3 U.S.C. § 301 (emphasis added). Congress did not amend section 301 after either Executive Order 11423 or Executive Order 13337 was issued, so the delegations made in those executive orders are, as matter of statute, revocable at any time.

Congress can repeal a statute by implication, but there is a "'stron[g] presum[ption]' that disfavors repeals by implication," and courts must "give effect to" two statutes absent a "'clear and manifest' congressional intention to displace one Act with another." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1616-17 (2018). Under these principles, even if Congress had *codified* Executive Order 13337, this Court would be required to give effect both to that codification *and* to 3 U.S.C. § 301's "revocable at will" mandate—by concluding that State must adhere to the Executive Order 13337 process as long as it had authority to grant permits for cross-border infrastructure, but that the President could revoke that authority if he chose to do so.

The TPTCCA, however, did not codify the Executive Order 13337 process, much less bar the President from revoking his delegation to State.[5] To the contrary,

---

[5] Congress codifies Executive Orders explicitly when that is its intent. *See* Iran Freedom Support Act of 2006, Pub. L. No. 109-293, § 101(a),120 Stat. 1344,

as discussed above, the statute reflected Congress' impatience with State's inaction and sought to cut the Executive Order 13337 process short, by (a) ordering the President to issue a permit for Keystone XL or explain why it was not in the national interest to do so and (b) terminating further environmental review of the project.

The TPTCCA mentions Executive Order 13337 once. Section 501(a) of the statute stated in full as follows:

> Except as provided in subsection (b), not later than 60 days after the date of enactment of this Act, the President, acting through the Secretary of State, *shall grant a permit* under Executive Order No. 13337 (3 U.S.C. 301 note; relating to issuance of permits with respect to certain energy-related facilities and land transportation crossings on the international boundaries of the United States) for the Keystone XL pipeline project application filed on September 19, 2008 (including amendments).

TPTCCA § 501(a), 125 Stat. at 1289 (emphasis added).

This Court has previously suggested that the TPTCCA "instruct[ed] that the Secretary of State *evaluate* the Keystone permit *based on* the procedures set forth in the 2004 Executive Order." *IEN* Dkt. 73 at 33 (emphases added). Respectfully, that suggestion was mistaken. Far from requiring State to "evaluate" the Keystone

---

1344-45 (providing, with certain exceptions, that "sanctions with respect to Iran imposed pursuant to sections 1 and 3 of Executive Order No. 12957, sections 1(e), (1)(g), and (3) of Executive Order No. 12959, and sections 2, 3, and 5 of Executive Order No. 13059 … as in effect on January 1, 2006, shall remain in effect").

permit "based on" the Executive Order 13337 process, the TPTCCA instructed the

President to "grant" that permit or justify his refusal to do so. TPTCCA § 501(a),

Indeed, Congress did not want the President (or State) to continue the Executive

Order 13337 process, but instead sought to terminate it. The TPTCCA provided

that, "[f]or the purpose of the permit issued under subsection (a)," *i.e.*, the permit

the President was directed to grant,

> (A) the final environmental impact statement issued
> by the Secretary of State on August 26, 2011, satisfies all
> requirements of the National Environmental Policy Act
> of 1969 (42 U.S.C. 4321 et seq.) and section 106 of the
> National Historic Preservation Act (16 U.S.C. 470f);
> (B) any modification required by the Secretary of State
> to the Plan described in paragraph (5)(A) shall not
> require supplementation of the final environmental
> impact statement described in that paragraph; and
> (C) no further Federal environmental review shall be
> required.

*Id.* § 501(c)(4). Engaging in environmental review consistent with NEPA and

assessments consistent with the National Historic Preservation Act were activities

that State performed (voluntarily) as part of the Executive Order 13337 process.

*See* U.S. Dep't of the Interior, Bureau of Land Mgmt., Record of Decision,

Keystone XL Pipeline Project Decision to Grant Right-of-way and Temporary Use

Permit on Federally-Administered Land (Jan. 22, 2020) (*Rosebud* Dkt. 138-1),

https://eplanning.blm.gov/epl-front-office/projects/nepa/1503435/2001

1555/250015801/Keystone_ROD_Signed.pdf (granting right-of-way). Congress

plainly sought to *end* these activities for Keystone XL, not to mandate them.

The legislative history—which TC Energy has previously cited and plaintiffs

have studiously ignored—confirms that the TPTCCA was passed because

Congress was impatient with the Executive Order 13337 process and wanted to

end it. Proponents repeatedly complained about the delays in approving Keystone

XL. *See* 157 Cong. Rec. 19771 (daily ed. Dec. 13, 2011) (statement of Sen. Tester)

("I do not believe we should have to wait until January 2013 for a decision [to

approve Keystone XL] that can create American jobs right now"); 157 Cong. Rec.

19829 (daily ed. Dec. 13, 2011) (statement of Rep. Cravaack) ("Last month, this

administration put yet another hold on implementing the Keystone pipeline project

and adding tens of thousands of American jobs to our fragile economy…. We

cannot wait."); 157 Cong. Rec. 19840 (daily ed. Dec. 13, 2011) (statement of Rep.

Lankford) (complaining that "[o]ur country has waited for Presidential approval

[of Keystone XL] for three years"); 157 Cong. Rec. 19850 (daily ed. Dec. 13,

2011) (statement of Rep. Royce) (describing Keystone XL as a "shovel-ready

project" and asking, "why do we keep delaying this?"); 157 Cong. Rec. 19851

(daily ed. Dec. 13, 2011) (statement of Rep. Terry) (complaining that the "process

sits in the State Department" where relevant information "has been sitting on your

desk collecting dust"). Opponents of the legislation likewise understood it as a

product of impatience with (not approval of) the inter-agency process, and complained that the statute was short-circuiting (not mandating) that process. They objected to an earlier version of the measure, *see* 157 Cong. Rec. 12042 (daily ed. July 26, 2011) H.R. 1938, the North American-Made Energy Security Act (Sec. 3. Expedited Approval Process), on the ground that Congress was "overriding" the Executive Order. Representative Waxman stated that the permitting process "was established by Executive orders issued by President Johnson and President George W. Bush . . . . *The bill overrides the Executive orders and other Federal law, it short-circuits the decisionmaking process...*." 157 Cong. Rec. 12032 (daily ed. July 26, 2011) (statement of Rep. Waxman). He made the same point with respect to the provision that was included in the 2011 TPTCCA itself, saying that it "would have the *whole process short-circuited* by *demanding* that [President Obama] come to the conclusion [to approve Keystone XL]." 157 Cong. Rec. 19906 (daily ed. Dec. 13, 2011) (statement of Rep. Waxman); *see also id.* at 19918 (the bill would "*approve* the Keystone [XL] pipeline *without proper review*") (statement of Rep. Stark) (emphases added).

While the foregoing evidence is more than dispositive, there are still other reasons that the TPTCCA cannot be understood as a general endorsement of the Executive Order 13337 process or a prohibition on President Trump's authority to alter the process and personally issue a permit for Keystone XL. First, by its own

23

terms, the TPTCCA was limited in time (it had no operative effect after 2012) and in scope (it applied to a single permit application). The statute directed President Obama to "grant a permit under Executive Order No. 13337 … for the Keystone XL pipeline project *application filed on September 19, 2008*," and to do so (or explain his reason for not doing so) *within 60 days*. TPTCCA § 501(a), (b), 125 Stat. at 1289 (emphasis added). President Obama denied the permit, and the TPTCCA's operative effect ended once the deadline for his obligation to explain his decision on the 2008 permit application to certain congressional committees passed. *See* § 501(b)(2). Accordingly, the TPTCCA could not be the source of any prohibition on President Trump's authority to issue a permit for Keystone XL in 2019 based on a *different* application.

Second, no requirement that all permits for cross-border oil pipelines be issued by State pursuant to an interagency process can be implied from the TPTCCA. Justice Jackson referred to "the expressed or *implied* will of Congress" in *Youngstown*, *see* 343 U.S. at 637 (Jackson, J., concurring) (emphasis added), but the evidence of Congress' "implied will" in that case was overwhelming. Between 1916 and 1952, Congress had "at least 16 times … specifically provided for executive seizure of production, transportation, communications, or storage facilities," but "[i]n every case it ha[d] qualified this grant of power with limitations and safeguards." *Id.* at 597-98 (Frankfurter, J., concurring). In 1947,

Congress was "again called upon to consider whether governmental seizure should be used to avoid serious industrial shutdowns," *id.* at 598, but it "chose not to lodge this power in the President," *id.* at 601. In light of this history, "Congress ha[d] expressed its will to withhold this power from the President as though it had said so in so many words." *Id.* at 602.[6]

By contrast, nothing in the TPTCCA or the history leading up to it can plausibly be viewed as the equivalent of an express prohibition on the President issuing permits for cross-border oil pipelines himself or revoking the revocable-at-will delegation to State. Instead, by its plain terms, the TPTCCA was limited to mandating action on a single application filed in 2008.

In short, there is no conceivable basis for concluding that the TPTCCA mandated that Presidents issue cross-border oil pipeline permits only through the Executive Order 13337 procedures, or that this statute somehow prohibited Presidents from ever revoking the revocable-at-will delegation to State and choosing to once again issue such permits themselves.

**B.      Did TPTCCA Endorse the EO 13337 Process Only For Keystone?**

As noted above, the TPTCCA did not "endorse" the Executive Order 13337 process generally, and it certainly did not make that process binding on the

---

[6] Justice Jackson concurred in this history and incorporated into his own analysis. *See id.* at 639 n.8 (Jackson, J., concurring).

President. It therefore follows that the TPTCCA did not bind the President to the Executive Order 13337 process with respect to Keystone alone. Indeed, it is particularly implausible to conclude that a statute that was enacted to force the President to *grant* a permit for Keystone XL, and that was understood by proponents and opponents alike to override and short-circuit process for that one pipeline project, somehow dictated that the Executive Order 13337 process always be used for that one pipeline project alone.

### C. Assuming TPTCCA Endorsed the EO 13,337 Process For Keystone, How Could TC Energy Obtain A Permit Once President Obama Denied The Permit?

For all of the reasons discussed, there is no basis for concluding that the TPTCCA "endorsed" the Executive Order 13337 process, much less required all Presidents to issue permits for cross-border oil pipelines only in accordance with the Executive Order 13337 process. There is thus no reason to speculate about how TC Energy could have obtained a permit for Keystone XL if Congress had adopted such a mandate.

If the Court were nevertheless to conclude that the TPTCCA did mandate compliance with the Executive Order 13337 process, it would have to limit that conclusion to the 2008 application for the Keystone XL project. As noted, the TPTCCA refers to Executive Order 13337 only once, and does so in a sentence that says that the President shall "grant a permit under Executive Order No. 13337

… for the Keystone XL pipeline project *application filed on September 19, 2008*."
TPTCCA § 501(a), 125 Stat. at 1289 (emphasis added). If the Court were to reach
the conclusion that this reference to Executive Order 13337 somehow mandated
compliance with the executive order's specific procedures, it would still have to
conclude that such compliance was mandated only for the application specifically
mentioned in the same sentence as the Executive Order, and not for any other
application, including the January 2017 application for Keystone XL.

### D. How Should The Court Interpret The Passage Of The Keystone XL Pipeline Approval Act?

In enacting the Keystone XL Pipeline Approval Act, Congress sought to
bypass the President and the then-operative Executive Order 13337 process for the
2012 Keystone XL permit application, and grant TC Energy the authority to build
the cross-border facilities for Keystone XL. The Act expressly authorized TC
Energy to "construct, connect, operate, and maintain the pipeline and cross-border
facilities described in the application filed on May 4, 2012," and further provided
that the Final Supplemental Environmental Impact Statement issued by State in
January 2014 "shall be considered to fully satisfy … all requirements of [NEPA];
and … any other provision of law that requires Federal agency consultation or
review (including the consultation or review required under Section 7(a) of the
[ESA]." Keystone XL Pipeline Approval Act, S. 1, 114th Cong. § 2.

The Act thus makes unmistakably clear that Congress sought to authorize construction and operation of Keystone XL's cross-border facilities notwithstanding the Executive Order 13337 process. In an effort to blink this reality, plaintiffs have argued that Congress' failure to override President Obama's veto of this legislation means that Congress *agreed with* the President's veto and the reasons he gave for it. *IEN* Dkt. 92 at 12. But the fact that there is not a *supermajority* in the House and Senate to override a veto does not establish that Congress no longer supports a bill it just passed. TC Energy is aware of no authority that supports such an illogical claim—which, if adopted, would mean that the President's ability to *block* a bill from becoming a law is actually a power to create positive law, if Congress lacks the votes to override a veto.[7]

In fact, the import of Congress's actions is clear. In 2011, it enacted the TPTCCA to force the President to issue a permit authorizing Keystone XL cross-border facilities; in 2015, it passed Keystone XL Pipeline Approval Act to authorize those facilities itself. It is simply untenable to conclude from this history that Congress "explicitly expressed its will" to *prohibit* the President from granting

---

[7] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), does not support Plaintiffs' novel claim. There, the Court deemed it significant that Congress had failed to pass a bill in the first instance, *id.* at 586; it did not address a congressional failure to override a veto.

28

a permit for Keystone XL except in compliance with a procedure that Congress itself had twice passed legislation to override.

\* \* \*

The history set forth above demonstrates that Executive Orders 11423 and 13337 were adopted for the convenience of the President, not to implement any statutory duty to grant permits for cross-border oil pipelines. Accordingly, the President had plenary power to withdraw, revoke, or supersede Executive Order 13337, and could do so in any manner he chose—including by simply authorizing action notwithstanding that Executive Order. *See Status of Presidential Memorandum Addressing the Use of Polygraphs,* 2009 WL 153263, at \*8 (O.L.C. Jan. 14, 2009) ("[T]he President is generally free to amend or revoke instructions to his subordinates in a form and manner of his choosing."). That is what President Trump did here, when he issued the 2019 permit "notwithstanding Executive Order 13337." No law compelled the President to follow Executive Order 13337, and the President's issuance of a permit for Keystone XL notwithstanding that Executive Order was consistent with the express and implied will of Congress. The 2019 Permit is plainly legal. This Court should so hold.

November 16, 2020                       Respectfully Submitted,


CROWLEY FLECK PLLP                      SIDLEY AUSTIN LLP

*/s/ Jeffery J. Oven*                   */s/ Peter C. Whitfield*
Jeffery J. Oven                         Peter C. Whitfield
Mark L. Stermitz                        Joseph R. Guerra
Jeffrey M. Roth                         1501 K Street, N.W.
490 North 31st Street, Ste. 500         Washington, DC 20005
Billings, MT 59103-2529                 Telephone: 202-736-8000
Telephone: 406-252-3441                 Email: pwhitfield@sidley.com
Email: joven@crowleyfleck.com                   jguerra@sidley.com
        mstermitz@crowleyfleck.com
        jroth@jcrowleyfleck.com

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(d)(2) of the United States Local Rules, I certify that this

Brief contains 6,804 words, excluding caption and certificates of service and

compliance, printed in at least 14 point and is double-spaced, including for

footnotes and indented quotations.

DATED this 16th day of November, 2020.

By: */s/ Jeffery J. Oven*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's

CM/ECF system on all counsel of record.

*/s/ Jeffery J. Oven*