# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>Plaintiffs,<br><br>vs.<br><br>PRESIDENT DONALD J. TRUMP, et al.,<br><br>Defendants,<br>and<br><br>TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TC ENERGY CORPORATION, a Canadian Public Company,<br><br>Defendant-Intervenors. | 4:19-cv-00028-BMM<br><br>ORDER ON MOOTNESS |

## INTRODUCTION

Indigenous Environmental Network ("IEN") and North Coast Rivers Alliance ("NCRA") (collectively, "Plaintiffs") brought this action against President Donald J. Trump and various government agencies and agents in their official capacities ("Federal Defendants"). Plaintiffs allege that President Trump violated

the Property Clause of the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and Executive Order 13,337 when he issued a Presidential Permit in 2019 ("2019 Permit") to Defendant-Intervenors TransCanada Keystone Pipeline, LP and TC Energy Corporation (collectively, "TC Energy") to construct a cross-border segment of the Keystone XL oil pipeline ("Keystone").

## BACKGROUND

TC Energy proposed Keystone as an expansion to its existing pipeline system in 2008. *Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV-17-29-GF-BMM, 2017 WL 5632435, at *1 (D. Mont. Nov. 22, 2017) (hereinafter "*IEN November 2017 Order*"). Keystone would transport up to 830,000 barrels per day of crude oil from Alberta, Canada and the Bakken shale formation in Montana to existing pipeline facilities in Nebraska. *Id*.

TC Energy first applied for a Presidential Permit to construct a pipeline crossing the US-Canada border in September 2008 ("2008 Application"). *Id.* Executive Order 13,337 governed cross-border oil pipeline permitting at that time. Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States, Exec. Order No. 13,337, 69 Fed. Reg. 25,299 (April 30, 2004) (hereinafter "EO 13,337"). EO 13,337 provided the State Department with the authority to issue Presidential Permits for cross-border oil pipelines if issuance of the permit to the

applicant "would serve the national interest." *Id.* at 25,300. The EO 13,337 process included State Department consultation with other agencies and environmental review of potential projects as required under the National Environmental Policy Act ("NEPA"). *See id.* The State Department issued a final environmental impact statement ("EIS") for Keystone as required by NEPA in August 2011. *IEN November 2017 Order*, 2017 WL 5632435, at *1. The State Department did not issue a Presidential Permit.

Congress passed the Temporary Payroll Tax Cut Continuation Act ("TPTCCA") mere months later. Pub. L. No. 112-78, 125 Stat. 1280 (Dec. 23, 2011). Congress directed the President, acting through the State Department, to render a final decision on TC Energy's 2008 Application within 60 days to either "grant a permit under" EO 13,337 or determine that Keystone "is not in the national interest" and deny the application. *Id.* The State Department denied the 2008 Application. *IEN November 2017 Order*, 2017 WL 5632435, at *2. The State Department explained that the arbitrary sixty-day deadline did not provide it with enough time to consider fully Keystone's potential environmental impacts. *Id.*

TC Energy submitted a new application to the State Department for a Presidential Permit on May 4, 2012 ("2012 Application"). *Id.* The State Department followed the EO 13,337 process to review the 2012 Application and released its Final Supplemental EIS in January 2014. *Id.* The Secretary of State

denied the 2012 Application on November 6, 2015, based on his determination that issuing a Presidential Permit for Keystone would not serve the national interest. *Id.*

Congress acted again on Keystone concurrent with the Secretary of State's consideration of the 2012 Application. Congress approved the Keystone XL Pipeline Approval Act ("Approval Act") on February 11, 2015. Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (Feb. 11, 2015). Congress authorized TC Energy to "construct, connect, operate, and maintain the pipeline and the cross-border facilities described in the [2012 Application]." *Id.* The Approval Act further provided that the State Department's 2014 Final Supplemental EIS "shall be considered to fully satisfy . . . all requirements of [NEPA]; and . . . any other provision of law that requires Federal agency consultation or review (including the consultation or review required under [the ESA]." *Id.* President Obama vetoed the Approval Act. President Obama described the Approval Act as an attempt to "circumvent longstanding and proven processes for determining whether or not building and operating a cross-border pipeline serves the national interest." Veto Message to the Senate: S. 1, Keystone XL Pipeline Approval Act, 2015 WL 758544 (2015).

President Trump took office in January 2017. President Trump soon thereafter issued a Presidential Memorandum to invite TC Energy to reapply for a Presidential Permit. *See* Construction of the Keystone XL Pipeline, 82 Fed. Reg.

4

8663 (Jan. 24, 2017). President Trump instructed the State Department to exercise his delegated authority to issue the Presidential Permit within sixty days if the State Department determined, as required by EO 13,337, that issuance of the Presidential Permit would serve the national interest. *Id*. at 8663.

TC Energy filed a renewed application to the State Department on January 26, 2017 ("2017 Application"). *IEN November 2017 Order*, 2017 WL 5632435, at *2. Under Secretary of State Thomas A. Shannon published a Record of Decision ("ROD") and a National Interest Determination ("NID") recommending that the State Department approve a Presidential Permit to TC Energy on March 23, 2017. *Id.* at *1. The State Department issued a Presidential Permit for Keystone on April 4, 2017 ("2017 Permit"). *See* Notice of Issuance of a Presidential Permit to TransCanada Keystone Pipeline, L.P., 82 Fed. Reg. 16,467 (Apr. 4, 2017). Plaintiffs in this case challenged the 2017 Permit in another action before this Court. *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 591 (D. Mont. 2018). The Court vacated the State Department's ROD and NID. *Id.* The Court remanded the matter to the State Department for further consideration. *Id.*

President Trump issued the 2019 Permit on March 29, 2019. Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada, 84 Fed. Reg. 13,101 (March 29, 2019). President Trump

personally issued the 2019 Permit pursuant to the "authority vested in [him] as President of the United States of America." *Id*. at 13,101.

The 2019 Permit grants TC Energy permission, subject to certain conditions, "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada . . . for the import of oil from Canada to the United States." The 2019 Permit expressly supersedes and revokes the 2017 Permit. *Id.* The 2019 Permit grants TC Energy permission to construct the cross-border pipeline facilities "notwithstanding" the EO 13,337 process. *Id.* President Trump's 2019 Permit rendered moot the 2017 Permit dispute.

President Joseph R. Biden signed an Executive Order on January 20, 2021 to revoke the 2019 Permit. *See* Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis, Exec. Order 13,990, 86 Fed. Reg. 7,037, 7,041 (Jan. 25, 2021). President Biden's revocation noted that the 2019 Permit included an express condition that the President could revoke that permit at "the President's sole discretion." *Id.*

Plaintiffs filed this action on April 5, 2019, to challenge President Trump's issuance of the 2019 Permit. (Doc. 1). Plaintiffs allege that President Trump violated the Property Clause of the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and Executive Order 13,337 when he issued the 2019 Permit. (Doc. 37 at 24, 27, 37). Plaintiffs seek declaratory and injunctive relief to prevent

6

all defendants from engaging in activities in furtherance of Keystone. (Doc. 37 at 32–33). The Court previously denied motions to dismiss, motions for a temporary restraining order and preliminary injunction, as well as motions for leave to file amended complaints. (Docs. 73, 147). Motions for summary judgment remain pending for both sides. TC Energy filed a Motion for Summary Judgment on January 24, 2020. (Doc. 77). Federal Defendants and Plaintiffs each filed a Motion for Summary Judgment on February 25, 2020. (Docs. 95, 100).

This case presents novel and complex questions of constitutional law and statutory interpretation. The Court therefore sought supplemental briefing on certain issues. (Doc. 74). The Court held a motion hearing on April 16, 2020, to hear arguments on the supplemental briefing as well as motions pending at that time. (Doc. 138). The Court issued an Order to resolve many of those pending motions and narrow the scope of case. (Doc. 147). The Court ruled in part that the 2019 Permit only authorized the 1.2-mile border-crossing segment of Keystone. *Id.* The Court also sought further supplemental briefing to distinguish the exact contours of presidential and congressional authority over pipeline border-crossing permits. *See id.*

## MOOTNESS

The Court deems it appropriate at this moment to address first the question of whether President Biden's revocation of President Trump's 2019 Permit has

rendered moot Plaintiffs' challenge. Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, §2. As a result, federal courts may not "decide questions that cannot affect the rights of litigants in the case." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Nor may federal courts advise "what the law would be upon a hypothetical state of facts." *Id*.

A federal court may consider a case only when the parties in that case maintain a live dispute. That dispute must remain active until the court's final disposition. A federal court lacks jurisdiction to proceed when a live controversy becomes moot. A controversy becomes moot "'when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Id*. (quoting *Knox* v. *Service Employees*, 567 U.S. 298, 307 (2012)). "'[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Id.* (quoting *Knox*, 567 U.S. at 307–08). For a case to be truly moot, the controversy must meet a "demanding standard." *Mission Product Holdings*, *Inc*. v. *Tempnology*, *LLC*, __ U.S. __, __, 139 S. Ct. 1652, 1660 (2019); *see also Adarand Constructors*, *Inc.* v. *Slater*, 528 U.S. 216, 222 (2000) (per curiam) (internal quotation marks omitted) (describing the "heavy burden" required to prove mootness).

The Court sought briefing on mootness in this case in light of President Biden's revocation of the 2019 Permit. (Doc. 162). Plaintiffs argued that the underlying case itself is not moot, and that the case meets at least one mootness exception. (Doc. 165). Federal Defendants and TC Energy argue in separate filings that the case is moot and does not meet a mootness exception. (Docs. 163, 164).

This case presents a live controversy because the Court can provide relief to Plaintiffs by ordering the removal of the constructed border segment. TC Energy filed several status reports that detailed its plans and implementation of construction activities. (Docs. 62, 75, 83, 135). TC Energy represented to the Court that it began construction of the border-crossing segment of the pipeline on April 4, 2020. (Doc. 135-1 at 3). TC Energy further represented that it anticipated completing the construction of that segment in May 2020. (Doc. 135-1 at 4). Images provided in those filings show the clearing of land, excavation of the pipeline route, and installation of the pipeline on the 1.2-mile border segment. (Docs. 62, 75, 83, 135). The Court relied on TC Energy's representations of its construction activities when the Court determined that a preliminary injunction would not prevent irreparable harm as those construction activities were already complete. (Doc. 147 at 12–13). This case does not involve mere text in the Federal Register. Rather, it involves a physical pipeline that today sits under the ground at the U.S.-Canada border. The Court can provide Plaintiffs with requested injunctive

9

relief by ordering TC Energy to remove that pipeline from the ground. Such relief certainly meets the low bar of providing "any effectual relief whatever to the prevailing party.'" *Chafin*, 568 U.S. at 172 (quoting *Knox*, 567 U.S. at 307). That relief demonstrates a live controversy.

Even if the Court could not provide injunctive relief in the form of pipeline removal, President Biden's revocation of the 2019 Permit meets an exception to mootness. Specifically, President Biden's revocation represents the voluntary cessation of unlawful activity. It remains unclear whether President Biden or a future president simply could issue unilaterally another permit to TC Energy. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "A case *might* become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203 (1968) (emphasis added). No such clarity exists here.

Although President Biden revoked the 2019 Permit, the possibility remains that he, or a future president, could issue unilaterally another permit. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, __ U.S. __, __, 137 S. Ct. 2012,

2019 n.1 (2017) (finding a controversy remained live where no barriers could prevent the Governor of Missouri from reinstating unilaterally the same challenged executive policy in the future). A president's decision to issue unilaterally a new cross-border permit would require no approval, no process, no examination, and could be performed without warning. *See id.* In fact, President Biden exercised such unilateral and unchecked authority in his revocation of the 2019 Permit. That revocation included no mention of the lawfulness of the underlying 2019 Permit, but instead noted that the 2019 Permit "disserves the U.S. national interest." Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis, Exec. Order 13,990, 86 Fed. Reg. 7,037, 7,041 (Jan. 25, 2021). That unilateral revocation now sits at the center of new litigation filed in the Southern District of Texas. *See State of Texas v. Joseph R. Biden, Jr.*, No. 3:21-cv-65 (S.D. Tex.).

Federal Defendants argue that the Court should treat the government's voluntary cessation of challenged conduct with "more solicitude" than similar actions by private parties. (Doc. 164 at 9 (quoting *Bd. of Trustees of Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc) (internal quotations and citation omitted))). The cases Federal Defendants cite prove inapposite. Those cases do not address unilateral and unchecked activities of the President. Rather, they involved: legislative actions, *see Bd. of*

*Trustees of Glazing Health & Welfare Trust*, 941 F.3d at 1199 ("legislative actions should not be treated the same as voluntary cessation of challenged acts by a private party"); *Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990); government admission of the unconstitutionality of the rescinded action, *see Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1094 – 95 (9th Cir. 2003) (citing an administrative "Clarification to Decision Notice" and other court filings that that "admitted [the challenged activity] . . . is constitutionally deficient"); cessation of an activity because plaintiff had prevailed in another forum, *see Oregon Nat. Res. Council, Inc. v. Grossarth*, 979 F.2d 1377, 1379 (9th Cir. 1992) ("[T]he Service's cancellation of the Auger Sale . . . was not a voluntary cessation within the meaning of that doctrine, but was instead the result of [plaintiff's] successful administrative appeal."); government adoption of the plaintiff's position as official policy, *see Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("The fact is the government changed its policy and agreed with ACT."); or a rescinded activity where Plaintiff expressed no fear of the executive official repeating the challenged activity, *see State of Nev., ex rel. Nevada State Bd. of Agric. v. United States*, 699 F.2d 486, 488 (9th Cir. 1983) ("Nevada has not expressed any fear that a similar moratorium may be imposed, and could harbor no 'legitimate concern' about such a prospect.").

This case involves a unilateral activity of the President of the United States. The President does not face the same burdens as the legislative branch when they undertake a unilateral action. Federal Defendants have not made admissions that the 2019 Permit was constitutionally deficient. Plaintiffs have not prevailed in another forum. Federal Defendants have not adopted Plaintiffs' position in the litigation as official policy. Plaintiffs have raised reasonable fears that President Biden or a future president could unilaterally issue a new border permit for the now decades-old Keystone project. The caselaw that Federal Defendants site simply does not apply to this case. Federal Defendants fail to meet the "heavy burden" necessary to demonstrate mootness when faced with voluntary cessation arguments. *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979).

The Court again retains authority to issue relief in this case under this mootness exception. Plaintiffs sought injunctive and declaratory relief. The Court remains convinced that it could provide some "effectual relief whatever" to the parties involved through its declaratory authority. *Chaffin*, 568 U.S. at 172. A declaration that the President lacked authority to issue personally a cross-border pipeline permit would provide relief from the future assertion of such unconstitutional authority by President Biden or any future president. Such relief goes beyond the injunctive relief of court-ordered removal of physical pipeline infrastructure described above.

Although both doctrines find their root in Article III, mootness presents a hurdle to the courthouse separate and distinct from standing. *See Friends of the Earth*, 528 U.S. at 191–92; *see also generally Honig v. Doe*, 484 U.S. 305, 329–332 (1988) (Rehnquist, C.J., concurring) (opining on the distinction between standing and mootness). Standing ensures the parties to a dispute can claim sufficiently a concrete stake in the issue before the court at the briefing stage. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–62 (1992) (describing the history and purpose of standing jurisprudence). Standing presents a barrier at the courthouse door. Plaintiffs already proved standing at the briefing stage. (Doc. 73). In contrast, mootness presents a challenge for those who have overstayed their welcome. Mootness ensures the parties retain personal interest in the outcome of their dispute throughout the existence of the litigation. *See Friends of the Earth*, 528 U.S. at 189–90. The Court remains convinced that the parties retain an interest in this case.

A court must not shy from exercising its jurisdiction. As Chief Justice John Marshall wrote, "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821). The federal courts have a "virtually unflagging" obligation to exercise jurisdiction. *Colorado River Water Conservation Dist*. v. *United States*, 424 U. S. 800, 817 (1976). The 2019 Permit presents a live controversy to the Court.

The Court will issue an order on the parties' pending motions for summary judgment in due course. Federal Defendants and TC Energy shall apprise the Court on any changes, expansions, or alterations to the existing pipeline infrastructure from the 1.2-mile border crossing segment during the pendency of this matter.

Dated the 28th day of May, 2021.

_____
Brian Morris, Chief District Judge
United States District Court